UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

SULLIVAN WALTER,

Plaintiff,

– against –

THE CITY OF NEW ORLEANS; JASON WILLIAMS, in his official capacity as Orleans Parish District Attorney; MICHELLE WOODFORK, in her official capacity as Superintendent of the New Orleans Police Department; HARRY CONNICK, SR., in his official capacity as former Orleans Parish District Attorney; EDDIE JORDAN, JR., in his official capacity as former Orleans Parish District Attorney; LEON CANNIZZARO, JR., in his official capacity as former Orleans Parish District Attorney; HARRY O'NEAL, in his individual capacity; and JOHN/JANE DOES #1-20, in their individual capacities,

Defendants.

---

Case No. 23-CV-4352

**COMPLAINT**

JURY TRIAL
DEMANDED

---

**MURELL LAW FIRM**

Christopher J. Murell
La. Bar No. 32075
2831 Saint Claude Avenue
New Orleans, LA 70117
(504) 717-1297 (Tel)
chris@murell.law

**SHANIES LAW OFFICE PLLC**

David B. Shanies* (T.A.)
Deborah I. Francois*
Eleanor C. Davis*
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

\* Applications for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff Sullivan Walter*

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

NATURE OF THE ACTION ............................................................................... 3

JURISDICTION AND VENUE .......................................................................... 4

PARTIES .............................................................................................................. 4

JURY DEMAND .................................................................................................. 7

FACTS .................................................................................................................. 7

    A. The Crime ..................................................................................................... 7

    B. The Investigation, Serological Testing, and Sullivan Walter's Arrest ................................. 7

    C. The Trial and Conviction ............................................................................. 10

    D. Sullivan Walter's Innocence, Appeal, and Motion for a New Trial .................................. 11

    E. Sullivan Walter's Exoneration ..................................................................... 13

    F. The City of New Orleans's Deliberate Indifference to Official Misconduct, Including *Brady* Violations and the Subornation and Commission of Perjury, and Its Failure to Train, Supervise, and Discipline Its Employees ................................. 14

        1. The City's Policies, Customs, and Practices of Condoning Misconduct ...................... 15

        2. The City's Policies, Customs, and Practices of Suppressing *Brady* Evidence .............. 18

        3. The City's Unlawful Policies, Customs, and Practices Concerning the Use of False or Misleading Testimony ................................. 29

DAMAGES ......................................................................................................... 31

CAUSES OF ACTION ....................................................................................... 33

REQUEST FOR RELIEF ................................................................................... 43

Plaintiff Sullivan Walter, by his undersigned counsel, the Murell Law Firm and the Shanies Law Office PLLC, as and for his Complaint against the above-named Defendants, alleges as follows:

## INTRODUCTION

1.      In December of 1986, Mr. Walter was wrongfully convicted of several crimes, none of which he committed, in connection with the May 10, 1986 rape of "L.S."[1]  At the time of his wrongful conviction, Mr. Walter was just 17 years old.  By the time he was exonerated in 2022, he had spent over 35 years in prison.  The true perpetrator of the crime was never arrested or prosecuted for it.

2.      Mr. Walter's wrongful prosecution, conviction, and incarceration was not an inadvertent mistake.  It was caused by Defendants' unconstitutional and tortious acts and omissions, which included fabricating evidence; suppressing exculpatory evidence; suborning and committing perjury; and creating and maintaining unlawful policies, customs, and practices that caused the wrongful and unconstitutional acts and omissions described in this Complaint.

3.      Mr. Walter was convicted after a *three-hour* trial, where the only evidence against him was the victim's highly unreliable, cross-racial identification, made six weeks after the assault. Before, during, and after the trial, the New Orleans Police Department ("NOPD"), the Orleans Parish District Attorney's Office ("OPDA"), and Defendant Harry O'Neal concealed and lied about critical exculpatory information, including scientific evidence that conclusively excluded Mr. Walter as the perpetrator of the crime and facts that could have helped Mr. Walter demonstrate the victim's misidentification.

---

1.   We refer to the victim by the initials "L.S." to protect her privacy as a victim of sexual assault.  The parties are aware of L.S.'s identity.  L.S. is now deceased, but her son—who was present at the scene of the assault and so is also a victim—has expressed "deep sorrow" for the injustice inflicted on Mr. Walter.

4.      Two weeks later, Mr. Walter was sentenced to serve 35 years at hard labor.

5.      Over the next few years, as court proceedings began to uncover the evidence demonstrating that Mr. Walter's innocence was a scientific certainty, the NOPD, the OPDA, and Defendant O'Neal doubled down on their misconduct, continuing to hide exculpatory information and affirmatively lying to the state courts to maintain their misbegotten conviction.[2]

6.      Decades later, the OPDA's Civil Rights Division worked with the Innocence Project of New Orleans ("IPNO") to conduct a comprehensive and cooperative reinvestigation of the case.  At the conclusion of that investigation, the adversaries adamantly agreed that Mr. Walter had been wrongfully convicted and his rights egregiously violated.

7.      At Mr. Walter's exoneration hearing last year, the OPDA stated, "So we, the state, today concede that Mr. Walter did not receive a fair trial; in all likelihood, he did not commit the crime."

8.      The State court judge who vacated Mr. Walter's conviction said, "To say this is unconscionable is an understatement" and described Mr. Walter's wrongful conviction as "an egregious injustice."  The court then told Mr. Walter:

> I'm really, really offended by the way you've been treated, and . . . the only encouragement I have is now, we are now at the point where the system is going to make amends to you, Mr. Walter, [and] recognize the injustice that has been done to you . . . . I'm at a loss for words to express the sorrow and

---

2.   All references in this Complaint to *Brady* and/or exculpatory information refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant and corresponding protections under Louisiana law.  *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88 (1935); La.C.Cr.P. art. 718 (A); La.C.Cr.P. art. 719 (A); La.C.Cr.P. art. 722; La. R. Prof'l. Cond. 3.8; *In re Seastrunk*, 236 So. 3d 509, 510 (La. 2017) (duty to disclose under Louisiana Rules of Professional conduct is "coextensive" with *Brady* obligation).

> the anger that I have at the treatment you have been
> dealt by the system.

9.      Because the injustice done to Mr. Walter was committed by Defendant O'Neal, an

employee of the NOPD, and made possible by the NOPD and OPDA's unconstitutional policies

and practices, Mr. Walter has legal claims under state and federal law to remedy the massive

damage he suffered due to his wrongful conviction and decades of imprisonment.

10.     Defendants' conduct caused Mr. Walter injuries and damages including bodily and

personal injuries; pain and suffering; mental anguish; emotional distress; loss of liberty; loss of

income and earning capacity; reputational harm; infliction of physical illness; inadequate medical

care; humiliation of himself and his family; degradation; and restrictions on all forms of personal

freedom including but not limited to diet, sleep, personal contact, educational opportunity, and

family relations.  These injuries began in 1986 and are ongoing in nature.

## NATURE OF THE ACTION

11.     This is an action to recover compensatory and punitive damages and an award of

costs and attorneys' fees for violations of Mr. Walter's rights secured by 42 U.S.C. §§ 1983 and

1988 and by the United States Constitution, including its Fifth and Fourteenth Amendments, as

well as the Louisiana Constitution and state law, arising from Defendants' suppression of *Brady*

information and manufacture of false evidence to prosecute, convict, and incarcerate Mr. Walter

for a crime he did not commit.

12.     The lawsuit also seeks to hold Defendant the City of New Orleans (the "City")

liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Both the NOPD and

the OPDA maintained unlawful policies, customs, and practices during Mr. Walter's investigation,

arrest, and trial.  In executing these unlawful policies, customs, and practices, the NOPD and

OPDA violated the constitutional rights of criminal suspects and defendants, including Mr. Walter.

In Mr. Walter's case, these unlawful policies, customs, and practices enabled Defendant O'Neal and other members, servants, employees, and agents of the City to violate Mr. Walter's constitutional rights.  The policymaking officials acting on behalf of the City were deliberately indifferent to the likelihood that their agencies' unlawful policies, customs, and practices would cause constitutional violations like Mr. Walter's.  As a result, the City caused and is liable for Mr. Walter's injuries.

