# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

**<u>Report of Professor Laurie L. Levenson</u>**

Laurie L. Levenson
Professor of Law
Chair in Ethical Advocacy
Loyola Law School
919 Albany Street
Los Angeles, CA 90015
(213) 736-1149

1



## I.      INTRODUCTION

I have been asked by counsel for Robert Jones to assess to what extent the policies, practices and customs of the Orleans District Attorney's Office ("OPDA") complied with the constitutional requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny (hereinafter, "*Brady*"), including whether OPDA's training, supervision and discipline of its prosecutors was adequate to ensure compliance with their obligations under *Brady*.  I have also been asked by counsel for Mr. Jones to assess whether, in my opinion, these policies, practices and customs contributed to the wrongful convictions of Mr. Jones.  This report contains my opinions regarding the case of *Robert Jones v. Leon Cannizzaro, Jr.,* No. 18-cv-503, currently pending in the United States District Court for the Eastern District of Louisiana.

In reaching these opinions, I have reviewed various transcripts, exhibits, pleadings and judicial opinions in the criminal prosecution and post-conviction proceedings of Mr. Jones, as well as in these proceedings.  I have also considered the law applicable to the issues in this case, including pertinent case law and professional standards.  A list of the materials I have considered in forming my opinion is set forth in Appendix A.  My opinions in this report are based on the record developed in this case to date.  I may seek to supplement these opinions if additional facts are developed during discovery.

Based on my review of these materials, as well as my professional expertise and experience in this area, I have formed the following opinions, which are briefly summarized here and discussed more fully in this report:

- OPDA lacked proper policies and procedures to ensure its prosecutors' compliance with their legal obligations pursuant to *Brady*.  The problems with OPDA's operations with respect to *Brady* were systemic and not limited to mistakes by individual prosecutors.  Rather, the office operated in a manner that predictably led to its lawyers' repeated failures to comply with their *Brady* obligations.

- From at least the beginning of Orleans Parish District Attorney Harry Connick, Sr.'s tenure in 1974, OPDA, among other failings, did not: (1) issue and maintain an accurate, current and adequately detailed written *Brady* policy; (2) properly train its prosecutors regarding their obligations under *Brady*; (3) properly supervise the discovery practices of its prosecutors, including by investigating and tracking *Brady* violations; (4) discipline prosecutors who did not comply with their *Brady* obligations; (5) institute and maintain procedures to monitor and ensure the disclosure of *Brady* material, which were particularly necessary in light of OPDA's policy of withholding any documents that were not required to be disclosed by law; (6) institute and maintain procedures requiring its prosecutors to obtain favorable information from police officers; and (7) institute and maintain procedures for the proper handling, tracking and disclosure of *Brady* information in related cases and cases handled by multiple prosecutors.

- The absence of proper *Brady* policies and procedures at OPDA led to a continued pattern of *Brady* violations that was known or should have been known to OPDA; nevertheless, OPDA failed to properly acknowledge or respond to these *Brady* violations by instituting reforms of policies, procedures, or practices.

## II.     BACKGROUND AND PROFESSIONAL QUALIFICATIONS

I am a Professor of Law and David W. Burcham Chair in Ethical Advocacy at Loyola Law School in Los Angeles.  I also serve as the Director of the Loyola Project for the Innocent.  I have been a professor at Loyola Law School since 1989.  I teach criminal law, criminal procedure, ethics, evidence and advanced criminal law subjects.  Prior to joining the Loyola Law School faculty, I served as an Assistant United States Attorney ("AUSA") for the Central District of California from 1981 to 1989.  While working in the United States Attorney's Office, I served as Chief of the Appellate Section, an Assistant in the Major Frauds Unit, Chief of Training and as a regular line Assistant.  I also taught Professional Responsibility as an adjunct professor while I was working as a federal prosecutor.  During my tenure in the United States Attorney's Office, I received numerous awards and commendations, including the Attorney General's Director Award for Superior Performance.  Since leaving the office, I have been consulted by innumerable state and federal prosecutors and judges on a wide range of ethical issues, including discovery matters involving *Brady v. Maryland*.

I am a graduate of Stanford University and UCLA School of Law.  As noted in my attached resume, I have authored numerous articles and books regarding criminal law, including Handbook on the Federal Rules of Criminal Procedure, California Criminal Procedure and several articles concerning *Brady* and prosecutors' discovery obligations.  I lecture frequently regarding ethics, particularly on issues arising in criminal cases.  For the last 25 years, I have lectured on ethics for the Federal Judicial Center, including at programs for federal district court judges, United States Magistrates and circuit judges.

I have served on numerous Blue Ribbon Commissions that have provided oversight to local and state prosecutorial offices.  In particular, I was an expert on *Brady* and prosecutorial misconduct for the California Commission on the Fair Administration of Justice (2007), a special advisory council for the Los Angeles County District Attorney's Office (2004), the Webster Commission on the Response to the Rodney King riots (2006) and an Independent Commission appointed to review the Rampart Scandal involving the Los Angeles Police Department and the Los Angeles District Attorney's Office (2001).  Recently, I served on the Informant Policies and Practices Evaluation Committee, appointed to evaluate systemic problems in the Orange County District Attorney's Office.

I have served on both local and national task forces addressing prosecutorial ethics, including the recent American Bar Association ("ABA") Study on the ABA Standard for Prosecutorial Ethics (2010).  I am an author of California's recent ethics Rule 3.8 regarding prosecutors' obligations under *Brady v. Maryland*.  Through my academic and professional activities, I have become familiar with the *Brady* policies of both federal and state prosecutorial agencies.  I have also served as a *Brady* expert for both the prosecution and defense.

I have attached hereto my current résumé, which includes a list of prior expert engagements, as Appendix B.  I was engaged by attorneys for Robert Jones at a rate of $200 per hour to serve as an expert witness in this case.

### III.    BACKGROUND FACTS

#### A.    Robert Jones's Wrongful Convictions

In 1992, Robert Jones was arrested on suspicion of committing robbery, kidnapping, rape and murder in New Orleans's French Quarter.  Prosecutors alleged that, on the night of April 6, 1992, Mr. Jones robbed a group of friends—TP, her boyfriend LJ and a friend HT—at gunpoint, after which he forced TP into a car and drove her to the Desire Housing Project, where he took her into a building and raped her.

Eight days later, on the night of April 14, 1992, Bethany Acosta and her boyfriend, Patrick Van Hoorebeek, were robbed by a man with a gun.  Shortly thereafter, about a block away, Julie Stott and her boyfriend, Peter Ellis, were accosted by a man with a gun. The assailant shot and killed Ms. Stott when she and Mr. Ellis refused the suspect's demand that they lie down.

On April 17, 1992, a $10,000 reward was announced for information leading to the arrest and conviction of the person who shot and killed Ms. Stott.  Based on a Crimestoppers tip that Mr. Jones had implicated himself in the murder, officers from the New Orleans Police Department ("NOPD") prepared a photo lineup that included a picture of Mr. Jones.  Ms. Acosta chose Mr. Jones from the photo lineup.  NOPD Detective Debra Coffee, who had been investigating the April 6 rape case, also showed a photo lineup to TP.  The photo lineup was flawed and impermissibly suggestive because TP knew at least one and possibly several of the fillers used in the lineup, thereby eliminating those fillers as possible suspects.  TP then identified Mr. Jones as her assailant. The police cheered her selection in her presence, thereby reinforcing her belief that she had picked the right suspect.  Following TP's identification, on April 18, 1992, police arrested Mr. Jones for the robberies of TP, LJ and HT; the kidnapping and rape of TP; the murder of Ms. Stott; and the robberies of Ms. Acosta and Mr. Van Hoorebeek.

Following Mr. Jones's arrest, TP—whose identification of Mr. Jones had already been tainted by the faulty photo lineup and police reaction—identified Mr. Jones in a physical lineup. TP physically and vocally reacted to Mr. Jones walking on to the stage for the lineup, in front of LJ.  After TP identified Mr. Jones in the physical lineup, LJ also identified Mr. Jones.  HT and Ms. Acosta identified fillers.

The crimes Mr. Jones was arrested for committing occurred during a crime spree of similar crimes in or around the French Quarter that all occurred across two weeks in April 1992.    One week after the April 6 robberies, kidnapping and rape, on April 14, Ms. Acosta and Mr. Van Hoorebeek, were robbed by a man with a gun.  Shortly thereafter, the attempted robbery of Ms. Stott and Mr. Ellis and murder of Ms. Stott occurred one block away.  Approximately two hours after that, Teresa McKay and Latrice Robinson were robbed at gunpoint near where the Stott murder occurred.  Six days later, on April 20, 1992, Lorrell Woodfork and his girlfriend, Donna Freeman, were robbed at gunpoint at a location near the prior robberies.

Several days after Mr. Jones was arrested, the police located a car in the Desire Housing Project that matched the description of the car used in each of the crimes.  The car belonged to

Lester Jones,[1] who matched the description of the perpetrator who committed each of the crimes and owned a car that looked like the car used in each of the crimes. Specifically, each of the victims had described a perpetrator that was in his mid-20s to 30, with no mention of gold teeth. At the time, Lester Jones was 30 and did not have gold teeth, whereas Robert Jones was 19 and had gold caps covering his front teeth. Each of the victims also described a car that looked like Lester Jones's car, which was a 1980 burgundy Oldsmobile Delta 88 with a white landau roof. Several of the victims also identified Lester Jones as the perpetrator and identified his car as the car used during the crimes. Police further linked Lester Jones to the murder when they found the murder weapon in his bedroom at his mother's apartment. They also found items stolen during each of the robberies in Lester Jones's possession, including a necklace belonging to HT.

Despite this evidence against Lester Jones and the fact that the final crime spree crime was committed when Robert Jones was in prison, as well as the flawed witness identifications, OPDA proceeded with its prosecution of Robert Jones for the April 6 crimes. Prior to trial, Mr. Jones's attorney filed a motion for OPDA to identify any "exculpatory evidence favorable to the defense." OPDA responded that the only favorable information it had to disclose was that HT had identified another person in the lineup.

Trial occurred on March 11 and 12, 1996. At trial, Mr. Jones's attorney requested Detective Coffee's supplemental report, which Detective Coffee had testified contained the initial descriptions of the perpetrator made by TP, LJ and HT. The court denied his request. Thereafter, the OPDA prosecutor, Fred Menner, elicited testimony from TP that the perpetrator's "mouth was full of gold" and that she had been forced to enter and exit the perpetrator's car through the driver's side door. Mr. Menner also asked NOPD Detective Herman Cade, who investigated several of the crime spree crimes, "[d]o you know whether or not through your investigation Lester Jones knows Robert Jones?" Detective Cade responded "[y]es."

In his closing argument, Mr. Menner referred to these exchanges to bolster OPDA's case against Mr. Jones. First, Mr. Menner argued that it was reasonable that TP was the only witness who testified to the perpetrator having gold teeth, because the perpetrator had been trying to hide his gold teeth prior to the rape. Second, Mr. Menner argued that TP's credibility was strengthened by her recollection of being forced in and out of the driver's side door of the perpetrator's car, because the passenger's side door on Lester Jones's car was damaged and unusable. Third, Mr. Menner argued that, based on Detective Cade's testimony, "we know the defendant knows Lester Jones. That's uncontroverted . . . [T]here's a link between Lester and Robert, uncontroverted. It's never been denied, and we know it to be true." He also argued that it was "important" that Lester Jones and Mr. Jones knew each other, because "we can only assume . . . that [Robert Jones] borrowed the car from Lester Jones, and he gave him the jewelry in exchange for that."

At the time, OPDA had in its possession, but had not disclosed to Mr. Jones, information that directly contradicted each of these assertions. First, TP's initial description of the perpetrator—which was included in Detective Coffee's supplemental report that was not disclosed to Mr. Jones's attorney—stated that the perpetrator was 25 to 30, with no mention of gold teeth,

---

[1] Throughout this report, I refer to Robert Jones by his name or as Mr. Jones. I refer to Lester Jones by his name only.

contrary to TP's description at trial that the perpetrator's "mouth was full of gold."  Second, Detective Coffee's supplemental report also reflected TP's statement to police that she had entered the perpetrator's car through the passenger's side door—a statement that was inconsistent with her testimony at trial.  The supplemental report also reflected TP's statement to police that the car was in "excellent" condition—contrary to Mr. Menner's argument in support of TP's credibility at trial. As reflected in other police reports, Lester Jones's car had in fact been damaged on the passenger's side door weeks after the April 6 crimes.

Third, at the time of trial, OPDA was aware that there was no credible evidence that Mr. Jones and Lester Jones knew each other, and thus, OPDA had no basis for its argument that Mr. Jones had borrowed Lester Jones's car in exchange for items stolen during the robberies.  That is because the only evidence linking Mr. Jones and Lester Jones was Lester Jones's statement to police, made after Lester Jones was arrested for the murder of Ms. Stott and allegedly under duress, that he knew Mr. Jones and that Mr. Jones had used his car to commit several of the crime spree crimes in exchange for items stolen during the robberies.  However, prior to Mr. Jones's trial, Lester Jones told Mr. Menner that he was recanting this statement and that it had never been made. Mr. Menner memorialized the recantation in an internal memorandum he drafted shortly after Mr. Jones's trial (hereinafter, the "Menner Memo").  He wrote: "I met with Lester and he recanted the entire statement.  He acknowledged his signature but insisted that the statement was not made."[2] Thus, the Menner Memo indicates that Mr. Menner knew prior to trying Robert Jones that there was no connection between Robert Jones and Lester Jones, contrary to his argument at trial.

In addition, prior to Mr. Jones's trial, two NOPD detectives who had investigated several of the crime spree crimes, Detective Cade and Detective James Stewart, had formed the opinion that Robert Jones and Lester Jones did not know each other and that Lester Jones had committed all of the crime spree crimes alone.[3]  At least one of the detectives, Detective Stewart, had also shared his belief with OPDA prior to Mr. Jones's trial that there was no credible evidence linking Mr. Jones and Robert Jones, and that all of the evidence from the April 14 and 15 crimes, which

---

[2] Depo. Ex. 8 (Menner Memo). Two OPDA supervisors, First Assistant Camille Buras and Chief of Trials Michael Bollman, were aware of and signed the Menner Memo in 1996.  OPDA did not disclose the information in the Menner Memo to Mr. Jones until September of 2015.  *See id.*; *see also* Depo. Ex. 108 (E-mail from OPDA prosecutor David Pipes to Mr. Jones's attorney Emily Maw (Sept. 23, 2015)).

[3] Depo. Ex. 30 at ¶ 7 (James Stewart Affidavit, Sept. 26, 2013) ("[W]e investigated whether Lester Jones and Robert Jones knew each other. Our investigation found no credible evidence that they knew each other."); *id.* at ¶ 10 ("I did tell the DA we had no credible evidence against Robert Jones and that he was the wrong guy and all the evidence implicated Lester Jones, solely."); Depo. Ex. 31 at 24:20–25:1 (*State v. Jones*, No. 356-745, Tr. of PCR Hearing (Orleans Crim. Dist. Ct. Sept. 26, 2013)) (testimony by Detective Cade that he investigated the relationship between Lester Jones and Robert Jones and "could find no relation or known relation or friendship involving the two . . . there was . . . no connection"); *id.* at 26:25–26:28 ("We concluded the same person did everything . . . Lester Jones.").

he had investigated, implicated Lester Jones, and that Robert Jones was innocent.  OPDA never disclosed this information to Mr. Jones.[4]

Finally, at the time of Mr. Jones's trial, OPDA had in its possession, but did not disclose, numerous police reports and other documents with information supporting that Lester Jones was the sole perpetrator of the crime spree crimes and that Robert Jones was innocent.

Having been denied this critical exculpatory information, Robert Jones was convicted at trial of robbery, kidnapping and rape.  Knowing that he faced a life sentence for the rape, and based upon representations by Mr. Menner that a guilty plea to manslaughter could substantially reduce the amount of time he would spend in prison, Mr. Jones pled guilty to the manslaughter of Ms. Stott and several other robberies, including those of Ms. Acosta and Mr. Van Hoorebeek, rather than go to trial on the murder case.[5]  Mr. Menner negotiated this plea deal and his supervisors— Ms. Buras and Mr. Bollman—approved the deal without disclosing to Mr. Jones or his counsel that Lester Jones had recanted his statement and that there was no credible evidence to support the claim that Robert Jones was linked to Lester Jones or that Robert Jones was involved in the murder.

For the next 19 years, OPDA opposed Mr. Jones's continuous requests for any and all favorable information, by falsely stating to Mr. Jones and to Louisiana and federal courts that all such information had been produced to him.  Mr. Jones ultimately began to uncover OPDA's suppression of favorable information in the years following his convictions.  For example, in 2007, Lester Jones testified at a hearing in Mr. Jones's post-conviction proceedings that he had told officers that he did not know Robert Jones, but that he finally implicated Mr. Jones under duress when he was threatened with a beating during the interrogation process.  Lester Jones also testified that he had told OPDA prior to Mr. Jones's trial that he did not know Robert Jones and that he had only said that he did because he wanted to be free of the beating.  Yet, even after this disclosure, OPDA continued to oppose Mr. Jones's efforts to obtain a new trial under *Brady*, including on the ground that Lester Jones's "latter-day recantation" was "simply specious" and likely "fabricat[ed]"—arguments directly undercut by the Menner Memo sitting in OPDA's files.

---

[4] Instead of revealing to Mr. Jones that the detectives could not find any connection between Mr. Jones and Lester Jones, Mr. Menner misled the jury by the nature of his questioning of Detective Cade and his reliance on that misleading testimony during closing argument.  Depo. Ex. 57 at 74:22–24 (*State v. Jones*, No. 356-745, Trial Tr. (Orleans Crim. Dist. Ct. Mar. 11–12, 1996)); Depo. Ex. 86 at 25:14–26:1 (*State v. Jones*, No. 356-745, Tr. of PCR Hearing (Orleans Crim. Dist. Ct. Sept. 26, 2013)).

[5] It is clear from the transcript of Mr. Jones's plea that he understood that the plea deal offered by Mr. Menner covered each of these crimes, even though Mr. Jones did not receive any reduction in sentence for the robberies.  During the plea colloquy, Mr. Jones asked the judge if he was being sentenced to "21 years [] for the whole case" to which the judge responded "[t]hat's correct."  *See State v. Jones*, No. 356-745, Tr. of Sentencing Colloquy at 7:27–29 (Orleans Crim. Dist. Ct. Apr. 2, 1996) (OPDA-JONES00436).

On October 8, 2014, the State of Louisiana Court of Appeal, Fourth Circuit concluded that, based on much of the information above, OPDA had violated Mr. Jones's *Brady* rights with respect to the April 6 crimes and granted him a new trial.[6]  Finally, in September 2015, when OPDA was considering re-prosecuting Mr. Jones for the April 6 crimes, OPDA produced the Menner Memo to Mr. Jones.  The OPDA prosecutor who disclosed the Menner Memo to Mr. Jones reported to the court that it had been in "plain sight" in OPDA's file for the murder of Ms. Stott.[7]  OPDA subsequently consented to the vacatur of all of Mr. Jones's remaining convictions and dropped all charges against him.

## B.    OPDA's Long History of Violating *Brady*

OPDA's suppression of favorable information in Mr. Jones's case must be considered in context.  OPDA has a lengthy history of *Brady* violations that both predated and continued after Mr. Jones's wrongful convictions.  Specifically, OPDA has been cited in at least 45 cases, affecting 46 defendants, where courts found that OPDA violated *Brady* by failing to disclose favorable information to defendants.[8]  In addition, OPDA has acknowledged *Brady* violations in at least 8

---

[6] *See* Depo. Ex. 87 (*Jones v. Cain*, No. 2014-K-0226 (La. Ct. App. Oct. 8, 2014)) [hereinafter, "*Brady* Decision"] (finding OPDA violated Mr. Jones's *Brady* rights).  In granting Mr. Jones's petition for post-conviction relief, the court detailed several of the *Brady* violations in Mr. Jones's case.  However, the court did not address all of the *Brady* allegations at issue in this case, in part because the record before the court was incomplete due to OPDA's continued failure to disclose the information in the Menner Memo.

[7] *See State v. Jones*, No. 356-745, Tr. of Proceedings at 13:27–14:1 (Orleans Crim. Dist. Ct. Jan. 8, 2016) (OPDA-JONES15235).

[8] *Adams v. Cain*, No. 278-951, Joint Mot. to Vacate (Orleans Crim. Dist. Ct. May 12, 2014); *State v. Anderson*, No. 472-217 (Orleans Parish Cr. Dist. Ct. Mar. 7, 2010); *Bernard v. Connick*, No. 89-1916 (E.D. La. Apr. 8. 1991); *State v. Bright*, 875 So.2d 37 (La. 2004); *State v. Bright & Truvia*, No. 252-514 (Orleans Crim. Dist. Ct. Oct. 1, 2002); *State v. Bruer*, No. 504-599 (Orleans Crim. Dist. Ct. Nov. 9, 2011); *State v. Carney*, 334 So.2d 415 (La. 1976); *Clark v. Blackburn*, 632 F.2d 531 (5th Cir. 1980); *State v. Cousin*, 710 So.2d 1065 (La. 1998); *Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973); *State v. Curtis*, 384 So.2d 396 (La. 1980); *State v. Duncan*, No. 450-320 (Orleans Dist. Ct. July 29, 2008), *adopting State v. Duncan*, No. 450 320 (Orleans Crim. Dist. Ct. Aug. 19, 2005); *Floyd v. Vannoy*, No. 11 Civ. 2819, 2017 WL 1837676 (E.D. La. May 8, 2017), *aff'd*, 94 F.3d 143 (5th Cir. 2018); *State v. Henderson*, No. 250-716, Tr. of Colloquy (Orleans Crim. Dist. Ct. Mar. 25, 1993); *Hudson v. Butler*, No. 91-CV-140, Orders and Reasons (E.D. La. Mar. 10, 1993); *State v. Hunter*, 648 So.2d 1025 (La. Ct. App. 1994); *State v. Jeanmarie*, No. 354-016, Judgment (Orleans Crim. Dist. Ct. Apr. 24, 2002); *State v. Knapper*, 579 So.2d 956 (La. 1991); *Kyles v. Whitley*, 514 U.S. 419 (1995); *State v. Labran*, No. 388-287, Ruling Tr. (Orleans Crim. Dist. Ct. Oct. 3, 2001); *State v. Lee*, 778 So.2d 656 (La. Ct. App. 2001); *State v. Lewis*, No. 2006-KA-0730, 2006 WL 6912825 (La. Ct. App. Oct. 18, 2006); *State v. Lindsey*, 844 So.2d 961 (La. Ct. App. 2003); *Mahler v. Kaylo*, 537 F.3d 494 (5th Cir. 2008); *Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1979); *State v. Falkins*, 356 So.2d 415 (La. 1978); *State v. Gibson*, No. 203-904, Tr. of Colloquy and Testimony (Orleans Crim. Dist. Ct. Dec. 18, 1992); *Monroe v. Maggio*, No. 83-

cases, sometimes by offering defendants who alleged credible *Brady* violations plea agreements in exchange for withdrawing their *Brady* claims.[9]  Last, there have been at least 5 cases, affecting 7 defendants, with credible *Brady* claims where courts granted relief on other grounds.[10]  Of these 58 total cases, affecting 61 defendants, 39 cases, affecting 42 defendants, including the seminal United States Supreme Court case of *Kyles v. Whitley*, 514 U.S. 419 (1995), were tried before Mr. Jones' case, and violations in 23 of those cases, affecting 25 defendants, were discovered prior to Mr. Jones' trial.  Moreover, all of these violations involved *Brady* misconduct that was also present in Mr. Jones's case, such as suppression of police records, withholding prior inconsistent statements or other impeachment material, suppression of evidence implicating others in the crimes, or the failure to disclose other favorable information that undermined the state's theory of the case.

In short, OPDA's violation of Mr. Jones's *Brady* rights was not an isolated matter.  It was the product of a prosecutor's office that had adopted and stubbornly maintained systems that directly and persistently led to *Brady* violations, such that *Brady* violations by the office were a predictable result of the manner in which the office chose to operate.

## IV.    ANALYSIS OF THE CASE

---

6277, Order (E.D. La. Feb. 28, 1984); *State v. Morgan*, No. 367-809, Order (Orleans Crim. Dist. Ct. Jan. 24, 2014); *State v. Oliver*, 682 So.2d 301 (La. Ct. App. 1996); *Perez v. Cain*, No. 04-1905, 2008 WL 108661 (E.D. La. Jan. 8, 2008); *State v. Perkins*, 423 So.2d 1103 (La. 1982); *State v. Rideau*, No. 2001-K-0146 (La. Ct. App. May 7, 2001); *State v. Rosiere*, 488 So.2d 965 (La. 1986); *Robinson v. Cain*, 510 F.Supp.2d 399 (E.D. La. 2007); *Smith v. Cain*, 565 U.S. 73 (2012); *State v. Thompson*, 825 So.2d 552 (La. Ct. App. 2002); *Triplett v. Cain*, No. 04-1434, Order, ECF No. 43 (E.D. La. Sept. 29, 2011); *State v. Walker*, No. 372-370 (Orleans Crim. Dist. Ct. Aug 27, 1997); *State v. Warner*, No. 508-807 (Orleans Crim. Dist. Ct. Aug. 15, 2013); *State v. Washington*, 546 So.2d 1360 (La. Ct. App. 1989); *State v. Wells*, 191 So.3d 1127 (La. Ct. App. 2016); *In re Williams*, 984 So.2d 789 (La. Ct. App. 2008); *State v. Williams*, No. 199-523, Tr. of Colloquy (Orleans Crim. Dist. Ct. Feb. 19, 1997); *Williams v. Butler*, No. 88-CV-5718, Finding and Recommendation (E.D. La. Feb. 3, 1992), *adopted by Williams v. Butler*, No. 88-CV-5718, Order (E.D. La. Mar. 11, 1992).

[9] *State v. Burse*, No. 507-903 (Orleans Crim. Dist. Ct. Dec. 1, 2017); *Conway v. Cain*, No. 377-313 (Orleans Crim. Dis. Ct. Mar. 21, 2014); *State v. Duncan*, No. 290-908, Tr. of Boykinization (Orleans Crim. Dist. Ct. Jan. 7, 2011); *East v. State*, No. 375-708 (Orleans Crim. Dist. Ct. June 13, 2017); *State v. Johnson*, No. 261-130, Mot. To Vacate Conviction and Sentence (Orleans Crim. Dist. Ct. Feb. 7, 2018); *State v. Ross*, No. 244-391, Mem. to Hon. Joseph Bossetta from John Craft (Orleans Crim. Dist. Ct. Dec. 9, 1981); *State v. Tucker*, No. 482-303, Joint Motion to Vacate the Conviction and Sentence (Orleans Crim. Dist. Ct. Dec. 14, 2001); *State v. Wolfe*, No. 380-150 (Orleans Crim. Dist. Ct. June 16, 2017).

[10] *Johnson v. Cain*, 68 F.Supp.3d 593 (E.D. La. 2014); *State v. Parker*, 361 So.2d 226 (La. 1978); *State v. Ruano*, No. 500-456 (Orleans Crim. Dist. Ct. Mar. 28, 2017); *State v. Smith & Scire*, 600 So. 2d 1319 (La. 1992); *State v. Smith & Wilkerson*, 591 So.2d 1219 (La. Ct. App. 1991).

I have analyzed this case to determine both whether OPDA's policies, practices and customs complied with *Brady* and whether those policies, practices and customs contributed to the *Brady* violations in Robert Jones's case.  It is my finding that the policies, practices and customs adopted by OPDA with respect to *Brady* repeatedly and predictably led to violations of defendants' *Brady* rights—including Mr. Jones's.  In other words, it is my opinion that the manner in which OPDA structured the operations of its office—from its policy manuals and *Brady* practices, to the training, supervision and lack of discipline of its prosecutors, and to how OPDA responded to *Brady* violations—created a practice or policy of repeatedly violating *Brady* and led to OPDA's violation of Mr. Jones's constitutional rights under *Brady*.

### A.    Nature of *Brady* Requirements

Under *Brady*, the prosecution must disclose all "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v. Bagley*, 473 U.S. 667, 674 (1985) (quoting *Brady*, 373 U.S. at 87).  This obligation includes impeachment evidence, *see Giglio v. United States*, 405 U.S. 150 (1972), and does not depend on whether the defendant requests disclosure, *see United States v. Agurs*, 427 U.S. 97, 107–12 (1976).  Moreover, the obligation is not contingent on the prosecutor's assessment of the quality, admissibility or credibility of the evidence.  *See Lindsey v. King*, 769 F.2d 1034, 1040 (5th Cir. 1985) (holding that prosecutors may not withhold *Brady* material simply because they did not find the evidence credible and that such license risked "setting *Brady* at nought").

Under *Brady*, a prosecutor is responsible not only for exculpatory or impeachment materials in its files, but also for all exculpatory or impeachment materials in the possession of the prosecution team, including law enforcement officers.  *See, e.g.*, *Kyles*, 514 U.S. at 437 (noting that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").  In *Kyles*, the United States Supreme Court held that, as a member of the prosecution's team, favorable evidence in the possession of the police must be disclosed under *Brady*.  *See id.* at 438.  In addition, the Court stated that all statements that "throw the reliability of the investigation into doubt" must be disclosed*.  See id.* at 447.  Notably, the decision in *Kyles* arose from a prosecution by OPDA, and was issued less than one year prior to Mr. Jones's trial.

Moreover, the Supreme Court made clear in *Kyles* that the duty to provide exculpatory or impeachment information in law enforcement's possession to the defense was not a new duty.  Rather, it was a duty established in *Brady* (1963) and *Bagley* (1985), cases decided well before Mr. Jones's trial in this case.  *See Kyles*, 514 U.S. at 438 ("To accommodate the State in this manner [by limiting the *Brady* obligation to information in the prosecution's actual possession] would []amount to a serious change of course from the *Brady* line of cases.").  This rule, similarly, had been firmly established in the Fifth Circuit by the time of both the decision in *Kyles* and Mr. Jones's trial.  *See Smith v. State of Fla.*, 410 F.2d 1349, 1351 (5th Cir. 1969) (police are part of the prosecution team); *United States v. Antone*, 603 F.2d 566, 567–70 (5th Cir. 1979) (if investigators and prosecutors are part of the same government, the investigators' knowledge is imputed to the prosecutors); *United States v. Auten*, 632 F.2d 478, 480 (5th Cir. 1980) (prosecution must produce favorable information that was "actually or constructively in its possession" under *Brady* (quoting *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975))).

Finally, prosecutors have both a legal and ethical duty to disclose favorable information. Both of these duties existed before the trial of Mr. Jones.  The Supreme Court stated this legal duty in *Brady* in 1963, *Giglio* in 1972, *Agurs* in 1976, *Bagley* in 1985, and *Kyles* in 1995.  In 1969, the American Bar Association's Model Rules of Professional Conduct established an ethical obligation for prosecutors in a criminal case to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . . except when the prosecutor is relieved of this responsibility by a protective order of the tribunal."[11]   The Louisiana State Bar Association also adopted a substantially identical rule in 1971.[12]  Under these ethical rules, a prosecutor is required to disclose favorable information even where "the prosecutor believes that the information has only a minimal tendency to negate the defendant's guilt, or that the favorable evidence is highly unreliable."[13]

In my own experience during the past forty years—including as a prosecutor in a major urban area, as an academic studying and writing on this issue, and as a consultant working with numerous prosecutors' offices and with the judiciary to prevent wrongful convictions by increasing compliance with *Brady* requirements—these legal and ethical principles constitute the foundation of any prosecutor's obligations to safeguard these rights.  Having spent a career learning and applying these principles, I am familiar with how the policies, practices and customs of a prosecution office can lead to *Brady* violations and wrongful convictions.

Based on my experience, it is clear that OPDA's conduct in Mr. Jones's case was a particularly egregious violation of these principles.  I believe the conduct in Mr. Jones's case is an even starker example of *Brady* misconduct than the conduct in *Kyles*, which Justice John Paul Stevens described as involving "blatant and repeated violations of a well-settled constitutional obligation."  *See Kyles*, 514 U.S. at 455 (Stevens, J., concurring).  Perhaps more troublingly, OPDA's misconduct in Mr. Jones's case occurred at a time—less than one year after *Kyles*—when OPDA should have been acting to remedy its serious problem with *Brady* compliance.  Yet, despite the stark reminder of its *Brady* obligations in *Kyles*, there is no tangible evidence that OPDA changed its *Brady* policies, practices or customs in the wake of *Kyles*, nor did OPDA follow the rule in *Kyles*—that information that undermines the reliability of an investigation must be disclosed.

---

[11]  Model Rules of Prof. Conduct R. 3.8(d) (the "ABA Model Rule on Disclosure").  This rule was first included in the ABA's 1969 Model Code of Professional Responsibility.  ABA Standing Comm. on Ethics & Prof. Responsibility, Formal Op. 09-454 at 3 (2009).

[12]  *See* LSBA, Articles of Incorporation, Art. 16, EC 7-13 (1971); *see also Connick v. Thompson*, 563 U.S. 51, 66 n.8 (2011) (citing this rule and noting that "[t]he Louisiana State Bar Code of Professional Responsibility included a broad understanding of the prosecutor's duty to disclose in 1985").

[13]  ABA Standing Comm. on Ethics & Prof. Responsibility, Formal Op. 09-454 at 5 (2009).

### B.    *Brady* Violations in Robert Jones' Case

For purposes of my analysis, I have accepted as correct the Fourth Circuit's conclusion, as set forth in *Jones v. Cain*, 151 So.3d 781 (La. Ct. App. 2014) and Mr. Jones's allegations, that OPDA committed the following *Brady* violations in Mr. Jones's case:

1.  Failure to disclose the information in the Menner Memo that Lester Jones told Mr. Menner prior to Mr. Jones's trial that he recanted his post-arrest statement implicating Mr. Jones and that the statement had not been made;[14]

2.  Failure to disclose the fact that Detectives Cade and Stewart determined there was no connection between Mr. Jones and Lester Jones, that Mr. Jones was innocent, and that at least Detective Stewart told OPDA prior to Mr. Jones's trial that he thought there was no credible evidence linking Mr. Jones and Robert Jones, that all of the evidence from the April 14 and 15 crimes implicated Lester Jones, and that Robert Jones was innocent;[15]

3.  Failure to disclose TP's initial description of the perpetrator, which estimated the perpetrator's age as 25 to 30 with no mention of gold teeth, a description that was a closer match to Lester Jones, who was 30 years old at the time and did not have gold teeth, as opposed to Robert Jones, who was only 19 years old at the time and had gold caps covering his front teeth;[16]

4.  Failure to disclose that TP told Detective Coffee that she had entered the passenger's side door of the perpetrator's car and that the car was in "excellent" condition, given that these statements conflicted with TP's testimony and Mr. Menner's closing argument at trial;

5.  Failure to disclose that TP told Detective Coffee that the perpetrator told TP he was taking her to his "neck of the woods" prior to the assault, given that the assault occurred one block from where Lester Jones, not Robert Jones, lived;[17] and

6.  Failure to disclose the crime spree crime information, specifically, that there was a series of five criminal incidents in or around the French Quarter from April 6 through April 20,

---

[14] The OPDA First Assistant at the time Mr. Menner drafted the Menner Memo, Camille Buras, confirmed in her testimony in this case that, from her perspective, the Menner Memo was *Brady* material that should have been given to defense counsel.  *See* Buras Depo. at 311:25–312:12; 318:9–10; *see also* Cannizzaro Depo. at 174:7–13 (agreeing that the information in the Menner Memo should have been turned over and that it was not turned over at the time of trial).