13.     The City is likewise liable under the doctrine of *respondeat superior* for the tortious conduct of its agents and violations of the Louisiana Constitution and state law.

## JURISDICTION AND VENUE

14.     This action is brought under 42 U.S.C. §§ 1983 and 1988 because Mr. Walter alleges that he was deprived under color of law of his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

15.     This Court has original subject matter jurisdiction over Mr. Walter's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Walter's constitutional and civil rights, and supplemental jurisdiction over Mr. Walter's state law claims under 28 U.S.C. § 1367.

16.     Venue is proper in the United States District Court for the Eastern District of Louisiana under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Mr. Walter's claims occurred in this District.

## PARTIES

17.     Plaintiff Sullivan Walter is a citizen of the United States and was at all relevant times a resident of the State of Louisiana.

18.     Defendant the City of New Orleans is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City of New Orleans and the State of Louisiana, and having the powers and duties imposed by law thereon.

19.     Defendant the City of New Orleans was at all relevant times relevant the public employer of the individual Defendants O'Neal and John/Jane Does #1-20 and was legally responsible for torts they committed within the scope of their employment or under the color of state law.  Defendant the City of New Orleans is also obligated under law and by contract to indemnify and defend the individual Defendants named herein.

20.     The NOPD and the OPDA are and were at all relevant times agencies of Defendant the City of New Orleans.  At all times relevant to this action, Defendant the City of New Orleans, by its officers, agents, servants, and employees, was responsible for the operation, maintenance, and control of the NOPD and the OPDA and for the selection, training, supervision, and discipline of police officers and prosecutors.

21.     Defendant Jason Williams is currently the Orleans Parish District Attorney, and currently responsible for the operation, maintenance, and control of the OPDA and for the selection, training, supervision, and discipline of prosecutors and other OPDA employees. Defendant Williams is sued in his official capacity.

22.     Defendant Michelle Woodfork is currently the Superintendent of the NOPD, and currently responsible for the operation, maintenance, and control of the NOPD and for the selection, training, supervision, and discipline of police officers and other NOPD employees. Defendant Woodfork is sued in her official capacity.

23.     Defendant Harry Connick, Sr. was the Orleans Parish District Attorney from 1974 to 2002, and was then responsible for the operation, maintenance, and control of the OPDA and

for the selection, training, supervision, and discipline of prosecutors and other OPDA employees. Defendant Connick is sued in his official capacity.

24.     Defendant Eddie Jordan, Jr. was the Orleans Parish District Attorney from 2003 to 2007, and was then responsible for the operation, maintenance, and control of the OPDA and for the selection, training, supervision, and discipline of prosecutors and other OPDA employees. Defendant Jordan is sued in his official capacity.

25.     Defendant Leon Cannizzaro, Jr. was the Orleans Parish District Attorney from 2008 to 2020, and was then responsible for the operation, maintenance, and control of the OPDA and for the selection, training, supervision, and discipline of prosecutors and other OPDA employees. Defendant Cannizzaro is sued in his official capacity.

26.     Defendant Harry O'Neal is a former officer of the NOPD.  At all relevant times, he was a duly appointed and acting officer of the NOPD employed by Defendant the City of New Orleans.  At all relevant times, Defendant O'Neal was working as a criminalist in the New Orleans Police Crime Lab.  At all relevant times, Defendant O'Neal acted toward Mr. Walter under the color of state law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of Louisiana and the City of New Orleans. This lawsuit seeks to hold Defendant O'Neal liable in his individual capacity.

27.     Defendants John/Jane Does #1-20 are employees of the NOPD or the OPDA who acted toward Mr. Walter under the color of state law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of Louisiana and the City of New Orleans; and who participated in the misconduct alleged herein; but whose actual names Mr. Walter has been unable to ascertain notwithstanding reasonable efforts

6

to do so.  This lawsuit seeks to hold Defendants John/Jane Does #1-20 liable in their individual capacities.

## JURY DEMAND

28.    Mr. Walter hereby demands trial by jury of all issues raised in this Complaint.

## FACTS

**A.    The Crime**

29.    On May 10, 1986, L.S., a white woman, was in her home in New Orleans.

30.    Shortly after midnight, as L.S. was stepping into the shower, an unknown Black man (the "Actual Perpetrator") entered with a yellow rag over his face, holding a knife.  L.S. described the yellow cloth as a "mask around" the Actual Perpetrator's face.  The Actual Perpetrator also had on a hat covering his head.  L.S. did not notice any distinguishing characteristic about the hat other than that it was blue and a type that was "fairly common" at stores at the time.  L.S. did not recognize this man as anyone she had previously seen.

31.    The Actual Perpetrator placed a yellow shirt over L.S.'s face.

32.    The Actual Perpetrator walked L.S. at knifepoint to her unlit bedroom and sexually assaulted her.  The Actual Perpetrator ejaculated during the sexual assault.

33.    The Actual Perpetrator's face covering dropped several times during the crime, and L.S. told police she believed that she would be able to identify him.

34.    After the Actual Perpetrator left, L.S. put on a shirt and a pair of shorts and called the police.  Other than the knife used during the assault, no property was stolen.

**B.    The Investigation, Serological Testing, and Sullivan Walter's Arrest**

35.    Immediately following the rape, L.S. described the perpetrator to the police as a Black man who was "5'11, slender, 18-20 years old, with thick eyebrows, jerri curl ringlets, wearing a backwards baseball hat."  She also told police that he "had two to three day's stubble."

36.     The victim's description of the perpetrator's hairstyle, eyebrows, facial hair, and build did not match Mr. Walter, who at the time was 17 years old with an average build, cropped natural hair (not "jerri curls"), average-sized and sparse (not "thick") eyebrows, and without facial hair.

37.     That night, L.S. was taken to Charity Hospital, where Dr. Thomas Sanders, an Emergency Medicine Resident, performed a rape kit.  Dr. Sanders performed, among other things, an exam that showed the presence of seminal fluid near L.S.'s genital area.  The doctor also took internal and external vaginal swabs, both of which were positive for spermatozoa.  Because of L.S.'s sexual history before the rape, that seminal fluid and spermatozoa could only have come from the Actual Perpetrator.

38.     Serological testing was also performed on fluids recovered from L.S.

39.     Serological testing is used to determine whether a person's body secretes ABO blood group antigens into their bodily fluids—such as saliva, sweat, and semen.

40.     A person whose body *does* secrete ABO blood group antigens (*i.e.*, antigens reflecting a blood type of A, B, AB, or O) into their bodily fluids is commonly referred to by scientists as a "secretor."

41.     A person whose body does *not* secrete ABO blood group antigens into their bodily fluids is commonly referred to by scientists as a "non-secretor."

42.     Approximately 25% of the population, including the Actual Perpetrator, are non-secretors.

43.     Approximately 75% of the population, including Mr. Walter, are secretors.

44.     The distinction between secretors and non-secretors allows laboratories to investigate evidentiary bodily fluids other than blood to eliminate persons of interest as the source,

in the same way that a person with blood type O could be eliminated as a suspect in a crime known to have been committed by a perpetrator with blood type A.

45.     The test to distinguish between these two groups in seminal and other bodily fluid—the absorption-inhibition test—is and was at all relevant times highly reliable when performed properly and functioned as an early precursor to modern DNA testing.

46.     In this case, Patricia Daniels, Medical Technologist of the Orleans Parish Coroner's Office ("OPC"), serologically tested the vaginal swabs taken from L.S.  The testing revealed that the seminal fluid came from a non-secretor.

47.     Additionally, Defendant O'Neal, acting on behalf of the NOPD, serologically tested semen retrieved from the victim's shorts.  That test independently demonstrated that the semen came from a non-secretor.

48.     In other words, the OPC and the NOPD Crime Lab separately analyzed specimens recovered from the victim.  Analysts from each office, testing two different samples, independently concluded that the perpetrator was a non-secretor.