[15] *See* Depo. Ex. 87 at 34 (*Brady* Decision).  Ms. Buras also testified that a detective's conclusion that a defendant is innocent should be disclosed to the defense.  Buras Depo. at 95:18–96:1.

[16] *See* Depo. Ex. 87 at 25 (*Brady* Decision).

[17] *See id.* at 28.

1992, in which a single perpetrator who fit the description of Lester Jones (in his mid-20s to 30, without mention of gold teeth) and drove a car that looked like Lester Jones's car (a 1980s maroon, burgundy or red car with a white landau roof), attempted to or did rob groups of two to three people, by using, in many of the crimes, a similar *modus operandi* (ordering the victims to lie down and/or kicking them) and a weapon consistent with the gun recovered from Lester Jones's mother's apartment; that Lester Jones was found in possession of items used in or stolen during each of the crimes; and that the final crime in the spree occurred on April 20, 1992, after Robert Jones was already in jail.[18]

This information was included in numerous documents that were in the actual or constructive possession of OPDA at the time of Mr. Jones's trial, but were suppressed from Mr. Jones, including: a 911 Call Log, dated April 7, 1992 (OPDA-JONES00012); Depo. Ex. 20 (Coffee Incident Report); Depo. Ex. 21 (Coffee Supplemental Report); Depo. Ex. 22 (Coffee Handwritten Notes); a 911 Call Log, dated April 15, 1992 (OPDA-JONES00888); an April 14, 1992 incident report (OPDA-JONES01539); an April 14, 1992 Criminal Investigation Bureau Report (OPDA-JONES01546); Bethany Acosta's April 15, 1992 statement to police (OPDA-JONES00840); Patrick Van Hoorebeek's April 15, 1992 statement to police (OPDA-JONES00846); NOPD Evidence/Property Cards dated April 22, 1992 (OPDA-JONES02263); a 911 Call Log, dated April 15, 1992 (OPDA-JONES00887); NOPD Criminal Investigations Bureau Homicide Section Information Dailies, dated April 14, 1992 (OPDA-JONES00813); Depo. Ex. 24 (Stewart Supplemental Report); Peter Ellis's April 15, 1992 statement to police (OPDA-JONES00842); Depo. Ex. 14 (Thomas Van Develde's April 22, 1992 Statement to Police); an April 23, 1992 Crime Laboratory Report (OPDA-JONES00635); an undated Major Offense Report Form (OPDA-JONES00811); Depo. Ex. 104 (an April 15, 1992 Criminal Investigation Bureau Report); Depo. Ex. 105 (an April 15, 1992 complaint history printout); an April 20, 1992 incident report (OPDA-JONES11125); Depo. Ex. 106 (an April 27, 1992 Criminal Investigation Bureau Report); an April 27, 1992 Criminal Investigation Bureau Report (OPDA-JONES00061); Depo. Ex. 13 (Memorandum from Roger Jordan (June 22, 1992)); and Depo. Ex. 15 (an August 11, 1992 Homicide Charge Conference Review Sheet). Additionally, information contained within the following documents was available to OPDA at the time of trial, but was not disclosed to Mr. Jones, including: Depo. Ex. 8 (Menner Memo); an Affidavit of Lester Jones, dated April 20, 2005 (OPDA-JONES10564); Lester Jones's testimony in *State v. Jones*, No. 356-745, Tr. of PCR Hearing (Orleans Crim. Dist. Ct. Dec. 17, 2007) (OPDA-JONES10911); an Affidavit of Lester Jones, dated July 24, 2013 (Jones00004378); Depo. Ex. 31 (Herman Cade's Testimony in *State v. Jones*, No. 356-745, Tr. of PCR Hearing (Orleans Crim. Dist. Ct. Sept. 26, 2013)); Depo. Ex. 156 (Affidavit of James Stewart, Sept. 26, 2013); and James Stewart's testimony in *State v. Jones*, No. 356-745, Tr. of PCR Hearing (Orleans Crim. Dist. Ct. Oct. 8, 2013) (OPDA-JONES11967).

It is my opinion that all of these *Brady* violations occurred as a result of OPDA's well-documented policies, practices and customs concerning *Brady*. By the time of the violations in Mr. Jones's case, OPDA had been repeatedly cited for *Brady* violations. Notwithstanding these repeated violations, OPDA failed to adopt policies, practices and customs that would bring the office into compliance with *Brady*. Instead, OPDA—particularly under the leadership of Mr. Connick—continued its practice of limiting discovery to the barest extent possible. In combination

---

[18] *See id.* at 29–31.

with the relative inexperience of OPDA's prosecutors, the near total lack of *Brady* training, daunting caseloads, and the pressure to win, it was entirely predictable that *Brady* violations would occur frequently at OPDA—and, indeed, they did, including in Mr. Jones's case.

### C.      OPDA Policies, Practices and Customs Leading to *Brady* Violations

In my opinion, several of OPDA's policies, practices and customs contributed to the *Brady* violations in Mr. Jones's case.[19]   I have identified from the discovery and records in this case, that those policies, practices and customs include that: (1) OPDA's statement of *Brady* duties for its prosecutors in its policy manuals was insufficient and erroneous; (2) OPDA provided insufficient training on *Brady* compliance and *Brady* issues for its prosecutors; (3) OPDA provided insufficient monitoring and supervision of its prosecutors to ensure compliance with *Brady*; (4) OPDA had insufficient disciplinary procedures for addressing *Brady* violations and did not discipline prosecutors who did not comply with their *Brady* obligations; (5) OPDA required prosecutors to withhold documents that were not required to be disclosed by law, without adopting sufficient safeguards to ensure that *Brady* was nonetheless complied with; (6) OPDA did not require its prosecutors to obtain favorable information from police officers; (7) OPDA did not institute or maintain procedures for the proper handling, tracking and disclosure of *Brady* information in related cases and cases handled by multiple prosecutors; and (8) despite court decisions finding repeated *Brady* violations by OPDA, OPDA leadership failed to acknowledge that OPDA had a problem with *Brady* compliance and did not act to remedy the office's relevant policies, practices and customs in order to ensure compliance with *Brady*.

Even the current Orleans Parish District Attorney, Leon Cannizzaro, Jr., has acknowledged that OPDA's *Brady* policies, practices and customs during much of Mr. Jones's criminal proceedings, and specifically during the tenure of Mr. Connick, were unsound and institutional. In 2014, he stated in a prepared speech that "[i]n the decades preceding my administration, the District Attorney's office [that is, under Mr. Connick, from 1974 to 2003] had been in a steady state of decline.  Over the course of that time period, bad policy decisions took root and became institutional," and as a result of the *Brady* claims in the case *Thompson v. Connick*, "some of those policy decisions had collateral consequences in the form of civil liability against the office."[20]   I agree with this observation.   There were deeply "root[ed]" and "institutional" problems at OPDA—problems that were the direct result of "bad policy decisions" with respect to *Brady*—that created an operation and environment in which *Brady* violations were inevitable and repeated, and that led to OPDA's violations of Mr. Jones's constitutional rights under *Brady*.

---

[19] My references to OPDA's polices, practices and customs refer to those in force at OPDA during the tenure of Mr. Connick, unless I state explicitly to the contrary or refer to testimony or other evidence concerning other time periods at OPDA.

[20] Depo. Ex. 49 at 3 (Leon Cannizzaro, 2014 Annual State of the Criminal Justice System Speech). The current OPDA First Assistant, Graymond Martin, also noted in prepared remarks that, when he came to OPDA, "[t]he District Attorney's Office was dysfunctional."  *Panel on Prosecutorial Immunity: Deconstructing Connick v. Thompson*, 13 LOY. J. PUB. INT. L. 305, 322 (2012).

1.      **Inaccurate and Inadequate Policy Manuals**

OPDA's policy manuals were extremely limited with respect to *Brady*, providing guidance that was not only misleading and wrong as to prosecutors' *Brady* obligations, but that also failed to provide adequate direction as to how the office's prosecutors should approach their *Brady* duties. Specifically, OPDA's written policy regarding *Brady*—which was issued and re-issued in policy manuals on February 1, 1987,[21] March 8, 1997[22] and in August 1999,[23] each time under Mr. Connick's name—consisted of only one, short paragraph on prosecutors' *Brady* obligations. It stated:

> In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so called <u>Brady</u> material—that is, information in the possession of the State which is exculpatory regarding the defendant. The duty to produce <u>Brady</u> material is ongoing and continues throughout the entirety of the trial. Failure to produce <u>Brady</u> material has resulted in mistrials and reversals as well as extended court battles over jeopardy issues. In all cases, a review of <u>Brady</u> issues, including apparently self-serving statements made by the defendant, must be included in a pre-trial conference and each Assistant must be familiar with the law regarding exculpatory information possessed by the State.[24]

This policy is both glaringly incorrect and inadequate. First, although this policy was issued more than twenty years after the *Brady* decision, it begins by inaccurately stating that *Brady* obligations are triggered by a judicial order issued in response to a defense request for the disclosure of *Brady* material. Of course, a prosecutor's *Brady* obligations do not depend on a specific request by defense counsel or on a court order. Second, as established in *Giglio*, a prosecutor's duties are not limited to strictly "exculpatory" materials. 405 U.S. at 155. They also

---

[21] Depo. Ex. 1 (1987 Manual); *see* Depo. Ex. 120 at ¶ 7 (Harry Connick Affidavit, *Cousin v. Small*, No. 00-0069 (E.D. La. Jan. 15, 2001)) (stating that the written *Brady* policy at section 5.25 of OPDA's policy manual was "[t]he only policy on *Brady* in my office").

[22] Depo. Ex. 32 (1997 Manual). Ms. Buras acknowledged that the 1997 Manual's *Brady* provision under section 5.25 is "verbatim" from the original 1987 policy. Buras Depo. at 23:13.

[23] Depo. Ex. 33 (1999 Manual). While OPDA has produced other manuals, *see, e.g.*, Depo. Ex. 37 (1989 Manual); OPDA-JONES07672 (1993 Manual), there are no *Brady* sections included, and both Mr. Connick and Ms. Buras have stated under oath that OPDA's written *Brady* policy remained the "same' from 1987 until at least 2001 and 1998, respectively. Depo. Ex. 120 at ¶ 7 (Harry Connick Affidavit, *Cousin v. Small*, No. 00-0069 (E.D. La. Jan. 15, 2001)); Depo. Ex. 78 at ¶ 5 (Camille Buras Affidavit, *Cousin v. Small*, No. 00-0069 (E.D. La. Jan. 16, 2001)). Val Solino, OPDA's former Chief Executive Assistant District Attorney and its 30(b)(6) witness in this litigation, agreed that section 5.25 was unchanged from 1987 to 1999. Solino Depo. at 23:6; 66:21–23; 69:20; 75; 81:19–21.

[24] Depo. Ex. 1 at THOMPSON-000434 (1987 Manual).

include information, whether from a witness or any other source, which undercuts the prosecution's case.  There is no reference to impeachment materials at all in the policy.  Third, the policy erroneously suggests that *Brady* disclosures need only occur "[i]n most cases," and not in every case tried by OPDA.  Fourth, the policy states that only "information in the possession of the State" need be disclosed, despite the fact that "the State" referred to OPDA and OPDA alone— and not NOPD, as clearly required by *Kyles*.[25]  Finally, the policy's reference to "self-serving statements made by the defendant" is both inaccurate and inflammatory.  It is inaccurate and inflammatory to suggest that a defendant's favorable statements are nothing but "self-serving" remarks that may or may not exculpate the defendant.  There is ordinarily a separate discovery obligation to disclose to the defense any statements made by the defendant.[26]  By lumping such statements into the general *Brady* policy, OPDA seems to be minimizing the importance of the *Brady* rule by suggesting that it may serve no purpose other than requiring the disclosure of a defendant's "self-serving" remarks.  This passage reflects both OPDA's misunderstanding of and disdain for the *Brady* rule.

Particularly in an office with OPDA's track record, the *Brady* policy ought to have included, but failed to include, guidance on the following aspects of *Brady* compliance: (1) how prosecutors should determine whether evidence is favorable;[27] (2) to what extent impeachment material should be considered as *Brady*;[28] (3) to what extent an investigation that focuses on another possible suspect constitutes *Brady*; (4) how to address witness recantations; (5) whether

---

[25] Connick Depo. at 106:21–107:17 (Q: "What's your understanding of what is meant in this document by 'State'?  Who is 'State'?  A: The – the prosecution. . . .  I thought that it meant me.").

[26] *See, e.g.*, La. Code Crim. Proc. Ann. art. 716 (1987) ("Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph or otherwise reproduce any relevant written or recorded confession or statement of any nature, including recorded testimony before a grand jury, or copy thereof, of the defendant in the possession, custody, control, or knowledge of the district attorney.").

[27] Bigelow Depo. at 88:5–12 (OPDA "assumed" prosecutors were aware of "what the current law is" and there was no written direction); Menner Depo. at 43:2–5 (OPDA did not provide any guidelines on how to determine whether something was favorable and needed to be disclosed as *Brady* material).

[28] According to Mr. Bigelow, there was no OPDA policy or practice regarding whether a witness statement that was inconsistent with other evidence needed to be turned over under *Brady*. Bigelow Depo. at 47:9–15.  Former OPDA First Assistant Ms. Bane testified that prior inconsistent statements were turned over only when they were exculpatory.  Bane Depo. 151:24–152:10.  Ms. Buras also testified that there was not a written policy requiring prior inconsistent witness statements to be disclosed, Buras Depo. at 71:9–11, and Mr. McElroy could not identify any such policy beyond section 5.25, McElroy Depo. 49:1–17.  While Mr. Connick thought that prior inconsistent witness statements were required to be disclosed, he did not know if there was a written policy documenting that.  Connick Depo. at 35:22–36:13.

prosecutors should be considering the materiality of exculpatory information when making disclosure decisions;[29] (6) the timing of *Brady* disclosures;[30] (7) the responsibility of prosecutors to determine whether other prosecutors or law enforcement officials have possible *Brady* material; (8) the process for obtaining advice as to whether to disclose *Brady* materials; (9) specific examples from prior cases that demonstrate failures in the office's responsibility to satisfy its *Brady* duty, as well as summaries of relevant case law; and (10) to what extent prosecutors should disclose undocumented *Brady* material.[31]

The deficiencies in the so-called *Brady* policy were evident enough that Mr. Cannizzaro readily conceded that this policy was inconsistent with prosecutors' *Brady* obligations as of 1987—the year OPDA issued the written policy.[32] Further, not a single former OPDA leader could explain why this policy was riddled with inaccuracies, beyond asserting that the policy was "bare bones"[33] and that prosecutors could learn their responsibilities through training.[34] This response might explain why the policy is so short, but it does not explain why it is flagrantly inaccurate. There is absolutely no reason why an accurate statement of *Brady* responsibilities could not have

---

[29] Mr. Connick testified that "[m]ateriality was very important" under OPDA's policy. Connick Depo. at 32:11. However, according to Mr. Bigelow, OPDA did not have a policy or practice of instructing prosecutors how to define materiality under *Brady*. Bigelow Depo. at 45:20–24; 49:21–24. Indeed, even Mr. Connick testified that there was no guidance to prosecutors as to whether exculpatory information was material; rather, "[t]hey were supposed to figure it out themselves." Connick Depo. at 33:11–15.

[30] Mr. Connick testified that the policy was to turn over *Brady* material "immediately," but that policy was not documented in any written policy or elsewhere. Connick Depo. at 36:20–37:11. Former OPDA First Assistant Timothy McElroy said disclosure must be timely, but admitted there was no clear objective standard for that what meant. McElroy Depo. at 54:24–55:15; *see also* Solino Depo. at 102:1–103:21.

[31] Neither Mr. McElroy or Mr. Bigelow could identify such a policy. McElroy Depo. at 43:24–45:6; Bigelow Depo. 46:24–47:2.

[32] Leon Cannizzaro Depo. at 105:5–109:4, *Adams v. City of New Orleans*, No. 15-1543 (E.D. La. Feb. 17, 2017).

[33] Buras Depo. at 29:20. It is particularly disturbing that those responsible for issuing the policy have attempted to explain away its inaccurate presentation of *Brady* responsibilities by saying that a prosecutors' responsibilities for accurately following *Brady* "goes without saying." *Id.* at 32:10. The very purpose of a manual is to accurately state a policy, rather than depend on what individuals might or might not know and follow without the written policy.

[34] *Id.* at 29:17–18.

been presented in the manual.[35]   Despite these obvious deficiencies, Mr. Connick could not identify any effort to revise, correct or update this *Brady* policy during his final 16 years as the policymaker for OPDA.[36]   Other leaders at OPDA confirmed that the written policy was never changed under Mr. Connick.[37]

It is thus undisputed that this policy was OPDA's operative written *Brady* policy at the time of Mr. Jones's trial in 1996.[38]   That raises three particularly concerning problems.   First, the policy manual clearly states that employees should "take the opportunity to read the manual thoroughly" and "[e]mployees of this office are required to read and follow the policies in this manual."[39]   Thus, at the time of Mr. Jones's trial, OPDA had in place an undoubtedly

---

[35] *Id.* at 32:15–18.   Contrary to Mr. Connick's assertion that "it was impossible to keep up with the [*Brady*] cases as it related to putting them into the manual," Connick Depo. at 16:9–10; *see also* Connick Depo. at 74:15–75:4, Feb. 20, 2017 ("I didn't . . . rush to the manual to change it . . . I didn't have time for that."), the fact that Mr. Cannizzaro has promulgated an improved written *Brady* policy proves that it was possible for OPDA to correct the *Brady* policy under Mr. Connick, *see* Leon Cannizzaro, Jr., *Brady* Policy (OPDA-JONES07924).

[36] Connick Depo. at 24:8–23.   It does not appear to be disputed that Mr. Connick was the policymaker for OPDA during his tenure as District Attorney.   Connick Depo. at 9:10–16; Bigelow Depo. at 13:19–23; Buras Depo. at 11:13–17; McElroy Depo. at 10:15–20; Solino Depo. at 34:2–13.

[37] Buras Depo. at 19:17–18; Solino Depo at 79:7–10.   Further, Mr. McElroy testified in this matter that the 1987 Manual memorialized pre-existing *Brady* policy memoranda, and that OPDA "cut and paste [the 1987 manual] from various memoranda." McElroy Depo. at 28:1–21.   Mr. Connick has also testified that he issued policy memoranda beginning in 1974, and that the memoranda were the predicate for the 1987 Manual.   Connick Depo. at 41:22–42:5, Feb. 20, 2017; Connick Depo. at 22:24–23:6, May 26, 2005.   Thus, it appears that OPDA's written *Brady* policy was largely unchanged and deficient since Mr. Connick took office.

[38] None of the witnesses deposed in this case recall seeing any other policy manuals regarding *Brady*.   Connick Depo. at 30:8–9 ("I know that remained constant, that paragraph."); McElroy Depo. at 39:7–10 (acknowledging that section 5.25 was the *Brady* policy from 1987 until Mr. Connick left office in 2003); Buras Depo. at 19:15–22 (does not recall the manual ever being changed); Solino Depo. at 127:24–128:14 (there was one written *Brady* policy and it was section 5.25).

[39] Depo. Ex. 1 at THOMPSON-000415–16 (1987 Manual).   Mr. McElroy testified that OPDA prosecutors received copies of the manual, McElroy Depo. at 33:13–34:20; Mr. Solino testified that every prosecutor in the office presumably had a copy of the manual by at least 1993, Solino Depo. at 23:3–14; and former OPDA prosecutor Roger Jordan recalled receiving a manual when he started working at OPDA, Jordan Depo. at 33:16–17.   Mr. Connick testified that prosecutors, at a minimum, could review the manual in OPDA's library.   Connick Depo. at 221:19–24.

18

unconstitutional written *Brady* policy that all of its prosecutors were required to read and follow. Second, by the time of Mr. Jones's trial, courts had already found nearly 20 *Brady* violations by OPDA.[40]  Nonetheless, OPDA did not make any effort to update this policy or to create a separate, accurate *Brady* manual for its office.  Third, by the time of Mr. Jones's trial, the rule in *Kyles* regarding the disclosure of information in police possession had been the law of the Fifth Circuit for decades.  Given the Supreme Court's decision, one would have expected that OPDA would have conducted a top-to-bottom reexamination of the office's *Brady* policies, practices and customs.  Instead, OPDA did not even bother to update its plainly incorrect policy manual.[41]  Correcting its *Brady* practices and policies could have prevented the miscarriage of justice that occurred in Mr. Jones's case.

To mitigate the evident problems with his office's policy manuals, Mr. Connick now suggests that OPDA circulated *Brady* "memoranda" that summarized *Brady* cases and supplemented the written *Brady* policy.[42]  However, there is no documentary evidence suggesting that such memoranda existed.  In addition, several OPDA prosecutors do not specifically recall

---

[40] *Bernard v. Connick*, No. 89-1916 (E.D. La. Apr. 8. 1991) (recounting *Brady* finding from 1989); *State v. Carney*, 334 So.2d 415 (La. 1976); *Clark v. Blackburn*, 632 F.2d 531 (5th Cir. 1980); *State v. Curtis*, 384 So.2d 396 (La. 1980); *Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973); *State v. Falkins*, 356 So.2d 415 (La. 1978); *State v. Gibson*, No. 203-904, Tr. of Colloquy and Testimony (Orleans Crim. Dist. Ct. Dec. 18, 1992); *Hudson v. Whitley*, 979 F.2d 158 (5th Cir. 1992); *State v. Henderson*, No. 250-716, Tr. of Colloquy (Orleans Crim. Dist. Ct. Mar. 25, 1993); *State v. Hunter*, 648 So.2d 1024 (La. Ct. App. 1994); *State v. Knapper*, 579 So.2d 956 (La. 1991); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1979); *Monroe v. Maggio*, No. 83-6277, Order (E.D. La. Feb. 28, 1984); *State v. Perkins*, 423 So.2d 1103 (La. 1982); *State v. Rosiere*, 488 So.2d 965 (La. 1986); *State v. Washington*, 546 So.2d 1360 (La. Ct. App. 1989); *In re Williams*, 984 So.2d 789 (La. Ct. App. 2008) (recounting *Brady* finding from 1991 or 1992); *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991).

[41] Commentators have specifically noted that "[d]espite the Court's reversal of the defendant's conviction in *Kyles*, Connick made no documented changes to his Office's disclosure policies or procedures." *See, e.g.*, Ellen Yaroshefsky, *New Orleans Prosecutorial Disclosure in Practice After Connick v. Thompson*, 25 GEO. J. LEGAL ETHICS 913, 925 (2012).  Part of the reason OPDA did not update its materials after *Kyles* may have been that Mr. Connick was "satisfied" with the policy, Connick Depo. at 103:20–104:6, May 26, 2005, as well as Mr. Connick's documented antipathy toward the decision.  He has openly stated that he believed it was "unreasonable" for the Supreme Court to make prosecutors responsible for turning over evidence under law enforcement's control.  Connick Depo. at 66:22–67:18, Feb. 20, 2017.  Mr. Connick also mistakenly believed that *Kyles* was "an expansion of" prosecutors' responsibilities under *Brady*.  *Id.* at 75:21–22.  As noted, the law in the Fifth Circuit was exactly the same even before *Kyles*.

[42] Connick Depo. at 15:15–20:12.

receiving or reviewing such summaries or supplemental materials.[43]  Nor is there any indication of what cases were summarized, if any, and whether those summaries, if they existed, were accurate.[44]  Also, if there were such materials, they were not systematically compiled or integrated into the office policy.[45]  Even Mr. Connick testified that prosecutors did not "necessarily" receive copies of the memoranda.[46]  To the extent such memoranda in fact existed, failure to ensure that all of its prosecutors received this material was a critical shortcoming.  Turnover at OPDA was high and OPDA hired many of its prosecutors directly from law school.[47]  If memoranda were not compiled and distributed to these new attorneys—who may have joined the office without knowledge of *Brady* and its progeny—there would be no written material to accurately guide these inexperienced prosecutors in the execution of their *Brady* obligations.[48]  Such loose, ad hoc memoranda would also be insufficient to guide even senior prosecutors, because there is no indication that the memoranda in fact set forward the policy of the office with respect to *Brady*.[49]

Finally, the general proclamation that prosecutors knew they had to follow ethical rules that were not otherwise set forth in the policy manuals does not in any way substitute for an accurate policy on prosecutors' *Brady* responsibilities.  The purpose of a training or policy manual is for prosecutors to understand the specific nature of their *Brady* responsibilities, as well as the

---

[43] For example, Mr. Jordan and Ms. Bane recalled that copies of new *Brady* decisions were circulated, but could not remember their content.  Jordan Depo. at 83:8–18; Bane Depo. at 166:7–169:24; *see also* Cannizzaro Depo. at 131:24–132:13; McElroy Depo. at 29:1–6; 123:15–18.

[44] *Id.*

[45] *See supra* notes 21–23, 38.

[46] Connick Depo. at 223:12–14.

[47] Connick Depo. at 176:8–15; McElroy Depo. at 227:17–10.  It is particularly odd for OPDA to rely on the assumption that its prosecutors knew their duties related to *Brady* given that it does not appear that OPDA consistently confirmed that the individuals it hired—often right out of law school—had learned about *Brady* in their law school curricula.  Bigelow Depo. at 140:5–8 (not knowing if *Brady* was part of the required curriculum for law school graduates); McElroy Depo. at 226:5–21 (indicating that OPDA did not receive transcripts for every job applicant).

[48] *See* Connick Depo. at 25:17–21 (Mr. Connick could not say that old memoranda were distributed to new hires).

[49] Importantly, *Brady* policies are not only crucial to guide inexperienced prosecutors; senior prosecutors may also misunderstand the scope of their *Brady* obligations or, in the absence of strict guidance, adopt unconstitutional practices.  Given the known problems at OPDA, one would expect the office would not only have had a current, accurate and complete *Brady* policy, but also that the policy would have been updated and maintained as new violations by its prosecutors were discovered.

office's expectations as to how prosecutors would fulfill those responsibilities.  OPDA provided no valid, written policy to its prosecutors to guide their disclosure practices.  Likewise, general admonitions to prosecutors to err on the side of caution, to the extent they even occurred, fall short of creating an accurate and verifiable office policy to govern behavior.  Such admonitions would be particularly inadequate in the face of repeated reports that OPDA prosecutors were not meeting their discovery obligations, as demonstrated by, among other evidence, judges' public remarks criticizing OPDA's failure to comply with *Brady* and *Brady* reversals.[50]

Without a coherent and accurate written *Brady* policy, it is not surprising that prosecutors who lacked a clear understanding of *Brady* would make mistakes, that "aggressive" prosecutors would adopt unconstitutional practices, and that *Brady* violations would result.  As former OPDA First Assistant Timothy McElroy testified in this case, "everybody practiced [*Brady*] differently" at OPDA.[51]  In a prosecutor's office staffed by many inexperienced prosecutors, facing substantial caseloads and a pressure to win, it is inevitable that—if prosecutors must figure out *Brady* on their own as they go—violations will occur.  And they did.

## 2.    Insufficient Training on *Brady* Compliance for Prosecutors

*Brady* training at OPDA, to the extent it occurred, was insufficient.  Several former OPDA prosecutors have testified that they did not recall receiving any training on *Brady* at OPDA.[52]  Nor has OPDA produced any documentary evidence that training occurred prior to 2002,[53] and the

---

[50] For example, in 1997, the *New Orleans Time-Picayune* reported that *Brady* issues were surfacing in several OPDA cases and that, "[i]ncreasingly, Orleans Parish Criminal Court judges are voicing their dismay."  Depo. Ex. 113 (Pamela Coyle, *Lawyers Claim DAs Withhold Evidence*, TIMES-PICAYUNE (Sept. 21, 1997));  *see also supra* note 8.

[51] McElroy Depo. at 245:7–10.

[52] Eric Dubelier Depo. at 69:17–71:10, *Thompson v. Connick*, No. 03-2045 (E.D. La. Mar. 21, 2005) (former OPDA prosecutor Eric Dubelier did not recall any *Brady* training); Michael Riehlmann Test. at 729:6–8, *Thompson v. Connick*, No. 03-2045 (E.D. La. Feb. 7, 2007) (former OPDA prosecutor Michael Riehlmann did not recall any *Brady* training); Menner Depo. at 274:14–275:20; 276:16–18 (Mr. Menner could not recall specific trainings relating to *Brady* although the topic "could" have arisen in other trainings); *State v. Jones*, No. 356-745, Tr. of Mot. to Recuse at 73:32–74:8 (Orleans Crim. Dist. Ct. Dec. 15, 2015) (OPDA-JONES15133) (former OPDA prosecutor Graham Bosworth testified that there was no specific training given, and when *Brady* issues came up, prosecutors would learn "piecemeal"); *id.* at 62:11–15 (former OPDA prosecutor and interim District Attorney Keva Landrum-Johnson testified that she could not recall organizing any trainings while she was District Attorney); Pickett Depo. at 57:4–11 (former OPDA prosecutor Andrew Pickett testified that he did not recall any *Brady* training).

[53] The sole exception may be the 1997 Manual, which may have been compiled to train prosecutors on the unconstitutional written *Brady* policy discussed above.  *See* Buras Depo. at 20:1–24 (Ms. Buras did not recall what context the 1997 Manual was presented in, but suggested it may have been used in a CLE or training session); Solino Depo. at 74:25–75:17 (Mr. Solino thought the

documentary evidence provided of the training after that time is minimal.[54]  To the extent *Brady* training did occur, there is only limited and sometimes conflicting testimony as to whether OPDA offered formal training programs specific to *Brady*,[55] and no evidence of dedicated training to teach new prosecutors—who lacked any experience with *Brady*—about their discovery responsibilities.[56]  Thus, at least prior to Mr. Cannizzaro's tenure, there was no structured approach to ensure that OPDA prosecutors understood and were fulfilling their *Brady* responsibilities.[57]

---

document may have been used for training).  Although witnesses also referred to *Brady* memoranda as a potential source of training, as noted above, there is no tangible evidence that these memoranda existed and memories of such memoranda were, at best, sketchy.  Notably, if such memoranda did exist, they were not effectively deployed for training purposes: even after the facts in this case came to light—including that OPDA prosecutors made false statements to courts that concealed OPDA's *Brady* violation—no memoranda were circulated regarding the misconduct.  Pickett Depo. at 212:6–23.

[54] The earliest evidence of any training produced includes a "Course Attendance Report" for OPDA's Ethics & Professionalism CLE in 2002.  Depo. Ex. 2.  The document does not specify the curriculum; however, it appears to reflect that a one or two hour lecture occurred.  *Id.* Remarkably, Mr. Jordan, who was the only OPDA prosecutor ever disciplined by the State Bar for a *Brady*-related ethics violations, received six hours of credit for teaching the course.  *Id.*  The earliest training materials produced by OPDA that mention *Brady* are from 2010.  *See* Val Solino, *Presentation on the Special Responsibilities of Prosecutors* (Orleans Parish District Attorney's Office Dec. 3, 2010) (OPDA-JONES18976).

[55] Former OPDA prosecutor Donald Rowan recalled training sessions on the weekends but did not recall any of those sessions being about *Brady*.  Donald Rowan Depo. at 36:18–38:7, *Adams v. City of New Orleans*, No. 15-1543 (E.D. La. Dec. 20, 2016).  In his deposition in *Truvia v. Julien*, Mr. Connick could not recall any specific seminar at OPDA related to *Brady*.  Connick Depo. at 56:22–57:2, *Truvia v. Julien*, No. 05-0680 (E.D. La. May 8, 2007).  Ms. Buras conceded she was unsure whether the in-house CLE programs and other training provided ever focused exclusively on *Brady*.  Buras Depo. at 103:8–20; 105:13–107:11.  Ms. Bane initially could not recall any specific trial meetings related to *Brady* and could not remember how many times there were specific training meetings dedicated to *Brady*, but believed there was at least one such session, although she could not recall any specifics.  Bane Depo. at 169:18–20; 190:1–6.

[56] Mr. Rowan stated that, when he started at OPDA, his training was on the job.  Rowan Depo. at 32:6–33:6.  Mr. Jordan did not recall a formal orientation when he started at OPDA or formal orientation on *Brady*.  Roger Jordan Depo. at 33:24–34:5, *Adams v. City of New Orleans*, No. 15-1543 (E.D. La. Mar. 3, 2017).  Mr. Pickett testified that he received no formal training when he started at OPDA.  Pickett Depo. at 50:23–51:22.

[57] According to one witness, after Mr. Cannizzaro took office, OPDA held some annual meetings regarding prosecutors' *Brady* obligations.  Pickett Depo. at 67:18–68:19.

Instead, it appears that *Brady* was occasionally discussed at office meetings or in casual discussions among prosecutors.[58] But there is no evidence that these meetings or discussions were used to provide prosecutors with guidance on carrying out the full range of their *Brady* responsibilities—including the disclosures of specific types of reports, witness statements, favorable information from related cases or from investigators, contrary statements by witnesses, recantations by witnesses, statements by witnesses that they would not support the prosecution's case, problems with witness identifications, inconsistencies between witness statements and physical evidence in a case, and other such *Brady* information.[59] There is also minimal evidence that OPDA distributed even the most basic of education materials explaining a prosecutor's *Brady* responsibilities during these meetings or discussions.[60] Such informal, one-off discussions do not compensate for the absence of formal, consistent training on the full panoply of prosecutors' obligations under *Brady*.[61]

---

[58] Bigelow Depo. at 104:3–12 (OPDA relied on casual discussions among its prosecutors to train them on recent decisions); Jordan Depo. at 34:11; 36:23 (training was a "continuing process," including talking about lessons learned at weekly meetings); Menner Depo. at 274:15–275:17 (training consisted of Saturday morning meetings where several topics were discussed, including *Brady*).

[59] Also indicative of OPDA's failure to provide adequate guidance on *Brady* is the fact that multiple OPDA prosecutors responded to requests for *Brady* evidence by saying the defendant was "not entitled" to such evidence. *See, e.g.*, Depo. Ex. 123 (*State. v. Lindsey*, No. 319-721, Motion for Production, Inspection and Copying and State's Answer (Orleans Crim. Dist. Ct. 1987)); Depo. Ex. 124a (*State v. Knapper*, No. 270-437, Prayer for Oyer and Answer (Orleans Crim. Dist. Ct. 1979)).