49.     A few days after the sexual assault, L.S. worked with a police sketch artist to prepare a composite drawing of the Actual Perpetrator.

50.     On June 23, 1986, Mr. Walter—then just 17 years old—was arrested for an unrelated simple burglary and identified as a potential match for the composite drawing.  At the time of his arrest, he was wearing a blue baseball hat.

51.     On June 26, 1986, a detective presented a photo array containing a photo of Mr. Walter and six other men to L.S.  The detective who conducted the photo array knew that Mr. Walter was the suspect.  Mr. Walter was the only man in the photo array wearing a hat.  After

viewing the array, L.S. made a cross-racial identification and incorrectly identified Mr. Walter as the perpetrator.

### C.     The Trial and Conviction

52.     Mr. Walter was charged on November 13, 1986, by grand jury indictment with two counts of aggravated crime against nature, one count of aggravated rape, and one count of aggravated burglary.  He was arraigned and pleaded not guilty on December 1, 1986.

53.     The next day, December 2, 1986, following a mere three-hour trial, a twelve-member jury found Mr. Walter guilty on all counts.

54.     While preparing for the criminal trial, Mr. Walter and his counsel were not aware of the serological testing the NOPD Crime Lab and the OPC had performed.  Neither Mr. Walter nor his attorney received either lab report before the morning of trial.  As a result, this evidence was unusable at trial, and Mr. Walter was deprived of an opportunity to obtain and present any evidence regarding his own secretor status or the implication of his secretor status.

55.     L.S. testified at trial.  She identified Mr. Walter and said that her perpetrator was "the type of person that didn't have much hair."  This contradicted her initial description of the perpetrator as having thick eyebrows, curly hair, and two to three days of stubble.

56.     Defendant O'Neal also testified at trial.  He testified that the police serology tests showed that the perpetrator was a non-secretor: "In this particular case, examination of seminal fluid revealed no secretor activity which would indicate that the individual who left seminal fluid stains was a non-secretor.  In other words, they did not secrete their blood type."

57.     On cross-examination, Defendant O'Neal further confirmed that the perpetrator was a non-secretor:

> Q.     Now—basically, all you had was—you examined the shorts and the blouse and found that the shorts contained seminal fluid, and the blouse did not, is that correct?

> A.   That is correct.
> Q.   That's all your analysis showed?
> A.   That's correct.
> Q.   You weren't able to establish a blood type?
> A.   No, sir.  **The stain that was tested for secretor activity reflected that there was no secretor activity**.

58.   Two weeks later, on December 16, 1986, Mr. Walter was sentenced to serve 35 years at hard labor.

### D.   Sullivan Walter's Innocence, Appeal, and Motion for a New Trial

59.   Mr. Walter appealed from the conviction, arguing that the OPDA prejudiced his ability to receive a fair trial by withholding results of the serology tests until the day of trial.  In his appeal, Mr. Walter asserted that the OPDA's untimely production of the lab reports deprived him of constitutional due process and was also a statutory discovery violation.

60.   In October 1987, the Louisiana Fourth Circuit Court of Appeal agreed that there was "no doubt" the OPDA "violated its duty" in discovery and remanded the case to the trial court to allow Mr. Walter to present *Brady* claims for a new trial based on the secretor evidence.

61.   On January 13, 1988, tests of Mr. Walter's blood and saliva were ordered.

62.   Defendant O'Neal performed the tests at the NOPD crime laboratory.  Defendant O'Neal reported that (a) the blood sample showed Mr. Walter was Blood Type B, and (b) the saliva sample showed Blood Type B secretor activity.

63.   Thus, the lab report, dated January 15, 1988, established with scientific certainty that Mr. Walter is a secretor.

64.   Accordingly, Mr. Walter cannot have been the perpetrator of the crimes against L.S.

65.   Based on these results, Mr. Walter filed a motion for new trial under Louisiana Code of Criminal Procedure, articles 851 *et seq.*, which provides a mechanism by which a

defendant in Louisiana can move for a new trial after a guilty verdict "based on the supposition that injustice has been done the defendant."

66.    On April 29, 1988, the Criminal District Court held an evidentiary hearing on Mr. Walter's motion for a new trial.

67.    The prosecution's only witness at the evidentiary hearing was Defendant O'Neal— the same criminalist who, before Mr. Walter was identified as a secretor, definitively determined and testified that the Actual Perpetrator was a non-secretor.

68.    Unbeknownst to Mr. Walter or the Criminal District Court, and as now admitted by the OPDA, prior to Defendant O'Neal's testimony, one or more agents of the OPDA directed Defendant O'Neal to lie about the secretor status testing and significance.  In the OPDA's words, the OPDA "asked its criminalist [O'Neal] to come in and 'fudge'" his testimony.  "And that's what he did."

69.    As directed, Defendant O'Neal changed his story to falsely say that the lab results did not necessarily exclude Mr. Walter from the pool of possible perpetrators.  Instead, he claimed—falsely, and for the first time—that his testing did not conclusively establish whether the perpetrator was a non-secretor.

70.    In the alternative, under Federal Rule of Civil Procedure 8(d)(2), Defendant O'Neal falsified his testimony concerning the secretor status testing without the OPDA's knowledge and concealed from the OPDA the fact that his testimony regarding his secretor status testing was false.

71.    Indeed, Defendant O'Neal's testimony was false, and it directly contradicted his own testimony at Mr. Walter's trial.  It also contradicted the corroborating test performed by the coroner's office on the victim's rape kit, which likewise demonstrated that the perpetrator was a non-secretor.

72.     Defendant O'Neal's false testimony at the hearing provided the sole basis for the Criminal District Court to deny Mr. Walter's motion for new trial.  No other witness testified at this hearing.

73.     Mr. Walter again appealed.  Unaware of Defendant O'Neal's and/or the OPDA's actions, the Louisiana Fourth Circuit Court of Appeal found no error in the Criminal District Court's denial of the motion for a new trial, affirmed Mr. Walter's convictions, amended the sentences, and affirmed them as amended.  In affirming the denial of a new trial, the Court of Appeal applied an incorrect standard to evaluate whether the newly discovered evidence would have changed the result at trial.

74.     The Louisiana Supreme Court granted Mr. Walter's writ application and remanded the case to the Court of Appeal to apply the correct standard for determining the materiality of the evidence the prosecution untimely disclosed, and whether Mr. Walter received a fair trial.

75.     On remand, the Court of Appeal again affirmed Mr. Walter's conviction and sentences as previously amended.

**E.     Sullivan Walter's Exoneration**

76.     IPNO began investigating Mr. Walter's case in October 2021.  IPNO contacted the Civil Rights Division ("CRD") of the OPDA about the case, and CRD began its own review and investigation.

77.     At the conclusion of those investigations, on August 23, 2022, the OPDA and Mr. Walter's IPNO attorneys filed a Joint Agreement and Motion to Vacate his conviction.

78.     A hearing on the motion was held on August 25, 2022.

79.     At the hearing, Judge Derbigny lamented that Mr. Walter was "an innocent man" who "ha[d] been incarcerated . . . for a crime that he did not commit."

13

80.     Judge Derbigny also described Mr. Walter's wrongful conviction and incarceration as "clearly a failure of the system" and "an egregious injustice."  Judge Derbigny thereby vacated Mr. Walter's conviction and ordered his immediate release from prison.

81.     During the hearing, the OPDA stated that "the serology evidence" disclosed on the morning of Mr. Walter's trial "shows that" Mr. Walter "did not commit the crime."

82.     The OPDA also stated during the hearing that "many of the factors that we know often to have been present in proven mistaken eyewitness identifications were present in this case."

83.     Further, the OPDA stated in the joint motion that among the materials not disclosed to Mr. Walter before 2021 were "[p]olice documents containing additional facts that might have been used to support an argument that the victim's identification had been mistaken."

84.     The OPDA "concede[d] that Mr. Walter did not receive a fair trial" and agreed that "in all likelihood, he did not commit the crime."