[60] Although Mr. Connick said that Mr. Solino, as Chief of Appeals, would have been responsible for preparing and issuing memoranda about new decisions that were handed down, Connick Depo. at 21:7–19, Mr. Solino had no specific recollections of preparing any materials that included information about *Brady*, except for a vague recollection of a handout related to *Kyles*, Solino Depo. at 252:6–254:14. Mr. McElroy also could not recall any training documents that were distributed to OPDA prosecutors, aside from court decisions. McElroy Depo. at 50:16–24.

[61] The need for formalized training on important topics was not a secret at the time of Mr. Connick's tenure at OPDA. The National District Attorneys Association ("NDAA") has long advised the creation of training programs. National Prosecution Standards, § 1-5.3 ("Prosecutors should participate in formal training and education programs [and] . . . should seek out continuing legal education opportunities that focus specifically on the prosecution function."). Other national organizations have also assisted in sharing training best practices since at least the 1970s. *See generally* Nat'l Ass'n Att'ys Gen., Comm. Office Att'y Gen., Prosecutor Training and Assistance Programs (1972); Nat'l Ass'n Att'ys Gen., Comm. Office Att'y Gen., Training and Assistance Programs for Local Prosecutors (1978). Similarly, both the NDAA and the ABA have long

The core of OPDA's approach to *Brady* training was simply to instruct its prosecutors to comply with *Brady*.[62]  Even Mr. Connick described *Brady* training at OPDA as consisting of on-the-job learning by prosecutors responding to defense lawyer motions.[63]  OPDA thus left it to individual prosecutors, including those who were brand new or overwhelmed with trial assignments, to ascertain whether there was any *Brady* material to be disclosed to the defense—a training approach even Mr. Cannizzaro referred to as a "baptism by fire."[64]  The result of this approach was that junior prosecutors were left without formal guidance as to their *Brady* obligations and senior prosecutors were left to develop fundamental misunderstandings of those obligations.  While such a dilatory approach would have been inadvisable in any office, it was particularly inexcusable at OPDA—an office that, by the time of Mr. Jones's trial, was or should have been well aware of its failings with respect to *Brady* compliance.

Moreover, OPDA had a ready trove of training material that it could have, but did not, deploy—each and every one of the dozens of court decisions finding that the office had violated *Brady*.  OPDA could have created comprehensive training materials from its own prior reversals to ensure that the same disclosure violations would not be repeated.  But OPDA failed to take even this obvious step.  Indeed, while some former OPDA leaders claimed that OPDA occasionally circulated *Brady* opinions,[65] it is telling that, to this day, every senior OPDA prosecutor who was

_____

suggested that offices provide prosecutors with handbooks and manuals to "guide the exercise of prosecutorial discretion."

[62] For example, Mr. Connick has previously testified that OPDA's *Brady* policy was "to follow the law."  Connick Depo. at 59:2–12, May 8, 2007.  Mr. McElroy stated that the last sentence of the written *Brady* policy put prosecutors "on notice that [the policy] may be static but the doctrine may be dynamic" and that prosecutors needed to stay up-to-date with what the law on *Brady* was.  *See* McElroy Depo. at 37:18–38:14.

[63] Connick Depo. at 48:10–49:1, May 8, 2007.

[64] Cannizzaro Depo. at 119:23; *see, e.g.*, *supra* note 56; Pickett Depo. at 51:9–22 (training at OPDA was "learn on the job").

[65] While some former OPDA leaders testified that *Brady* cases were circulated, they generally could not identify any particular decision that was circulated, *see, e.g.*, Buras Depo. at 106:8–107:11; McElroy Depo. at 123:6–18, and no prosecutor was able to produce any *Brady* case that was purportedly distributed, *see, e.g.*, Buras Depo. at 108:10–16; McElroy Depo. at 122:17–123:5; *see also* Solino Depo. at 149:22–4.  Even Mr. Connick could only testify that his chief of appeals was "supposed to" prepare and circulate summaries of new appellate decisions, but he did not know if this was actually done.  Connick Depo. at 20:2–21.  Instead, it appears prosecutors may have had the option of perusing case summaries, but there is no evidence that the practice was consistent or required.  *See* Cannizzaro Depo. at 130:22–133:4; Bigelow Depo. at 103:3–7.  And, even if cases were disseminated, there is no evidence that they were accompanied by written

asked claimed not to know anything about nearly every decision handed down during his or her tenure that found that OPDA had violated *Brady*.[66]

With adequate training, OPDA could have prevented the ongoing *Brady* violations that plagued its office.  However, OPDA did not make such efforts.  Instead, OPDA resisted taking even the most modest steps to ensure *Brady* compliance.  OPDA's position is encapsulated in an exchange in January 1998 between Orleans Parish Criminal District Court Judge Calvin Johnson and Mr. Connick.  That month, dismayed by the "behavior of some of [OPDA's] assistant district attorneys" with respect to *Brady*, Judge Johnson wrote to Mr. Connick to remind him of OPDA's legal and ethical responsibilities under *Brady*, propounded the virtues of an "open file" discovery policy (which Mr. Connick had refused to adopt), and asked that Mr. Connick circulate seminal *Brady* cases (including *Brady*, *Giglio*, and *Kyles*) to his prosecutors.[67]  Judge Johnson copied every OPDA prosecutor.[68]

Mr. Connick scoffed at the request, responding to "Calvin" that he was "aware of, and follow[ed], the rules of professional conduct" and that it was OPDA's policy "to do likewise."[69] He continued that "what sometimes is or is not *Brady* is not etched in large black letters on a field of white.  What some judges, or courts, consider to be *Brady* is sometimes ridiculous to the extreme.  The United States Supreme Court, as you are aware, is unable to reach a unanimous opinion in this regard."[70]  Mr. Connick's response—which mischaracterizes *Brady* as an ethical, not legal, obligation, and mocks the notion that the *Brady* rule is knowable, much less teachable— is nothing other than a rebuke of a judicial plea that OPDA's prosecutors comply with their *Brady* responsibilities.  Mr. Connick did not even deign to circulate the referenced opinions to his prosecutors.[71]  Given Mr. Connick's public disdain for the *Brady* doctrine, it should come as little

---

guidance or policy statements to assist prosecutors in understanding or applying the decisions. Buras Depo. at 110:9–15.

[66] Bane Depo. at 215:12–216:11; Bigelow Depo. at 128:3–12; Buras Depo. at 215:24–223:17; Solino Depo. at 265:8–267:3.  Mr. Cannizzaro, who in addition to being District Attorney since 2008 was also a judge on the Orleans Parish Criminal District Court and the Louisiana Fourth Circuit Court of Appeals, admitted that he was "not familiar" with specific OPDA *Brady* cases aside from *Thompson* and *Kyles*.  Cannizzaro Depo. at 98:7–99:15.

[67] *See* Depo. Ex. 3 (Letter from Hon. Calvin Johnson, Jan. 5, 1998).

[68] *Id.*

[69] *See* Depo. Ex. 76 (Letter from Harry Connick, Jan. 12, 1998).

[70] *Id.*

[71] Connick Depo. at 130:10–20; Solino Depo. at 174:2–23.  Mr. Connick also could not identify any training that was provided as a result of the letter from Judge Johnson.  Connick Depo. at 134:9–13.  Ms. Buras, the First Assistant at the time of the letter, also had no recollection of the

surprise that OPDA's training practices evinced a similar disregard for compliance with disclosure obligations and *Brady* violations resulted.

### 3.    Insufficient Disciplinary Procedures for Addressing *Brady* Violations

OPDA lacked a consistent system to discipline its prosecutors who committed *Brady* violations. As an initial matter, even Mr. Connick could not detail in his deposition how OPDA's disciplinary system worked, and several former prosecutors testified that they could not recall any discipline being imposed as a result of a *Brady* violation.[72] At most, Mr. Connick and some former OPDA prosecutors could only consistently recall two possible instances in the history of OPDA during which an active OPDA prosecutor was disciplined for a *Brady* violation, despite a record of dozens of violations committed by the office.

First, Mr. Connick has suggested that he may have disciplined one prosecutor, James Dugan, for a *Brady* violation.[73] However, Mr. Connick's account of this episode has varied and he testified at one point that he "sympathized" with Mr. Dugan because it was impossible for Mr. Dugan to have made it through all the files, given how heavy the docket was.[74] To the extent Mr. Dugan faced any repercussion for his conduct, it amounted to no more than Mr. Connick telling him to "try to avoid that in the future."[75] This was the sum of actions taken by Mr. Connick despite the fact that Mr. Dugan's conduct spurred Judge Johnson to write his 1998 letter to Mr. Connick calling on every OPDA prosecutor to stop the office's repeated failure to comply with *Brady*.[76]

Second, Mr. Connick suggested that he disciplined another prosecutor, Roger Jordan, for his violation of *Brady*. Mr. Jordan had a history of *Brady* violations while at OPDA in the 1990s and early 2000s. The Louisiana Supreme Court found that Mr. Jordan failed to disclose "obviously exculpatory" information in the case of Shareef Cousin, specifically, initial statements made to the police by the sole eyewitness to identify Mr. Cousin that she could not identify the perpetrator

---

decisions being circulated and did not recall any changes to policy or practices at OPDA following the letter. Buras Depo. at 155:5–25.

[72] Connick Depo. at 159:9–24; 161:17–162:12. Ms. Bane, Mr. Bigelow, and Ms. Buras did not recall anyone being disciplined during their OPDA tenures, which spanned from 1975 to 1998, collectively. Bane Depo. at 207:2–7; Bigelow Depo. at 133:25–134:6; Buras Depo. at 173:3–7; *see also* Menner Depo. at 282:6–8 (not aware of anyone being disciplined by OPDA for a *Brady* violation).

[73] Connick Depo. at 86:4–88:3, May 26, 2005; Connick Depo. at 9:25–16:16, Feb. 20, 2017.

[74] Connick Depo. at 14:6–15:4; 25:16–26:6, Feb. 20, 2017; Connick Depo. at 87:16–88:3, May 26, 2005.

[75] Connick Depo. at 87:16–88:3, May 26, 2005; Connick Depo. at 16:11–16, Feb. 20, 2017.

[76] *See* Connick Depo. at 9:20–10:16, Feb. 20, 2017.

because she was not wearing corrective lenses at the time of the crime.[77]  Mr. Jordan also failed to disclose a favorable witness statement in the case of James Walker, prompting a judge to reprimand the prosecutors from the bench, saying that they "had an obligation as an officer of this Court" to turn over *Brady* evidence when they became aware of it and the information they had failed to disclose was "Hornbook *Brady* law."[78]  Ultimately, to "salvage" the trial, the judge instructed the jury that prosecutors had neglected to give Mr. Walker's attorneys information that might be favorable to his case.[79]  Mr. Jordan was also the lead prosecutor in Juan Smith's case, which resulted in a decision by the United States Supreme Court that OPDA had violated *Brady* by failing to disclose that the sole eyewitness had told police prior to trial that he could not identify the perpetrators.[80]  Mr. Jordan also prosecuted Mr. Jones and has admitted involvement with the false *Brady* response in his case.[81]  While only the violations in Mr. Cousin's and Mr. Walker's cases had come to light when Mr. Jordan was still active at OPDA, the violations were no trivial matter. For example, the violation in Mr. Cousin's case allowed OPDA to secure a death sentence against Mr. Cousin, who was convicted at the age of 17 and became one of the youngest people sentenced to die in the country.[82]

---

[77] *State v. Cousin*, 710 So.2d 1065, 1066 & n.2 (La. 1998).  Mr. Jordan was subsequently charged by the Office of Disciplinary Counsel and sanctioned by the Louisiana Supreme Court for suppressing the evidence.  Depo. Ex. 115 at 5 (*In re Jordan*, No. 04-B-2397 (La. June 29, 2005)). In these disciplinary proceedings, Mr. Jordan made the incredible assertion that the suppressed statement was not material because it was inculpatory—not exculpatory—since the witness recounted specific details about the defendant's clothing and socks.  *Id.* at 10.  Notably, Mr. Cousin's trial occurred just four months prior to Mr. Jones's trial.

[78] *State v. Walker*, No. 372-370, Tr. of Proceedings at 12:11–30 (Orleans Crim. Dist. Ct. Aug. 27, 1997).

[79] *Id.*; Jordan Depo. at 105:17–106:13; *see also* Pamela Coyle, *Attorney's Debate Disrupts Murder Trial Judge Rebukes Prosecutors for Not Disclosing Facts*, TIMES-PICAYUNE (Aug. 28, 1997).

[80] *Smith v. Cain*, 565 U.S. 73, 75–76 (2012).  Mr. Jordan was also referred to disciplinary counsel for his conduct in Mr. Smith's case.  Jordan Depo. at 112:10–23.  Notably, Mr. Menner was also a prosecutor in Mr. Smith's case and signed OPDA's false discovery response prior to trial.  *See* Menner Depo. at 264:17–20; *State v. Jones*, No. 356-745, Tr. Evid. Hearing at 129:1–28 (Orleans Crim. Dist. Ct. Jan. 23, 2017) (OPDA-JONES08319).

[81] Jordan Depo. at 138:21–139:19 (admitting that writing on the state's discovery response to Mr. Jones was his own); *see also* Depo. Ex. 6 at 3 *(State v. Jones*, No. 356-745, State's Answer to Application for Bill of Particulars and Mot. for Discovery and Inspection (Orleans Crim. Dist. Ct.)).

[82] James Varney, *DA Drops Murder Charge Inmate on Death Row Was Granted New Trial*, TIMES-PICAYUNE (Jan. 9, 1999).

Despite these egregious violations, OPDA's "discipline" of Mr. Jordan amounted to no more than a private discussion with Mr. Connick, who told Mr. Jordan not to commit any future violations.[83] There was no requirement that Mr. Jordan receive remedial training or face any other consequence as a result of his *Brady* violations.[84] Instead, Mr. Jordan rose in prominence in the office: he was promoted twice in the years following his violations, to Deputy Chief of the Violent Offender Strike Force and to Deputy Chief of Trials; received several salary increases; and Mr. Connick nominated him for an "Outstanding Prosecutor Award."[85] Mr. Jordan felt so warmly toward Mr. Connick at the end of his tenure at OPDA that, he thanked Mr. Connick in his resignation letter for "standing beside [him] in the toughest of times"—an admitted reference to the disciplinary proceedings against Mr. Jordan in the *Cousin* case.[86] Even Mr. Connick has admitted that Mr. Jordan probably should have been disciplined more than he was.[87]

Mr. Connick has tried to excuse this inadequate discipline record by claiming that OPDA could not discipline prosecutors who had already left the office at the time their *Brady* violations came to light.[88] But that ignores the fact that OPDA did not discipline several other prosecutors who were still in the office when their *Brady* violations were discovered.[89] It also does not explain why such light discipline was imposed on a repeat offender like Mr. Jordan. Additionally, it ignores the steps OPDA could have taken, but did not, to demand accountability from its former prosecutors, including by reporting former prosecutors to disciplinary bodies or opening criminal investigations into knowing acts of suppression. While OPDA prosecutors have committed dozens of documented *Brady* violations, the record reflects that OPDA reported prosecutors in only two cases involving *Brady* violations: Juan Smith's case and John Thompson's case, in which an

---

[83] Jordan Depo. at 103:3–14; Connick Depo. at 165:15–166:2; Connick Depo. at 35:25–36:5, Feb. 6, 2001.

[84] Jordan Depo. at 104:19–23.

[85] Connick Depo. at 36:6–13, Feb. 6, 2001; McElroy Depo. at 210:24–213:15; Jordan Depo. at 282:15–22.

[86] Jordan Depo. at 283:7–17; *see also* Depo. Ex. 35 (Resignation Letter from Roger Jordan, Dec. 19, 2002).

[87] Connick Depo. at 172:15–20.

[88] Connick Depo. at 154:24–155:23; Connick Depo. at 27:1–13, Feb. 20, 2017.

[89] For example, based on court records, it appears prosecutors from *State v. Falkins*, 356 So.2d 415 (La. 1978); *Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1979); and *State v. Rosiere*, 488 So.2d 965 (La. 1986) were still with ODPA when those violations were found by a court.

OPDA prosecutor knowingly withheld a blood report.[90]   Similarly, OPDA opened only one criminal investigation into a *Brady* violation, in Mr. Thompson's case, but the grand jury investigation was abandoned and no charges were brought.[91]

Finally, the argument ignores that OPDA could have warned its active prosecutors that *Brady* violations would result in discipline.  There is no evidence such warnings were issued.[92] Instead, Mr. Connick sent precisely the opposite message in his response to Judge Johnson, in which he lambasted the judge for identifying potential *Brady* misconduct and wrote that "I assure you that if any assistant has *knowingly and or willfully* violated any rules, I will deal with them appropriately."[93]   Thus, Mr. Connick made clear to prosecutors that only intentional *Brady* violations would have consequences.

In sum, there was relatively little incentive for OPDA prosecutors to fulfill their *Brady* obligations and almost no deterrent for those who ignored their *Brady* responsibilities.  OPDA's failure to warn prosecutors that *Brady* violations would result in discipline, Mr. Jordan's rise in stature at OPDA following his publicized *Brady* violations, and Mr. Connick's rejection of any discipline in all but the most serious *Brady* cases, when combined with the pressure to win imposed on all prosecutors at OPDA, all but incentivized OPDA prosecutors to not take their *Brady* obligations seriously.  Given Mr. Connick's ambivalence toward *Brady* compliance, it is not surprising that there was a consistent pattern of *Brady* violations.

**4.    Inadequate Supervision of *Brady* Practices and Violations, Including the Failure to Track and Investigate *Brady* Violations**

Prosecutors at OPDA, including inexperienced prosecutors handling serious cases, lacked adequate supervision of their *Brady* practices.[94]   OPDA's failure to adequately supervise prosecutors' *Brady* practices generally, and the lack of supervision of *Brady* decisions in individual cases, increased the chances that there would be repeated and serious *Brady* violations.

OPDA's manual does not set forth any requirement that supervisors review *Brady* compliance as part of case preparation.  Section 5.17 of the manual states that prosecutors should

---

[90] Connick Depo. at 158:5–159:2; Connick Depo. at 14:9–15:2, Feb. 6, 2001; Jordan Depo. at 111:7–112:24.

[91] *See* John Jerry Glas Depo. at 96:15–115:19, *Thompson v. Connick*, No. 03-2045 (E.D. La. Feb. 4, 2005).

[92] Bigelow Depo. at 134:19–135:1.

[93] Depo. Ex. 76 (Letter from Harry Connick Letter, Jan. 12, 1998) (emphasis added).

[94] Bane Depo. at 206:9–15 (agreed there was no process of reviewing individual cases for *Brady* compliance); Solino Depo. at 49:2–52:10 (no review of disclosures because there were too many cases).

conduct a pre-trial review of "Problem witnesses" and "Legal problems anticipated," but there is no requirement that problems with witnesses—such as witnesses recanting their testimony—must be disclosed to the defense, much less a general requirement that supervisors review prosecutors' decisions to disclose or not to disclose under *Brady*. OPDA has not provided any policies from at least prior to 2003 that describe in any way the supervisors' obligations to ensure that there is *Brady* compliance by their supervisees.

To the extent OPDA prosecutors were required to meet with their supervisors to review their cases pretrial, those meetings did not focus on reviewing what evidence had been provided in discovery or whether there was additional—evidence that should be disclosed to comply with *Brady*.[95] For example, former OPDA Chief Executive Assistant District Attorney Val Solino testified that as many as 80 cases were pretried with one or two supervisors every day throughout Mr. Connick's tenure.[96] Even assuming that not all of these cases received an equal amount of time or attention, it is inconceivable that an adequate discussion of the prosecutors' disclosure decisions could have occurred. That is confirmed by testimony from former OPDA prosecutors, who have stated that supervisors generally relied on the line prosecutor to proactively raise any potential *Brady* issues,[97] and that there "weren't specific checks and balances established to ensure that *Brady* was fulfilled."[98] For example, OPDA did not assign *Brady* coordinators, conduct regular reviews of prosecutors' discovery practices, audit its *Brady* compliance,[99] or provide *Brady*

---

[95] Connick Depo. at 263:10–23 (describing pretrial as general discussion of the case, but no mention of *Brady* compliance); Buras Depo. at 96:2–25 (describing general nature of pretrial meeting). Mr. Menner had no recollection of any specific document that directed that *Brady* material should be discussed at the pretrial. Menner Depo. at 70:14–17.

[96] Solino Depo. at 49:25–50:11.

[97] Bane Depo. at 116:22–117:1; Connick Depo. at 33:17–25.

[98] Bane Depo. at 149:25–150:12.

[99] Mr. Connick said he never had an outside expert or consultant audit the office's *Brady* policies because "[he] did not have to rely on . . . outside so-called experts, to let me know what to do or how I was doing." Connick Depo. at 64:17–15; *see also* Bane Depo. at 204:15–205:25; 206:16–20 (OPDA never sought to audit its compliance with *Brady* or have an outside consultant help in a review of its *Brady* compliance procedures); Bigelow Depo. at 54:9–11 (there were no audits of prosecutors' discovery responses); Buras Depo. at 198:24–199:3 (not aware of any efforts to identify all *Brady* cases over a period of time); Solino Depo. at 261:25–263:14 (not aware of any efforts to audit *Brady* compliance, bring in an outside consultant or create internal reports about compliance). Mr. Connick also never asked a senior prosecutor to sample cases to determine whether *Brady* had been complied with. Connick Depo. at 65:4–15; 66:7–15.

checklists to its prosecutors[100]—all measures that may successfully ensure or improve a prosecutor's office's compliance with *Brady*.

In addition, OPDA did not have a policy or practice that required prosecutors to report either their own or other prosecutors' *Brady* violations.[101]  Thus, there was no mechanism that would alert supervisors to *Brady* violations that occurred and the need to remedy them, other than post-conviction petitions or court decisions that could identify only a small portion of *Brady* violations long after they occurred.  Even the First Assistant who was at OPDA at the time of Mr. Jones' arrest acknowledged that there "most probably" should have been such a policy.[102]

Even when OPDA did become aware of *Brady* violations, there is no evidence that OPDA systematically tracked those violations, so that it could detect patterns (such as problem prosecutors or recurring types of *Brady* violations) and respond appropriately.[103]  There is no evidence that OPDA even attempted to compile a list of its *Brady* violations until late 1997, when Mr. Solino appears to have compiled a partial list of the office's *Brady* violations.[104]  There is no indication that the list was prepared in any effort to address and change office practices.  Rather, the memorandum was prepared as a resource for Mr. Connick to respond to media requests regarding *Brady* violations by his office.[105]  Mr. Solino updated the memorandum in 1999 and

---

[100]  While Mr. Connick recalled creating a checklist after *Kyles*, there is no documentary record of such a checklist and even Mr. Connick admits that, if it existed, it may never have been put into use. Connick Depo. at 41:1–43:8; 81:4–82:7.  Instead, the record reflects that, while OPDA had a detailed pretrial checklist to guide its prosecutors handling of cases under Mr. Connick, there is no mention of *Brady* on the list.  *See* Depo. Ex. 50 at 1 (Case Review and Trial Checklist).  Rather, the checklist refers to prosecution motions to discover evidence *from* the defense.  *Id.*; *see also* Jordan Depo. at 77:22–78:17; 79:5–7 (no *Brady* checklist at OPDA); Buras Depo. at 89:1–18 (did not recall there ever being a pre-trial checklist for *Brady* disclosure).  The record reflects that OPDA did not institute a checklist covering common *Brady* material until 2011.  E-mail from Donna Andrieu Re: *Brady* Checklist (Dec. 9, 2011) (OPDA-JONES18797).

[101]  Buras Depo. at 207:5–12; Connick Depo. at 97:8–98:4; McElroy Depo. at 168:4–9; Bigelow Depo. at 125:2–16 (stating such a policy would "most probably" have been helpful).

[102]  Bigelow Depo. at 125:1–16.

[103]  Buras Depo. at 177:3–6; Solino Depo. at 261:19–24; Connick Depo. at 66:7–15; 94:5–8; McElroy Depo. at 148:9–149:7; Bane Depo. at 204:10–14; Bigelow Depo. at 113:23–25. According to Mr. Bigelow, no one at OPDA kept track of *Brady* violations by OPDA, Bigelow Depo 113:23–25, although such information would have been helpful, *id.* at 117:16–118:20.

[104] This initial memorandum appears to be missing, but a second version of the memorandum states that the initial memorandum was prepared in "September 1997."  Depo. Ex. 34 at 1 n.2 (Memorandum from Val Solino to Harry Connick).

[105] Mr. Solino testified that the memorandum was compiled to help Mr. Connick prepare for an "interview of some type surrounding *Brady*."  Solino Depo. at 210:14–211:13.  Notably, the *New*

2002, but does not recall the reason for doing so and admitted that there was no ongoing tracking system in the office for *Brady* violations.[106]   Mr. Cannizzaro's discovery responses in this case also suggest that there is no current system for tracking *Brady* violations at OPDA.[107]   In response to a request to identify each case in which a court found that OPDA had violated *Brady*, Mr. Cannizzaro responded that OPDA does not maintain a list of such cases and that it would be "unduly burdensome" for OPDA to create one.[108]   Similarly, OPDA did not implement a system to track *Brady* violations that may have led to plea bargains, *no lo contendere* pleas, actual or threatened mistrials, or dismissals.[109]   Thus, OPDA did not investigate, even after a series of *Brady* violations, the extent to which *Brady* errors were occurring in cases that did not result in an actual opinion or decision by the court.[110]   As a result, it appears OPDA still cannot reliably report how many times it has violated *Brady* or know where particular problems may lie.

Finally, it does not appear that OPDA systematically investigates the *Brady* violations it becomes aware of for purposes of improving its *Brady* policies and practices.[111]   That failure is evident from OPDA's conduct in Mr. Jones's case under Mr. Cannizzaro.   Rather than have a protocol for comprehensively investigating the violation, OPDA's Chief of Appeals, Donna Andrieu, appears to have only interviewed two witnesses following OPDA's disclosure of the

---

*Orleans Times-Picayune* published an account of OPDA's history of *Brady* violations the same month that Mr. Solino first compiled the list.  The article cited Ms. Buras for the proposition that "only 10 convictions since 1974 have been reversed on grounds that prosecutors withheld favorable evidence"—the same number of violations reflected in the memorandum (a marked undercount of the violations that had been identified by that time).  *See* Depo. Ex. 113 (Pamela Coyle, *Lawyers Claim DAs Withhold Evidence,* Times-Picayune (Sept. 21, 1997)); *supra* note 8.

[106] Solino Depo. at 214:13–217:9; Depo. Ex. 51 (Memorandum from Val Solino to Tim McElroy (Sept. 23, 2002)).  Even after three attempts, none of Mr. Solino's lists identified all of OPDA's *Brady* violations.  Solino Depo. at 215:24–221:5.  Further, OPDA did not undertake any policy review or implement any reforms in response to any of the cases in the lists.  *Id.* at 233:9–20.

[107] *See Jones v. Cannizzaro*, No. 18-503, Second Amended Responses to Pl.'s First Set of Interrogatories at 17 (E.D. La. Jan. 3, 2019).

[108] *Id.*

[109] McElroy Depo. at 148:12; 165:3–20; Connick Depo. at 96:18–22; Bigelow Depo. at 122:8–123:2; Buras Depo. at 203:8–206:18.

[110] McElroy Depo. at 163:25–164:24.

[111] According to Mr. Connick, there was no formal investigative process for *Brady* violations. Connick Depo. at 161:17–162:12; 165:3–12.

Menner Memo to Mr. Jones, and decided that any violation was inadvertent.[112]  Given the serious nature of the alleged *Brady* violations in this case, such an investigation seems cursory at best. However, because OPDA has no apparent protocol for investigating allegations of *Brady* violations, there is no way to know whether the investigation was focused on discovering failures by the office to prevent future violations or justifying OPDA's litigation positions.

## 5.     Inadequate Systems to Ensure *Brady* Compliance

The problems with *Brady* compliance at OPDA went beyond a failure to adequately train, supervise or discipline prosecutors.  The problems at OPDA were structural and cultural.  Under Mr. Connick, OPDA had a conservative approach to providing discovery.  Specifically, Mr. Connick set a specific policy against open file discovery[113] and repeatedly resisted attempts to open up discovery for the defense.[114]  Rather, he promulgated policy manuals instructing his prosecutors to withhold all documents that did not have to be disclosed under state law and ordered his prosecutors to parcel out discovery based on how "trustworthy" the prosecutors believed the defense lawyer to be.[115]  He also specifically instructed his lawyers not to give up any information that, in their opinion, did not fall within the *Brady* rule and placed the burden on the defense to scour files to determine what evidence might be missing.[116]  While prosecutors are not required to have open file policies, it can be problematic when even senior prosecutors are afraid of getting into trouble if they are liberal with their discovery practices.[117]  Thus, a prosecutor's office with

---

[112] Depo. Ex. 109; Depo. Ex. 110.  *See also State v. Jones*, No. 356-745, Tr. Evid. Hearing at 131:14–141:7 (Orleans Crim. Dist. Ct. Jan. 24, 2017) (OPDA-JONES15789).

[113] Bigelow Depo. at 181:20–24 (Mr. Connick did not have an open-file policy); Bane Depo. at 142:15–22 (OPDA had a closed-file discovery practice); Buras Depo. at 49:10–12 (OPDA did not have an open discovery policy); Solino Depo. at 117:9–24 (OPDA did not have an open-file discovery policy under Mr. Connick).  In his 2001 deposition, Mr. Connick said that "[t]he policy of the office [was] not to have open-file discovery."  Connick Depo. at 20:5–19, Feb. 6, 2001. OPDA's magistrate policy manual under Mr. Connick also instructed that, "if the code [of criminal procedure] articles do not clearly entitle the defense to the matter sought to be discovered, the defense is not entitled to discover it."  1999 Magistrate Division Manual at 25 (OPDA-JONES07713); *see also* 1994 Magistrate Division Manual at 31 (OPDA-JONES19897).

[114] Connick Depo. at 23:25–24:6, Feb. 20, 2017.

[115] Connick Depo. at 20:5–21:9, Feb. 6, 2001; *see also supra* note 113.

[116] *See* Depo. Ex. 113 (Pamela Coyle, *Lawyers Claim DAs Withhold Evidence*, Times-Picayune (Sept. 21, 1997)) ("Connick says his prosecutors are told if the information does not fall under the *Brady* rule, 'don't give it up.'").

[117] The First Assistant at the time of Mr. Jones's arrest, Mr. Bigelow, testified that he "didn't do open file discovery, but [he] turned over pretty much everything" and that that "was not Mr.

33

such a policy bears the burden of adopting safeguards to ensure that favorable material is disclosed. Mr. Connick did not adopt such safeguards at OPDA. Instead, my analysis of several of OPDA's specific discovery policies, practices and customs revealed numerous deficient procedures—or the absence of procedures—that, particularly in conjunction with Mr. Connick's message to prosecutors to err against disclosure, failed to comply with *Brady* and contributed to the *Brady* violations in Mr. Jones's case.

### a.    Supplemental Police Reports

Supplemental police reports are a crucial potential source of *Brady* information. Generally, NOPD officers only document initial information about an investigation in an initial report, such as where the crime occurred, the victim's identity and other factual information about the crime.[118] Supplemental reports, by contrast, document the entire investigation into the crime.[119] As part of Mr. Connick's policy against open discovery, OPDA discouraged the disclosure of supplemental reports, such that, "as a rule," supplemental reports were not provided to the defense.[120] This practice was particularly troublesome given the nature of supplemental reports, because, as this case demonstrates, key exculpatory evidence is often documented in supplemental reports. It was therefore critical for OPDA to have either a policy that supplemental reports were to be disclosed to the defense in every case or, if the reports were not to be disclosed, to enact safeguards to ensure

---

Connick's policy." Bigelow Depo. at 181:25–182:1. Mr. Bigelow admitted that he "might have got in trouble if [Mr. Connick] found out what [he] was doing." *Id.*

[118] *See, e.g.*, Coffee Depo. at 89:12–90:23.

[119] *Id.* at 178:22–179:2. Mr. Bigelow said it was "always the case" that the supplemental report contained more information than the incident report. Bigelow Depo. at 80:3–6.

[120] Menner Depo. at 35:4–36:13 (testifying that it was OPDA's practice to not turn over supplemental reports unless there was *Brady* material in the report); *State v. Jones*, No. 356-745, Tr. Evid. Hearing at 76:5–8; 77:25–78:8 (Orleans Crim. Dist. Ct. Jan. 23, 2017) (OPDA-JONES08319) (Mr. Menner testified that supplemental reports were not disclosed unless they contained *Brady* material and admitted that he did not think that was the best practice today); Jordan Depo. at 51:12–14; 53:2–3 (testifying that supplemental reports were not generally provided to the defense); Glas Depo. at 53:23–54:7 (supplemental reports were not turned over "as a rule"); Ralph Capitelli Depo. at 115:3–5, *Adams v. City of New Orleans*, No. 15-1543 (E.D. La. Jan. 11, 2017); James Williams Test. at 350:20–25, *Connick v. Thompson*, No. 03-2045 (E.D. La. Feb. 6, 2007) (under Mr. Connick's policies, a supplemental report was not an item required to be turned over by law and the office policy was not to turn them over unless ordered to do so by a judge); Solino Depo. at 114:9–117:7 (testifying that there was no policy in effect at the time of Mr. Jones's case requiring that supplemental reports be turned over); McElroy Depo. at 109:16–20 ("There was no office policy that required it."); Buras Depo. at 48:6–9 (no office-wide policy with respect to whether to disclose supplemental reports); *see also* Affidavit of Curklin Atkins at Ex. A (Dec. 3, 2012) (Jones00003343) (OPDA never produced supplemental reports).

34

that any favorable information in the reports was disclosed.   There is no evidence of such safeguards at OPDA.

Instead, OPDA repeatedly violated *Brady* by failing to disclose favorable information in these reports.[121]   That includes Mr. Jones's case, where the supplemental report in the April 6 crimes case—which OPDA apparently refused to provide despite Mr. Jones's attorney's request—reflected inconsistent statements that conflicted with both the victim's testimony and OPDA's argument at trial.[122]   In addition, the supplemental report in the murder case of Ms. Stott, which OPDA also did not disclose to Mr. Jones, included several pieces of favorable information that exculpated Mr. Jones of the crime spree crimes.[123]   Notably, the failure to disclose these supplemental reports in Mr. Jones's case occurred less than one year after the Supreme Court's decision in *Kyles*—in which the Court faulted OPDA for its failure to disclose information from NOPD.   Plainly, OPDA's policy against the disclosure of supplemental reports, in the absence of procedures to ensure the disclosure of favorable information in the reports, contributed to the *Brady* violation in Mr. Jones's case relating to the failure to disclose supplemental reports.