**F.      The City of New Orleans's Deliberate Indifference to Official Misconduct, Including *Brady* Violations and the Subornation and Commission of Perjury, and Its Failure to Train, Supervise, and Discipline Its Employees**

85.     Mr. Walter's wrongful conviction and imprisonment were not a random miscarriage of justice in an otherwise well-functioning law enforcement regime.  Rather, during the relevant period, policymakers acting on behalf of Defendant the City of New Orleans engaged in the following misconduct, which was reflected in, and led to, the false conviction in Mr. Walter's case: officials acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; and implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of City officials—including, but not limited to, properly documenting and disclosing exculpatory information, not presenting false evidence, not

fabricating evidence by causing witnesses to give false testimony, and correcting testimony a prosecutor knows to be false.

### 1. *The City's Policies, Customs, and Practices of Condoning Misconduct*

86.    Prior to, and at the time of, the unlawful investigation, prosecution, and incarceration of Mr. Walter, the NOPD and OPDA—both agencies of the City of New Orleans— by and through their policymakers, maintained a policy, custom, or pattern and practice of condoning official misconduct, including by failing to train, supervise, and discipline police officers and prosecutors.

87.    Among other things, the NOPD failed to maintain individual training records; failed to conduct any in-service or advanced training for supervisors; failed to ensure that its supervisors had the training and resources to supervise serious investigations, including of rapes; and failed to adequately document and enforce disciplinary investigations and findings against individual officers.

88.    In 1991, just a few years after the rape investigation in this case, the International Association of Chiefs of Police published a report citing a "stunning lack of training" at the NOPD and finding that the NOPD's training record was "not nearly in compliance with professional expectations."  The report concluded that the NOPD's failure to keep training records "leaves the department dangerously defenseless against failure-to-train based allegations and lawsuits."  With respect to criminal investigations, the report concluded, "[T]he CIB [the Criminal Investigation Bureau] is failing in almost every crime category.  While the entire department must share responsibility for this poor performance, the CIB is simply not getting its portion of the job done. . . .  [P]rimitive case management practices, absence of performance goals, measurement accountability, flawed selection process, and a stunning lack of training inhibits investigative effectiveness."

89.     Throughout the 1980s and early 1990s, the NOPD maintained a widespread practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, including, but not limited to, (a) creation and presentation of false or materially misleading evidence, and (b) failure to document and disclose exculpatory and impeachment evidence to prosecutors, defense counsel, and courts, and engaging in the affirmative and/or passive concealment of this type of misconduct.

90.     Despite actual and constructive notice that the NOPD's custom, pattern, and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, and failing to adequately supervise, discipline, and train its officers, was reasonably likely to lead to constitutional violations similar to those perpetuated against Mr. Walter, the NOPD leadership continued to maintain those customs, patterns, and practices of deliberate indifference to the rights of the suspects.

91.     With respect to training in particular, in 1994, the Louisiana National Guard, in partnership with the City, found that "[a] great deal has been written about the state of training within the NOPD.  Year after year it does not seem to improve.  It is clearly apparent that the city and department leaders do not understand, or simply choose to ignore, the importance of training for police officers and police civilians engaged in supporting police officers. . . .  Unfortunately, even after three previous reports criticizing training within the NOPD, very little action has been taken to improve the situation."

92.     NOPD supervisors and policymakers had actual and constructive notice of the NOPD's policy, custom, pattern, or practice of investigative misconduct and failures to supervise and train through numerous cases and investigations that took place prior to the investigation in this case.  The misconduct committed in those cases by NOPD officers, including Defendant

16

O'Neal, was actually or constructively known to NOPD supervisors and policymakers prior to Mr. Walter's wrongful conviction, and NOPD supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand Defendant O'Neal and other NOPD employees in response to such actual and constructive notice.

93.     NOPD supervisors and policymakers had actual and constructive notice of a pattern and practice of presenting false evidence—including, in particular, by the NOPD Crime Lab—and providing false testimony in criminal proceedings.  Repeatedly, when confronted with instances of evidence fabrication and perjury by police officers—including, in particular, by the NOPD Crime Lab—NOPD supervisors and policymakers, as a matter of policy and custom, failed to impose reasonable discipline on the employee(s) involved and failed to take other reasonable, remedial measures to deter and prevent such misconduct.

94.     Similarly, throughout the 1980s and 1990s, the OPDA maintained policies, customs, and practices that promoted, facilitated, and condoned misconduct by prosecutors and other OPDA employees and agents, concerning the fabrication of evidence and presentation of perjured testimony.

95.     Prior to, during, and after the 1980s and 1990s, OPDA supervisors and policymakers had actual and constructive notice of a pattern and practice of prosecutors' knowing presentation of false or fabricated evidence, including perjured testimony.  Repeatedly, when confronted with instances of evidence fabrication and prosecutors' presentation of perjured testimony, OPDA's supervisors and policymakers, as a matter of policy and custom, failed to impose reasonable discipline on the employee(s) involved and failed to take other reasonable, remedial measures to deter and prevent such misconduct.  OPDA supervisors and policymakers likewise failed to train and supervise OPDA employees regarding the repeated presentation of false

or fabricated evidence, despite their actual and constructive notice of a pattern and practice of such behavior, and despite the knowledge that their failure to train and supervise OPDA employees would likely result in wrongful prosecutions, convictions, and imprisonment of criminal defendants, including Mr. Walter.

96.    The NOPD's policy, custom, pattern, and practice of investigative misconduct and failures to supervise and train through numerous cases and investigations that took place prior to the investigation in this case.  The misconduct committed in those cases by NOPD officers, including Defendant O'Neal, was actually or constructively known to NOPD supervisors and policymakers prior to Mr. Walter's wrongful conviction and, upon information and belief, NOPD supervisors and policymakers failed to train, supervise, discipline, or otherwise reprimand Defendant O'Neal and other NOPD employees in response to such actual and constructive notice.

### 2.    *The City's Policies, Customs, and Practices of Suppressing* **Brady** *Evidence*

97.    At all relevant times, the City of New Orleans, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the suppression of *Brady* information.

98.    At all relevant times, the City's policies, rules, and procedures governing documentation and disclosure of information collected during criminal investigations did not adequately ensure that City employees would document or disclose *Brady* information to suspects or defendants, courts, and, in some cases, prosecutors.

99.    The City of New Orleans has revealed, through discovery in other wrongful conviction lawsuits and otherwise, that the OPDA's formal policies permitted prosecutors to suppress *Brady* information by embracing an unduly limited definition of "exculpatory" information that was at odds with governing jurisprudence and the U.S. Constitution.  Moreover, at the time of Mr. Walter's prosecution and conviction, the OPDA's formal policies did not require

prosecutors to disclose *Brady* information to criminal defendants, their attorneys, or the courts, at all.

100.    By declining to promulgate, much less enforce, any policy requiring timely disclosure of *Brady* information at the time of Mr. Walter's prosecution and conviction, the OPDA effectively delegated policymaking authority on such matters to individual prosecutors, including the prosecutors responsible for litigating Mr. Walter's criminal case.

101.    Even when the OPDA did adopt a formal policy requiring disclosure of some—but not all—*Brady* information to the defense, the policy was extremely deficient.  Among other things, the policy failed to instruct prosecutors: (1) on how to determine whether evidence is favorable, (2) to what extent (if any) impeachment information should be considered *Brady*, (3) to what extent the facts of an investigation focused on another suspect constitutes *Brady*, (4) how to address recanted testimony, (5) whether and to what extent prosecutors should be considering the materiality of exculpatory information when making disclosure decisions, (6) the timing of *Brady* disclosures, (7) prosecutors' responsibility to determine whether other prosecutors or law enforcement personnel have *Brady* information, (8) how to obtain advice regarding *Brady* disclosures, (9) specific examples from prior cases demonstrating OPDA's failures to meet its *Brady* obligations and summaries of relevant case law, and (10) to what extent (if any) prosecutors should disclose undocumented *Brady* information.