### b.   *Brady* Information in NOPD Files

At least under Mr. Connick, there was no policy or practice that required OPDA prosecutors to request *Brady* materials from the police or to inspect police files for possible *Brady* materials.[124]   That may be because, in Mr. Connick's opinion, OPDA prosecutors had no time to

---

[121] *See, e.g.*, *Adams v. Cain*, No. 278-951, Joint Mot. to Vacate (Orleans Crim. Dist. Ct. May 12, 2014); *State v. Bright & Truvia*, No. 252-514 (Orleans Crim. Dist. Ct. Oct. 1, 2002); *State v. Duncan*, No. 290-908, Tr. of Boykinization (Orleans Crim. Dist. Ct. Jan. 7, 2011); *Hudson v. Butler*, No. 91-CV-140, Orders and Reasons (E.D. La. Mar. 10, 1993); *State v. Jeanmarie*, No. 354-016, Judgment (Orleans Crim. Dist. Ct. Apr. 24, 2002); *State v. Lewis*, No. 2006-KA-0730, 2006 WL 6912825 (La. Ct. App. Oct. 18, 2001); *Mahler v. Kaylo*, 537 F.3d 494 (5th Cir. 2008); *State v. Gibson*, No. 203-904, Tr. of Colloquy and Testimony (Orleans Crim. Dist. Ct. Dec. 18, 1992); *State v. Oliver*, 682 So.2d 301 (La. Ct. App. 1996); *State v. Rideau*, No. 2001-K-0146 (La. Ct. App. May 7, 2001); *Robinson v. Cain*, 510 F.Supp.2d 399 (E.D. La. 2007); *State v. Williams*, No. 199-523, Tr. of Colloquy (Orleans Crim. Dist. Ct. Feb. 19, 1997); *State v. Wolfe*, No. 380-150 (Orleans Crim. Dist. Ct. June 16, 2017).

[122] *See* Depo. Ex. 21 (Coffee Supplemental Report); Atkins Depo. at 93:7–15; Coffee Depo. at 260:25–261:4.

[123] Depo. Ex. 24 (Stewart Supplemental Report).

[124] Connick Depo. at 50:17–51:2 (no policy or practice to get information from NOPD); Bigelow Depo. at 77:6–8 (never asked NOPD for all the favorable information); Jordan Depo. at 44:17–20; 45:12–22 (relied on NOPD to provide all the relevant information they had); Buras Depo. at 36:2–6 (prosecutors relied on NOPD to provide all the relevant information they had); Cannizzaro Depo. at 59:18–60:14 (describing that the police presented the reports to OPDA); Coffee Depo. at 118:4–8 (no recollection of a prosecutor ever asking her about *Brady* material not in her reports).

ensure that they were obtaining all favorable information from the police because "they had enough to say grace over without adding another responsibility."[125]  This was his position despite the clear command of *Kyles*.  Remarkably, Mr. Connick maintained this policy even though he knew that police did not always turn over favorable information to OPDA.[126]  Thus, OPDA established and maintained discovery practices that contributed to the likelihood that favorable information in the possession of the police would not be disclosed to the defense.

In my opinion, those practices contributed to the constitutional violation in Mr. Jones's case in at least two ways:[127]  OPDA failed to obtain or disclose Detective Coffee's handwritten notes reflecting TP's initial description of the perpetrator and her statement to police that the

---

[125] Connick Depo. at 50:17–23.

[126] *Id.* at 54:15–17.  Some witnesses testified that OPDA provided training to NOPD officers to encourage the disclosure of favorable information.  McElroy Depo. at 140:8–141:2; Connick Depo. at 55:17– 56:10; Solino Depo. at 254:16–257:2.  However, others were less certain as to when and whether such training occurred.  *See, e.g.*, Bigelow Depo. at 105:2–18 (believes OPDA must have provided training to NOPD, but no knowledge of any such training); Bane Depo. at 244:20–23 (not recalling any training offered by OPDA to NOPD regarding *Brady*); Stewart Depo. at 31:1–3 (no recollection of *Brady* training); no documentary evidence and only minimal, conflicting testimony that it occurred after *Kyles*, *compare* McElroy Depo. at 140:8–141:2 (stating that OPDA gave trainings on *Kyles* to NOPD commanders), *with* Jordan Depo. at 89:10–15 (did not recall any *Brady* training provided by OPDA to NOPD after *Kyles*).  Moreover, even if such training occurred, it would not have relieved OPDA of its obligation to seek out favorable information from police officers in specific cases.  OPDA's apparent reliance on NOPD officers to disclose favorable information on their own is particularly suspect given OPDA prosecutors' apparent low opinion of NOPD officers in the 1990s.  *See, e.g.*, McElroy Depo. at 90:12–21 (recounting that, in the 1990s, NOPD officers were corrupt and killing each other); Buras Depo. at 40:21–41:2 (recalling that NOPD was in "a sorry state of affairs on many levels").

[127] It is difficult to know which of the other numerous police reports OPDA did or did not obtain from NOPD prior to Mr. Jones's trial, given that OPDA lost its file for the April 6 crimes and did not produce information from the other files to Mr. Jones until years after his trial.

perpetrator said he was bringing TP to his "neck of the woods"[128] and other favorable information known to the police.[129]

### c.    Multiple Prosecutors

At least under Mr. Connick, OPDA had no written policy, or other practice or procedure, guiding how prosecutors who were handing off or taking over a case from another prosecutor were expected to proceed with respect to *Brady*.[130]  Such a system is important to ensure that prosecutors fully identify and advise fellow prosecutors of all *Brady*-related issues, so that there will be full compliance at any and all stages of the case.  The failure to have such a system is particularly dangerous in an office like OPDA, which experienced constant staff turnover and entrusted major cases to young and relatively inexperienced prosecutors.[131]  Without safeguards to ensure that prosecutors who join a case midstream are aware of all *Brady* information that had and had not been disclosed, there is a substantial risk that *Brady* material will slip through the cracks.  It is also a particular concern when a case is handled by multiple prosecutors and none of them comply with disclosing *Brady* information.  Such a violation suggests an endemic failure to produce *Brady* material, as opposed to failures that are isolated to individual prosecutors.

This very problem occurred in Mr. Jones's case, where the case passed through at least five prosecutors' hands before Mr. Jones was convicted, and where the prosecutor who made the initial (and inadequate) *Brady* disclosure was not the same prosecutor who handled the trial.[132]  Mr.

---

[128] Depo. Ex. 21 (Coffee Supplemental Report); Depo. Ex. 22 (Coffee Handwritten Notes).  As noted above, Detective Coffee's handwritten notes contained exculpatory evidence, but were never produced to the defense—in keeping with OPDA's practice of neither requesting nor disclosing police officer's handwritten notes.  *See* Connick Depo. at 49:11–15; Bane Depo. at 196:23–24; Bigelow Depo. at 74:23–24; Buras Depo. at 36:20–25; Jordan Depo. at 47:7–11, 50:7–15; McElroy Depo. at 102:8–12; Coffee Depo. at 75:6–13.  Mr. Menner, the trial prosecutor, testified that he had not received the handwritten notes, never asked for them, and believed it was the practice at OPDA at the time not to get or ask for such handwritten notes.  Menner Depo. at 24:16–25:4; 53:13–15; *see also* Tr. Evid. Hearing at 90:10–13 (Orleans Crim. Dist. Ct. Jan. 23, 2017) (OPDA-JONES08319) (Mr. Menner admitted he would not have known about the exculpatory evidence in Detective Coffee's handwritten notes).

[129] Depo. Ex. 87 at 34 (*Brady* Decision); Compl. ¶ 78–79.

[130] Some former OPDA prosecutors could not recall any such policy.  Bane Depo. at 245:22–246:3; Menner Depo. at 43:12–21.  Other prosecutors agreed that there was no official policy, and at most, said that a file should be kept in order to educate a successor.  McElroy Depo. at 64:3–15; Pipes Depo. at 69:6–18; Buras Depo. at 79:15–80:7; Solino Depo. at 62:12–65:8.

[131] Connick Depo. at 155:20–21; 176:8–15; Buras Depo. at 149:4–8; 150:4–5; McElroy Depo. at 189:9–15; 228:6–10; Solino Depo. at 129:11–14; 130:4–7.

[132] *See Jones v. Cannizzaro*, No. 18-503, Second Amended Responses to Pl.'s First Set of Interrogatories at 2 (E.D. La. Jan. 3, 2019); *compare* Depo. Ex. 6 (*State v. Jones*, No. 356-745,

Jones's case is also not an isolated one.  A review of just 28 *Brady* violation cases by OPDA supports that at least 39% of these cases involved prosecutors who handled discovery disclosures prior to trial, but who did not participate in the trial.[133]

### d.    Related Cases

It is critical that there be coordination among prosecutors on related cases to ensure that the prosecutors are aware of any *Brady* material in their case that may be in a related case file. Accordingly, a prosecution office must have a system in place to ensure that favorable materials from other cases are reviewed by prosecutors as part of their *Brady* responsibilities.  But OPDA, at least under Mr. Connick, lacked any written policy, or other practice or procedure, guiding how prosecutors should handle related cases with respect to *Brady*.[134]  At most, Mr. Solino testified that cases with related defendants were placed in the same court section, so they would be handled by the prosecutors assigned to that section.[135]  However, there was no guarantee that such cases would be assigned to the same section, much less that they would be handled by the same prosecutor in that section given OPDA's practice of appointing prosecutors not assigned to the sections to handle certain trials.  In addition, the practice did not account for the many different types of related cases that do not involve common defendants, such as cases involving common victims, witnesses, fact patterns, or suspects—like Mr. Jones's case.

The potential fallout of OPDA's failure is thus well illustrated by Mr. Jones's case.  Mr. Menner, the trial prosecutor on Mr. Jones's case, testified repeatedly that it was not his job to review the case files for any crimes beyond the April 6 crimes—including the other crime spree crimes that Mr. Jones and Lester Jones were charged with committing—and that he therefore did

---

State's Answer to Application for Bill of Particulars and Mot. for Discovery and Inspection (Orleans Crim. Dist. Ct.) (signed by Charles Lane), *with* Depo. Ex. 57 (*State v. Jones*, No. 356-745, Trial Tr. (Orleans Crim. Dist. Ct. Mar. 11–12, 1996) (state represented by Frederick Menner and Trina Thomas).

[133] Of the identified *Brady* cases, *see* Exhibits 2–3, discovery responses that were signed or listed a prosecutor's name were identified in 28 cases.  Of those 28 cases, the discovery responses in the cases of Norman Clark, Ronald Monroe, John Floyd, Roland Gibson, Errol Bernard, Norris Henderson, Larry Curtis, Alvin Jeanmarie, Darnell Lewis, Calvin Duncan, and Troy Wilkerson were signed by a prosecutor who did not appear at trial.  *See also* Depo. Ex. 113 (Pamela Coyle, *Lawyers Claim DAs Withhold Evidence*, TIMES-PICAYUNE  (Sept. 21, 1997)) (noting case where six prosecutors handled a case and none had turned over key *Brady* evidence to the defense); *see also* Buras Depo. at 143:19–22 (explaining that prosecutors frequently rotated in and out of Judge Calvin Johnson's section); Solino Depo. at 62:12–16 (describing that prosecutors were transferred between sections regularly).

[134] Bigelow Depo. at 49:25–50:14; Buras Depo. at 78:20–79:14; Jordan Depo. at 74:25–76:16; Menner Depo. at 43:12–15; McElroy Depo. at 61:23–64:2; Connick Depo. at 39:10–24.

[135] Solino Depo. at 134:8–135:13.

not review any of these files.[136]  If Mr. Menner's testimony is accurate, OPDA's failure to require Mr. Menner to be familiar with other cases connected to Mr. Jones's case contributed to OPDA's failure to disclose substantial *Brady* material in Mr. Jones's case.

### e.    Documenting Disclosures

It is imperative that prosecutors have a reliable practice for documenting the disclosure of *Brady* materials—particularly in an office, such as OPDA, with high prosecutor turnover and many novice prosecutors.  In the absence of such a policy or practice, it will be difficult or impossible for prosecutors taking over a case to reliably and consistently know what *Brady* disclosures have and have not been made, and for defendants to prove in post-conviction proceedings that favorable information has been withheld.  A failure to implement such a policy or practice therefore creates an environment where *Brady* violations are more likely to occur and to go undetected.  OPDA did not have such a policy, including a failure to maintain discovery logs or another specific system for documenting disclosures.[137]  The repercussions of such a failure are palpable in Mr. Jones's case, where Mr. Menner and OPDA now claim that a number of items of the *Brady* information described above were in fact disclosed, without any record support for that assertion.[138]

### f.    Post-Conviction Procedures

OPDA compounded all of these problems with *Brady* disclosure by not having a reliable system for reviewing post-conviction challenges based on *Brady*.  In addition to a near total lack of training, OPDA prosecutors responding to post-conviction *Brady* claims were not required to review a trial file when responding to such a claim, and could instead dispose of a claim as "efficiently" as possible by relying on procedural objections.[139]  If procedural objections failed

---

[136] Menner Depo. at 61:16–63:7; 98:3–100:1.

[137] McElroy Depo. at 57:21–58:2; Jordan Depo. at 63:4–18; 76:17–77:12; Bigelow Depo. at 60:5–20 (aside from responding to discovery requests, there was no consistent practice of documenting discovery disclosures).  Mr. McElroy testified that there were a "variety of methods" of documenting what information was conveyed to the defense, but that office policy did not require a specific method of documentation.  McElroy Depo. at 83:8–84:8.  Ms. Buras opined that problems with documenting discovery may have led to Judge Johnson's letter expressing frustration over OPDA's failure to comply with *Brady* responsibilities.  Buras Depo. at 144:13–145:11.  According to Mr. Solino, attorneys were told to make a record, but the actual practice of documentation varied from attorney to attorney.  Solino Depo. at 106:1–8.

[138] Menner Depo. at 33:13–15; 76:5–79:4; 129:13–131:3; Pipes Depo. at 119:22–120:24.

[139] *State v. Jones*, No. 356-745, Tr. of Mot. to Recuse at 93:6–13 (Orleans Crim. Dist. Ct.  Dec. 15, 2015) (OPDA-JONES15133); Tr. Evid. Hearing at 142:28–32 (Orleans Crim. Dist. Ct. Jan. 24, 2017) (OPDA-JONES15789) (Ms. Andrieu agreed that OPDA's policy when responding to applications for post-conviction relief was to litigate viable procedural bars before proceeding to the merits); Pickett Depo. at 79:5–14; 81:16.

and prosecutors were required to respond to a claim on the merits, they were not obligated by office policy to review related files or to speak with the trial prosecutor to determine whether a *Brady* claim had any merit.[140]   At least one former OPDA prosecutor has testified that these policies contributed to his failure to investigate the allegation of a *Brady* violation in Mr. Jones's case,[141] and the policies may have contributed to the numerous OPDA prosecutors who worked on Mr. Jones's post-conviction claims not only failing to disclose favorable information to Mr. Jones—including the Menner Memo that, as reflected by the record, sat in at least one of the prosecutor's offices for years—but also making several misrepresentations to Louisiana and federal courts that no such information existed.[142]

In addition, the individual responsible for maintaining files post-conviction and reviewing case files for production in response to public records requests, John Rohr, had the discretion to set aside documents as protected by work-product privilege, but had never received *Brady* training

---

[140] *State v. Jones*, No. 356-745, Tr. of Mot. to Recuse at 75:20–32 (Orleans Crim. Dist. Ct.  Dec. 15, 2015) (OPDA-JONES15133) (Mr. Bosworth testified that there was no policy requiring him to request or review the trial case file, request or review the police file or speak with the trial prosecutor just because a *Brady* allegation was made); *id.* at 62:26–63:6 (interim District Attorney Keva Landrum-Johnson could not recall any written policies for how to handle a post-conviction *Brady* claim).

[141] *See id.* at 92:14–93:13 (Mr. Bosworth testified that his decision to not check the trial file in Mr. Jones's case did not violate any OPDA policy).

[142] *See, e.g.*, *State v. Jones*, No. 356-745, State's Response to Post Conviction Relief Application at 7 (Orleans Crim. Dist. Ct. Dec. 13, 2007) (claiming that Mr. Jones's request for notes documenting contradictory statements by TP regarding her assailant were "completely unsubstantiated, contradicted, and without merit," although such notes did, in fact, exist but were not disclosed to the defense); *State v. Jones*, No. 2008-KA-0516, State's Opp'n to Defense Application for Writ at 8 (La. Ct. App. Aug. 8, 2008) (OPDA-JONES10371) (objecting to Mr. Jones's claim that OPDA failed to disclose communications it had with Lester Jones prior to Mr. Jones's trial and describing the communications as "supposed"); Depo. Ex. 85 at 10 (*State v. Jones*, No. 356-745, State's Response to Petitioner's Application for Post-Conviction Relief at 10 (Orleans Crim. Dist. Ct. May 15, 2013)) (stating that Mr. Jones could not plausibly suggest that information concerning Lester Jones's recantation was in OPDA's possession at the time of Mr. Jones's trial).  In fact, OPDA had a pattern of summarily responding to requests for *Brady* by challenging them as incredible and "specious."  *See Jones v. Cain*, No. 10-2625, Response to Petition for Habeas Corpus Relief at 30–33 (E.D. La. July 31, 2012) (stating that Lester Jones's 2007 testimony was not credible because he waited 15 years before recanting and describing Lester Jones's testimony as a "sudden recantation—made some fifteen years after the crime"); *State v. Jones*, No. 2014-K-0226, Reply Brief to Writ at 17 (La. Ct. App. July 17, 2014) (OPDA-JONES 13597) (describing Lester Jones's "recantation" as "sudden" and "made some fifteen years after the crime").

and never considered *Brady* when withholding files from production.[143] This lack of training could lead to a failure to preserve favorable information that might be needed in subsequent proceedings as well as a failure to disclose information that had been preserved. Both failures impacted Mr. Jones—not long after Mr. Jones's convictions, OPDA stated to Mr. Jones that the OPDA file regarding his prosecution for the April 6 crimes had gone missing, potentially taking valuable *Brady* information with it. In addition, the record suggests a strong likelihood that Mr. Rohr withheld the Menner Memo from Mr. Jones for years, on the basis that the memorandum consisted of work product.[144] Work product, however, does not excuse a prosecutor's failure to disclose *Brady* information. Thus, the delegation of these responsibilities to Mr. Rohr may very well have played some role in Mr. Jones not receiving the Menner Memo until 2015, despite Mr. Jones having filed numerous requests with OPDA seeking favorable information in his case.[145]

### 6.      Creating a Prosecutorial Culture Focused on "Winning," Not *Brady* Compliance

While OPDA did not have a system to track *Brady* compliance, it did keep track of the win and losses of its prosecutors.[146] Prosecutors' wins and losses were tracked by the trial secretary

---

[143] Rohr Depo. at 11:12–13; 13:5–13 (stating that he did not have a law degree and describing position as records manager); *id.* at 49:9–21 (stating that he had not received guidance on complying with the United States Constitution but had reviewed law books on his own); *id.* at 57:5–13 (describing his role in defining attorney/client privilege or work product documents to be withheld); *id.* at 59:20–21 (stating that he has "never been aware" or "given thought" about whether documents should be disclosed under the Constitution); *id.* at 114:25–115:9 (noting that he had heard about *Brady* on television).

[144] Notably, Mr. Pipes, the OPDA prosecutor who found the Menner Memo "in plain sight" inside Ms. Stott's murder case file, said that he found the memorandum in a green folder with other documents that he would classify as work product. Pipes Depo. at 256:8–257:9. In addition, in responding to one of Mr. Jones's public records requests, Mr. Rohr provided a list of documents withheld, including, like the Menner Memo, a "Two (2) page memorandum." Depo. Ex. 74 (Case 357-917, Privileged List). This document was withheld pursuant to "La. R.S. 44:4.1(C)," the Louisiana public records exception for work product. *Id.*

[145] Depo. Ex. 98 at 55:16–28 (*State v. Jones*, No. 356-745, Tr. of Hearing (Orleans Crim. Dist. Ct. Dec. 14, 2010)).

[146] Connick Depo. at 134:14–135:4 (noting that lawyers tracked their wins and losses and they were required to submit a jury trial report to their supervisors); McElroy Depo. at 228:24–229:22 (the secretary to the Chief of Trials kept a log of trials that documented all trial outcomes; this book was accessible by anyone in the office); Buras Depo. at 240:18–24 (a prosecutor's supervisor would be aware of the wins and losses through the trial reports); Bigelow Depo. at 142:8–142:24 (outcomes were tracked and wins/losses were placed into personnel files by the trial secretary); Bane Depo. at 102:25–104:8 (individuals tracked their own wins and losses but Ms. Bane said she sometimes asked for those statistics as their supervisor to see how they were doing); *see also* Trial

41

and went into their personnel files, and wins and losses were discussed at trial meetings and with supervisors, with prosecutors potentially being given a hard time for their losses.[147]  By contrast, *Brady* violations were not included in the personnel file.[148]  In my experience, a focus on a prosecutor's win/loss record can create a culture in which prosecutors will be reluctant to acknowledge and reveal favorable information.  The pressure to have a high conviction rate seemed particularly acute at OPDA, because Mr. Connick relied on his policy of screening out many cases to assert that prosecutors should be winning the cases that remained.[149]

### 7.    OPDA's Failure to Acknowledge Its Problem with *Brady* Violations

It is evident from reading all the statements in this case that OPDA is trying to minimize its *Brady* compliance problems by suggesting that the number of cases with *Brady* violations is minimal given the overall number of cases the office prosecuted.  There are several problems with this approach.  First, in my experience, reported cases regarding *Brady* violations are just the tip of the iceberg.  Many *Brady* violations do not come to the attention of the court because cases are resolved by plea deals, making it far less likely that a defendant would pursue a post-conviction *Brady* challenge, even with a valid claim.[150]  Every OPDA supervisor to testify in this case who was asked has confirmed that the "vast majority" of OPDA's case that ended with a conviction

---

Division Annual Reports (listing, *inter alia*, "Homicides Moved By Attorney," guilty verdicts, and acquittals and mistrials).

[147] Connick Depo. at 136:6–13 (Mr. Connick would call assistants whose cases ended in acquittals to his office to discuss what went wrong); Bigelow Depo. at 142:25–144:13 (losses were discussed more frequently with supervisors to try to determine what went wrong); McElroy Depo. at 231:4–24 (trial outcomes were discussed at the weekly trial meetings).  While Mr. McElroy previously testified in *Thompson v. Connick* that he was "pretty sure" that prosecutors who lost trials were given a hard time for having lost at the weekly meetings, McElroy Depo. at 64:21–67:2, May 25, 2005, he testified in this litigation that there was no "hazing" or "jeering" at the trial meetings for prosecutors who had lost cases, McElroy Depo. at 223:25–234:4.

[148] Bigelow Depo. at 146:4–9.  By way of example, Mr. Jordan's 136-page personnel file contained numerous documents covering his OPDA tenure, however, there were no mention of his involvement with any cases in which a *Brady* violation was found.  *See* Roger Jordan Personnel File (OPDA-JONES22325); *supra* note 78–80.

[149] Connick Depo. at 139:15–140:4.

[150] *See Alvarez v. City of Brownsville*, 904 F.3d 382, 394 (5th Cir. 2018), *cert. denied sub nom. Alvarez v. City of Brownsville, Tex.*, No. 18-854, 2019 WL 2412940 (U.S. June 10, 2019) (holding that defendants entering guilty pleas do not have a right to *Brady* information).

were resolved by plea.[151]   Additionally, a violation of a defendant's right to the disclosure of favorable information is inherently difficult to detect because, by definition, it involves the suppression of information[152]   Courts may also grant relief on *Brady* grounds, but not publish a decision, or may grant relief on grounds other than *Brady*, even in the face of a valid *Brady* claim—a documented phenomenon at OPDA.[153]   Courts may also preempt a *Brady* violation that would otherwise have occurred if the prosecutor had gone unchecked.[154]   Finally, OPDA may seek to obscure its true rate of *Brady* violations, protecting the office's convictions and preventing subsequent civil liability, by offering defendants who mount a compelling *Brady* challenge to their convictions incentives to drop their *Brady* claims, such as plea deals that may be entered without reference to the *Brady* violation prompting the deal.   There is reason to believe that has occurred repeatedly at OPDA.[155]   Thus, while there have been at least 45 documented court decisions

---

[151]  Bane Depo. at 96:18–97:15; Bigelow Depo. at 178:21–179:7; Buras Depo. at 12:16–23; McElroy Depo. at 224:5–11; Solino Depo. at 305:12–23.

[152]  *See Imbler v. Pachtman*, 424 U.S. 409, 443–44 (1976) (White, J., concurring) (The "judicial process will by definition be ignorant of" a violation involving suppressed evidence, and "it is reasonable to suspect that most violations never surface."); *Connick v. Thompson*, 563 U.S. 51, 80 (2011) (Ginsberg, J., dissenting) (*Brady* violations "are not easily detected" and are frequently the result of a "chance discovery").

[153]  *See, e.g.*, *supra* note 10.  Mr. Connick acknowledged that such cases could exist.  Connick Test. at 864:24–865:7; 866:10–20, *Thompson v. Connick*, No. 03-2045 (E.D. La. Feb. 8, 2007).

[154]  *See, e.g.*, Pamela Coyle, *Court to DA: Stop Stalling Office Ordered to Disclose File*, TIMES-PICAYUNE (June 23, 1998) (summarizing instances where judges ordered OPDA prosecutors to open their files).

[155]  For instance, in one case, the defendant filed a post-conviction relief application alleging that his *Brady* rights were violated when OPDA failed to disclose a police report containing a prior inconsistent statement from the state's sole eyewitness. Matt Sledge, *Key Police Report Frees Inmate Serving Life in Angola for Decades-Old Killing in Deal with Orleans DA*, THE ADVOCATE (June 16, 2017).  OPDA offered the defendant a plea deal that allowed for his immediate release, noting that his appeal "possessed merit."  *Id.*  In another case, information corroborating the defendant's claim of self-defense was revealed for the first time at trial, during a cross-examination of an OPDA witness.  *Wells*, 191 So.3d at 1139.  Based on the late disclosure, the trial court found that "the *Brady* violation is there," but adjudication of the *Brady* claim was deferred to post-conviction proceedings.  *Id.*  Rather than litigate the post-conviction claim, OPDA offered the defendant a plea agreement.  *See State v. Wells*, No. 480-153, Tr. of Mem. of Understanding, Guilty Plea and Sentencing (Orleans Crim. Dist. Ct. Jan. 25, 2019).  To execute the plea, an OPDA prosecutor asked the trial court judge, Ms. Buras, that she vacate the defendant's original conviction without citing the grounds for relief.  *Id.* at 2:31–3:29.  At the time, only the defendants' *Brady* claim was pending.  *See Wells v. Ducote*, No. 480-153, Application for Post-Conviction Relief (Orleans Crim. Dist. Ct. July 9, 2018); *see also supra* note 9.

finding *Brady* violations by OPDA, affecting 46 defendants, the actual number of violations is almost certainly substantially larger.

Second, even if OPDA handles a high volume of cases, OPDA's history of at least 45 court-found *Brady* violations, nearly all of which occurred in some of OPDA's most significant cases, involving murder, rape or armed robberies, is an objectively large number of *Brady* findings.[156] Also, as the First Assistant at the time of Mr. Jones's trial, Ms. Buras, stated in her deposition, each case is significant and its importance cannot be minimized merely because OPDA handled a high volume of cases.[157]   She is correct.   Yet, OPDA did not respond to even this substantial number of violations by doing what was necessary to ensure that each defendant's *Brady* rights were honored.[158]

Third, OPDA's number of violations far eclipses those of comparable prosecutor's offices that handled a significant number of cases, including Atlanta, Memphis and St. Louis.[159]   The numbers are not even close: from 1963 to the present, based on searches of Westlaw and news coverage, only 4 *Brady* violations were identified in cases prosecuted by the Fulton and DeKalb County District Attorneys' Offices (encompassing Atlanta, Georgia), 6 *Brady* violations by the Shelby County District Attorney's Office (encompassing Memphis, Tennessee), and 10 *Brady* violations by the St. Louis City Circuit Attorney's Office.[160]   Thus, since the *Brady* decision, New

---

[156] One report has ranked Orleans Parish as first in Louisiana for prosecutorial misconduct, particularly *Brady* violations.  *See* Fair Punishment Project, *The Recidivists: New Report on Rates of Prosecutorial Misconduc*t 6–8 (July 13, 2017).

[157] Buras Depo. at 280:6–18; 281:14–18.

[158] Bane Depo. at 219:9–13; 211:2–7; Solino Depo. at 267:18–22.

[159] *See* Exhibit 1.

[160] Atlanta, Memphis and St. Louis were chosen as test cities based on their similarity to New Orleans in terms of population and crime rate.  *See generally* Federal Bureau of Investigations, Uniform Crime Reporting Statistics, https://www.ucrdatatool.gov/.  These *Brady* violations were identified by searching Westlaw for published opinions citing to *Brady v. Maryland*, 373 U.S. 83 (1963) in the relevant state and federal courts.  The search results were reviewed to determine if there was a *Brady* finding and if it was prosecuted by the relevant office.  The major newspaper in each city was also searched on Westlaw for articles including terms like "new trial," "withheld evidence," "mistrial," "exculpatory," and revers! w/10 "of convict!."  Search results were reviewed to determine if there was a *Brady* finding and if it was prosecuted by the relevant office.  If it was unclear whether a *Brady* finding was made from the opinion or article, the defendant's name was searched in Westlaw for additional cases or newspaper articles.  The National Registry of Exonerations and local Innocence Project websites were also consulted for individuals whose convictions were overturned on the basis of *Brady*.

Orleans' rate of 37 *Brady* violations that were also found in searches of Westlaw and news coverage is nearly *400% higher* than the next highest jurisdiction on this list.[161]

Fourth, the mere fact that three of the most prominent Supreme Court *Brady* decisions since *Brady v. Maryland—Kyles* (1995), *Connick v. Thompson* (2011), and *Smith v. Cain* (2012)—concerned violations by OPDA should have prompted OPDA to reassess its policies, practices and customs, as well as its history of violating *Brady*. No other prosecutor's office can speak of such a troubling record. But these cases did not prompt OPDA to reassess, even today.[162]

Finally, and most importantly, OPDA's consistent tendency to minimize its problems with *Brady*, despite the drumbeat of *Brady* reversals it received, verges on a willful refusal to address the office's shortcomings. For example, Ms. Buras has stated that instances of withholding *Brady* material at OPDA were "rare and isolated,"[163] but the dozens of *Brady* violations that had been found by the time Ms. Buras made that statement were neither rare nor isolated, even if one ignores the many more violations that had already occurred but had not yet resulted in reversals. That OPDA received this notice and failed to appropriately respond suggests an ingrained culture of

---

[161] The figure for New Orleans was obtained using the same methods detailed in note 160, *supra*, to ensure comparability. Thus, this figure does not include cases involving *Brady* violations that were discovered by inspecting court records in New Orleans, due to the difficulty of undertaking such a review in multiple other jurisdictions, or *Brady* violations that have been identified but that do not cite to *Brady v. Maryland*, 373 U.S. 83 (1963). The court-found violations that are detailed in note 8, *supra*, but were excluded for the purposes of the cross-city comparison are *Clark v. Blackburn*, 632 F.2d 531 (5th Cir. 1980); *Bernard v. Connick*, No. 89-1916 (E.D. La. Apr. 8. 1991); *State v. Henderson*, No. 250-716, Tr. of Colloquy (Orleans Crim. Dist. Ct. Mar. 25, 1993); *State v. Jeanmarie*, No. 354-016, Judgment (Orleans Crim. Dist. Ct. Apr. 24, 2002); *State v. Oliver*, 682 So.2d 301 (La. Ct. App. 1996); *State v. Lewis*, No. 2006-KA-0730, 2006 WL 6912825 (La. Ct. App. Oct. 18, 2006); *State v. Duncan*, No. 450-320 (Orleans Dist. Ct. July 29, 2008), *adopting State v. Duncan*, No. 450 320 (Orleans Crim. Dist. Ct. Aug. 19, 2005).

[162] OPDA's denial of its problems with *Brady* compliance continues to this day. When asked to admit that OPDA committed a *Brady* violation in the 45 cases, affecting 46 defendants, where courts found that OPDA violated *Brady*, OPDA only admitted that "a *Brady* Violation occurred" in three of the cases, but denied that "OPDA committed a *Brady* violation in any of the cases." *See Jones v. Cannizzaro*, No. 18-503, Responses to First Set of Requests for Admission at 4 (E.D. La. July 19, 2019). OPDA's disagreement with over *93%* of the judges in these cases—including with the Supreme Court in *Kyles* and *Smith*—and its assertion that a *Brady* violation was occasionally committed, but not by OPDA, reflects a surprising level of disdain for both the judiciary overseeing OPDA's *Brady* compliance as well as the rule in *Kyles* and cases preceding it that prosecutors are the ultimate party responsible for *Brady* compliance. *See Kyles*, 514 U.S. at 437 ("The prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of [materiality] is reached.").

[163] Depo. Ex. 78 (Camille Buras Affidavit, *Cousin v. Small*, No. 00-0069 (E.D. La. Jan. 16, 2001).

resistance to *Brady* compliance. Indeed, instead of recognizing the need for change represented by cases like *Kyles*, Mr. Connick denigrated the decision, stating that "[j]ust because a guy puts on a black robe doesn't mean he is right," he was "satisfied with what [OPDA's *Brady*] policy was" despite the decision in *Kyles*,[164] and *Kyles* (incorrectly) "wasn't a *Brady* case."[165] Likely following Mr. Connick's cue, the OPDA prosecutor in Mr. Kyles's re-trial called the decision in *Kyles* "as wrong as *Plessy v. Ferguson*," which upheld the separate but equal doctrine for racial segregation.[166] Perhaps unsurprisingly in light of these statements, OPDA continued to violate *Brady* at a notable rate even after *Kyles*.[167]

### D. OPDA's Conduct Amounted to a Municipal Policy that Resulted in Dozens of *Brady* Violations Similar to the Violations in Mr. Jones's Case

Based on my foregoing findings and the facts discussed and relied on in this report, it is my opinion that OPDA did not have a problem limited to isolated prosecutors. Rather, OPDA established a system that was unconcerned and nonresponsive to ongoing *Brady* violations. It is my opinion that the *Brady* violations that this system led to—before, during and after Mr. Jones's trial—are both more egregious and more systematic than those demonstrated in two prior Fifth Circuit *Brady*-based § 1983 litigations, *Connick v. Thompson*, 563 U.S. 51 (2011), and *Truvia v. Connick*, 577 Fed. 3d. Appx. 317 (5th Cir. 2014) (unpublished).

In *Thompson*, the United States Supreme Court found only that a single *Brady* violation was insufficient to establish *Monell* liability under a failure to train theory.[168] In so ruling, the

---

[164] Depo. Ex. 113 (Pamela Coyle, *Lawyers Claim DAs Withhold Evidence*, TIMES-PICAYUNE (Sept. 21, 1997)); Connick Depo. at 102:20–103:6, May 26, 2005.