102.    On the materiality question, for example, former District Attorney Harry Connick has testified that while "[m]ateriality was very important" under his office's *Brady* policy, there was no instruction on how to define materiality or guidance for prosecutors in making such determinations.  Instead, Mr. Connick testified, prosecutors "were supposed to figure it out themselves."

103.     The City's policy and practice was to tolerate, fail to discipline, and encourage violations of officials' constitutional obligations to make timely disclosure to the defense of *Brady* information.   The City's deliberate indifference to such violations created a laissez-faire atmosphere that caused such violations to persist, including in Mr. Walter's case.

104.     The City of New Orleans has revealed, through discovery in other wrongful conviction lawsuits and otherwise, that its policymakers created and furthered policies and practices that encouraged and tolerated *Brady* violations.   For example, former Orleans Parish District Attorney Leon Cannizzaro, Jr., described the tenure of his predecessor, Mr. Connick, as follows:

> In the decades preceding my administration, the District Attorney's office [*i.e.*, under Mr. Connick, from 1974 to 2003] had been in a steady state of decline.   Over the course of that time period, bad policy decisions took root and became institutional.

Mr. Cannizzaro observed that, as a result of the *Brady* claims in the case *Thompson v. Connick*, "some of those policy decisions had collateral consequences in the form of civil liability against the office."

105.     Indeed, during his tenure as District Attorney, Mr. Connick repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions—including, in one notable instance, a plea from a sitting Orleans Parish Criminal District Court Judge—that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance.

106.     The deficiencies of the OPDA's policies, customs, and practices regarding disclosure of *Brady* information are both legion and well-documented.   For example, Mr. Walter attaches as Exhibit 1 and incorporates by reference the expert report of Professor Laurie Levenson,

filed in the case of *Jones v. Cannizzaro* et al., E.D. La. Civil Action No. 18-503, which methodically documents and discusses many of the deficiencies.

107.    These policies, customs, and practices directly and proximately caused the violations of Mr. Walter's constitutional rights described herein and his wrongful conviction, imprisonment, and other damages.

108.    As the National Registry of Exonerations has reported, in the 1980s, concealing exculpatory evidence in New Orleans was routine.  Justice John Paul Stevens observed in 1995 that the OPDA's *Brady* violations were "blatant and repeated."  Justice Ruth Bader Ginsberg later observed in 2012 that the OPDA during the 1980s was "a tinderbox . . . in which *Brady* violations were nigh inevitable."  For example, John Thompson was sentenced to death in 1985 because a New Orleans prosecutor hid (and eventually lost or destroyed) a critical item of physical evidence: a piece of cloth with a stain of the criminal's blood that tests had proven could not have come from Mr. Thompson.

109.    Empirical data support this conclusion.  Orleans Parish has the highest per capita exoneration rate of any county or parish in the country.  As of 2020, in 78% of exonerations from New Orleans, exculpatory evidence was concealed (*i.e.*, in 18 of the 23 exonerations); prosecutors committed misconduct in nearly 90% of those cases (*i.e.*, in 16 of the 18 cases in which exculpatory evidence was concealed).

110.    In addition to post-conviction exonerations, there are at least 51 criminal cases from New Orleans in which courts have found—or the prosecution has acknowledged—that the OPDA violated *Brady*, as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds.  As such, the actual total of cases with concealed exculpatory evidence is much higher.

111.    The following cases provide three illustrative and notable instances of the City's policies, customs, and practices of tolerating, failing to discipline, and encouraging violations of officials' constitutional obligations to make timely *Brady* disclosures:

a.   *Connick v. Thompson*, 563 U.S. 51 (2011):  John Thompson was wrongfully convicted of murder.  Roughly one week before Thompson's trial, a blood sample collected from the crime scene was sent to the crime laboratory; two days before trial, an Assistant District Attorney ("ADA") received the report, stating that the perpetrator had blood type B.  On the first day of trial, a different ADA checked out all the physical evidence in the case from the police property room, including the bloodstained swatch.  This second ADA then checked all the evidence, except the swatch, into the courthouse property room.  Neither the lab report nor any mention of the swatch was ever disclosed to Thompson's counsel.  When a private investigator discovered the crime lab report in New Orleans Police Crime Laboratory files, Thompson's blood was tested.  He was determined to be type O, and therefore not a match for the undisclosed blood samples.

b.   *Kyles v. Whitley*, 514 U.S. 419 (1995):  The U.S. Supreme Court granted habeas relief to Curtis Lee Kyles for his 1984 conviction and held that the prosecution had withheld evidence favorable to the defense—significantly, that a key, non-testifying witness had made inconsistent and self-incriminating statements to the police.  The defense was also never told that an eyewitness, who testified that Mr. Kyles was the perpetrator, had described the perpetrator as having features significantly different from Mr. Kyles's.   Moreover, the prosecution also

22

suppressed a list of cars present at the crime scene after the murder—a list that

would have exculpated Mr. Kyles.

c. *Floyd v. Vannoy*, No. 11-2819, 2017 WL 1837676, 2017 U.S. Dist. LEXIS 69705,

(E.D. La. May 8, 2017), *aff'd* 894 F.3d 143 (5th Cir. 2018):  This Court granted

federal habeas corpus relief to John Floyd after suppression of forensic and other

evidence led to his 1982 murder conviction.  The suppressed evidence included

fingerprint results that the NOPD had analyzed and an affidavit that misrepresented

information a witness gave to Detective John Dillman—an NOPD detective guilty

of other constitutional rights violations.

112.   These three cases are not isolated incidents.   Other individuals who were

documented victims of the *Brady* violations rampant in New Orleans in the 1980s and 1990s

include, but are not limited to, the following:

a. Reginald Adams (*convicted: 1983; exonerated: 2014*):  The only evidence used in

Mr. Adams's trial was a coerced confession that got nearly every fact about the

crime wrong.  The prosecution suppressed a police report showing that detectives

had discovered the murder weapon, traced it to the people who had access to the

gun shortly before the murder, and subsequently arrested one of them—on whom

they found a bracelet stolen from the victim's home—for accessory to first-degree

murder.  Nevertheless, detectives testified that their only real lead developed once

Mr. Adams confessed and that they never located the murder weapon or any of the

victim's stolen property.  The prosecution also falsely represented to Mr. Adams's

defense team that no evidence was ever recovered and that no forensic examination,

including ballistics testing, had ever been conducted, when the opposite was true.

b.  Calvin Duncan (*convicted: 1985; exonerated: 2021*):  Mr. Duncan was convicted
of first-degree murder after the prosecution withheld evidence that showed he had
no knowledge of the crime, the perpetrator did not match Mr. Duncan's physical
characteristics, and the identification process was completely unreliable.   In
response to an explicit request from the defense for any exculpatory evidence in the
case, the prosecution told the defense, "The state has no exculpatory evidence."
The prosecution also suppressed evidence that an officer on the case had a felony
conviction.

c.  George Toca, Jr. (*convicted: 1985; exonerated: 2022*):  Mr. Toca was convicted of
second-degree murder after the prosecution withheld exculpatory evidence,
including witnesses' initial descriptions of the perpetrator that did not match Mr.
Toca.  One witness also stated that he probably would not be able to make an
identification but subsequently identified Mr. Toca at trial.  Moreover, the defense
was not given a police report that supported Mr. Toca's alibi.  Specifically, the
report detailed his alibi witness's call to the police after Mr. Toca's arrest, during
which she reported that Mr. Toca was innocent and provided a tip pointing to
someone else.

d.  Raymond Flanks (*convicted: 1985; exonerated: 2022*):  Mr. Flanks was convicted
of murder after the prosecution claimed it did not possess evidence favorable to the
defense, when, in fact, the opposite was true.  First, the eyewitness reported a "white
blotch" on the perpetrator's face—a marking Mr. Flanks did not have.  Although
Mr. Flanks lacked this marking, the witness identified him in a photo lineup.
Second, according to the witness's grand jury testimony, Detective John Dillman,