[165] Connick Depo. at 100:17–101:15, May 26, 2005.

[166] Depo. Ex. 113 (Pamela Coyle, *Lawyers Claim DAs Withhold Evidence*, TIMES-PICAYUNE (Sept. 21, 1997)).

[167] In just the five years after the Court's decision in *Kyles*, when the office should have been on heightened alert as to the problems with its *Brady* practices, OPDA committed reversible *Brady* error in at least 12 major trials: *State v. Bright*, 875 So.2d 37 (La. 2004) (1996 Trial); *State v. Cousin*, 710 So.2d 1065 (La. 1998) (1996 Trial); *State v. Lee*, 778 So.2d 656 (La. Ct. App. 2001) (2000 Trial); *State v. Lewis*, No. 349-812, No. 2006-KA-0730, 2006 WL 6912825 (Aug. 11, 2001) (November 1995 Trial); *Mahler v. Kaylo*, 537 F.3d 494 (5th Cir. 2008) (1998 Trial); *Perez v. Cain*, No. 04-1905 (1998 Trial); *State v. Rideau*, No. 2001-K-0146 (La. Ct. App. May 7, 2001) (October 1995 Trial); *Smith v. Cain*, 565 U.S. 73 (2012) (1996 Trial); *Triplett v. Cain*, No. 04-1434 (1998 Trial); *Robinson v. Cain*, 510 F.Supp.2d 399 (1998) (1999 Trial); *State v. Walker*, No. 372-370 (1997 Trial)—and in Mr. Jones's case. *See* Ellen Yaroshefsky, *New Orleans Prosecutorial Disclosure in Practice After Connick v. Thompson*, 25 GEO. J. LEGAL ETHICS 913 (2012) (noting OPDA's failure to revise its policies or practices in the wake of *Kyles*).

[168] *Thompson*, 563 U.S. at 71–72.

Court noted that the plaintiff could not establish that OPDA had a pattern of *Brady* violations that put it on notice of the need for *Brady* training because the plaintiff had only pled four violations that were dissimilar to the violation in his case, which involved the withholding of a blood report.[169]   By contrast, Mr. Jones does not rely on a single-violation failure-to-train claim; the record in this case reflects a pattern of unconstitutional conduct that not only caused the violation of Mr. Jones's *Brady* rights, but also caused the violation of, at a minimum, dozens of other defendants' *Brady* rights.   Moreover, nearly all of these dozens of violations share a trait with the numerous improper practices that led to the withholding of several different types of *Brady* information in Mr. Jones's case.[170]

In *Truvia*, the court found that the plaintiff could not premise *Monell* liability by only pointing to other cases where OPDA responded to discovery requests by saying the defendant was not entitled to *Brady* material.[171]   Rather, the Fifth Circuit indicated that the plaintiffs needed to "point[] to case law preceding their convictions that held the DA's office responsible for committing *Brady* violations or that upheld other criminal defendants' claims of *Brady* violations."[172]   Unlike *Truvia*, and as noted above, a substantial record has been created in Mr. Jones's case that OPDA was on notice that it was regularly engaging in *Brady* violations prior to Mr. Jones's trial, yet did not change any of its *Brady* policies, practices or customs.[173]

Thus, rather than the isolated incidents of *Brady* violations discussed in *Thompson* and *Truvia*, the dozens of court-found *Brady* violations by OPDA reflected in the record in this case reveal an office that adopted and stubbornly maintained systems that directly led to *Brady* violations, committed by dozens of prosecutors, even experienced prosecutors, across decades. Specifically, courts have found that, from 1967 to 2012, OPDA violated at least 46 defendants' *Brady* rights, including 32 violations that occurred before Mr. Jones's trial and 19 instances in which courts found in written decisions that OPDA violated *Brady* prior to Mr. Jones's trial. Notably, these 46 *Brady* violations were committed by at least 70 trial prosecutors from OPDA, as well as an untold number of prosecutors that were involved in the cases at a time other than

---

[169] *Id.* at 62–63 ("Those four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here.  None of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind.  Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.").

[170] *See* Exhibit 2.

[171] *Truvia*, 577 F. App'x at 322.

[172] *Id.*

[173] *See* Exhibit 2.  Mr. Jones has identified numerous examples of court findings of *Brady* violations—the "case law" that was apparently lacking in *Truvia*.

trial.[174]  Even this lengthy list of court-found violations does not capture all of the problems OPDA evidently had in complying with *Brady*.  OPDA has acknowledged *Brady* violations in at least 8 other cases and courts have granted relief on other grounds in at least 5 cases, affecting 7 defendants, with credible *Brady* claims.  Ten of these violations occurred before Mr. Jones's trial and 6 of these violations were discovered before Mr. Jones's trial.  An additional 16 OPDA trial prosecutors committed the violations in these cases.[175]  As noted above, due to the sheer number of ways in which OPDA violated Mr. Jones's *Brady* rights, including by suppressing numerous police records, withholding prior inconsistent statements or other impeachment material, suppressing evidence implicating others in the crimes, or failing to disclose other favorable information that undermined the state's theory of the case,  every one of these violations bears a similarity to some aspect of Mr. Jones's case.[176]

In short, there was more than enough actual and constructive notice to OPDA that its operations were leading to repeated violations of defendants' *Brady* rights—a history so well known that the State of Louisiana Court of Appeal, Fourth Circuit, referred to it as OPDA's "storied, shameful history of . . . noncompliance" with *Brady*—but OPDA failed to make even the most basic changes to its deficient *Brady* policies, practices and customs in response.[177]  OPDA's deficient *Brady* policies, practices and customs, and its refusal to remedy those policies, practices and customs in the face of these and other warnings of *Brady* non-compliance, thus created a "municipal policy" that failed to adhere to *Brady* and its progeny.

## V.    CONCLUSION

---

[174]  *See* Exhibit 2.   According to Mr. Connick, everyone "familiar with the case has [the] responsibility" to turn over *Brady* material.  Connick Depo. at 327:16–329:25.

[175]  *See* Exhibit 3.  This number does not include Bridget Bane, Craig Famularo, James Williams, Karen Herman, Matt Coman, and Sheila Myers, who also tried defendants listed in Exhibit 2.

[176]  There is limited case law stating how "similar" a *Brady* violation must be to put an office on notice of a problem with *Brady* training.  However, the Supreme Court in *Thompson* provided some guidance when it stated that "four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here" because "[n]one of those cases involved failure to disclose *blood evidence, a crime lab report, or physical or scientific evidence of any kind*." *Thompson*, 563 U.S. at 62–63.  The Court thus broadly compared the failure to disclose a blood report to the failure to disclose "physical or scientific evidence of any kind." *Id.*  Similarly, although "prior acts must be fairly similar to what ultimately transpired," the Fifth Circuit has stated that "the specificity required should not be exaggerated. . . ." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).  From this guidance, it appears that violations need not be precisely similar to provide notice, but may be broadly comparable (particularly given that no two *Brady* cases could ever be precisely similar).

[177]  *Wells*, 191 So.3d at 1139.

Having reviewed the Complaint and evidence gathered during discovery in this case to date, as well as other relevant materials, it is my opinion that:

1.   OPDA promulgated and distributed a facially deficient written *Brady* policy;

2.   OPDA failed to adequately train its prosecutors on the requirements of *Brady* and its progeny, to adequately monitor its prosecutors' *Brady* practices and to adequately discipline its prosecutors for *Brady* violations;

3.   OPDA discouraged its prosecutors from providing "too much" discovery, without adopting safeguards to ensure favorable information was disclosed;

4.   OPDA knew or should have known that its prosecutors were not complying with *Brady*, due to the repeated identification of *Brady* violations by the office as well as other red flags concerning the office's non-compliance with *Brady*;

5.   OPDA nevertheless did not revise its policies, practices or customs with respect to *Brady* to ensure compliance with *Brady*; and

6.   OPDA's misconduct and refusal to remedy its deficient *Brady* policies, practices and customs resulted in dozens of known *Brady* violations, in addition to Mr. Jones's case, almost all of which involved violations similar to those in Mr. Jones's case.

7.   Finally, the *Brady* violations in Mr. Jones's case were the cause of Mr. Jones's wrongful convictions.   Although prosecutors can make inadvertent discovery mistakes, the facts of this case show a pattern of unacceptable behavior that aligned with OPDA's deficient *Brady* policies, practices and customs.   OPDA not only withheld substantial favorable information from Mr. Jones at the time of his trial, it also fought Mr. Jones's efforts to access that information for nearly two decades. I believe these violations resulted from systemic flaws in OPDA's *Brady* policies, practices and customs, and could have been prevented through appropriate policies, procedures, training, supervision and discipline.

Date:  August 13, 2019

_____

Laurie L. Levenson

**Exhibit 1**

**St. Louis Circuit Attorney Office's *Brady* Violations**

|     | Defendant | Citation | Trial Date |
| --- | --- | --- | --- |
| 1. | James Laney | *Laney v. State*, 584 S.W.2d 411 (Mo. Ct. App. 1979) | Jan. 1971 |
| 2. | Wesley Austin | *Austin v. Wyrick*, 535 F.2d 443 (8th Cir. 1976) | 1971 |
| 3. | Charles McClain | *State v. McClain*, 498 S.W.2d 798 (Mo. 1973) | Oct. 1971 |
| 4. | Johnnie Lee Brooks | *State v. Brooks*, 513 S.W.2d 168 (Mo. Ct. App. 1973) | May 1972 |
| 5. | George Allen, Jr. | *State ex rel. Koster v. Green*, 388 S.W.3d 603 (Mo. Ct. App. 2012) | 1983 |
| 6. | Derric Morrison | Tim Poor, Prosecutor Lied, *Says U.S. Judge Court Delays Trial in Child Rape Case*, ST. LOUIS POST-DISPATCH (May 4, 1990); Andre Jackson, *Judge Declares Mistrial in City Sex Abuse Case*, ST. LOUIS POST-DISPATCH (June 9, 1989). | June 1989 |
| 7. | Reginald Clemons | *State ex rel. Clemons v. Larkins*, 475 S.W.3d 60 (Mo. 2015) | 1993 |
| 8. | Anthony Williams | Robert Patrick, *Judge Reverses 1995 Murder Conviction, Says St. Louis Prosecutors Withheld Evidence*, ST. LOUIS POST-DISPATCH (June 20, 2014) | 1995 |
| 9. | Lamar Allen Johnson | Tony Messenger, *Messenger: Gardner's New Conviction Integrity Unit Alleges Perjury and Misconduct in 1994 Murder Case*, ST. LOUIS POST-DISPATCH (July 24, 2019). | 1995 |
| 10. | Jason Merriweather | *Merriweather v. State*, 294 S.W.3d 52 (Mo. 2009) | April 2005 |

**Fulton and DeKalb County (Atlanta) District Attorney Offices' *Brady* Violations**

|     | Defendant | Citation | Trial Date |
| --- | --- | --- | --- |
| 1. | C.L. Allen | *Allen v. State*, 1196 S.E.2d 660 (Ga. Ct. App. 1973) | Unknown |
| 2. | J.A. Masterson | *Allen v. State*, 1196 S.E.2d 660 (Ga. Ct. App. 1973) | Unknown |
| 3. | Holman Freeman | *Freeman v. State of Ga.*, 599 F.2d 65 (5th Cir. 1979) | Unknown |
| 4. | Jon Thieme | *Matter of Lee*, 799 S.E.2d 766 (Ga. 2017) | Dec. 2013 |
| 5. | Johnny McClendon | *McClendon v. State*, 820 S.E.2d 167 (Ga. Ct. App. 2018) | Feb. 2015 |
| 6. | Georgio Glover | *McClendon v. State*, 820 S.E.2d 167 (Ga. Ct. App. 2018) | Feb. 2015 |

**Shelby County (Memphis) District Attorney Office's *Brady* Violations**

| | Defendant | Citation | Trial Date |
|---|---|---|---|
| 1. | Clarence Branch | *Branch v. State*, 469 S.W.2d 533 (Tenn. Crim. App. 1969) | Unknown |
| 2. | Margo Freshwater | *Freshwater v. State*, 354 S.W.3d 746 (Tenn. Crim. App. 2011) | 1969 |
| 3. | Erskine Johnson | *Johnson v. State*, 38 S.W.3d 52 (Tenn. 2001) | Dec. 1985 |
| 4. | Francis Ballard | *State v. Ballard*, No. 99, 1991 WL 18697 (Tenn. Crim. App. Feb. 20, 1991), *aff'd*, 855 S.W.2d 557 (Tenn. 1993) | 1987 |
| 5. | Andrew Thomas | *Thomas v. Westbrooks*, 849 F.3d 659 (6th Cir.), cert. denied, 138 S. Ct. 390 (2017) | Sept. 2001 |
| 6. | Noura Jackson | *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014) | Feb. 2009 |

**Exhibit 2**[178]

**Cases with Court-Found *Brady* Violations by OPDA**

| Defendant | Charge | Date of Trial / Conviction | Date of *Brady* Finding | OPDA Prosecutors | Description of *Brady* Violation |
|---|---|---|---|---|---|
| Larry Hudson | First-degree murder | Dec. 1967 | Mar. 10, 1993 | Alvin Oser, Harry Hull | Suppressed a supplemental police report detailing that the state's only testifying eyewitness previously identified someone else in a photo array and was unable to identify that same person in a physical lineup. |
| Hayes Williams | First-degree murder | Feb. 1968 | Feb. 19, 1997 | Harry Hull | Suppressed a supplemental police report containing the prior inconsistent statement of the sole eyewitness to the crime, where he indicated he never saw the face of the third perpetrator (who the state alleged was Williams). |
| Linroy Davis | Manslaughter | Sept. 1968 | May 29, 1973 | Unknown | Suppressed inconsistent statements by testifying and non-testifying witnesses that supported the defendant's version of events (self-defense), contradicted the state's version of events, and could have been used to impeach witnesses. |
| Roland Gibson | First-degree murder | Nov. 1968 | Dec. 18, 1992 | Alvin Oser | Suppressed a supplemental police report containing the prior inconsistent statements of a key witness regarding his initially exculpatory account of the crime and alibis. |

[178] I have reviewed underlying documentation and court records in all these cases (where available), in determining that they demonstrate the *Brady* violations listed for each case.

53

54

| Name | Crime | | | | Description |
|---|---|---|---|---|---|
| | | | | | which he gave before he confessed to the crime and implicated the defendant. |
| James Carney | Second-degree murder | Sept. 1974 | June 21, 1976 | Edward "Rusty" Armstrong, John Baker | Suppressed information that could have been used to impeach a key witness's testimony, specifically a cooperation agreement. |
| Michael Williams | Second-degree murder | Apr. 1974 | Mar. 13, 1992 | John Volz | Suppressed a police report containing a statement from a key witness that could have been used to impeach the quality of her identification of the defendant at trial, specifically a statement that she had visited a methadone clinic approximately two hours before the crime. |
| Arthur Monroe | Armed robbery | Apr. 1974 | Nov. 21, 1979 | Ralph Capitelli | Suppressed a statement given to police by the victim, a key trial witness, that the defense could have used to impeach the witness on the grounds that he "improved" his trial testimony by adding facts to support the prosecution's theory. |
| Norman Clark | Distribution of heroin | Dec. 1974 | Dec. 10, 1980 | Jack Ciolino, David Craig | Suppressed the fact that the state made unavailable a witness who could testify to exculpatory information regarding the defendant, specifically that the defendant was not in the room during a crime, a fact inconsistent with the prosecution's theory of the case. |
| Floyd Falkins | Armed robbery | Sept. 1976 | Mar. 6, 1978 | Sheila Myers | Suppressed evidence casting doubt upon testifying witnesses' identifications of the defendant as the perpetrator, specifically the fact that two witnesses had previously identified a man who was concededly not involved in the crime as a perpetrator. |

| Errol Bernard | Second-degree murder | Jan. 1976 | Oct. 27, 1989 | John Lenfant IV, Henry Julien, Bridget Bane | Suppressed an initial police report containing a prior inconsistent statement by a testifying witness that supported the defendant's version of events (self-defense), contradicted the state's version of events, corroborated statements from the victim's family that he had been acting "paranoid," and could have been used to impeach the witness. |
|---|---|---|---|---|---|
| Gregory Bright | Second-degree murder | July 1976 | Oct. 1, 2002 | Henry Julien, Patrick Quinlan | Suppressed a supplemental police report containing witness statements that implicated persons other than the defendants in the crime and indicated that police pursued other suspects, as well as information that could have been used to impeach the credibility of the state's sole eyewitness. |
| Earl Truvia | Second-degree murder | July 1976 | Oct. 1, 2002 | Henry Julien, Patrick Quinlan | Suppressed a supplemental police report containing witness statements that implicated persons other than the defendants in the crime and indicated that police pursued other suspects, as well as information that could have been used to impeach the credibility of the state's sole eyewitness. |
| Norris Henderson | Second-degree murder | Mar. 1977 | Mar. 25, 1993 | Joseph Meyers | Suppressed an initial police report containing a victim's statement that cast doubt upon the victim's identification of the defendant, specifically due to the fact that the victim's dying declaration also accused another individual who was in prison at the time of the crime, and that could have been used to impeach the testimony of trial witnesses. |
| Calvin Williams | First-degree murder | June 1977 | ~1991–1992 | Joseph Johnson | Suppressed a police report casting doubt upon a witness's identification of the defendant, specifically the fact that the |

55

| | | | | | |
|---|---|---|---|---|---|
| | | | | | witness had not identified the defendant in a previous photographic lineup, and that contained prior inconsistent statements by the witness that could have been used to impeach the witness. |
| Larry Curtis | Second-degree murder | June 1979 | May 19, 1980 | Joseph Meyer | Suppressed information casting doubt upon a key testifying witness's identification of the defendant, specifically the fact that the witness had not identified the defendant as the perpetrator in a previous photographic lineup. |
| Isaac Knapper | First-degree murder | Oct. 1979 | May 6, 1991 | David Paddison, Donald Foret | Suppressed an initial police report with a prior inconsistent statement by a testifying witness that could have been used to both impeach the witness and challenge another state's witness, specifically regarding the color of the perpetrator's shirt, and with crime spree evidence supporting that others committed a similar robbery using the same weapon nearby on the same evening. |
| William Perkins | First-degree murder | Jan. 1980 | Nov. 29, 1982 | David Batt | Suppressed a written witness statement given to police that supported the defendant's version of events (self-defense) and contradicted the state's version of events. |
| Ronald Monroe | First-degree murder | Jan. 1980 | Feb. 28, 1984 | Fred Harper | Suppressed information given to the police that implicated a different individual in the crime, specifically notes indicating that the victim's husband had confessed to her murder in a different jurisdiction. |
| John Floyd | Second-degree murder | Jan. 1982 | May 8, 2017 | David Plavnicky | Suppressed favorable police records, specifically fingerprint analysis supporting the conclusion that someone other than the defendant committed crimes similar to the |

56

| | | | | | |
|---|---|---|---|---|---|
| | | | | | one the defendant was charged with committing and a statement from one victim's friend supporting the defendant's theory that another person was responsible for the murder. |
| Reginald Adams | First-degree murder | Aug. 1983 | May 12, 2014 | Ronald Bodenheimer, Harold Gilbert | Suppressed a supplemental police report that implicated two different individuals in the crime, specifically by showing that the murder weapon and jewelry stolen in the crime had been traced to two people with no connection to the defendant. |
| Stephen Rosiere | Second-degree murder | Feb. 1984 | May 20, 1986 | Eric Dubelier, Robert Long | Suppressed statements by testifying and non-testifying witnesses to the police that supported the defendant's version of events (self-defense), contradicted the state's version of events, and could have been used to impeach witnesses. |
| Curtis Lee Kyles | First-degree murder | Dec. 1984 | Apr. 19, 1995 | Cliff Strider, James Williams | Suppressed prior inconsistent statements made by a testifying witness to police that could have been used to impeach the witness, specifically statements regarding the perpetrator's appearance that were inconsistent with the defendant's appearance and whether the witness saw the shooting; as well as prior inconsistent statements made by a non-testifying witness to police that could have led the jury to infer that the witness was anxious to see the defendant arrested because the witness was actually the perpetrator; as well as police records reflecting information that was inconsistent with the prosecution's theory of the case, specifically a list of cars created by police showing that the |

| | | | | | |
|---|---|---|---|---|---|
| John Thompson | First-degree murder | May 1985 | June 29, 1999 | James Williams, Gerry Deegan, Eric Dubelier | defendant's car was not in the parking lot after the murder. Suppressed exculpatory police records, specifically a crime lab report indicating the perpetrator's blood type that excluded the defendant as the perpetrator. |
| Erin Hunter | Second-degree murder | July 1988 | Dec. 15, 1994 | Laurie White, Luke Walker | Suppressed prior inconsistent testimony of a key testifying witness that could have been used as impeachment, specifically a statement regarding whether the witness saw the defendant with a gun in his hand following the shooting. |
| Darryl Washington | Manslaughter | Mar. 1988 | June 29, 1989 | Joseph Iuzzolino, Fran Oliver | Suppressed a prior inconsistent statement given to police that cast doubt upon the witness's identification of the defendant at trial, specifically because the prior statement indicated that the witness had provided a different surname for the perpetrator. |
| Eugene Lindsey | Second-degree murder | Oct. 1988 | Apr. 2, 2003 | Laurie White, Claude Kelly | Suppressed prior inconsistent statements by testifying witnesses regarding whether the defendant was drunk at the time of the crime that supported the defendant's intoxication defense and could have been used as impeachment. |
| Alvin Jeanmarie | Second-degree murder | Oct. 1992 | Apr. 24, 2002 | Charles Lane, Eric La Fleur | Suppressed initial and supplemental police reports containing prior inconsistent statements by testifying witnesses, including statements about the appearance of the perpetrator. |
| Alfred Oliver | Armed robbery, second-degree kidnapping | May 1994 | Oct. 9, 1996 | Dwayne McClure, Keith Detweiler | Suppressed initial and supplemental police reports containing prior inconsistent statements by the testifying victims that could have been used as impeachment, specifically |

statements regarding the circumstances of one victim's escape.

| Name | Crime | | | Names | Description |
|---|---|---|---|---|---|
| Jerome Morgan | Second-degree murder | Sept. 1994 | Jan. 24, 2014 | Sharon Andrews, Karen Godail | Suppressed a 911 call log that exculpated the defendant, specifically by indicating that police did not believe the perpetrator remained in a ballroom where a shooting occurred and where the defendant was located when police arrived. |
| Daniel Rideau | First-degree murder | Oct. 1995 | May 7, 2001 | Lisa Lavie, Robert Egan | Suppressed a supplemental police report containing non-testifying witness statements that cast doubt upon a key witness's identification of the defendant at trial, specifically statements that described a person other than the defendant leaving the crime scene with a gun of the type used in the murder. |
| Darnell Lewis | Aggravated rape, aggravated burglary, aggravated crime against nature | Nov. 1995 | Aug. 15, 2001 | Deborah Kettering, David Wolfe | Suppressed supplemental police reports and police notes containing prior inconsistent statements by rape victims that cast doubt upon their identifications of the defendant at trial, specifically statements given to police by the victims that the victims could not see or identify their assailant. |
| Shareef Cousin | First-degree murder | Jan. 1996 | Apr. 14, 1998 | Roger Jordan | Suppressed prior inconsistent statements to police from the sole eyewitness that cast doubt upon her identification of the defendant and could have been used as impeachment, specifically a statement that she was not wearing corrective lenses on the night of the crime and could not identify the perpetrator. |
| Dan Bright | First-degree murder | July 1996 | May 25, 2004 | Karen Kirshbom Herman, David Weilbaecher | Suppressed evidence that could have been used to impeach the sole eyewitness's testimony, specifically the fact that the |

| | | | | | witness was on parole and had a motivation to cooperate with law enforcement to avoid parole revocation for admitted drinking. |
|---|---|---|---|---|---|
| Dwight Labran | First-degree murder | July 1997 | Oct. 3, 2001 | Michael Monistere, Margaret Lagautta | Suppressed evidence that could have been used to impeach the sole eyewitness's testimony, specifically by failing to correct the witness's false testimony about his name, which thereby concealed the witness's criminal history. |
| Juan Smith | First-degree murder | Dec. 1996 | Jan. 10, 2012 | Fred Menner, Roger Jordan | Suppressed police notes containing prior inconsistent statements by the victim that cast doubt upon the victim's identification of the defendant at trial and that could have been used as impeachment, specifically the witness's statement that he could not supply a description of the perpetrators other than that they were "black males," which called into question his trial testimony describing a perpetrator's build, haircut, and gold teeth. |
| James Walker | Second-degree murder | Aug. 1997 | Aug. 27, 1997 | Roger Jordan, Tim McElroy | Suppressed a prior inconsistent statement by a witness that cast doubt upon the witness's identification of the defendant at trial, specifically a statement that the perpetrator was 10 years younger and 3 inches shorter than the defendant and had a mustache. |
| Salvador Perez | First-degree murder | Mar. 1998 | Jan. 8, 2008 | Craig Famularo, Val Solino | Suppressed a police report containing a prior statement of a testifying witness that the defendant looked "crazy" at the time of a shooting, a statement that supported the defendant's insanity defense and could have been used to challenge contrary trial testimony from the witness and a police officer. |

60

| David Mahler | Manslaughter | Apr. 1998 | July 28, 2008 | Rick Pickens, Matt Coman | Suppressed a supplemental police report and prior inconsistent statements of several witnesses that supported the defendant's version of events (self-defense) and contradicted the state's version of events, and could have been used to impeach witnesses. |
|---|---|---|---|---|---|
| Eddie Triplett | Cocaine possession | Oct. 1998 | Sept. 29, 2011 | Andre Jeanfreau, Stephen Huber | Suppressed a police report that could have been used to impeach police officers' testimony, specifically by contradicting the officers' testimony regarding the number of individuals stopped during an arrest and supporting the defense's claim that another individual stopped at the same time had been holding the cocaine at issue. |
| Julian Robinson | Aiding and abetting second-degree murder | Feb. 1999 | Aug. 31, 2007 | Juliet Clark | Suppressed a supplemental police report containing statements that supported the defendant's theory that another individual committed the crime and called into question the credibility of a key state's witness. |
| George Lee | Forcible rape, second-degree kidnapping | Apr. 2000 | Apr. 4, 2000 | Jeff Davidson, Lionel Burns, Lynda Van Davis | Suppressed a prior inconsistent witness statement to police that supported the defendant's account of one of the incidents. |
| John Duncan | Second-degree murder | Mar. 2005 | July 29, 2008 | Shannon Swaim, Jaime Mosser | Suppressed a witness statement to police that contradicted the sole testifying witness's account of the perpetrator's appearance and that implicated the testifying witness in the crime. |
| Michael Anderson | First-degree murder | Aug. 2009 | Mar. 7, 2010 | Kevin Guillory, John Alford | Suppressed prior inconsistent statements to prosecutors by the state's sole eyewitness that contradicted her testimony, specifically statements regarding the timeline of events surrounding the crime; as well as information |

61

| | | | | | that could have been used to impeach a different witness at trial, specifically a cooperation agreement. |
|---|---|---|---|---|---|
| Christopher Wells | Manslaughter | Apr. 2010 | Apr. 13, 2016 | Myles Ranier, Leila Braswell | Suppressed prosecutor's notes documenting a prior inconsistent statement of a key witness that supported the defendant's claim of self-defense and contradicted the state's version of events. |
| Henry Bruer | Attempted second-degree murder | Nov. 2011 | Nov. 9, 2011 | Blair Berthelot, Jonathan Landry | Suppressed information that could have been used to impeach the victim and sole eyewitness to the crime at trial, specifically a cooperation agreement. |
| Ronald Warner | Second-degree battery, possession with intent to distribute cocaine, possession with intent to distribute heroin | May 2012 | Aug. 15, 2013 | Alex Calenda, Shalita Sanders | Suppressed a 911 call log and police report with statements that could have been used to challenge witness testimony implicating the defendant, specifically a shooting victim's statements indicating that he did not know who shot him, which contradicted the prosecution's theory of the case and multiple witnesses at trial who testified that the victim had identified the defendant after the incident. |

**Exhibit 3[179]**

**Cases Where OPDA's Conduct Amounted to Admission of _Brady_ Violations**

| Defendant | Charge | Date of Trial / Conviction | Date of Relief | OPDA Prosecutors | Description of _Brady_ Violation |
|---|---|---|---|---|---|
| Johnny Ross[180] | Aggravated rape | Feb. 1975 | Dec. 7, 1981 | Lawrence Centola | Suppressed a police report and records that could have exculpated the defendant, specifically a record indicating the perpetrator's blood type and a report acknowledging the need for the defendant's blood to be a different type, which would have exculpated the defendant if he had been typed. |
| Bobbie Jean Johnson[181] | First-degree murder | Oct. 1978 | Feb. 7, 2018 | Joseph Roberts | Suppressed handwritten police notes implicating an individual other than the defendant, specifically by indicating that the murder weapon was found in another suspect's apartment before later being placed |

[179] I have reviewed the applications for post-conviction relief, court opinions granting relief, and/or any relevant transcripts related to the grant of post-conviction relief in determining that they demonstrate the _Brady_ violations listed for each case.

[180] While Mr. Ross's conviction was overturned in federal court on the basis of a joint motion, rather than re-try Ross, OPDA filed a memorandum in the Orleans Parish Criminal District Court stating "In the police report, it is clearly stated 'It will be essential that Ross' blood will be Group B . . . .' Ross' blood was never typed. The assistant district attorney who prosecuted Ross never had him typed nor did he inform Ross' lawyer of this most essential and potentially exculpatory fact."

[181] After Ms. Johnson filed an application for post-conviction relief alleging _Brady_, _Napue_ and ineffective assistance of counsel claims, OPDA allowed her to plead to reduced charges in exchange for immediate release.

63

| | | | | | |
|---|---|---|---|---|---|
| | | | | | in the defendant's purse; as well as police records, specifically fingerprint analysis implicating an individual other than the defendant and contradicting a detective's trial testimony that there were no suitable surfaces at the crime scene from which to obtain fingerprints; as well as police reports, handwritten police notes, and witness statements disproving elements of the defendant's allegedly coerced confession. |
| Calvin Duncan[182] | First-degree murder | Jan. 1985 | Jan. 7, 2011 | Bruce Whittaker, Glenn Alexander | Suppressed incident and supplemental police reports, police notes, police memoranda, a witness statement, and grand jury testimony containing prior inconsistent statements of a testifying eyewitness regarding the perpetrator's appearance and her ability to identify the perpetrator, as well as her prior statements regarding whether the perpetrator had gold teeth; as well as a police report that impeached the testifying police officer's testimony. |
| Charles Conway[183] | Second-degree murder | Jan. 1996 | Mar. 21, 2014 | Karen Herman, Michael Futrell | Suppressed police records with witness statements supporting the defense's theory that a prosecution witness committed the crime, specifically a statement regarding the appearance of the perpetrator that matched the appearance of the prosecution witness and |

[182] OPDA entered into a plea agreement with Mr. Duncan "based on some *Brady* material discovered" after Mr. Duncan filed an application for post-conviction relief alleging *Brady* claims.

[183] OPDA entered into a plea agreement with Mr. Conway after he filed an application for post-conviction relief alleging *Brady* claims.

64

| | | | | | |
|---|---|---|---|---|---|
| | | | | | a statement placing the perpetrator at the location where the prosecution witness was found; as well as evidence impeaching the prosecution witness's credibility, specifically his criminal history; as well as a prosecutor's notes reflecting prior inconsistent statements by the prosecution witness, that could have been used as impeachment. |
| Albert Wolfe[184] | Second-degree murder | June 1997 | June 16, 2017 | David Groome, Randy Hoth | Suppressed a supplemental police report containing prior inconsistent statements by the state's primary witness regarding the perpetrator's appearance and the witness's account of the crime. |
| Trenadad East[185] | Second-degree murder | Aug. 1997 | June 13, 2017 | Matt Coman, Erin Casey | Suppressed information that could have been used to impeach a key witness's testimony (who was also the other suspect), specifically a cooperation agreement. |
| Jamaal Tucker[186] | Second-degree murder | Oct. 2010 | Dec. 14, 2011 | Eusi Phillips, James Myers | Suppressed information that could have been used to impeach two key witnesses' testimony, specifically cooperation agreements. |

[184] OPDA entered into a plea agreement with Mr. Wolfe that allowed for his immediate release after he filed an application for post-conviction relief alleging *Brady* claims.

[185] OPDA entered into a plea agreement with Mr. East after the court ordered an evidentiary hearing on his *Brady* claims.

[186] OPDA entered into a plea agreement with Mr. Tucker after the court ordered an evidentiary hearing on his *Brady* and *Napue* claims.

65

| Jeremy Burse[187] | Second-degree felony murder | June 2013 | Dec. 1, 2017 | Laura Rodrigue, Brittany Reed | Suppressed information that could have been used to impeach a key witness's testimony, specifically a cooperation agreement. |

**Cases with Evidence of *Brady* Violations Resolved on Other Grounds**

| Defendant | Charge | Date of Trial / Conviction | Date of Relief | OPDA Prosecutors | Description of *Brady* Violation |
|---|---|---|---|---|---|
| Wilbert Parker[188] | Second-degree murder | Dec. 1974 | June 19, 1978 | Ernest Chen | Suppressed information that could have been used to impeach the victim's testimony and support the defendant's claim of self-defense, specifically the victim's criminal history. |
| Leonard Johnson[189] | Second-degree murder | May 1976 | Dec. 18, 2014 | Sheila Myers | Suppressed a police report containing the prior inconsistent witness statement that conflicted with the witness's account of the crime at trial and supported the defendant's "sudden passion" defense. |
| Clarence Smith[190] | First-degree murder | Feb. 1985 | May 26, 1992 | Don DeGabrielle, Bridget Bane | Suppressed information that could have been used to impeach key witnesses' testimony, specifically that the witnesses had extensive |

[187] OPDA entered into a plea agreement with Mr. Burse that allowed him to plead to reduced charges after he filed an application for post-conviction relief alleging *Brady* and *Napue* claims.

[188] The court ordered a new trial due to the lack of a trial transcript to evaluate Mr. Parker's *Brady* claim.

[189] The court granted relief on the basis of problems with the jury instructions without reaching the *Brady* claim.

[190] The court ordered a new trial on the basis of problems with the jury instructions and declined to address all of the defendants' assignments of error.

66

| | | | | | criminal histories as well as an out of state cooperation agreement with one of the witnesses. |
|---|---|---|---|---|---|
| Anthony Scire[191] | First-degree murder | Feb. 1985 | May 26, 1992 | Don DeGabrielle, Bridget Bane | Suppressed FBI reports containing prior inconsistent statements of the state's sole witness who implicated the defendant in the murder, specifically statements concerning who committed the crime, the motive to commit the crime, the means used to kill the victim, and the opportunity to commit the crime. |
| Tyrone Smith[192] | Second-degree murder | July 1989 | Dec. 11, 1991 | James Williams, Craig Famularo | Suppressed information that could have been used to impeach a key witness's testimony, specifically a cooperation agreement. |
| Troy Wilkerson[193] | Second-degree murder | July 1989 | Dec. 11, 1991 | James Williams, Craig Famularo | Suppressed information that could have been used to impeach a key witness's testimony, specifically a cooperation agreement. |

---

[191] The court ordered a new trial on the basis of problems with the jury instructions and declined to address all of the defendants' assignments of error.