24

during the lineup, "sh[ook] his head and s[aid,] 'that's him'"; yet, at trial, Dillman testified that he did not influence the lineup and that he was sure no one else had, either.  Third, Mr. Flanks drove a new car, whereas police knew that the perpetrator drove an old one.  Fourth, Dillman testified that the eyewitness informed him that she saw "a late model automobile" flee the scene when, in reality, police reports revealed that the perpetrator's car was described as being an unknown make and model.  Indeed, a joint agreement and motion to vacate Mr. Flanks' conviction observed that Dillman had "altered the age of the perpetrator, age of the perpetrator's car, appearance of the perpetrator's gun, and appearance of the perpetrator's mustache to fit the State's case."  Finally, a police analysis claimed that a gun recovered from Mr. Flanks was the murder weapon (based on a bullet analysis and a shell casing); after a mistrial, the Federal Bureau of Alcohol, Tobacco and Firearms determined that that was false.

e.  Jerome Morgan (*convicted: 1994; exonerated: 2016*):  Mr. Morgan was wrongfully convicted of second-degree murder after the prosecution withheld a 911 call log revealing that the police had arrived at the scene and sealed it up within a few minutes after the shooting, which undermined the prosecution's theory that Mr. Morgan fled the scene after the shooting and then returned before police arrived. Two witnesses also later recanted their testimonies and said that police pressured them into falsely identifying Mr. Morgan; in fact, during a photographic lineup, one detective pointed to Mr. Morgan's photo.  Both witnesses also later testified that police told them Mr. Morgan was the shooter.

25

f.  Kuantau Reeder (*convicted: 1995; exonerated: 2021*):  Mr. Reeder was wrongfully convicted of second-degree murder after the prosecution failed to disclose that a key witness had a federal conviction for lying on a gun application (which the witness then lied about during testimony, a lie the prosecution did not correct). Although police recovered the jacket the shooter had been wearing and lifted a fingerprint from a stamp in the pocket, the print was not compared to Mr. Reeder's prints; in 2021, the NOPD examined the print and concluded that it excluded Mr. Reeder.  Additionally, as the practice of the OPDA was to not turn over prosecutors' notes to the defense, the prosecution did not disclose that the key witness said twice that he had identified another suspect as the shooter during a photographic lineup.

g.  Larry Moses (*convicted: 1995; exonerated: 2023*):  Mr. Moses was convicted after prosecutors withheld the fact that one of their key witnesses had pinned crimes on romantic rivals in the past.  The witness would later go on to share inconsistent accounts of the crime and admit to others that he set up Mr. Moses in an act of revenge.  Additionally, the prosecutor relied on the testimony from a woman who was only 70 or 75% sure of the robber's voice that she heard on the night of the murders.

h.  Shareef Cousin (*convicted: 1996; exonerated: 1999*):  Mr. Cousin was wrongfully convicted of murder and sentenced to death after police coerced Mr. Cousin's former friend into implicating him.  Mr. Cousin's conviction was reversed after it was determined that the prosecution had improperly questioned witnesses and improperly withheld a statement by the key witness that she was unable to see the perpetrator clearly and likely could not identify him.

26

i.   Bernell Juluke, Jr.; Kunta Gable; and Leroy Nelson (*convicted: 1996; exonerated: 2022*):  Messrs. Juluke, Gable, and Nelson were each convicted of murder after the prosecution withheld exculpatory evidence, including police communication logs and information that undermined a witness's testimony.  The prosecution also withheld that a witness initially testified that the getaway car was green, contradicting his trial testimony that the car was blue.  Meanwhile, Mr. Juluke, who was pegged as the driver, had a gray car.  Moreover, two NOPD officers on the case who broadcast the information that implicated the three men were indicted in 1994 for drug dealing and conspiracy in a woman's death.

j.   Dan L. Bright (*convicted: 1996; exonerated: 2004*):  Mr. Bright was wrongfully convicted of murder after the prosecution withheld FBI documents stating that a confidential informant had identified another man as the killer, as well as evidence that undermined the credibility of the prosecution's key witness.

k.   Robert Jones (*convicted: 1996; exonerated: 2017*):  Mr. Jones was exonerated of four separate crimes, including rape, robbery, kidnapping, and manslaughter, after it was revealed in the years following his conviction that the prosecution and police had withheld numerous key facts.  Among other things, they failed to disclose: (1) the rape victim's descriptions of the perpetrator, which matched Lester Jones (the actual perpetrator) and not Robert Jones; (2) the rape victim's statement that the perpetrator told her that the location where he raped her was his "neck of the woods," a critical fact given that the location was a block from where Lester Jones lived; (3) the fact that the investigating detectives concluded that Robert Jones and Lester Jones did not know each other, and that Lester Jones was responsible for all

the crimes of which Robert Jones was convicted; (4) Lester Jones's possession of items stolen in each robbery; and (5) a memorandum by the trial prosecutor corroborating that Lester Jones and Robert Jones did not know each other.

l.   Eddie Triplett (*convicted: 1998; exonerated: 2011*):  Mr. Triplett was convicted of drug charges after the prosecution withheld from the defense a police report describing how officers stopped both Mr. Triplett and another person before arresting Mr. Triplett and releasing the other man.  This police report named the other man, not Mr. Triplett, as the person detained.  The police report refuted the police's testimony at trial that no other person besides Mr. Triplett was present at the scene.

m.   Cedric Dent (*convicted: 1999; exonerated: 2022*):  Mr. Dent was convicted of second-degree murder after the prosecution withheld evidence, including the lead detective's notes revealing that there was a second eyewitness, and that this eyewitness's description of the shooter was not a match to Mr. Dent.  The notes also contradicted the detective's account in his police report about how Mr. Dent came to be a suspect in the case.  Finally, prosecutors failed to disclose four out of the six accounts provided by the original eyewitness, each of which differed.

113.   Under the City's policies, customs, and practices, officials were permitted and encouraged to refrain from making any record of *Brady* information, despite the fact that disclosure of such information was and remains constitutionally required.

114.   Through a policy, custom, and practice of not disciplining officials for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), the City

encouraged such violations by demonstrating to officials that they would face no negative consequences for their failures to comply with *Brady* and other constitutional requirements.

### 3. *The City's Unlawful Policies, Customs, and Practices Concerning the Use of False or Misleading Testimony*

115.     At the time of Mr. Walter's arrest and prosecution, the City also created and/or maintained policies, customs, and practices that permitted and encouraged officials to commit perjury and provide false or misleading testimony.

116.     Policymakers for both the NOPD and OPDA independently and jointly created and furthered the use of such policies, customs, and practices.

117.     In this case, an OPDA prosecutor explicitly instructed Defendant O'Neal to perjure himself to maintain Mr. Walter's wrongful conviction.  At the post-conviction hearing in 2022, the OPDA acknowledged that John/Jane Doe #1 "asked its criminalist [Harry O'Neal] to come in and 'fudge.' And that's what he did."

118.     In the alternative, pursuant to Federal Rule of Civil Procedure 8(b)(2), Defendant O'Neal made the decision to perjure himself without an explicit instruction from a prosecutor, but in accordance with the NOPD's policy, custom, and practice of promoting, facilitating, and condoning the presentation of false or fabricated evidence—including perjured testimony— including by declining to train, supervise, and discipline its employees so as to deter and prevent the presentation of false or fabricated evidence.

119.     Moreover, during the 1980s and 1990s, there was a specific pattern of testimonial deficiencies regarding serological testing within the NOPD Crime Lab, including by Defendant O'Neal.

120.     For example, in the 1983 trial of Brent Washington, Defendant O'Neal offered, at best, misleading and contradictory—and at worst, patently false—testimony regarding serological

test results.  Most notably, he testified that a sample of semen obtained from a rape victim's clothing indicated that the perpetrator was a type A secretor.  On cross-examination, however, he testified that he could not totally exclude a potential suspect who is a type O non-secretor.  This testimony was contradictory, misleading, and scientifically impossible.

121.   Defendant O'Neal's supervisors at the NOPD were aware, or should have been aware, of his contradictory and misleading testimony in the trial of Mr. Washington.  They nonetheless failed to discipline Defendant O'Neal, to provide him additional training, or to otherwise ensure that he would not provide similarly misleading testimony in future cases.