[192] The court ordered a new trial under the Sixth Amendment, and not with respect to the defendants' *Brady* claims. In addition to being a case with *Brady* violations where the court granted relief on other grounds, Mr. Smith and Troy Wilkerson can also be classified as cases where OPDA has admitted to a *Brady* violation, because these defendants' cases are listed in the memoranda authored by Mr. Solino identifying court-found *Brady* violations. *See* Depo. Ex. 34 (Memorandum from Val Solino to Harry Connick); Depo. Ex. 51 (Memorandum from Val Solino to Tim McElroy (Sept. 23, 2002)).

[193] *See supra* note 192.

| Julio Ruano[194] | Simple burglary of an automobile, aggravated battery, second-degree battery | July 1997 | Oct. 3, 2001 | Inga Petrovich, Andrew Doss | Suppressed information about the perpetrator's vehicle received from an eyewitness, specifically the license plate number on the perpetrator's vehicle that did not match the defendant's license plate; as well as information that could have been used to impeach a key witness's testimony, specifically the witness's criminal history and cooperation agreements. |

[194] After the defendant submitted multiple briefs in support of his *Brady* claim and one brief putting forward new evidence in his case, the court determined that "[u]pon review of all the material that has been supplied to this Court, I have come to the decision that the new material satisfies the basis for the possibility of a new Judge or Jury's judgment should this be presented at trial anew."

68

# Appendix A

**Appendix A[1]**

| |
|---|
| *Jones v. Cannizzaro* – Complaint, Doc. No. 1 |
| *Jones v. Cannizzaro* – Deposition Exs. 1–170 |
| Depositions of Roger Jordan (*Jones*, *Adams*) |
| Deposition of Debra Coffee (*Jones*) |
| Depositions of Harry Connick, Sr. (*Jones*, *Adams*, *Thompson*, *Cousin*, *Truvia*, *Bernard*) |
| Deposition of Timothy McElroy (*Jones*) |
| Deposition of Frederick Menner (*Jones*) |
| Deposition of Raymond Bigelow (*Jones*) |
| Deposition of John Rohr (*Jones*) |
| Deposition of Camille Buras (*Jones*) |
| Deposition of Andrew Pickett (*Jones*) |
| Deposition of David Pipes (*Jones*) |
| Deposition of Val Solino (*Jones*) |
| Depositions of Leon Cannizzaro, Jr. (*Jones*, *Adams*) |
| Deposition of Bridget Bane (*Jones*) |
| Deposition of Curklin Atkins (*Jones*) |
| Deposition of James Stewart (*Jones*) |
| Deposition of Tonette Patterson (*Jones*) |
| Deposition of Robert Jones (*Jones*) |
| Discovery Requests and Responses (*Jones*) |
| OPDA *Brady* Policy under Leon Cannizzaro, Jr. |
| 12/3/2010 - Slide Deck (Ethics for Prosecutors) by Val Solino |
| E-mail from Donna Andrieu Re: *Brady* Checklist (Dec. 9, 2011) |
| *State v. Jones*, No. 356-745: Disc. Req. (Orleans Crim. Dist. Ct. July 2, 1992); Tr. of Sentencing (Orleans Crim. Dist. Ct. Apr. 2, 1996); State's Resp. to PCR (Orleans Crim. Dist. Ct. Dec. 13, 2007); Tr. of PCR Hr'g (Orleans Crim. Dist. Ct. Oct. 8, 2013); Tr. of Recusal Hr'g (Orleans Crim. Dist. Ct. Dec. 15, 2015); Tr. of Recusal Hr'g (Orleans Crim. Dist. Ct. Jan. 8, 2016); Tr. of Evid. Hr'g (Orleans Crim. Dist. Ct. Jan. 23–24, 2017); Nolle Prosse All Counts (Orleans Crim. Dist. Ct. Jan. 26, 2017) |
| *State v. Jones*, No. 2008-KA-0516, OPDA Opp. to Appl. for Writ (La. Ct. App. Aug. 8, 2008) |
| *Jones v. Cain*, No. 10-2625, Resp. to Pet. for Habeas Corpus Relief (E.D. La. July 31, 2012) |
| *State v. Jones*, No. 2014-K-0226, OPDA Reply Br. Re: PCR Writ (La. Ct. App. July 17, 2014) |
| Search Warrant Issued to James Stewart (Apr. 23, 1992) |
| Lester Jones Statement (Apr. 22, 1992) |
| Supplemental Incident Report for Woodfork / Freeman (Apr. 23, 1992) |
| Lorrell Woodfork Statement (Aug. 19, 1992) |
| Affidavit of Trina Wilson (Jan. 20, 2017) |
| Handwritten Notes Regarding Tonette Patterson (June 16, 1993) |
| Model Rules of Prof. Conduct R. 3.8(d) |

---

[1] In some cases, I reviewed only portions of documents that were relevant to my opinions.  For example, I referred to many of these documents for limited purposes, such as for the name(s) of the trial prosecutor(s).

| |
|---|
| ABA Standing Comm. on Ethics & Prof. Responsibility, Formal Op. 09-454 (2009) |
| LSBA, Articles of Incorporation, Art. 16, EC 7-13 (1971) |
| National Prosecution Standards, § 1-5.3 |
| Nat'l Ass'n Att'ys Gen., Prosecutor Training & Assistance Programs (1972) |
| Nat'l Ass'n Att'ys Gen., Training and Assistance Programs for Local Prosecutors (1978) |
| *Prosecutorial Imm.: Deconstructing Connick v. Thompson*, 13 LOY. J. PUB. INT. L. 305 (2012) |
| *N.O. Pros. Discl. in Practice After Connick v. Thompson*, 25 GEO. J. LEGAL ETHICS 913 (2012) |
| FPP, *The Recidivists: New Report on Rates of Prosecutorial Misconduct* (July 13, 2017) |
| *Brady* Documents Referenced on P. 12–14 of Report |
| Affidavit of Curklin Atkins (Dec. 3, 2012) |
| Deposition of Donald Rowan (*Adams*) |
| Deposition of Ralph Capitelli (*Adams*) |
| Deposition of Daniel Cazenave (*Adams*) |
| Deposition of Eric Dubelier (*Thompson*) |
| Deposition of John Jerry Glas (*Thompson*) |
| *Thompson v. Connick* – Trial Tr., Vols. 2–4 |
| Matt Sledge, *Key Police Report Frees Inmate Serving Life in Angola for Decades-Old Killing in Deal with Orleans DA*, THE ADVOCATE (June 16, 2017) |
| Pamela Coyle, *Court to DA: Stop Stalling Office Ordered to Disclose File*, TIMES-PICAYUNE (June 23, 1998) |
| James Varney, *DA Drops Murder Charge Inmate on Death Row Was Granted New Trial*, TIMES-PICAYUNE (Jan. 9, 1999) |
| Pamela Coyle, *Attorney's Debate Disrupts Murder Trial Judge Rebukes Prosecutors for Not Disclosing Facts,* TIMES-PICAYUNE (Aug. 28, 1997) |
| OPDA Magistrate Division Manuals, dated 1994, 1999 (Chapter III) |
| OPDA Introduction and Personnel Manual, dated 1993 |
| Roger Jordan Personnel File |
| OPDA Annual Reports – Trial Division |
| *Adams v. Cain*, No. 278-951: Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Oct. 31, 1980); Trial Tr. (Orleans Crim. Dist. Ct. Aug. 8, 1983); Tr. of PCR (Orleans Crim. Dist. Ct. May 12, 2014); Joint Mot. and Order to Vacate Conviction (Orleans Crim. Dist. Ct. May 14, 2014) |
| *Reginald Adams,* NAT'L REGISTRY OF EXONERATIONS (July 11, 2017) |
| *State v. Anderson*, No. 472-217: Docket and Judgment (Orleans Crim. Dist. Ct. Mar. 7, 2010) |
| *Bernard v. Connick*, No. 89-1916 (E.D. La. Apr. 8. 1991) |
| *State v. Bernard*, No. 249-257: Min. Entries; Disc. Req. & Answer (Orleans Crim. Dist. Ct.) |
| *State v. Bright*, 875 So.2d 37 (La. 2004) |
| *State v. Bright*, No. 375-994: Min. Entries; Disc. Req. & Answer (Orleans Crim. Dist. Ct.) |
| *Dan Bright,* NAT'L REGISTRY OF EXONERATIONS (July 10, 2014) |
| *State v. Bright & Truvia*, No. 252-514: Min. Entries; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Jan. 16, 1976); Judgment (Orleans Crim. Dist. Ct. Oct. 1, 2002) |
| *Earl Truvia Gregory Bright,* NAT'L REGISTRY OF EXONERATIONS (Dec. 3, 2018) |
| *State v. Bruer*, No. 504-599, Trial Tr. (Orleans Crim. Dist. Ct. Nov. 9, 2011) |
| *State v. Carney*, 334 So.2d 415 (La. 1976) |
| *State v. Carney*, No. 243-263: Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. 1974); Trial Tr. (Orleans Crim. Dist. Ct. Sept. 12, 1974) |

| |
|---|
| *Clark v. Blackburn*, 632 F.2d 531 (5th Cir. 1980) |
| *State v. Clark*, No. 244-191: Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Aug. 26, 1974); Trial Tr. (Orleans Crim. Dist. Ct. Dec. 4, 1974) |
| *State v. Cousin*, 710 So.2d 1065 (La. 1998) |
| *Shareef Cousin,* NAT'L REGISTRY OF EXONERATIONS |
| *Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973) |
| *State v. Curtis*, 384 So.2d 396 (La. 1980) |
| *State v. Curtis*, No. 266-983: Disc. Reqs. & Answers; Jury Trial Report (1979) |
| *State v. Duncan*, No. 450-320: Docket; Ruling on Mot. for New Trial (Orleans Crim. Dist. Ct. Aug. 19, 2005); Ruling (Orleans Crim. Dist. Ct. July 29, 2008) |
| *Floyd v. Vannoy*, No. 11-CV-2819, 2017 WL 1837676 (E.D. La. May 8, 2017) |
| *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) |
| *State v. Floyd*, Nos. 280-729 & 280-730: Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Apr. 28, 1981); Trial Tr. (Orleans Crim. Dist. Ct. Jan. 5–6, 1982) |
| *State v. Henderson*, No. 250-716: Min. Entries; Tr. of Colloquy (Orleans Crim. Dist. Ct. Mar. 25, 1993) |
| *Hudson v. Whitley*, 979 F.2d 1058 (5th Cir. 1992) |
| *Hudson v. Butler*, No. 91-140, Order and Reasons (E.D. La. Mar. 10, 1993) |
| Memo. from Mark Pethke to Scott Gardner, et al. Regarding *State v. Hudson* (Feb. 25, 1993) |
| *State v. Hudson*, No. 199-523, Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. June 27, 1967) |
| *Larry Hudson & Hayes Williams,* NAT'L REGISTRY OF EXONERATIONS (Apr. 24, 2019) |
| *State v. Hunter*, 648 So.2d 1025 (La. Ct. App. 1994) |
| *State v. Hunter*, No. 322-200, Min. Entry (Orleans Crim. Dist. Ct. July 27, 1988) |
| *State v. Jeanmarie*, No. 354-016: Min. Entries; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Jan. 16, 1992); Judgment (Orleans Crim. Dist. Ct. Apr. 24, 2002) |
| *State v. Knapper*, 579 So.2d 956 (La. 1991) |
| *State v. Knapper*, No. 270-437, Trial Tr. (Orleans Crim. Dist. Ct. Oct. 24, 1979) |
| *Isaac Knapper,* NAT'L REGISTRY OF EXONERATIONS |
| *Kyles v. Whitley*, 514 U.S. 419 (1995) |
| *State v. Kyles*, No. 303-970, Trial Tr. (Orleans Crim. Dist. Ct. Dec. 6–8, 1984) |
| *Curtis Kyles,* NAT'L REGISTRY OF EXONERATIONS (Oct. 28, 2015) |
| *Labran v. Cain*, No. 388-287: Amended Pet. for PCR; Min. Entry (Orleans Crim. Dist. Ct. July 7, 1997); Ruling Tr. (Orleans Crim. Dist. Ct. Oct. 3, 2001) |
| *State v. Lee*, 778 So.2d 656 (La. Ct. App. 2001) |
| *State v. Lee*, No. 412-994, Min. Entries (Orleans Crim. Dist. Ct. Apr. 4–5, 2000) |
| Rhonda Bell, *Mistrial Declared in Cop's Rape Case*, TIMES-PICAYUNE (Apr. 6, 2000) |
| *State v. Lewis*, No. 2006-KA-0730, 2006 WL 6912825 (La. Ct. App. Oct. 18, 2006) |
| *State v. Lewis*, No. 349-812: Disc. Req. & Answers; Trial Tr. (Orleans Crim. Dist. Ct. Nov. 7, 1995) |
| *State v. Lindsey*, 844 So.2d 961 (La. Ct. App. 2003) |
| *State v. Lindsey*, No. 319-721, Docket (Orleans Crim. Dist. Ct.) |
| *Mahler v. Kaylo*, 537 F.3d 494 (5th Cir. 2008) |
| *State v. Mahler*, No. 392-990: Disc. Reqs. & Answers; Trial Tr. (Orleans Crim. Dist. Ct. Apr. 20, 1998) |
| *Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1979) |

| |
|---|
| *State v. Monroe*, No. 242-040: Min. Entries; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Apr. 9, 1974) |
| *State v. Falkins*, 356 So.2d 415 (La. 1978) |
| *State v. Falkins*, No. 254-699, Min. Entries (Orleans Crim. Dist. Ct.) |
| *State v. Gibson*, No. 203-904: Min. Entries; Tr. of Colloquy and Testimony (Orleans Crim. Dist. Ct. Dec. 18, 1992); Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. May 31, 1968) |
| *Gibson v. State*, No. 99-C-1730 (La. Apr. 11, 2000) |
| *Roland Gibson,* NAT'L REGISTRY OF EXONERATIONS |
| *Monroe v. Maggio*, No. 83-6277, Mem. Op. (E.D. La. Feb. 28, 1984); Findings and Conclusions (E.D. La. Feb. 2, 1984); Order (E.D. La. Feb. 15, 1994) |
| *Monroe v. Butler*, 690 F.Supp 521 (E.D. La. 1988) |
| *Monroe v. Butler*, 883 F.2d 331 (5th Cir. 1988) |
| *State v. Monroe*, No. 261-647: Docket; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct.) |
| *State v. Morgan*, No. 367-809: Trial Tr. (Orleans Crim. Dist. Ct. Sept. 7, 1994); Order (Orleans Crim. Dist. Ct. July 24, 2014) |
| *State v. Oliver*, 682 So.2d 301 (La. Ct. App. 1996) |
| *State v. Oliver*, No. 368-638, Min. Entry (Orleans Crim. Dist. Ct. May 23, 1994) |
| *Perez v. Cain*, No. 04-CV-1905, 2008 WL 108661 (E.D. La. Jan. 8, 2008) |
| *State v. Perez*, No. 385-086: Min. Entries; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Mar. 4, 1997) |
| *State v. Perkins*, 423 So.2d 1103 (La. 1982) |
| *State v. Perkins*, No. 270-075: Min. Entries; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. 1979) |
| *State v. Rideau*, No. 2001-K-0146 (La. Ct. App. May 7, 2001) |
| Gwen Filosa, *Man Strikes Plea Deal in 1994 Slaying Prospect of New Trial Worried Prosecutors*, TIMES-PICAYUNE (May 23, 2003) |
| *State ex rel. Rideau v. State*, 749 So.2d 646 (La. 1999) |
| *State v. Rideau*, No. 374-848, Min. Entry (Orleans Crim. Dist. Ct. Oct. 11, 1995) |
| *State v. Rosiere*, 488 So.2d 965 (La. 1986) |
| *State v. Rosiere*, 476 So.2d 816 (La. Ct. App. 1985) |
| *State v. Rosiere*, No. 298-334: Min. Entries; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct.) |
| Walt Philbin, *Ex-Cop Tries to Pay Debts, Claim Salary*, TIMES-PICAYUNE (June 18, 1989) |
| *Robinson v. Cain*, 510 F. Supp. 2d 399 (E.D. La. 2007) |
| Rhonda Bell, *Jury Finds N.O. Killer Guilty in Mins.*, TIMES-PICAYUNE (Mar. 2, 1999) |
| *Smith v. Cain*, 565 U.S. 73 (2012) |
| *Smith v. Cain*, No. 10-8145, Joint App'x (U.S.) |
| *State v. Smith*, No. 378-343, Disc. Reqs. and Answers (Orleans Crim. Dist. Ct.) |
| *State v. Thompson*, 825 So.2d 552 (La. Ct. App. 2002) |
| *State v. Thompson*, No. 305-826, Disc. Reqs. and Answers (Orleans Crim. Dist. Ct.) |
| *Triplett v. Cain*, No. 04-CV-1434, Order and Reasons, ECF No. 43 (E.D. La. Sept. 29, 2011) |
| *Triplett v. Cain*, No. 04-CV-1434, 2011 WL 3678173 (E.D. La. July 7, 2011) |
| *State v. Triplett*, No. 400-740, Jury Trial Report (Oct. 28, 1998) |
| *State v. Walker*, No. 372-370, Tr. of Proceedings (Orleans Crim. Dist. Ct. Aug. 27, 1997) |
| *State v. Warner*, No. 508-807: Docket; Hr'g Tr. (Orleans Crim. Dist. Ct. Aug. 15, 2013) |
| *State v. Washington*, 546 So.2d 1360 (La. Ct. App. 1989) |

| |
|---|
| *State v. Washington*, No. 321-012, Trial Tr. (Orleans Crim. Dist. Ct. Mar. 16, 1988) |
| *State v. Wells*, 191 So.3d 1127 (La. Ct. App. 2016) |
| *State v. Wells* No. 480-153: Docket (Orleans Crim. Dist. Ct); Appl. for Post-Conviction Relief (Orleans Crim. Dist. Ct. July 9, 2018) |
| *In re Williams*, 984 So.2d 789 (La. Ct. App. 2008) |
| *State v. Williams*, No. 259-071: Min. Entries; Disc. Req. & Answer (Orleans Crim. Dist. Ct. July 18, 1977) |
| *Calvin Williams,* Nat'l Registry of Exonerations (Mar. 2, 2017) |
| *State v. Williams*, No. 199-523: Mot. for New Trial and or to Set Aside Guilty Plea (Orleans Crim. Dist. Ct. Feb. 16, 1993); Tr. of Colloquy (Orleans Crim. Dist. Ct. Feb. 19, 1997) |
| *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991) |
| *Williams v. Butler*, No. 88-5718, Finding & Rec. (E.D. La. Feb. 3, 1992); Order (E.D. La. Mar. 11, 1992); Doc. No. 35 (E.D. La. Mar. 13, 1992) |
| *State v. Burse*, No. 2016-KA-0826, Mot. to Stay & Remand La. Ct. App. Mar. 24, 2017) |
| *State v. Burse*, No. 507-903: Docket; Second Mot. for New Trial (Orleans Crim. Dist. Ct. Mar. 24, 2017) |
| *State v. Burse*, No. 507-903, Docket (Orleans Crim. Dist. Ct.) |
| *State v. Conway*, No. 377-313: Min. Entry (Orleans Crim. Dist. Ct. Jan. 16, 1996); Amend. Appl. for PCR (Orleans Crim. Dist. Ct. Sept. 3, 2013); Plea & Sentencing Tr. (Orleans Crim. Dist. Ct. Mar. 21, 2014) |
| *State v. Duncan*, 26 So.3d 148 (La. 2010) |
| *Duncan v. Cain*, No. 290-908, Subm. in Light of La. Sup. Ct. Ruling (Orleans Crim. Dist. Ct.) |
| *State v. Duncan*, No. 290-908: Minute Entries; Disc. Reqs. & Answers (Orleans Crim. Dist. Ct. Oct. 8, 1982); Tr. of Boykinization (Orleans Crim. Dist. Ct. Jan. 7, 2011) |
| *State ex rel. East v. State*, No. 375-708: Min. Entries; Order for Evid. Hr'g (Orleans Crim. Dist. Ct. Jan. 3, 2017); Tr. of Ct. Proceedings (Orleans Crim. Dist. Ct. June 13, 2017) |
| *State v. Johnson*, No. 261-130: Min. Entries; Trial Tr.  (Orleans Crim. Dist. Ct. Oct. 10, 1978); Appl. for PCR (Orleans Crim. Dist. Ct. Oct. 31, 2016); Mot. to Vacate Conviction & Sentence (Orleans Crim. Dist. Ct. Feb. 7, 2018) |
| *Ross v. Phelps*, No. 80-458: R & R (E.D. La. Nov. 18, 1981); Joint Mot. for Habeas & Stips. (E.D. La. Dec. 1, 1981); Order (E.D. La. Dec. 7, 1981); Judgment (E.D. La. Dec. 8, 1981) |
| Memo. from J. Craft to Hon. J. Bossetta Re: *State v. Johnny Ross*, No. 244-391 (Dec. 9, 1981) |
| *State v. Ross*, No. 244-391: Min. Entries; Disc. Request & Answer (Orleans Crim. Dist. Ct. Oct. 2, 1974) |
| *State v. Tucker*, No. 482-303: Docket; Sup. Mot. for New Trial (Orleans Crim. Dist. Ct. Oct. 7, 2011); Joint Mot. to Vacate Conviction and Sentence (Orleans Crim. Dist. Ct. Feb. 10, 2012) |
| *State v. Wolfe*, No. 380-150: Min. Entries; Appl. for PCR (Orleans Crim. Dist. Ct. Feb. 20, 2013) |
| *Johnson v. Cain*, 68 F. Supp. 3d 593 (E.D. La. 2014) |
| *State v. Johnson*, No. 253-115: Min. Entries; Disc. Reqs. (Orleans Crim. Dist. Ct. Mar. 16, 1976) |
| *State v. Parker,* 361 So.2d 226 (La. 1978) |
| *State v. Parker*, No. 244-612, Min. Entries (Orleans Crim. Dist. Ct.) |
| *State v. Ruano*, No. 500-456: Docket; Min. Entries; PCR Appl. & Mem. (Orleans Crim. Dist. Ct. Mar. 22, 2017); PCR Hr'g Tr. (Orleans Crim. Dist. Ct. Mar. 28, 2017) |

*State v. Smith & Scire*, No. 89-KA-0001: Br. of Appellant Anthony Scire; Br. of Appellant Clarence Smith (La. Jan. 27, 1992)

*State v. Smith & Scire*, No. 298-874, Trial Tr. (Orleans Crim. Dist. Ct. Feb. 6, 1985)

*State v. Smith*, 600 So.2d 1319 (La. 1992)

*State v. Smith*, 591 So.2d 1219 (La. Ct. App. 1991)

*State v. Smith & Wilkerson*, No. 326-873: Disc. Reqs. & Answers; Min. Entry (Orleans Crim. Dist. Ct. June 27, 1988)

*Eddie Triplett,* NAT'L REGISTRY OF EXONERATIONS (Oct. 22, 2016)

*Allen v. State*, 1196 S.E.2d 660 (Ga. Ct. App. 1973)

*Freeman v. State of Georgia*, 599 F.2d 65 (5th Cir. 1979)

*Freeman v. State of Georgia*, 204 S.E.2d 445 (Ga. Ct. App. 1974)

*Matter of Lee*, 799 S.E.2d 766 (Ga. 2017)

Rhonda Cook, *Fulton County Prosecutor Accused of Withholding Evidence*, ATLANTA JOURNAL-CONSTITUTION (Dec. 12, 2013)

*McClendon v. State of Georgia*, 820 S.E.2d 167 (Ga. Ct. App. 2018)

*State of Georgia v. McClendon*, No. 14-SC-128239, Docket

*Branch v. State of Tennessee*, 469 S.W.2d 533 (Tenn. Crim. App. 1969)

*Freshwater v. State*, 354 S.W.3d 746 (Tenn. Crim. App. 2011)

Lawrence Buser, *Plea Ends Long Trail to Resolve '66 Killings -- Sentenced to 25 Years, Freshwater May Be Freed*, MEMPHIS COMMERCIAL APPEAL (Oct. 29, 2011)

*Johnson v. State of Tennessee*, 38 S.W.3d 52 (Tenn. 2001)

*State of Tennessee v. Johnson*, 762 S.W.2d 110 (Tenn. 1988)

*State of Tennessee v. Ballard*, No. 99, 1991 WL 18697 (Tenn. Crim. App. Feb. 20, 1991), *aff'd*, 855 S.W.2d 557 (Tenn. 1993)

*Frances Ballard*, NAT'L REGISTRY OF EXONERATIONS (June 18, 2014)

*Thomas v. Westbrooks*, 849 F.3d 659 (6th Cir.), *cert. denied*, 138 S. Ct. 390 (2017)

*State of Tennessee v. Thomas*, 158 S.W.3d 361 (Tenn. 2005)

*State of Tennessee v. Jackson*, 444 S.W.3d 554 (Tenn. 2014)

*State of Tennessee v. Jackson*, No. W2009-01709-CCA-R3CD, 2012 WL 6115084 (Tenn. Crim. App. Dec. 10, 2012), *rev'd in part*, 444 S.W.3d 554 (Tenn. 2014)

*Laney v. State of Missouri*, 584 S.W.2d 411 (Mo. Ct. App. 1979)

*Austin v. Wyrick*, 535 F.2d 443 (8th Cir. 1976)

*State of Missouri v. Austin*, 496 S.W.2d 799 (Mo. 1973) (en banc)

*State of Missouri v. McClain*, 498 S.W.2d 798 (Mo. 1973)

*State of Missouri v. Brooks*, 513 S.W.2d 168 (Mo. Ct. App. 1973)

*State of Missouri ex rel. Koster v. Green*, 388 S.W.3d 603 (Mo. Ct. App. 2012)

*George Allen, Jr.*, NAT'L REGISTRY OF EXONERATIONS (Feb. 6, 2018)

Tim Poor, *Prosecutor Lied, Says U.S. Judge Court Delays Trial in Child Rape Case*, ST. LOUIS POST-DISPATCH (May 4, 1990)

Andre Jackson, *Judge Declares Mistrial in City Sex Abuse Case*, ST. LOUIS POST-DISPATCH (June 9, 1989)

*State ex rel. Clemons v. Larkins*, 475 S.W.3d 60 (Mo. 2015)

Robert Patrick, *Judge Reverses 1995 Murder Conviction, Says St. Louis Prosecutors Withheld Evidence*, ST. LOUIS POST-DISPATCH (June 20, 2014)

*Merriweather v. State of Missouri*, 294 S.W.3d 52 (Mo. 2009)

| |
|---|
| Tony Messenger, *Messenger: Gardner's New Conviction Integrity Unit Alleges Perjury and Misconduct in 1994 Murder Case*, ST. LOUIS POST-DISPATCH (July 24, 2019) |
| OPDA CLE Materials |
| Gwen Filosa, *COURT IS ADJOURNED: New Orleans' Longtime and Controversial DA Harry Connick Says He Has No Regrets and Looks Forward to His Family Time and His Singing Career*, TIMES-PICAYUNE (Jan. 10, 2003) |
| John Simerman, *Newly Revealed Memo Shows Orleans Parish DA's Office Can't Handle 1992 French Quarter Kidnapping and Rape Case, Defense Argues,* THE ADVOCATE (Oct. 5, 2015) |
| Samuel Gross & Michael Shaffer, *Exonerations in the United States, 1989-2012, Report by the National Registry of Exonerations* |
| Emily West & Vanessa Meterko, *Innocence Project: DNA Exonerations (1989-2014): Review of Data and Findings from the First 25 Years,* 79 ALBANY L. REV. (2015) |
| Letter from William Aaron to Gwen Roberson Regarding *State v. Jones* (May 10, 2007) |
| Materials Regarding Bar Complaints Against Roger Jordan, Frederick Menner, and Andrew Pickett by Emily Maw and Richard Davis |
| Memo from D. Pipes Re: "Policy Regarding Disclosure of Information" (May 19, 2016) |
| 1998 Screening Division Manual |
| 1999 Chapter VI - Investigations Division |
| 2000 Chapter II - Executive |
| 2000 Chapter VII - Appeals Division |
| 2002 Diversionary Program Policies and Procedures Manual |
| 2003-07 (est.) OPDA Trial Division Policy Manual Vols. 1–4 |
| 2004 OPDA Appeals Division Policy Manual |
| 2004 Records Management Procedures |
| 2009 OPDA DA Investigator's Manual |
| 2010 Trials Division Manual |
| 2016 (est.) OPDA Human Resources Policy and Procedure Manual |
| New Orleans District Attorney's Office Magistrate Manual |
| Undated *Brady* Handout (OPDA-JONES07919) |
| Pamela Coyle, *New Trial Ordered in Death of Child Description of Driver Disputed*, TIMES-PICAYUNE (Mar. 14, 1998) |
| Pamela Coyle, *Judge Gives Prosecutors Tongue-Lashing*, TIMES-PICAYUNE (Jan. 17, 1998) |

# Appendix B

**LAURIE L. LEVENSON**
Loyola Law School
919 So. Albany Street
Los Angeles, CA  90015
W:  (213) 736-1149
Laurie.Levenson@lls.edu

## EMPLOYMENT

| | |
|---|---|
| Spring 2008 – Present | **DAVID W. BURCHAM CHAIR IN ETHICAL ADVOCACY** <br> First holder of new Professor Chair dedicated to ethical issues and advocacy in the criminal justice system.  Teach and coordinate programs on criminal law, criminal procedure, ethics and advocacy. |
| Fall 2012 – Present | **FOUNDING DIRECTOR, LOYOLA'S PROJECT FOR THE INNOCENT** <br> Established and supervise Innocence Project dedicated to overturning wrongful convictions.  Helped to institute new conviction Review Unit for Los Angeles County District Attorney's Office and adoption of new ethical rules for prosecutors' discovery obligations in California. |
| Fall 2000 – Present | **PROFESSOR OF LAW** <br> **WILLIAM M. RAINS FELLOW** <br> **DIRECTOR, CENTER FOR ETHICAL ADVOCACY** <br> **& FIDLER INSTITUTE ON CRIMINAL JUSTICE** <br> **LOYOLA LAW SCHOOL** <br> Teach and research ethics, criminal law, criminal procedure, advanced criminal justice, terrorism and the law, and white collar crime.  Coordinate curriculum, faculty, speakers and institutes for advocacy program. <br><br> **DISTINGUISHED VISITING PROFESSOR** <br> Visiting professor in criminal law, criminal procedure, evidence and Anti-terrorism at UCLA School of Law, USC School of Law, Pepperdine School of Law. |
| Spring 2005 – Present | **LECTURER AND COORDINATOR** <br> **JOURNALIST LAW SCHOOL** <br> Regular lecturer and coordinator for Loyola's Journalist Law School. Lecturer on Criminal Law, Criminal Procedure and Advanced Criminal Justice issues, including police misconduct. |
| Spring 1996 - April 1999 | **ASSOCIATE DEAN FOR ACADEMIC AFFAIRS** <br> **LOYOLA LAW SCHOOL** <br> Responsible for curriculum, faculty matters, student discipline and campus scholarship and teaching.  Additional responsibilities include:  fundraising, alumni relations and community relations. |
| Fall 1981-June 1989 | **ASSISTANT UNITED STATES ATTORNEY** <br> **UNITED STATES ATTORNEY'S OFFICE, LOS ANGELES** <br> Federal criminal prosecutor with both trial and appellate practice. Investigation and prosecution of white collar offenses, public corruption, narcotics crimes, conspiracies, civil rights violations, and violent federal offenses. |

1988-89:        Chief, Training Section

1

| | |
|---|---|
| 1986-88: | Chief, Criminal Appeals |
| 1983-85: | Major Frauds Unit |
| 1982-83: | Major Crimes Unit |

Commendations and Awards:
1988 Atty General Director's Award for Superior Performance
Commendations from FBI, IRS, U.S. Postal Service and DEA

**Fall 1982-Spring 1989**   **ADJUNCT PROFESSOR OF LAW**
**SOUTHWESTERN UNIVERSITY SCHOOL OF LAW**
Professor for Professional Responsibility, Advanced Criminal Law,
and Post-Conviction Relief Courses.

**Fall 1980-Spring 1981**   **JUDICIAL LAW CLERK**
**THE HONORABLE JAMES HUNTER, III**
**U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT**
Prepared bench memoranda, drafted opinions, conducted legal
research, supervised law externs.

## EDUCATION

Legal   **UCLA SCHOOL OF LAW**
J.D., 1980

| | | |
|---|---|---|
| 1978-80 | | UCLA Law Review |
| | - | Chief Article Editor |
| | - | Published:  27 UCLA Law Rev. 177 |
| | | "Res Judicata and § 1983" |
| 1979-80 | | UCLA Moot Court Program |
| | - | Invitee |
| 1979-80 | | Teaching Assistant |
| | - | Civil Procedure and Legal Research |

Undergraduate   **STANFORD UNIVERSITY**
A.B., June 1977, Departmental Honors
Major, Political Science
Activities:
- Honors Project in International Terrorism
- Varsity Crew
- Student Conduct Legislative Council
- Stanford Speaking Bureau

**STANFORD-IN-BRITAIN**
Studied Health Care Administration and Delivery in Great Britain.
Member of interdisciplinary team, Horton General Hospital,
Banbury.  Summer '75.

## ADDITIONAL WORK EXPERIENCE

**Summer 1978**   **RESEARCH ASSISTANT**
**PROFESSOR THEODORE EISENBERG, UCLA LAW SCHOOL**
Research for civil rights article on § 1983 immunities.

**Fall 1976**   **RESEARCH AIDE**
**MELVIN KENNEDY, ATTORNEY**
Researched evidence and law for Title VII employment
discrimination cases.

## PUBLICATIONS

### Books

FEDERAL CRIMINAL RULES HANDBOOK (Thomson Reuters 2019)

HANDBOOK ON CALCRIM INSTRUCTIONS (Thomson Reuters 2019)

CALIFORNIA CRIMINAL LAW (Thomson Reuters 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019)

CALIFORNIA CRIMINAL MOTIONS (Thomson Reuters 2010, 2011, 2012, 2013, 2014, 2015, 2016. 2017, 2018, 2019)

STUDENT GUIDE TO FEDERAL CRIMINAL RULES (WEst 2003)

California Criminal Procedure (Thomson Reuters 2019, 2018, 2017, 2016, 2015, 2014, 2013, 2012, 2011, 2010, 2009, 2008, 2007, 2006, 2005, 2004, 2002-2003, 1999, 1995)

ROADMAP OF CRIMINAL LAW (5th edition 2016)

Co-editor, MOORE'S FEDERAL PRACTICE (3rd Ed. 1997)

GLANNON GUIDE TO CRIMINAL LAW (Aspen Publishing Co./ Wolters Kluwer) (2014 4th Ed.)