122.   These policies, customs, and practices of condoning or suborning perjury in the NOPD in the 1980s and 1990s were not limited to Defendant O'Neal.  Two other specific documented instances are reflected in the following cases:

   a.   *United States v. Duzac*, 622 F.2d 911 (5th Cir. 1980):  After subjecting Darrell Land to physical and verbal abuse during his wrongful arrest, NOPD Officers Reynolds and Duzac were indicted for lying to a grand jury.  Duzac was also indicted for willfully depriving Land of his civil rights and was found guilty on both counts. Reynolds was acquitted.

   b.   *State v. Greco*, 862 So.2d 1152 (La. Ct. App. 4th Cir. 2003):  The Louisiana Fourth Circuit Court of Appeal found that an NOPD detective and an OPDA investigator forced witnesses "to lie both in their pretrial statements and at trial," finding evidence the officers suborned perjury.

123.   In addition to these two cases, numerous other documented instances illustrate the City's policies, customs, and practices of condoning or suborning perjury, including, but not

limited to, in the above-described prosecutions of John Floyd, Reginald Adams, Jerome Morgan, Kuantau Reeder, Shareef Cousin and Eddie Triplett.

## DAMAGES

124.    This action seeks damages for the period from June 23, 1986 (the date of Mr. Walter's arrest), through the present.   Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith, and/or malicious acts, misdeeds, and omissions caused Mr. Walter to be unfairly tried and wrongfully convicted; to endure over 35 years of wrongful imprisonment (including serving hard labor), including the physical and mental damage arising therefrom; and to spend his entire young adulthood bearing the burden and stigma of being falsely branded as a convicted rapist.

125.    Mr. Walter has spent most of his life wrongfully imprisoned.  He was arrested at 17 for a heinous crime he did not commit, and within 16 days of being arraigned, was sentenced to 35 years of imprisonment serving hard labor—a term he served until he was released in 2022. Mr. Walter's wrongful conviction and incarceration deprived him of the most vital years of his life, forcing him to spend those years in oppressive conditions, including performing forced prison labor.  His wrongful conviction denied Mr. Walter nearly every joy in life.

126.    Starting from the time he was only 17 years old, Mr. Walter served his sentence in various harsh and oppressive prisons throughout Louisiana—including approximately a decade he spent at the Louisiana State Penitentiary, also known as Angola, a notoriously dangerous and abusive prison, particularly in the 1980s and 1990s when Mr. Walter was wrongfully incarcerated there.

127.    Due to his wrongful conviction and imprisonment, Mr. Walter lost his chance to have meaningful relationships with his family members and friends.  He also lost all the social

benefits that come from freedom, including the opportunities to create community ties and participate in normal civilian life.

128.    The torment his family suffered exacerbated Mr. Walter's own torment and the psychological burden he had to bear.

129.    As a direct and proximate result of the acts, misdeeds, and omissions of Defendants, the injuries and damages sustained by Mr. Walter, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fifth and Fourteenth Amendments to the United States Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, and egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

130.    All the alleged acts, misdeeds, and omissions committed by the individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Deprivation of Liberty Without Due Process of Law*
*(United States Constitution Amendments V and XIV)*

**Against the Individual Defendants**

131.    Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

132.    The individual Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, improperly suppressed and failed to timely disclose material exculpatory evidence, fabricated evidence, and engaged in the affirmative concealment of such misconduct, thereby depriving Mr. Walter of his right not to be deprived of liberty without due process of law.

133.    Specifically, the individual Defendants failed to timely disclose material exculpatory evidence by waiting until the day of trial to disclose serological testing results conclusively demonstrating that the perpetrator is a non-secretor, thereby rendering this evidence unusable in any meaningful fashion to the defense.  Then, after Mr. Walter conducted his own serological testing, confirming that he is a secretor and therefore scientifically excluded from being the perpetrator, the individual Defendants caused Defendant O'Neal to commit perjury and falsely testify that the serological testing of the fluids recovered from the victim did not conclusively establish whether the perpetrator is a secretor.  Defendant O'Neal, at the hearing on Mr. Walter's motion for a new trial, committed such perjury and provided such false testimony.  Finally, the individual Defendants suppressed material exculpatory evidence of such fabrication of evidence, perjury, and false testimony.

134.     Had the individual Defendants' fabrications and/or the material exculpatory evidence known to them been disclosed, this evidence would have tended to prove Mr. Walter's innocence, cast doubt on the entire police investigation and prosecution, and impeached L.S.'s identification of Mr. Walter.

135.     The individual Defendants' misconduct did not cease with Mr. Walter's conviction, but continued through his exoneration, thereby prolonging his wrongful incarceration.

136.     The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1986 or 1988 would have believed that the individual Defendants' actions were lawful.

137.     As a direct and proximate result of the individual Defendants' actions, Mr. Walter was wrongly prosecuted, detained, and incarcerated for over thirty-five years and suffered the other grievous injuries and damages set forth herein.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Engaging in Violations of Due Process that Shock the Conscience*
*(United States Constitution Amendment XIV)*

#### Against the Individual Defendants

138.     Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

139.     In their drive to secure Mr. Walter's wrongful conviction and incarceration, the individual Defendants deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Mr. Walter's substantive due process rights under the Fourteenth Amendment.

140.     Specifically, the individual Defendants suppressed and failed to timely disclose material exculpatory evidence, fabricated evidence against Mr. Walter, engaged in the affirmative concealment of such misconduct, and engaged in additional, conscience-shocking misconduct that led to the wrongful incarceration of an innocent man.

141.     The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1986 or 1988 would have believed that the individual Defendants' actions were lawful.

142.     As a direct and proximate result of the individual Defendants' actions, Mr. Walter was wrongly prosecuted, detained, and incarcerated for over thirty-five years and suffered the other grievous injuries and damages set forth herein.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Failure to Intervene*

### Against the Individual Defendants

143.     Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

144.     By their conduct and under color of law, during the constitutional violations described herein, the individual Defendants stood by without intervening to prevent other Defendants and others yet unknown from violating Mr. Walter's constitutional rights, even though those individual Defendants had the opportunity to so intervene.

145.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Walter's clearly established constitutional rights.

146.     The individual Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1986 or 1988 would have believed the individual Defendants' actions were lawful.

147.     As a direct and proximate result of the individual Defendants' actions, Mr. Walter was wrongly prosecuted, detained, convicted, and incarcerated for over thirty-five years and suffered the other grievous injuries and damages set forth herein.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983

*Civil Rights Conspiracy*

**Against the Individual Defendants**

148.     Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

149.     The individual Defendants and others yet unknown agreed among themselves and other individuals to act in concert to deprive Mr. Walter of his clearly established rights not to be deprived of liberty without due process of law, and not to be illegally seized and detained.

150.     In furtherance of the conspiracy, the individual Defendants engaged in and facilitated numerous overt acts, including but not limited to the following:

a.   acting in concert to fail to timely disclose material exculpatory evidence, including but not limited to serological testing evidence demonstrating that the perpetrator is a non-secretor;

b.   acting in concert to fabricate evidence, including but not limited to false witness statements; and

c.   acting in concert to affirmatively conceal such misconduct.

151.    As a direct and proximate result of the individual Defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Walter was wrongly prosecuted, detained, convicted, and incarcerated for over thirty-five years and suffered the other grievous injuries and damages set forth herein.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant the City of New Orleans

152.    Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

153.    At all times relevant, Defendant the City of New Orleans was responsible for the policies, customs, and practices of the NOPD and the OPDA.

154.    The actions of each of the individual Defendants were undertaken pursuant to a policy, custom, and/or practice of the NOPD and/or the OPDA that included but was not limited to:

      a.    Suppressing and failing to timely disclose material exculpatory evidence;

      b.    Fabricating evidence, including but not limited to false witness statements; and

      c.    Engaging in the affirmative concealment of such misconduct.