Levenson, Crump & Cohen, CRIMINAL LAW   (Lexis/ Nexus Publishing Co.) (2005)

Chemerinsky & Levenson, CRIMINAL PROCEDURE (Aspen Publishers/ Wolters Kluwer) (2018) (3rd edition)

JOURNALIST GUIDE TO AMERICAN LAW  (2013) (CO-AUTHOR)

COMPLEX CRIMINAL LITIGATION (2019) (CO-AUTHOR)

EVIDENCE (forthcoming 2021)


### Book Chapters

Judaism and Criminal Justice, Ch. 24 (Oxford University Press 2012)

Supreme Court Fourth Amendment Developments 2000-2001, published in 17th Annual Section 1983 Civil Rights Litigation (2001)

"Free Press/Fair Trial," Chapter in Supplement III, Encyclopedia of the American Constitution (1998)

Treatise on California Criminal Law, Conspiracy Chapter (1994)

Encyclopedia Britannica, White Collar Crime (2002)

My First Year as a Lawyer, Edited by Mark Simenhoff (1994)

Life in the Ladies Lane, Edited by Jacquelyn Slotkin (2007)

Encyclopedia of the American Constitution, Supplement II, "Free Press/Fair Trial" 1997)

3

Death Penalty & Purposes of Punishment, Jewish Choice & Jewish Voices (2008)

THE OXFORD HANDBOOK ON JEWISH ETHICS AND Morality (edited by Elliot Dorff and Jonathan    Crane) (Dec. 2012) (author, Chapter on Judaism and Criminal Justice)

MEDIA COVERAGE IN CRIMINAL JUSTICE CASES (2013)

WORDS ALONE, SPEAKING OF LANGUAGE AND THE LAW (Oxford Press) (2014)

**Law Review Articles**

*Judicial Ethics:  Lessons from the Chicago Eight Trial*, LOY. U. CHI. L.J. (forthcoming 2019)

*Politicization of Prosecutors,* 16 Ohio St. J. Crim. Law (forthcoming 2019)

Book Review, *"We the People":  A Guide for the Perplexed Progressive*, L.A. Review of Books (April 2019)

*The Politics of Ethics*, 69 Mercer L. Rev. 1 (2018)

*Finding Justice*, Univ. of Akron ConLaw NOW Journal (Spring 2017)

*The Problem with Cynical Prosecutor's Syndrome:  Rethinking a Prosecutor's Role in Post-Conviction Cases*  (20 Berkeley Journal of Criminal Law 2 (March 2016)

*Searching for Injustice:  The Challenge of Postconviction Discovery, Investigation and Litigation*, 87 S. CAL. L. REV. 101 (2014)

*Discovery from the Trenches:  The Future of Brady*, 60 UCLA L. Rev. Disc. 74 (2013)

Book Review, *"The People's Courts:  Pursuing Judicial Independence in America*, 62 Journal of Legal Education 4 (May 2013)

*Peeking Behind the Plea Bargaining Process,* 46 LOY. L.A. L. REV.457 (2013)

*Post-Conviction Death Penalty Investigations:  The Need for Independent Investigators*, 44 LOY. L.A. L REV. S225 (2011)

*Conflicts Over Conflicts:  Challenges in Redrafting the ABA Standards for Criminal Justice on Conflicts of Interest*, 39 HASTINGS CONST'L LAW QUARTERLY 101 (2011)

*On One Foot:  Book Review of "In the Name of Justice,"* 43 LOY. L. REV. 627 (2010)

*Prosecutorial Soundbites:  When do they Cross the Ethical Line?,* 44 GEORGIA L. REV. 1021 (2010)

*Res Judicata and Section 1983: The Preclusive Effect of State Court Actions on Federal Civil Rights Cases,* 27 UCLA L. REV. 177 (1979)

*Good Faith Defenses: Reshaping Strict Liability Crimes,* 78 CORNELL L. REV. 401 (1993)

*Change of Venue and the Role of the Criminal Jury,* 66  S. CAL. L. REV. 1533 (1993);

*The Law of Prime Numbers,* 68 N.Y.U. L. REV. 185 (1993)

*The Future of State and Federal Civil Rights Cases: The Lessons of the Rodney King Trial,* 41 UCLA L. REV. 509 (1994)

*NAFTA:  A Criminal Justice Impact Report,* 27 U.C. DAVIS L. REV. 509 (1994)

*Reporting the Rodney King Trial: The Role of Legal Experts,* 27 LOY. L.A. L. REV. 649 (1994)

*The Future of State and Federal Civil Prosecutions: The Lessons of the Rodney King Trial,* 41 UCLA L.REV. 509 (1994)

*Ethics of Legal Commentators,* Chemerinsky & Levenson, 69 S. CAL. L. REV. 1303 (1996)

*The Ethics of Being a Commentator II,* 37 SANTA CLARA L. REV. 913 (1997)

*The Jurisprudence of Yoga Berra,* 46 EMORY L.J. 697 (1997)

*Administrative Replacements: How Much Can They Do?,* 26 PEPP. REV. 879 (1998)

*The Ethics of Legal Commentators III,* Levenson & Chemerinsky, 50 MERCER L. REV. 737 (Spring 1999)

*Working Outside the Rules: The Undefined Responsibilities of Federal Prosecutors,* 26 FORDHAM URB. L.J. 553 (1999)

*Cases of the Century,* 33 LOY. L.A. L. REV. 585 (2000)

*Popular Culture or Popular Laws,* JURIST (Nov. 2000) (Book Review)

*Unnerving the Judges:  Judicial Responsibility for the Rampart Scandal,* 34 LOY. L.A. L. REV. 787 (2001)

*Supreme Court Fourth Amendment Developments* 2000-2001, 665 PLI/LIT 853 (2001)

*Police Misconduct & New Models for Reform,* 35 SUFFOLK U. L. REV. 1 (2001)

*Witness to History:  The Role of Legal Commentators in High Profile Trials,* 49 CLEV. ST. L. REV. 439 (2001)

*Police Corruption and New Models for Reform,* 35 SUFFOLK L. REV. 1 (2001).

*Detention, Material Witnesses & the War on Terrorism,* 35 LOY. L.A. L. REV. 1217 (2002)

*High Profile Prosecutors & High Profile Conflicts,* 39 LOY. L.A. L. REV. 1237 (2006)

*Courtroom Demeanor: The Theater of the Courtroom,* 92 MINN. L. REV. 573 (2008)

*The Dirty Little Secrets about Pay-To-Stay,* Levenson & Gordon, 106 MICH. L. REV. 67 (2007)

*Live and Learn: Depoliticizing the Interim Appointment of U.S. Attorneys,* 31 SEATTLE U.L.REV. 297 (2008)

**Misc. Law Review**

*Memorial to William J. Landers,* 26 LOY. L.A. L. REV. 276 (1993)

*Tribute to Judge Richard A. Gadbois,* 30 LOY. L.A. L.REV. 1427 (1997)

*The Sound of Silence: Reflections on the Use of the Gag Order,* 17 LOY. L.A. ENT. L.J. 305 (1997)

5

## Reports

Report on Orange County District Attorney's Office, Use of Prison Informants (January 2016)

An Independent Analysis of the Los Angeles Police Department's Board of Inquiry Report on the Rampart Scandal, Chemerinsky, Hoffman, Levenson, Paz, Rice, Sobel, 666 PLI/Lit 169 (2001)

Blue Ribbon Rampart Review ("Rice") Commission Report to the Los Angeles Police Commission Regarding Reforms to the Los Angeles Police Department (2006)

California Commission for the Fair Administration of Justice, Report on Prosecutorial Misconduct with focus on Brady policies (2007)

Webster Commission, Study of the Causes of the Los Angeles Riots Following the Rodney King Verdict  (Nov. 9, 1992)

Special Advisory Counsel, Los Angeles County District Attorney's Office , Review of Policies & Practices of  Largest District Attorney's Office in the United States (2004)


## Newspaper and Magazine Articles

Michael Cohen was Doomed Because Trump Thinks Lawyers Are Lackeys, Washington Post (Aug. 24,  2018)

How to Judge Kavanaugh's Credibility, https://the hill.com/opinion/judiciary/409484-how-to-judge-kavanaughs-credibility (with John Nockleby) (Oct. 2, 2018)

Preventing Juror Misconduct is a Big Challenge, Nat'l L. J. (Nov. 21, 2016)

The "Plain Hearing" Doctrine and the 'Carey Rule, Nat'l L.J. (Sept. 26, 2016)

 "The Patty Hearst Story:  Too Bizarre to Make Up," Book Review of Jeffrey Toobin's "American Heiress," LA Review of Books (Nov. 9, 2016) (10 pages)

Summary Judgments, "Trump is Yugely Wrong in His Attack on Judges (June 6, 2016)

 "Because of Sex," Book Review, L.A. Review of Books (Apr. 25, 2016)

Batson Report:  What Counts as Discriminatory Challenges, Nat'l L. J. (June 6, 2016).

 "Scalia on Criminal Law:  Unpredictable," Nat'l L. J. (Feb. 29, 2016)

"Police Should be Open, Honest About Their Mistakes," Op-Ed, Orange County Register (Aug. 7, 2015)

"Clinton's Email:  Unwise, But Likely Not Criminal," Nat'l. L. J. (Sept. 21, 2015)

"Rights and Restrictions of Pro Se Defendants," Nat'l L. J. (June 8, 2015)

"Monitoring Prisoner Emails: Does Privileged Communication in Custody Really Exist?" L.A. Daily Journal (July 28, 2014)

"California is Overdue in Adopting Rule on Exculpatory Evidence," LA Times (Dec. 15, 2014) (op-ed)

"Truth and Lies about Polygraph Evidence in the Criminal Justice System," Nat'l L. J. (June 2014)

6

*"Technology and the Fourth Amendment,"* Nat'l L. J. (Oct. 2014)

 "Court of Public Opinion – Not Court of Law," Nat'l Law Journal (Dec. 15, 2014)

"A Pressing Need for Access to Cellphone Data," Nat'l Law Journal (Oct. 13, 2014)

"California is Overdue in Adopting Rule on Exculpatory Evidence," L.A. Times (Dec. 15, 2014)

"Sometimes Jurors Do the Darndest Things," Nat'l Law Journal (June 17, 2013)

"When Time is Stacked Against the Defendant:  Lost or Incapacitated Witnesses in Habeas
        Proceedings," Nat'l Law Journal (Nov. 11, 2013)

"Searches and Mentally Ill Suspects," Nat'l Law Journal (Mar. 17, 2014)

Book Review:  "The People's Courts:  Pursuing Judicial Independence in America," 62 Journal of
        Legal Education 631 (May 2013)

"When Legislators Actually Mattered," Book Review of American Founding Son:  John Bingham and
the Invention of the 14th Amendment, LA Review of Books (2/6/14)

Op-Ed, Los Angeles Times:  "Policing L.A.'s Sheriffs:  Protocols for the Office of the Independent
        Review  (Nov. 1, 2013)

"Rebels at the Bar:  The Fascinating, Forgotten Stories of America's First Women Lawyers," Los
Angeles Review of Books, July 25, 2013 (5 pages)

*"Supreme Court's Rulings on Ineffective Assistance at Plea Bargaining Stage Call for New Efforts
        by Not Only Defense Counsel But Also Prosecutors and Judges,* 91 Criminal Law Reporter 1
        (BNA 4-25-12)

*Retroactivity of Cases on Criminal Defendant's Rights*, Nat'l L. J. 26 (Aug. 13, 2012)

*A Variety of Hurdles to Prosecuting Gun Charges*, Nat'l L J. 26 (Jan. 14, 2013)

*Diversity Lacking on State Bench*, L.A. Daily J. 7 (Feb. 15, 2013)

*Despite Basic Rules, Interesting Venue Issues Often Arise*, L.A. Daily J. 5 (Aug. 9, 2012)

*Book Review:  Death on a High Floor:  A Legal Thriller*, L.A. Daily J. 8 (Apr. 12, 2012)

Retroactivity of Cases on Criminal Defendants' Rights, National Law Journal (Aug. 13, 2012);

Naming Names:  Shaming Prosecutorial Misconduct, National Law Journal (Mar. 12,
        2012)

Just Do it:  The Importance of Training Law Students in Public Advocacy, Daily Journal
(Sept. 27, 2011)

"Do GPS Tracking Devices Violate the 4th Amendment," National Law Journal 9 (May
        30, 2011)

*Looking Forward to 2011:  Key Criminal Procedure Cases*, L.A. Daily J. A8 (Dec. 30,
2010)

*Just Give Me a Real Lawyer*, National Law Journal A10 (Aug. 9, 2010)

*Criminal Fraud Cases Survive Skilling Decision*, National Law Journal A7 (Jan. 3, 2011)

Mandatory Minimum Sentencing Flaws Show Need for Congressional Remedy, 87 Crim.
       Law Reporter 531 (June 30, 2010) (12 pages)

 "Mandatory Minimum Sentencing Flaws Show Need for Congressional Remedy," BNA
       Reporter (June 30, 2010)

"Avoiding the Perils and Pitfalls of Internal Corporate Investigations:  Proper Use of
       *Upjohn* Warnings," ABA *Litigation* Journal (Feb. 2010)

"Strict Liability Offenses:  Are They Real Crimes?" 25 Crim. Justice (Spring 2010)

"Interference with Potential Defense Witnesses" (Apr. 5, 2010)

"Beware of Binding Plea Agreements," Nat'l L. J. (Oct. 5, 2009)

"The Fading Exclusionary Rule," Nat'l L. J. (June 8, 2009)

"Honest Services Fraud," Nat'l L. J. (Mar. 9, 2009)

"Negotiating Federal Guilty Pleas in a Post-*Gall* Sentencing World, 23 ABA Criminal
       Justice 40 (Fall 2008)

"The Future of the Exclusionary Rule," L.A. Daily J. 7 (Nov. 19, 2008)

"Computer Searches," Nat'l L. J. (Oct. 13, 2008)

"Griffin Errors," Nat'l L. J. (Aug. 4, 2008)

"Passenger Rights," Nat'l L.J. (May 26, 2008)

 "Beating Traffic," L.A. Daily J. 7 (Apr. 23, 2008)

"Ex Post Facto Law," Nat'l L.J. (Mar.17, 2008)

"Out Of the Question," L.A. Daily J. 6 (Feb. 21, 2008)

"Privacy Rights," Nat'l L.J. (Jan. 7, 2008)

"Reopening Closing Arguments," L.A. Daily J. 7 (Dec. 26, 2007)

"O.J.'S Kidnapping Charge" Nat'l L.J. (Oct. 8, 2007)

"Grand Defense: Juries: L.A. Daily J. 7 (July 24, 2007)

"Forfeiture by Wrongdoing," Nat'l L.J. (July 23, 2007)

"Criminal Searches at Work," L.A. Daily J. (June 4, 2007)

"Defrauding the Courts," Nat'l L.J. A13 (May 7, 2007)

"Post-Hypnotic Testimony," L.A. Daily J. A7 (Apr. 9, 2007)

"Entrapment Defenses," Nat'l L.J. A13 (Feb. 5, 2007)

"Calibrating ethics in criminal law," L.A. Daily J. 6 (Feb. 2, 2007)

"The Ethical Minefield of Criminal Law," L.A. Daily J. A8 (Jan 2007)

"A Delicate Balance:  The Exigent Circumstances Exception," L.A. Daily J. A9 (June 20, 2006)

"Test? What Test?  Courts Leave Policies to Prison Officials," L.A. Daily J. A9 (Aug. 8, 2006)

"Dangers of Being Too Creative with Punishment," L.A. Daily J. A8 (Oct. 18, 2006)

"U.S. Can't Try Simpson for Murder," L.A. Daily J. A8 (Dec. 6, 2006)

"Using Plain English," Nat'l L. J. A16 (Dec. 4, 2006)

"Probationary Web Use," Nat'l. L.J. A13 (Oct. 9, 2006)

"RICO Gangs," Nat'l L.J. A13 (July 2006)

"Polygraphs," Nat'l L. J. A9 (June 5, 2006)

"Prisoner Rights," L.A. Daily J. A9 (Aug. 8, 2006)

"Attorney-Client Privilege and Warrant Affidavits," L.A. Daily J. A7 (Apr. 21, 2006)

"Wiretaps," L.A. Daily J. A9 (Feb. 28, 2006)

"Ethical Standards for Legal Commentators," Cal. Cts. Review (Jan. 2006)

"Deciding to Testify," Nat'l L. J. A10 (May 16, 2005)

"Sentencing Tsunami," Nat'l L J. A20 (July 18, 2005)

"Federal and State Drug Laws," L.A. Daily Journal, A9 (Dec. 27, 2005)

"Looting or Survival," Nat'l L. J. A20 (Sept. 19, 2005)

"Are Drug Dealers Murderers?," Nat'l L. J. A12 (Nov. 21, 2005)

"Overturning Guilty Pleas," Nat'l L. J. A17 (Jan. 30, 2006)

"Constitution will not protect clients from lawyer's breach." L.A. Daily J. 7 (Apr. 21, 2006)
"Taking Sequestration Seriously," Nat'l L. J. A13 (Apr. 3, 2006)

"Child Molestation," L.A. Daily Journal, A7 (June 14, 2005)

"Miranda Rights & Confessions of Minors," L.A. Daily Journal, A7 (Aug. 2005)

"Abuse of Subpoena Process," L.A. Daily Journal, A7 (Oct. 24, 2005)

"Due process rights trump those of court's spectators," L.A. Daily J. 7 (Apr. 25, 2005)

"Wiretaps," L.A. Daily Journal, L.A. Daily Journal, A9 (Feb. 28, 2005)

"For Jackson, others, calling character witnesses is risky"  L.A. Daily J. 7 (Feb. 23, 2005)

"Two-Faced Arguments," Nat'l L.J. 12 (March 21, 2005)

"Courtroom Demeanor as Evidence," Nat'l L.J. 10 (Jan. 10, 2005)

"Border Searches," Nat'l L.J. 11 (Nov. 1, 2004)

"Evolving Sentencing Procedures," Nat'l L. J. 11 (Aug. 30, 2004)

"Character Witnesses Galore," L.A. Daily J. A7 (Feb. 24, 2005)

"Justices Create Confusion in Sentencing by Declaring Guidelines Advisory," LA. Daily J. A6 (Jan. 18, 2004)

"Uses of Hunches in Determining Reasonable Suspicion," L.A. Daily J. A7 (Dec. 27, 2004)

"Recent Developments in Restitution Law," L.A. Daily J. A7 (Oct. 18, 2004)

"War on Drugs Finds Dregs of Possession," L.A. Daily J. A7 (Aug. 18, 2004)

"*Blakely* Signifies Great Change in Sentencing in Criminal Cases," L.A. Daily J. A7 (June 28, 2004)

"*Crawford* Forces Re-Evaluation of Hearsay Evidence," L.A. Daily J. A7 (July 6, 2004)

"Grand Jury Nullification, Nat'l L. J. A14 (June 14, 2004)

"Juror Misconduct, L.A. Daily J. A7 (Apr. 26, 2004)

"The War on Sex Abuse," Nat'l L. J. 30 (June 2, 2003);

"Picking Up the Slack in Miranda," Nat'l L. J. 28 (July 2003);

"The Dynamite Charge," Nat'l L. J. 15 (Nov. 3, 2003);

"Prosecuting Terrorists," Nat'l L. J. A12 (Feb. 23, 2004);

"Car Searches," Nat'l L. J. (Apr. 26, 2004)

"Respecting Attorney-Client Privilege," L.A. Daily J. A7 (June 23, 2003);

"Privacy Rights for Parolees," L.A. Daily J. A7 (Aug. 25, 2003);

"Knock and Notice Practices," L.A. Daily J. A7 (Oct. 27, 2003);

"Felony-Murder," L.A. Daily J. A7 (Dec. 22, 2003);

Book Review, "Hostile Witnesses," L.A. Daily J. A6 (Feb. 11, 2004);

"Third-Party Culpability," L.A. Daily J. A7 (Feb. 23, 2004);

"Juror Misconduct," L.A. Daily J. A7 (Apr. 26, 2004);

"The Dynamite Charge an 'Allen' Instruction Can Give a Stalled Jury a Nudge, but It's Not Without Risk" The San Francisco Recorder (Nov. 19, 2003)

"Transferred Intent Doesn't Apply to Murder Attempt," L.A. Daily J. 7 (Apr. 28, 2003)

"Moral Wrangling:  Kozinski's Conduct Left Officials no Choice But to Act," LA. Daily J. 6 (Mar. 4, 2003)

"Fingerprint Evidence," L.A. Daily J. at A7 (Feb. 24, 2003)

"Trials in Absentia," Nat'l L.J. at B8 (Jan.20, 2003)

"Unconscionable Searches," L.A. Daily J. at A7 (Dec. 23, 2002)

"Character Evidence," Nat'l L.J. at B11 (Nov. 2002)

"Stun Belts," Nat'l L.J. at B11 (Sept. 9, 2002)

"Drug Experts," Nat'l L.J. at B11 (June 10, 2002)

"The Door Closes On the Case and the Cause" LA Times at A13 (Nov. 11, 2002)

"Role of Appellate Judges," L.A. Daily News (Nov. 2002)

"The New Federal Rules of Criminal Procedure," L.A. Daily J. at 7 (Oct. 2002)

"Fifth Amendment and *McKune*," L.A. Daily J. at 7 (Aug. 2002)

"Deadly Pools," L.A. Daily J. at 7 (June 2002)

"Plea Advice," L.A. Daily J. at 7 (April 2002)

"Beware of Informants," Nat'l L.J. at B13 (Mar. 25, 2002)

"Definition of 'Intent' Key to Mauling Case," Lexington Herald-Leader (Mar. 24, 2002)

"It's Not the Dog That's On Trial, It's the Dog's Owner," LA Times A17 (Mar. 15, 2002)

"Guilty Plea Hearings," L.A. Daily J. 7 (Mar. 25, 2002)

"DNA Evidence," L.A. Daily J. 7 (Feb. 25, 2002)

"Prosecuting Treason," L.A. Daily J. 7 (Jan. 28, 2002)

"Search and Seizure," Nat'l L.J.B11 (Jan. 21, 2002)

"Roadblocks," L.A. Daily J.  7 (Dec. 24, 2001)

"Monitoring Attorney-Client Conversations," L.A. Daily J. At 7 (Dec. 17, 2001)

"Guilty Pleas Shouldn't Have Wiggle Room" La Times At A7 (Nov. 7, 2001)

"Material Witnesses," Nat'l L.J. At B11 (Nov. 5, 2001)

"Lessons from the Past," Nat'l L.J. At A25 (Sept. 24, 2001)

"How To Prosecute A Terrorist," 6 Fulton County Daily Report (Sep. 20, 2001)

"Involuntary Acts," Nat'l L.J. B10 (July 16, 2001)

"Attorney-Client Privileges," Nat'l. L.J. A14 (May 28, 2001)

"Open Preliminary Hearings," L.A. Daily J. At 7 (Sept. 24, 2001)

"Attorney Fees," L.A. Daily J. At 7 (Aug. 27, 2001)

"Retroactive Ruling," L.A. Daily J. At 7 (July 23, 2001)

"After *Apprendi*," L.A. Daily J. At 7 (June 25, 2001)

"Brady Waivers," L.A. Daily J. At 7 (Mar. 26, 2001)

"Voir Dire and Racial Prejudice," L.A. Daily J. At 7 (Feb. 26, 2001)

"Defendant's Absence from Trial," L.A. Daily J. At 7 (Jan. 26, 2001)

"Eyewitness Ids," Natl. L. J. At A20 (July 10, 2000)

"Overzealous Counsel" Natl. L. J. At A15 (Oct. 20, 2000)

"Silence Is Golden:  Pre-Miranda Silence," L.A. Daily Journal at 7 (Oct. 27, 2000)

"Rico:  Justice Jackhammer," L.A. Daily Journal at 7 (Sept. 22, 2000)

"Habeas Corpus," L.A. Daily Journal at 7 (July 28, 2000)

"Fishing Expedition: Prosecutors Cannot Use Compelled Documents If There Is No
      Independent Source," L.A. Daily Journal at 7 (June 23, 2000)

"Squeeze Box; Court Limits Police Power to Examine Luggage on Buses," L.A. Daily Journal
      at 7 (May 26, 2000)

"Serving Two Masters; Attorneys Risk Credibility When They Ignore Ethical Rules," L.A.
      Daily Journal 7 (April 28, 2000)

"Jury Selection," Nat'l L.J. A17 (Apr. 3, 2000).

"Bad Attendance; Comment On Defendant's Presence at Trial Is Permissible," L.A. Daily J. 7
      (Mar. 24, 2000)

"Disappearing Act; Defense Counsel Must Follow Section 1340 for Out-Of- State Witnesses,"
      L.A. Daily J. 7, (Feb. 25, 2000)

"Talking Points" Levenson & Chermerinsky, Los Angeles Lawyer (Feb. 2000)

"Based On Our Experiences" Levenson & Chemerinsky, Los Angeles Lawyer (Feb. 2000)

"Safety Net; When Prosecutors Inadvertently Fail To List Priors, How Late Can They Still
      Amend the Information," L.A. Daily J. 7   (Jan. 28, 2000)

"Guidelines Sentencing," Nat'l L.J. A15 (Jan. 10, 2000)

"Grading School Searches: How Far Do Fourth Amendment Protections Extend To
      Students?" Nat'l J.L.J. 29 (Jan. 3, 2000)

"Back To the Future; Cases Decided During the 1960s Protect Some of the Accused's Most
      Important Rights")   L.A. Daily J. 7 (Dec. 30, 1999)

"Tarnished Halos; an Acquitted Defendant May Seek A Finding of Innocence," L.A. Daily J. 7
      (Nov. 26, 1999)

"Seeing Double; 9th Circuit Upholds Use of Dual Juries in Capital Cases," L.A. Daily J. 7
      (Oct. 22, 1999)

"The Necessity Defense," Nat'l L.J. B19 (Oct. 11, 1999)

"Inspector's Gadgets; Courts Respond to the Use of High-Tech Devices," L.A. Daily J. 7 (Sept. 24, 1999)

"Warrantless Searches," Nat'l L.J. B14 (Sep. 13, 19999)

"Future Prosecutions," Nat'l L.J. B20 (Aug. 2, 1999)

"Proffer Pitfalls," Nat'l L.J. B17 (July 12, 1999)

"Gilding The "Lilly;" When Are Co-Defendants' Confessions Admissible? L.A. Daily J. 7 (June 25, 1999)

"The Causation Chain," Nat'l L.J. B21 (June 7, 1999)

"Double Jeopardy: An Endless Maze," L.A. Lawyer (June 1999)

"Double Trouble: Under What Circumstances Can A Defendant Be Prosecuted For The Same Act Under Different Statutory Provisions?" L.A. Lawyer (June 1999)

"Show Me; Proffer-Session Materials May Be Subject To Disclosure," L.A. Daily J. 7 (May 28, 1999)

"Representing Aliens," Nat'l L.J. B15   (May 10, 1999)

"Baseless Brief; What Responsibilities Do Appointed Counsel Have To Pursue Meritless Appeals" L.A. Daily J. 7 (Apr. 23, 1999)

"Trial Court Conduct," Nat'l L.J. B20 (Apr. 12, 1999)

"Taking the Fifth," Nat'l L.J. B21 (Jan. 25, 1999)

"Effective Assistance of Counsel," Nat'l L.J. B9 (Feb. 22, 1999)

"Absence of Malice," L.A. Daily Journal 7 (Feb. 26, 1999)

"The Penalties for Lying," Nat'l L. J. B23 (Mar. 22, 1999)

"Pointing The Finger: Incriminating Statement by Co-Defendant Can Be Used At Preliminary Hearing," L.A. Daily Journal 7 (Mar. 26, 1999)

"Preview Of Upcoming Supreme Court Cases," Nat'l L. J. B23 (Apr. 7, 1999)

"The Right to Effective Counsel on Appeal," L.A. Daily J. 7 (Apr. 23, 1999)

"Lucky Starr," L.A. Daily J. 7 (Aug. 28, 1998)

"Disproportionate Sum: Forfeitures May Violate the Excessive Fines Clause," L.A. Daily Journal 7 (July 24, 1998)

"Unprotected Utterances; the Crime-Fraud Exception to the Attorney-Client Privilege," L.A. Daily J. 7 (May 22, 1998)

"The Case for A Code of Ethics for Legal Analysts," Chemerinsky & Levenson, Nat'l Lj 27 (May 18, 1998)

"Redefining the Way Grand Juries Work," L.A. Daily J. (Aug. 28, 1998)

"The Fifth Amendment Privilege Is Not Limited to Criminal Cases," L.A. Daily J. 7 (Sept. 25, 1998)

"Perjury Traps: When Do Police Investigative Techniques Cross The Line?" L.A. Daily J. (Oct. 23, 1998)

"Prosecutors Beware," Nat'l. L.J. B5 (Oct. 19, 1998)

"Can Police Use Marital Communications To Further Investigations?" L.A. Daily J.7 (Nov. 27, 1998)

"Sentencing," Nat'l L.J. B21 (Dec. 7, 1998)

"Tough Questioning: Under What Conditions May A Juror Be Excused During Deliberations?" L.A. Daily Journal 7 (Jan. 22, 1999)

When The Criminal Blames the Victim," Wiley & Levenson, L.A. Daily Journal, (Sept. 17, 1996);

"Last Strike; Battered Woman's Syndrome Used To Argue Traditional Defenses," L.A. Daily J. 7 (June 26, 1998)

"Lessons of the Trial of the Century," 9 Calif. Litig. 7 (1996);

"Divide & Conquer: The Admissibility of the Briseno Videotape," 16 L.A. Lawyer 32 (Sept. 1993);

State Bar, Criminal Law Section Newsletter, Editor 1988-1992;

Analysis of Proposition 115 (June 1990);

The *King Retrial: What Made The Difference?* California Lawyer Magazine, June '93.