155.    Prior to and at the time of the unlawful investigation, prosecution, and incarceration of Mr. Walter, the City, by and through its final policymakers, maintained a policy, custom, and/or practice of failing to adequately train, monitor, and supervise its employees regarding the constitutional duties to disclose exculpatory evidence and not to fabricate evidence, despite the obviousness that such training, monitoring, or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees had failed to

comply with these constitutional duties. The general practice of withholding exculpatory evidence, fabricating evidence, and failing to appropriately train, monitor, and supervise was so common and well established as to constitute official policy that fairly represented the City's official policy, custom, and/or practice.

156.    Prior to and at the time of the unlawful investigation, prosecution, and incarceration of Mr. Walter, the City, by and through its final policymakers, also maintained a policy, custom, and/or practice of failing to supervise and discipline misconduct.

157.    The City's final policymakers knew of these policies, customs, and practices, and implemented them with deliberate indifference to the likelihood that wrongful incarceration would result from them.

158.    The City's policies, customs, and practices were a moving force behind the denial of due process to Mr. Walter in that they directly caused police and prosecutorial improprieties and errors, including suppressing and failing to timely disclose exculpatory material to the defense, and presenting false testimony.

159.    As a result of these improprieties caused by the City's policies, customs, and practices, Mr. Walter was subject to criminal proceedings that offend fundamental principles of justice and transgress any principle of fundamental fairness, including because he was convicted, incarcerated, and denied a new trial as a direct result of intentional suppression of exculpatory information and the presentation of false testimony by NOPD and OPDA employees.

160.    The misconduct and constitutional violations committed by the individual Defendants in the course of the investigation and prosecution of Mr. Walter were carried out pursuant to these policies, customs, and/or practices of investigative misconduct, and were directly and proximately caused by the City's failure to train, supervise, and discipline investigators.

161.    As a direct and proximate result of the City's policies, customs, and/or practices, Mr. Walter was wrongly prosecuted, and continually detained for over thirty-five years and suffered the other grievous and continuing injuries and damages as set forth herein.

## SIXTH CAUSE OF ACTION

### Malicious Prosecution

*Louisiana State Law*

### Against the Individual Defendants

162.    Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

163.    The individual Defendants, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Mr. Walter to be prosecuted, detained, and incarcerated for the rape of L.S.

164.    Specifically, the individual Defendants suppressed until the day of trial material exculpatory evidence demonstrating that the perpetrator was a non-secretor; fabricated evidence by directing individual Defendant O'Neal to commit perjury and falsely testify about the serological testing results and, in Defendant O'Neal's case, committing such perjury and providing such false testimony; and failed to correct witness statements they knew to be false or misleading.

165.    The individual Defendants engaged in this conduct without concern for or consideration of the perceived guilt or innocence of Mr. Walter, and for no purpose related to any legitimate prosecutorial concerns.

166.    Mr. Walter is, and has consistently maintained that he is, innocent of the rape of L.S.  The Criminal District Court for the Parish of Orleans vacated his conviction and dismissed the charges against him in their entirety.

39

167.     As a direct and proximate result of the individual Defendants' malicious prosecution of Mr. Walter, Mr. Walter was wrongfully detained and incarcerated and served over thirty-five years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Wrongful Conviction and Wrongful Imprisonment**

*Louisiana State Law*

**Against the Individual Defendants**

168.     Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

169.     The individual Defendants acting separately and in concert, individually and in their official capacities did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Mr. Walter to be prosecuted, convicted, and incarcerated for an ongoing and continuing basis lasting over thirty-five years for a crime he did not commit.

170.     The individual Defendants intentionally, maliciously, and with reckless disregard for and deliberate indifference to his rights, suppressed and failed to timely disclose material exculpatory evidence, fabricated false evidence, and presented false argument and false facts to the court for the purpose of ensuring that Mr. Walter was detained, prosecuted, convicted, and incarcerated and to preclude judicial authorities from discovering the lack of probable cause for the prosecution and ongoing detention of Mr. Walter.

171.     As a direct and proximate result of the individual Defendants' wrongful imprisonment of Mr. Walter, Mr. Walter suffered the physical, emotional, and pecuniary damages as described herein.

**EIGHTH CAUSE OF ACTION**

**Negligence and/or Gross Negligence**

*Louisiana State Law*

**Against the Individual Defendants and Defendant City of New Orleans**

172.    Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

173.    The individual Defendants and City of New Orleans failed to take due care, and instead were negligent and/or grossly negligent in suppressing and failing to timely disclose material exculpatory evidence from Mr. Walter, and in fabricating evidence against Mr. Walter.

174.    It was foreseeable that, as a result of such negligence by the individual Defendants and City of New Orleans, Mr. Walter would be wrongfully detained and incarcerated, and in fact, Mr. Walter was wrongfully detained and incarcerated and served over thirty-five years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

**NINTH CAUSE OF ACTION**

**Intentional and/or Reckless Infliction of Emotional Distress**

*Louisiana State Law*

**Against the Individual Defendants**

175.    Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

176.    The individual Defendants, acting separately and in concert, individually and in their official capacities, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Mr. Walter's rights engage in extreme and outrageous conduct in connection with the detention, prosecution, conviction, and incarceration of Mr. Walter, including, without

41

limitation, prosecuting Mr. Walter without probable cause; suppressing and/or failing to timely disclose material exculpatory evidence, including without limitation serological testing results showing that the perpetrator was a non-secretor; fabricating false evidence, including without limitation about the serological testing results; and presenting false argument and false facts to the court for the purpose of ensuring that Mr. Walter was indicted, detained, and incarcerated.

177.     The individual Defendants desired to inflict severe emotional distress on Mr. Walter or knew that severe emotional distress would be certain or substantially certain to result from their joint and several conduct.

178.     As a direct and proximate result of the individual Defendants' joint and several extreme and outrageous behavior, Mr. Walter suffered severe emotional distress for which he is entitled to damages.

## **TENTH CAUSE OF ACTION**

### **Vicarious Liability**

*Louisiana State Law*

**Against Defendant the City of New Orleans**

179.     Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

180.     At all times, the individual Defendants were acting within the scope of their employment and as agents for the City of New Orleans.

181.     Consequently, the City of New Orleans is liable under the doctrine of *respondeat superior* for any and all tortious actions of its employees and agents.

## ELEVENTH CAUSE OF ACTION

### Violations of the Louisiana State Constitution

*Louisiana State Law*

### Against the Individual Defendants and Defendant City of New Orleans

182.   Mr. Walter repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

183.   The Louisiana State Constitution, like the United States Constitution, guarantees a person's right to be secure in his person and effect from unreasonable seizure, to equal protection of the law, to due process of law, to be free from discrimination, to be free from cruel, excessive, or unusual punishment, and to additional unenumerated rights.  *See* La. Cost. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, & 24.

184.   By reason of the same intentional, malicious, reckless, and deliberate conduct that violated Mr. Walter's rights under the United States Constitution, the individual Defendants and the City of New Orleans's conduct violated the rights guaranteed to Mr. Walter under Article I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, and 24 of the Louisiana State Constitution.

185.   These violations of the Louisiana State Constitution proximately and directly caused Mr. Walter to be wrongfully detained and incarcerated for a crime he did not commit, and suffer the additional physical, emotional, and pecuniary damages as described herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Sullivan Walter demands judgment against the above-captioned Defendants as follows:

a.  for compensatory damages to be determined at trial, but in all events no less than $50 million;

b.  for punitive damages against the individual Defendants in an amount to be determined at trial;

43

c.  for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.  for pre- and post-judgment interest as allowed by law; and

e.  for such other relief as this Court deems just and proper.

Dated:  August 25, 2023
        New Orleans, Louisiana

MURELL LAW FIRM

By: */s/ Christopher J. Murell*

Christopher J. Murell
La. Bar No. 32075
2831 Saint Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 (Tel)
chris@murell.law

SHANIES LAW OFFICE PLLC

By: */s/ David B. Shanies*

David B. Shanies* (T.A.)
Deborah I. Francois*
Eleanor C. Davis*
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

* Applications for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff Sullivan Walter*