## LECTURES    [Partial List]

### Ethics Programs

Speaker, Virgin Islands District Conference, Ethics Lecture (1/22/19)

Federal Judicial Center, Ethics for Judges (Denver, 7/12/18)

Speaker, Program on Ethics in Negotiations, Media Law Resource Center (4/3/19)

Speaker, Pasadena Bar Association (Elimination of Bias) (1/24/18)

Speaker, Eight Circuit Conference, Judicial Ethics  (7/12/17)

Speaker, Media Law Resources Center, "The Ethics of Hiring Non-Lawyer Investigators," (Dec. 19, 2017)

Pasadena Bar Association (Elimination of Bias) (Jan. 24, 2018 – Evening)

FJC Program, Ethics for Bankruptcy Judges (Mar. 17, 2018) (New Orleans)

FJC Program, Ethics for Bankruptcy Judges (Nov. 14, 2017)

.    Ethics Update, Irell & Manella (Dec. 14, 2017)

Ethics Update, Beverly Hills Lawyers (8/17/17)

Panel on Prosecutorial Ethics, Loyola Law School (Sept. 2016)

Federal Judicial Center, Ethics for Career Law Clerks (March 2017)

U.S. District for the Virgin Islands, Ethics Presentation (January 2017)

Ethics & Corruption in Public Office, L.A. Law Library (Oct. 2016)

Federal Judicial Center, Ethics for U.S. Bankruptcy Judges (March 2017)

Federal Judicial Center, Ethics for U.S. Bankruptcy Judges (Apr. 2016)

Iowa Bar Convention, Ethics Update (Dec. 2016)

U.S. District for the Virgin Islands, Ethics Presentation (January 2016)

ABA Property Tax Conference, Ethics Presentation (March 2016)

Federal Judicial Center, Ethics Programs for U.S. Bankruptcy Judges (2015)

Federal Judicial Center, Senior Law Clerks Ethics Program (Pepperdine 2015)

Federal Judicial Center, *Senior Law Clerks Ethics Program* (Seattle, May 5, 2014)

Speaker, Federal Judicial Center, Ethics for Bankruptcy Judges (Mar. 24, 2015)

Stanford Symposium on Prosecutorial Ethics and Discretion, Moderator (May 16, 2014)

Federal Judicial Center, Ethics for U.S. Bankruptcy Judges, San Diego, Aug. 12, 2014

Keynote Address, College of Idaho, Jewish Law and Modern Practices, Oct. 3, 2013

Lecturer, UCLA Program on Legal Ethics (2/22/14)

Speaker, COPRAC Statewide Ethics Symposium, Trial Publicity (Apr. 20, 2013)

Moderator, Federal Bar Association, "Judging the Judges" (Apr. 2013)

Federal Judicial Center Program on Ethics for U.S. Bankruptcy Judges, Atlanta (Nov. 2, 2013)

Federal Judicial Center, Ethics Program for Pro Se Law Clerks (Sept. 12, 2013)

FJC Judicial Education Program, Ethics for Pro Se Attorneys (Sept. 12, 2013)

FJC Judicial Education Program, Ethics for District Court Judges (2013)

FJC Judicial Education Program, Webinar on Judicial Ethics (Mar. 28, 2013) (200 participants, including federal judges and federal research attorneys)

Judicial Clerkship Institute (March 2013), Lecture on Ethics for Law Clerks, Wm. Matthey Byrne, Jr., Judicial Clerkship Institute (Pepperdine Law School)

MCLE Program, "Elimination of Bias in the Legal Profession," Pasadena Bar Association (Mar.19, 2013)

Keynote Speaker, "Don't Count Us Out Yet:  The Future of Legal Education and the Legal Profession, Long Beach Bar Association Judge's Night, Nov. 29, 2012

Civil Justice Association of California, "The Media and the Law," (San Diego Sept. 11, 2012)

UCLA Law School, MCLE on Elimination of Bias in the Legal Profession (Mar. 20, 2013)

Federal Judicial Center, "Ethics Update for District Court Judges," (San Francisco July 16, 2012)

Federal Judicial Center, "Ethics for U.S. Bankruptcy Judges," (New Orleans, Apr. 15, 2013)

UCLA, State Bar Conference on Ethics, Panelist (May 20, 2013)

Federal Judicial Center, Bankruptcy Judge's Workshop on Ethics (Feb. 28, 2012) (Charleston)

Federal Judicial Center, Bankruptcy Judges Ethics Program (Portland, Aug. 3, 2011)

Federal Judicial Center, Ethics Program for Federal Judges (San Francisco Apr. 8, 2010)

Federal Judicial Center, Bankruptcy Ethics and Technology (San Francisco, July 27, 2010)

National Conference of Bankruptcy Judges, "Social Networking and Law Firms – Ethical Issues" (New Orleans Oct. 16, 2010)

University of Texas, ABA Roundtable on Ethical Standards for Prosecutors and Defense Lawyers (Nov. 19, 2010)

FJC Program for Bankruptcy Judges, Controlling Court Calendars & Technology, Ethics Program (Charlotte Mar. 22, 2011)

FJC Program for Magistrate Judges, Ethics Presentation (Portland, Apr. 12, 2011)

Ethics Speaker, Loeb & Loeb (Jan. 5, 2011)

Ethics Lecture, Chapman University Law School (Feb. 23, 2011)

Speaker, Ethical issues for Public Counsel, U.S. Dist. Ct. (Feb. 24, 2011)

Coordinator, Ninth Circuit Retreat on Prosecutorial & Defense Ethics (2010)

Moderator, Ethical Issues & Technology (Federal Judicial Center 2009-10)

Keynote Speaker, Healthcare Symposium 2008

Legal Ethics, Executives Program (Lecturer), 3/2/06

Speaker, Appellate Ethics, Los Angeles County Bar Association, 1/25/06

Speaker, Legal Integrity, Federal Bar Program, 11/10/05

Panelist, Ethical Responsibilities of Criminal Defense Lawyers, 11/13/05

Speaker, Ethics in Dealing with the Media, Reed Smith Conference (10/28/05)

Speaker, National Conference of Bankruptcy Judges (2 lectures of Judicial Ethics), 11/3 & 11/5/05

Speaker, Conference of Bankruptcy Judges, Ethics Update (Sept. 15, 2005)

Speaker, Private Practice Ethics Symposium (June 24, 2005)

Speaker, American Corporate Counsel Association, Ethics Update (June 29, 2005)

Speaker, Ethics for Associates, Loeb & Loeb Meeting (June 17, 2005)

Speaker, Society of Professional Business Ethics, Palm Springs (Feb.26, 2005)

Speaker, FJC Program on Ethics for Bankruptcy Judges (Mar. 15, 2005)

Speaker, Ethics for Summer Associates, Loeb & Loeb (June 15, 2004)

Speaker, Trial Supervision & Judicial Ethics, Nevada Judges Association (May 19, 2004)

Speaker, Ethics Program for Bankruptcy Judges, Nashville, Oct. 11, 2004

Speaker, Sarbanes-Oxley Act & Legal Ethics, Loeb & Loeb Meeting (Oct. 23, 2003)

Speaker, FJC Program on Ethics for Bankruptcy Judges (Nov. 13, 2003)

Speaker, Ethics for Appellate Lawyers, Los Angeles County Bar Association (2003)

Speaker, Ethics in Appellate Practice, College of Appellate Law (2002)

Speaker, Loeb & Loeb Continuing Education Program (2001)

Moderator, Prosecutors and the Media, L.A. County DA's Office (2001)

Speaker, "Ethics of Legal Commentators" (Pasadena 2001)

Panelist, AALS Conference, Integrating Ethics (Wash. D.C. 2000)

Speaker, "Integrity of Judicial System," State Bar of California (San Diego 2000)

Moderator, Trial Ethics, California Attorneys for Criminal Justice (Berkeley 1999)

Keynote Presenter, Symposium on Ethics of Legal Commentators, Mercer Law School
    (Jan. 1999)

Keynote Speaker, National Conference of Bar Counsel, Ethics Update (Feb. 1999)

Speaker, Role and Ethics of Legal Commentators, Inn of Court, Phoenix, Arizona (Mar.
    1999)

Panelist, Appellate Ethics, Orange County Bar Association Appellate College (Mar. 1999)

Moderator and Speaker, California Judges Association, Ethics, Judicial Roles &
    Arbitration (Sept. 1998)

Speaker, Los Angeles Inn of Court (1997)

Speaker, Department of Justice (1st Assistants Conference) (1997)

Speaker, Public Counsel (Ethics Update) (1997)

Speaker, Long Beach Inn of Court (1997)

Presenter, Courts & the Mass Media: The Ethical Issues, Santa Clara (1997)

Speaker, Wilshire Bar Association (Ethical Issues in Dealing with the Media - 1994)

Speaker, ABA Conference in New Orleans (Media Ethics)

Speaker, Compton District Attorney's Office (White Collar Crime law)

Speaker, UCLA Symposium on Ethics (1995)

Speaker, California Conference of Judges (1995)

Speaker, ABA National Conference on Professional Responsibility (1994)

Chair in Jewish Law and Ethics, Panel Member (1993)

Lecturer, Jury Consultants:  Effective Use & Ethical Responsibilities (March 1994)

Criminal Law:  Hot Topics in the Practice and Ethics of Criminal Law (1993 & 1992)

Ethics Issues in Real Estate Transactions (January 1993)

Joint Defense Agreements in Civil and Criminal Litigation, Avoiding Conflicts of Interest
    and Disqualification, ABA White Collar Crime Subcommittee (1991)


**Other Topics**   [Partial List]

Speaker, Alaska Bar Convention, Supreme Court Update (5/8/19)

Speaker, Conference for Black Prosecutors (3/30/19)

Keynote Speaker, Hot Topics in the Supreme Court and Criminal Law, The Executives
    (1/31/19)

Speaker, Ninth Circuit Program on the 4th Amendment in the 21st Century (2/21/19)

Speaker, The Conservative Supreme Court and Religious Rights, Orthodox Union
    (12/16/18)

Speaker, Wrongful Convictions, Temple Beth El (Dec. 5, 2018)

Speaker, Justice Manella Confirmation Hearing (8/23/18)

Panelist, FJC Program on Supreme Court Term (7/1/18)

Speaker, Alaska Bar Convention, Supreme Court Update (5/9/18)

Keynote Speaker, Law Day, Yosemite (May 4, 2018)

Panelist, Criminal Law & Procedure Update (Central District Conference (4/20/18)

Speaker, Ninth Circuit Jury Trial Summit (4/9/18)

ABA Program on CyberSecurity (1/24/18)

Keynote Speaker, ABA Program (San Francisco, 5/5/17)

Speaker, Alaska Bar Convention, Supreme Court Update (5/10/17)

Law Preview, Review of Criminal Law (6/29/17)

.    Southeastern Association of Law Schools Conference, Workshop on Criminal Law & Procedure,
    "Disruptive Innovations" (July 30, 2017)

Speaker, Pico-Union Project & ADL:  Leadership and Elections (9/6/17)

Speaker, Appellate Judges Education Institute (Nov. 2, 2017)

ABA Program on CyberSecurity (Jan. 24, 2018 – Lunch program)

Pasadena Bar Association (Elimination of Bias) (Jan. 24, 2018 – Evening)

Speaker, Ninth Circuit Jury Trial Summit, Update on Jury – Cases and Reforms (4/19/18)

Panelist, Criminal Law & Procedure Update, Central District Conference (Lake Arrowhead 4/20/18)

Keynote Speaker, Yosemite Law Day (May 4, 2018)

Speaker, Alaska Bar Convention, Update on Supreme Court (May 9, 2018)

Women's League Conference, "Take Action," (May 6, 2018)

Guest Speaker, Los Angeles County Law Library Beacon of Justice Awards (April 12, 2018)

Moderator, Women, Leadership & the Law, LLS program for Women's Law Society (April 4, 2018)

Keynote Speaker, Martin Luther King, Jr. Celebration, Media Fellowship House (Media, Pennsylvania)
    (Jan. 14, 2018)

Panelist, ABTL Cyber-Security Program (1/24/18)

Women's Professional Network, Supreme Court Update (Dec. 4, 2017)

Speaker, UCI Program on Wrongful Convictions (10/18/17)

"13th and Prosecutors," LLS Program on Mass Incarceration (9/12/17)

"Seeking Justice," Jewish Federation Panel on Post-conviction law (8/17/17)

"Courts, Convicts & Contempt," WWCDA (June 28, 2017)

Speaker, White Collar Crime Seminar, Women Lawyers (2016)

Speaker, Evidence for Bankruptcy Judges (2016)

Panelist, Federal Bar Council, Miranda Program (2017)

Speaker, Federal Judicial Center, Evidence for New Federal Judges (Feb. 2017)

Speaker, Federal Judicial Center, National Workshop of U.S. District Judges, Criminal Procedure  (2016)

Speaker, The Role of Innocence Projects in our Criminal Justice System (June 2016)

Constitution Day Presentation, University of Akron School of Law (2016)

Law Day Presentation, U.S. District Court for the Eastern District of California (2015)

Law Day Presentation, U.S. District Court for the Central District of California (2015)

Supreme Court Update, Criminal Law Cases, Alaska Bar Association (2015)

Keynote Speaker, Federal Bar Association, Innocence Projects and their Role in the Criminal Justice
    System, Riverside, California (Feb. 4, 2015)

Panelist, AALS Conference, Legal Education at the Crossroads, Reprioritizing Accuracy as the     Primary Goal of the Criminal Justice Process (Jan. 5, 2015)

Federal Judicial Center Program for District Court Judges, New Orleans (Apr. 15, 2013)

Federal Judicial Center Program for U.S. Bankruptcy Judges, Denver (June 28, 2013)

Federal Judicial Center Program for U.S. Bankruptcy Judges, Boston (Oct. 3, 2013)

Keynote Speaker, "Defenders of the Constitution," Sacramento (Jan. 31. 2014)

Speaker, LaVerne Law School, Symposium on Civil Rights (Apr. 2013)

Speaker and Coordinator of "Trial Advocacy in Probate Court" Programs  (May 13, 2014)

Panelist, International Bar Association, "The Media in Criminal Cases," Boston (Oct. 2013)

Panelist, Dealing with the Media, Gibson, Dunn & Crutcher (Oct. 10, 2013)

Federal Judicial Center, Supreme Court Review (broadcast to all federal circuit, district, magistrate and bankruptcy judges) (Washington, DC) (July 17, 2013)

Nevada State Court Judges, Conference on Evidence Developments (Apr. 25, 2014)

Speaker, Alaska State Bar, Supreme Court Update (May 15, 2013)

Keynote Speaker, FBI Program on Women in Law Enforcement (Apr. 4, 2014)

Keynote Speaker, Pepperdine's Byrne Judicial Clerkship Institute (Mar. 2014)

Guest Speaker, USC "Law & the Media" (3/11/14)

Moderator, Bet Tzedek Program on "How to Become a Judge" (3/10/14)

American Constitutional Society, "Gideon after 50 Years," (Mar. 19, 2013)

UCLA Speaker's Series, Genocide Trials since Nuremberg (Mar. 21, 2013)

Federal Bar Association, Program for the Bar and Federal Judges, "Judging from the Judge's           Perspective," (Apr. 18, 2013)

Federal Judicial Center, "Evidence for Bankruptcy Judges," (Santa Fe, New Mexico, Aug. 2, 2012)

ABA White Collar Crime Conference, Panelist (Apr. 13, 2012)

California State Bar Program, Speaker, Review of the Supreme Court Term (Oct. 2, 2012)

Police Misconduct Lecture, Loyola Law School (Sept. 11, 2012)

Invited Speaker, Asian Initiative for Justice in Cambodia, Speech to Monitors of International Tribunal in Phnom Penh (Jan. 8, 2013)

Keynote Speaker, "Media, Law & Medicine," National Conference of Physicians (Jan. 18, 2013)

Keynote Speaker, UCLA Law Review Forum, "Discovery from the Trenches and the Future of Brady," (Mar. 18, 2013)

Propositions 34 and 36, Speaker for League of Women Voters Symposium, Loyola Law School (Aug. 18, 2012)

MCLE Program, "Oversight in Civil Rights Cases," 2013 University of La Verne College of Law § 1983 Civil Rights Symposium

"The Bill of Rights," Presenter, Skirball Cultural Center Soapbox Series on Constitutional Rights (Jan. 2013)

MCLE Program for Los Angeles Superior Court Probate Division on Evidence and Trial Skills (Mar. 16 and Apr. 13)

Lecture: *Seeking Justice in Cambodia War Crimes Tribunal* (UCLA Art of Discourse Series (Mar. 2013)

Speaker, Symposium on Jewish and American Law, Bet Tzedek Legal Services (Jan. 25, 2012)

Keynote speaker, Federal Bar Association of Riverside, Independence of the Judiciary (Feb. 9, 2012)

Federal Judicial Center, Bankruptcy Judge's Workshop on Ethics (Feb. 28, 2012) (Charleston)

Speaker, E-Discovery Conference at Annual ABA White Collar Crime Conference (Apr. 13, 2012)

Federal Judicial Center, National Workshop for U.S. District Judges, Criminal Procedure lecture (Apr. 30, 2012 Boston)

Speaker, Alaska Bar Association and Convention of Judges, Supreme Court Update (May 3, 2012)

Panelist, § 1983 Civil Rights Symposium, University of La Verne College of Law (Jan. 20, 2012)

Speaker, Riverside County Superior Court Judge's Meeting, "Media and the Courts," Presented 2-hour program (Nov. 2011).

Speaker, The Ethics of Charitable Giving, Jewish Federation Network (Oct. 27, 2011)

Keynote Speaker, Supreme Court Update (Executives Program) (Nov. 2011).

Speaker, ACS Supreme Court Review (Oct. 12, 2011).

Panelist, NCJW Conference, Women's Rights and the Media (Oct. 30, 2011)

Keynote speaker, Brandeis University, Supreme Court Update (May 19, 2011)

Moderator, Conference for the U.S. Court of Appeals for the 7th and D.C. Circuits (Baltimore, June 28, 2011)

Workshop at Loyola Law School, *Conflicts for Investigators*

Speaker, National Association of Appellate Attorneys (San Diego, July 9, 2011)

Federal Judicial Center Supreme Court Review (Washington, DC, July 11-12, 2011)

UCI Supreme Court Review (July 13, 2011)

Federal Judicial Center, Bankruptcy Judges Ethics Program (Portland, Aug. 3, 2011)

ABA Task Force on Fair Trial & Free Press (Washington, D.C., Oct. 23, 2010)

Keynote Speaker, San Diego Superior Court Retreat

Moderator, National Conference of Bankruptcy Judges Panel

Conference of Nevada Judges, Evidence and Supreme Court Review (Apr. 24, 2010)

Alaska Bar Convention, Supreme Court Review (Apr. 29, 2010)

Speaker, National Conference of Jewish Women, Abortion Rights (May 26, 2010)

Testified before U.S. Sentencing Commission (May 27, 2010)

Coordinated and Spoke at Montana Conference for U.S. Attorneys and Federal Public
        Defenders (June 7-8, 2010)

Speaker, Riverside Program for U.S. District Court, Selection of Supreme Court Justices (June 23,
        2010)

Federal Judicial Center, Supreme Court Update (July 14, 2010)

Federal Judicial Center, Minneapolis Conference for District Judges (July 15, 2010)  (Evidence
Lecture)

Federal Judicial Center, U.S. Magistrates Program (San Francisco August 6, 2010)

USC Public Interest Program on Expungement (Sept. 17, 2010)

Federal Judicial Center, U.S. District Judge Program on Ethics (Portland, Sept. 20, 2010)

Keynote speaker, Law & the Media, San Diego Judges Conference (Oct. 3, 2010)

Speaker, ABA Program on Data Mining & Social Networking Sites (WCC Conf.
San Diego Mar. 3, 2011)

Federal Bar Association Conference, Helena, Montana, Evidence Presentation (Mar. 11,
2011)

"Impact of the Legal Profession on the Practice of Medicine," UCLA Medical Center (Mar. 16, 2011)

Supreme Court Review, Nevada Judges Conference (Reno Apr. 29, 2011)

USC Media & Three Strikes Program, Speaker (May 2, 2011)

Supreme Court Review, Alaska Bar Convention (May 5, 2011)

Reforming Mandatory Minimum Sentences, Testimony before Sentencing Commission
        (2010)

Preserving Impartial Courts, Testimony before Commission (2008)

Idaho District Conference, Supreme Court Review (2008)

California State Bar Convention, Supreme Court Review (2008)

Evidence Law for New Bankruptcy Judges, Federal Judicial Center (2008)

The "New Media" and its Impact on the Courts, Rehnquist Center (Panelist) 2008

National Sentencing Program on Post-Booker Sentencing (Lecturer), 5/2/05

UCI Course on Graduate Education (Lecturer), 5/10/05

Conference for Alaska Judges and Attorneys (Lecturer on Supreme Court Term), 5/13/05

CJER Conference, Criminal Procedure Update (Lecturer), 5/20/05

Criminal Courts Committee, L.A. County Bar (Keynote Speaker), 5/25/05

LawPreview Lecture on Criminal Law (Lecturer) 6/10/05

FJC Program on Supreme Court Term (Panelist) 7/19-20/05

LawPreview Lecture on Criminal Law (Lecturer) 7/22/05

CJER Program on Judges and the Media (Lecturer), 9/7/05

USC Lecture Series, The Lessons of the Terri Schiavo Case (Lecturer), 9/8/05

War on Terrorism, Constitution Café (Lecturer) (10/26/05)

Federal Bar Program on War on Terrorism (Lecturer) (10/27/05)

Ethics in Dealing with the Media, Reed Smith Conference (Speaker) (10/28/05)

UCI Course on Graduate Education (Lecturer), 11/1/05

University Georgia Symposium on Legal Commentators (Speaker), 11/4/05

White Collar Crime, UCLA Lecture Series (Lecturer), 11/15/05)

Sexual Harassment Law & Criminal Exposure (Lecturer), 12/8/05

Lecture Series on Jewish Law vs. American Law (Lecturer for 6 weeks), University of Judaism (Spring 2006)

Challenges to *Roe v. Wade*, National Conference Sponsored by NCJW (Speaker), 1/24/06 Spectrum Debate Series, USC Program on Integrity in Government, 1,500 students in attendance (2-day debate), 3/7/06

The New Supreme Court and Civil Liberties (Speaker), 3/16/06

Changes in the Criminal Justice System, Brandeis University Group (Lecturer) 3/18/06

Panelist, JAWs (Women Journalist's Assoc., Covering the Courts, Portland, Sept. 11, 2004

Lecturer, FJC Program in Seattle, Evidence, Sept. 20, 2004

Speaker, University of Judaism, American vs. Jewish Criminal Law, Sept. 21, 2004

Moderator, Loyola Program on Civil Rights and Torts, Oct. 1, 2004

Moderator, Bet Tzedek Program on the Patriot Act, Oct. 4, 2004

Moderator, Loyola Program on Domestic Violence at Home Project, Oct. 6, 2004

Keynote Speaker, Beverly Hill's Law Guild, Terrorism and the Law, Oct. 13, 2004

Speaker, Jewish Votes Program, Loyola Law School, Oct. 19, 2004

Lecturer, FJC Program in Atlanta, Evidence, Oct. 27, 2004

Lecturer, USC Program on Terrorism & the Patriot Act, Nov. 10, 2004

Speaker, University of Judaism, "The Trial of Jacob," Nov. 21, 2004

Panelist, Californian's Aware Conference, Fair Trials, Jan. 8, 2005

Moderator, Series of 3 Debates by ADL on Terrorism and the Law, Gay Rights, Freedom of Religion in the Workplace, Whittier Law School, January - March, 2005

Lecturer, Ninth Circuit Conference in San Francisco, Employment Evidence, Feb. 1, 2005

Moderator, Legal Aspects of the War on Terrorism, Loyola Law School, Feb. 16, 2005

Speaker, Ladera Association, High-Profile Trials, Feb. 15, 2004

Keynote Speaker, Riverside Bar Association, Supreme Court Update, Feb. 18, 2005

Keynote Speaker, Carmel Association, Long Beach, March 1, 2005

Speaker, Ninth Circuit Judges and Clerks, Program on Employment Evidence, Apr. 6, 2005

Keynote Speaker, 100th Anniversary of California Court of Appeal, April 11, 2005

Keynote Speaker, ADL Program, High-Profile Cases, Apr. 20, 2005

Moderator, ABA Sentencing Program, Apr. 21, 2005

Panelist, National Conference of Public Defenders, Sentencing Reform, May, 2, 2005

Speaker, Alaska Bar Convention, Supreme Court Update, May 13, 2005

Lecturer, CJER Program, Supreme Court Update, May 20, 2005

Scholar-in-Residence, Ramah Program on Law (July 25, 2004)

Panelist, FJC Program on Supreme Court Cases (July 19, 2004)

Speaker, New Developments in the Law, Ventura Bar Association (July 14, 2004)

Speaker, Federal Judicial Center, Evidence Program, Chicago, Illinois (June 7, 2004)

Keynote Speaker, Law Day, Pasadena Bar Association (May 4, 2004)

Speaker, Jewish Home for the Aged (May 6, 2004)

Keynote Speaker, Law Day, Mountain Home Air Force Base, Boise, Idaho (May 11, 2004)

Guest Speaker, UC Irvine Graduate Programs (May 18, 2004)

Moderator, State Bar Convention, "Trials & Technology" (Sept. 6, 2003)

Speaker, "War on Terrorism," Temple Bet Shalom (Sept. 15, 2003)

Speaker, ABA White Collar Committee Program (Sept. 29, 2003)

Panelist, Women's Lawyer Program on the Recall Election (Oct. 1, 2003)

Keynote Speaker, Long Beach Bar Association Meeting (Oct. 16, 2003)

Guest Speaker, UC Irvine Graduate Programs (Oct. 28, 2003)

Advocate/Speaker, UJ Program on Trial of David (Nov. 9, 2003)

Lecturer, "Rape Shield Laws," MCHS (Nov. 12, 2003)

Keynote Speaker, Riverside Federal Bar Association (Nov. 18, 2003)

Speaker, "Great Mind Series," Cal. Judicial Council (Dec. 10, 2003)

Speaker, Brandeis Univ. Men & Women Council (Dec. 17, 2003)

Panelist, Terrorism & Civil Liberties, Advancement Program (Jan. 25, 2004)

Speaker, Defense Research Institute (San Diego) (Jan. 29, 2004)

Speaker, Terrorism & the Law, Hadassah (Feb. 19, 2004)

Speaker, "Good Samaritan Laws," MCHS (Mar. 1, 2004)

Speaker, Terrorism & the Law, Carmel Group (Mar. 2, 2004)

Lecturer, Mock Law School Class, So. Calif. L. Prev. (Mar. 11, 2004)

Panelist, CJER Program on Courts and the Media (S.F.) (Apr. 14, 2004)

Moderator, L.A. Inn of Court, "Media & the Law" (Apr. 15, 2004)

Speaker, Portland Program on Bankruptcy & Evid. (Apr. 16, 2004)

Speaker, Philadelphia FJC Program for Dist. Judges (Evidence) (Apr. 19, 2004)

Speaker, Alaska Bar Conference, Supreme Court Update (Apr. 30, 2004)

Speaker, "Son of Patriot: Developments in the War on Terrorism," Rotary Club (2003)

Speaker, "Religious Defenses and the Criminal Justice System " Americans for Separation
        of Church and State (2003)

Speaker, "Experts in Governmental Liability Cases," New Orleans (2003)

Moderator, American Judicature Society, "Models for Reform: Preventing Wrongful
        Convictions" (2003)

Speaker, Plato Society, "Justice and the Media" (2002)

Moderator, "Authority, Extremism & the Law," Loyola Law School (2002)

Speaker, Terrorism and the Law, Conference for the California Judges Association,   Retired
Judges (2002)

Moderator, Update on Terrorism, Annual Conference for the Central District of California
        (2002)

Panelist, ABA White Collar Crime Convention, Media & the Law (2002)

Speaker, Civil Rights & Governmental Tort Liability (2002)

Speaker, Riverside Federal Bar Association, Terrorism Today (2001)

Guest Lecturer, USC Undergraduate Course on Law & Politics (2001)

Speaker, Symposium on Terrorism in our Age, Loyola Law School (2001-2002)

Moderator, Attorney General's Conference on Crime (2002)

Keynote Speaker, Brandeis University Alumni Association (2001)

Panelist, Sentencing After *Apprendi*, Federal Sentencing Commission Program (2001-2002)

Lecturer, Federal Judicial Center (Programs on Evidence)(2001-2002)

Guest Lecturer, Graduate Programs in the 21st Century, University of California, Irvine (2001)

Keynote Speaker, *Sheppard* and its Legacy, Cleveland State University Marshall School of Law (2001)

Speaker, American Adjudicature Society (2001)

Speaker, Developments under *Apprendi*, Central District of California Judges (2001)

Commentator, Language and the Law, American Association of Science (2001)

Donahue Distinguished Lecturer, Suffolk Law School (2001)

Moderator, National Conference of Bankruptcy Judges, Boston (2000)

Panelist, Symposium on LAPD Rampart Scandal (Loyola Law School 2000)

Lecturer, Federal Judicial Center, Review of Supreme Court Term 2000, Evidence Workshop for Federal Bankruptcy Judges 2000

Lecturer, National Judicial College (5th Amend., Right to Counsel, Double Jeopardy) (Oct. 1999)

Lecturer, Developments in Evidence Law, National Judicial Center (San Francisco June 1999)

Keynote Speaker, Annual Conference of Grand Jurors (June 1999)

Keynote Speaker, Traynor Forum, California Judges College in Berkeley (June 1999)

Keynote Speaker, Western Regional International Conference of Personnel Management, Developments in Labor Rights for Women (May 1999)

Guest Lecturer, Legal Opportunities in the 2lst Century, University of California, Irvine (May 1999)

Moderator, Panel of Bench Bar Media Committee, Courts and the Media (May 1999)

26

Lecturer, Fifth Amendment & Double Jeopardy, National Judicial College, Reno, Nevada
    (Apr. 1999)

Moderator, U.S. Attorney's Office and its Relation to the Defense Bar, ABA White Collar
    Crime Committee (Apr. 1999)

Moderator, Courts and the Media, Conference of U.S. District Judges for the Central District
of California (Apr. 1999)

Guest Lecturer, USC Undergraduate Course on Criminal Justice, The Media and the
    Courts (Mar. 1999)

Organizer and Moderator, The Future of the Independent Counsel Act, L.A. County Bar
    Ass'n (Feb. 1999)

Keynote Speaker, Update on the Criminal Justice System, Ventura UJA (Feb. 1999)

Presenter, Independent Counsel Act, L.A. County Bd. of Trustees Meeting (Jan. 1999)

Moderator, Right of Privacy Panel, Skirball Museum (Dec. 1998)

Speaker, Museum of Tolerance, Panel on Right of Privacy (Dec. 1998)

Symposium Speaker, Role of Federal Prosecutors, Fordham Law School (N.Y. Nov. 1998)

Keynote Speaker, Orange County Trial Lawyers Association (Nov. 1998)

Guest Lecturer, University of California, Irvine (Nov. 1998)

Speaker, State Conference of Consumer Attorneys (San Francisco Nov. 1998)

Keynote Speaker, National Conference of Bankruptcy Judges (Dallas Oct. 1998)

Lecturer, Conference for Seventh and Eighth Circuit Judges (Evidence Lecture)(Rapid
    City, South Dakota Oct. 1998)

Lecturer, Federal Judicial Center, Supreme Court Review (July 1998)

Speaker, Plato Society (UCLA), The Future of the American Jury (1997)

Supreme Court Update, Federal Judicial Center (1997)

Speaker, European Economic Union Conference on Fraud in Dublin, Ireland (1997)

Speaker, California District Attorney's Association, Rules and Regulations Governing
    Special Masters (1997)

Speaker, Conference for the Central District of California, Proposed Federal Jury Reforms
    (1997)

Speaker, Italian-American Bar Association, Media and the Courts (1997)

Speaker, Pasadena Bar Association, Impact of High-Profile Cases on Judges, Lawyers and
    the Community (1997)

Speaker, Orange County Inn of Court, Lessons of the Trial of the Century for Civil
    Litigators (1997)

Speaker, Westchester Rotary Association, Litigating High-Profile Cases (1997)

Keynote Speaker, International Trials of the Century, ATA San Antonio (1996)

Panelist, Governor's Conference, Role of Women Lawyers  (1996)

Panelist, CJA Conference on the Media & the Courts (Apr. 1996)

Panelist, Federal Bar Program on "Ethics of Appellate Advocacy," (May 1996)

Special Master for Search for Los Angeles Superior Court

Speaker, Ventura Bar Association

Speaker, United States Attorney's Office

Speaker, El Camino College (History of Women in the Law)

Speaker, Federal Bar Association, "Taking the Step" Program (Appellate panel)

Speaker, Los Angeles County Bar Association Barrister's Dinner

Panelist, Fair Trial and Fair Press, ABA Convention, New Orleans, (August 1994)

Moderator, Statewide Forum on Community Policing (April 1994)

Speaker, Anti-Defamation League, Justice in Los Angeles (March 1994)

Debate, UCLA Hillel Forum, "Justice in L.A." (Feb. 1994)

Speaker, Tenth Annual International Law Symposium, "International Human Rights
       Law in a Changing World," (June 1993)

Speaker, The Rodney King Trial, Chancellor's Forum, Loyola Law School (May 1993)

Commentator, CJA Workshop for Journalists and Judges, "Covering the Courts," (June
       1993)

Moderator, ABA White Collar Panel on the "Rodney King Case," (June 1993)

Panelist, El Camino College Public Policy Forum, "Rebuilding L.A." (April 1993)

Speaker, "Federal Appellate Practice," L.A. Chapter of Federal Bar Association 13th  Annual
"Taking the Steps to Federal Court" Program (March 1994)

Speaker, "Federal Appellate Practice," L.A. Chapter of Federal Bar Association 12th  Annual
"Taking the Steps to Federal Court" Program (April 1993)

Lecturer, Bank Fraud and Money Laundering, FBI Academy, Quantico, Virginia (Fall
       1985)

## PROFESSIONAL ACTIVITIES

Bar Activities            Counsel, "Webster Commission Report"
                          Lawyer Representative, Central District of California
                          -       Report on Civil Disorder in Los Angeles, 1992
                          Special Master
                          -       Los Angeles Superior Court, 1991 - Present

(Execute criminal search warrants of attorneys' offices)
American Bar Association
-     Regional Subcommittee on White Collar Crime
Lawyer and Commission Member
-     Rice Commission on Rampart Scandal
-     Chemerinsky Commission on Rampart Scandal
Member, Los Angeles Inn of Criminal Courts
Executive Committee, Criminal Law Section
State Bar of California
-     Advisor (1992-93)
-     Secretary-Treasurer (1990-91)
-     Editor, Criminal Law Section Newsletter
Los Angeles County Bar Association
-     Judicial Appointments Committee
-     Judiciary Committee (2000-2001)
-     Criminal Law Section
-     Professional Responsibility Committee
-     District Attorney's Advisory Committee
Special Advisor to Los Angeles District Attorney's Office
-     District Attorney Advisory Report (1993-1994)
ABA Committee on Ethics, Gideon and Professionalism
ABA Study on the ABA Standards for Prosecutorial Ethics
-     Testified before California Senate in Sacramento regarding SB 490 (Bill to Abolish Death Penalty in California, sponsored by Sen. Loni Hancock)
Testified before California State Bar
-     Proposal for Ethics Rule 3.8 (Brady policy for prosecutors) (2014)
Orange County Informant Policies and Practices Evaluation Committee (2015)
-     Investigation of in-custody informant policy and practices
Founder, Judge Arthur L. Alarcón Scholarship and Ethics Symposium (2015)
Director, Fidler Institute on Criminal Justice (2003 – present)


Other Activities     U.S. Magistrate Judge Selection Panel
-     Chair, 2002-2004
Los Angeles City Ethics Commission (2000 - 2002)
-     Alternative Probable Cause Officer
Ninth Judicial Circuit Historical Society (2000 - Present)
-     Board of Directors
Special Master (1995-Present)
-     U.S. District Court for Central District of California
-     Los Angeles Superior Court
Legal Commentator (1995-Present)
-     CBS, CNN, ABC, NBC, BBC, NPR and media services
Bet Tzedek Legal Services (Present)
-     Board of Directors
Levitt & Quinn Advisory Counsel (Present)
Expert, California Commission on Fair Administration of Justice (2008)
Alarcón Advocacy Center (post-conviction habeas litigation program)
Director, Fidler Institute on Criminal Justice (2006-2017)
Working Committee, Prison Litigation Summit (Nov. 2015)
Advisory Committee Forum, Proposed Changes to Fed. R. Evid.(2017)
Sinai Akiba Academy
-     Board of Directors
Troop 1085, Girl Scout Troop for Homeless Girls (Los Angeles Council)
Scholar in Residence, Mock Trial Litigant, Sexual Harassment trainings for local religious institutions


Alumni Activities     UCLA Law Alumni Association

-       President (1985-86)
-       Board of Directors (1982-86)
Loyola Women's Roundtable (1996- Present)

Bar Admissions          United States District Court
-           Central District of California
United States Court of Appeals
-           Ninth Circuit
-           Third Circuit
Supreme Court of California

Teaching Awards         John Brown Scholarship Award presented by Federal Judicial Center
for Excellence in Teaching (2003);
Loyola Law School, Student Body Association, Professor of the Year (2003, 2016).

Exonerations            *People v. Obie Anthony* (2011)
Successfully secured exoneration of Obie Anthony after his wrongful conviction in 1994 for murder.  Conducted investigation, filed habeas corpus  petition, handled and evidentiary hearing with co-counsel from Northern California Innocence Project.

*People v. Kash Register* (2013)
Successfully secured exoneration of Kash Register for wrongful murder after he served 34 years in prison. Conducted investigation, prepared pleadings, handled evidentiary hearing.

*People v. Andrew Wilson* (2017)
Successfully secured release of Andrew Wilson after he served 32 years in prison. Prosecution conceded Brady errors.

*People v. Marco Contreras* (2017)
Successfully secured exoneration of Marco Contreras after 20 years in prison. Court found Contreras to be factually innocent.

*People v. Maria Mendez (*2018)
Successfully secured release of Maria Mendez after 11 years in prison and evidentiary hearing

*People v. Michael Tirpak* (2019)
Successfully secured release of Michael Tirpak after 25 years in prison on wrongful felony murder conviction

Expert Consultant       [Representative list for Pre-2015]

In re Micha
Levenson (2019)           Ethics expert for prosecutor in Los Angeles City Attorney's Office

Williams v.
Connick (2014) Ethics expert on prosecutorial misconduct, including Brady violations

Johnson v.               Ethics expert on prosecution Brady duties
City of Bogalusa
(2012)

U.S. v. Samueli:         Ethics expert for Dr. Henry Samueli who was charged in federal

(2008)                 indictment with stock backdating charges.  I argued the prosecutorial
                       motion and was successful in having the court dismiss all charges against
                       Dr. Samueli.

U.S. v. Quintero‑      Expert for U.S. District Court for Eastern District of California in
‑Feliz (2012)          determining whether Brady issues created conflicts of interest requiring
                       disqualification of counsel

Stanley v. Ylst        Investigation into misconduct of Deputy Attorney General's Office in
(2006)                 post‑conviction interviews of trial jurors.

Frye v. Brown          Expert regarding ineffective assistance of counsel for death penalty case.
(2004)

Lopez v.               Expert regarding plea bargaining and sentencing
Schwarzenegger
(2016)

Cain v. Adams          Expert regarding Brady practices in New Orleans Parish District Attorney's
(2017)   Office

SCIF v. Drobot         Expert regarding conflicts of interest and recusal issues
(2016)