UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

SULLIVAN WALTER,

       Plaintiff,

 – against –

THE CITY OF NEW ORLEANS; JASON
WILLIAMS, in his official capacity as Orleans
Parish District Attorney; ANNE KIRKPATRICK, in
her official capacity as Superintendent of the New
Orleans Police Department; HARRY O'NEAL, in
his individual capacity; and JOHN/JANE DOES
#1-20, in their individual capacities,

       Defendants.

No. 23-CV-04352 (SM) (DPC)

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT JASON R. WILLIAMS'S MOTION TO DISMISS

**MURELL LAW FIRM**

Christopher J. Murell
La. Bar No. 32075
Meghan K. Matt
La. Bar No. 39975
2831 Saint Claude Avenue
New Orleans, LA 70117
(504) 717-1297 (Tel)
chris@murell.law
meghan@murell.law

**SHANIES LAW OFFICE PLLC**

David B. Shanies (T.A.) (admitted *PHV*)
Deborah I. Francois (admitted *PHV*)
Eleanor C. Davis (admitted *PHV*)
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com

*Attorneys for Plaintiff Sullivan Walter*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND .................................................................................................... 2

PROCEDURAL HISTORY ....................................................................................... 5

LEGAL STANDARD .............................................................................................. 6

ARGUMENT ....................................................................................................... 7

    I.   Defendants Violated Mr. Walter's Right to Due Process under the
        Fifth and Fourteenth Amendments ................................................................ 8

       A.  Defendants' Failure to Disclose Exculpatory Serological Testing
           Results Until the Day of Trial Was a *Brady* Violation ................................ 8

       B.  The OPDA Allowed the Presentation of Defendant O'Neal's
           False Testimony in Violation of *Napue v. Illinois* .................................... 17

    II.  Former District Attorney Harry Connick Was a Final Policymaker ............................... 19

   III.  The OPDA Had Official Policies, Customs, and Practices That Were
        the Moving Force Behind Mr. Walter's Injuries ............................................. 20

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Adams v. City of New Orleans*, 2016 WL 4275246, 2016 U.S. Dist. LEXIS 107534
(E.D. La. Aug. 12, 2016) ..................................................................................... 9, 11

*Allen v. Hays*, 65 F.4th 736 (5th Cir. 2023) ............................................................... 7

*Allen v. McCurry*, 449 U.S. 90 (1980) ...................................................................... 8

*Arnold v. Williams*, 979 F.3d 262 (5th Cir. 2020) .................................................... 6

*Arnone v. Dallas County*, 29 F.4th 262 (5th Cir. 2022).......................................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................................... 6

*Banks v. Dretke*, 540 U.S. 668 (2004) ..................................................................... 11

*Banks v. Thaler*, 583 F.3d 295 (5th Cir. 2009) ........................................................ 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..................................................... 6

*Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985) ....................................................... 14

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996) ....................................................... 17

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ 8, 24

*Brown v. Miller*, 519 F.3d 231 (5th Cir. 2008)....................................................... 17

*Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) ........................ 19, 20

*Cadena v. El Paso Cty.*, 946 F.3d 717 (5th Cir. 2020) ............................................ 24

*City of Canton v. Harris*, 489 U.S. 378 (1989)....................................................... 21

*District Attorney's Office v. Osborne*, 557 U.S. 52 (2009)...................................... 18

*Donley v. Hudsons Salvage, L.L.C.*, 517 F. App'x 216 (5th Cir. 2013) ..................... 8

*Durant v. Gretna City*, 2020 WL 263669, 2020 U.S. Dist. LEXIS 8422
(E.D. La. Jan. 17, 2020)......................................................................................... 25

*Evans v. Lopinto*, 2022 WL 2304512, 2022 U.S. Dist. LEXIS 112705
(E.D. La. June 27, 2022)........................................................................................... 8

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) (per curiam) .................... 10, 11, 12, 17

*Grace v. Cain*, 2021 WL 5711942, 2021 U.S. Dist. LEXIS 230654
(E.D. La. Dec. 2, 2021)........................................................................................... 12

*Grace v. Hooper*, 2023 WL 2810059, 2023 U.S. App. LEXIS 8261
(5th Cir. Apr. 6, 2023) ............................................................................................ 12

*Guillot v. Lopinto*, 2022 WL 684159, 2022 U.S. Dist. LEXIS 40383
(E.D. La. Mar. 8, 2022).......................................................................................... 22

*Ho v. Thaler*, 495 F. App'x. 488 (5th Cir. 2012)............................................... 17, 18

*Jason v. Tanner*, 938 F.3d 191 (5th Cir. 2019)....................................................... 22

*Jauch v. Choctaw Cty.*, 874 F.3d 425 (5th Cir. 2017) .................................................................. 25

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................................ 9, 10, 11

*LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728 (5th Cir. 2011) ............................ 12

*Lawrence v. Lensing*, 42 F.3d 255 (5th Cir. 1994) ...................................................... 15

*Leka v. Portundo*, 257 F.3d 89 (2d Cir. 2001) ............................................................ 14

*Luebano v. Office Depot, L.L.C.*, 2023 WL 4249268, 2023 U.S. App. LEXIS 16524
   (5th Cir. 2023) (per curiam) ........................................................................................ 7

*Marshall v. Webre*, 2023 WL 5952645, 2023 U.S. Dist. LEXIS 162031
   (E.D. La. Sept. 13, 2023) ............................................................................... 7, 21, 24

*Mays v. Dir., Office of Workers' Comp. Programs*, 938 F.3d 637 (5th Cir. 2019) ..................... 12

*McMillian v. Monroe County*, 520 U.S. 781 (1997) ........................................................ 19

*McWilliams v. City of Houston*, 2022 WL 17337820, 2022 U.S. App. LEXIS 33076
   (5th Cir. Nov. 30, 2022) .............................................................................. 21, 22

*Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360 (E.D. La. May 2, 2016) .................. 23, 24

*Mixon v. Pohlmann*, 2022 WL 2921733, 2022 U.S. Dist. LEXIS 131160
   (E.D. La. July 25, 2022) ............................................................................... 7, 21, 24

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) .................................. 2, 7

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................................. 17, 24

*Neal v. Vannoy*, 2021 WL 1212663, 2021 U.S. Dist. LEXIS 62132
   (E.D. La. Mar. 30, 2021) ............................................................................... 9, 12

*O'Quinn v. Manuel*, 773 F.2d 605 (5th Cir. 1985) ...................................................... 8

*Powell v. Quarterman*, 536 F.3d 325 (5th Cir. 2008) ............................. 9, 12, 13, 15

*Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011) ............................................ 10

*Smith v. Black*, 503 U.S. 930 (1992) ..................................................................... 12

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990) ................................................... 12, 14

*Smith v. Williams*, 2023 WL 2263841, 2023 U.S. Dist. LEXIS 32662
   (E.D. La. Feb. 28, 2023) ............................................................................... 19

*State v. Kemp*, 828 So.2d 540 (La. 2002) (per curiam) ............................................ 14

*State v. Walter*, 514 So.2d 620 (La. App. 4 Cir. 1987) ...................................... 1, 4, 9

*State v. Walter*, 698 So. 2d 439 (La. App. 4 Cir. 1997) ............................................ 8

*Sutton ex rel. Rjano Holdings, Inc. v. Jack Adams, Maison Royale, LLC*,
   356 So. 3d 1017 (La. 2023) ........................................................................... 8

*Thomas v. City of Galveston*, 800 F. Supp. 2d 826 (S.D. Tex. 2011) .......................... 23

*Truvia v. Connick*, 577 F. App'x 317 (5th Cir. 2014) ............................................... 9

*United States v. Bagley*, 473 U.S. 667 (1985) ......................................................... 11

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ............................................................... 13

*United States v. Burke*, 571 F.3d 1048 (10th Cir. 2009) .............................................................. 13

*United States v. Djibo*, 730 F. App'x 52 (2d Cir. 2018) .............................................................. 13

*United States v. Higgs*, 713 F.2d 44 (3d Cir. 1983) ..................................................................... 13

*United States v. McKinney*, 758 F.2d 1036 (5th Cir. 1985) .......................................................... 16

*United States v. Morrison*, 833 F.3d 491 (5th Cir. 2018) ............................................................. 15

*United States v. Nixon*, 634 F.2d 306 (5th Cir. 1981) ................................................................... 15

*United States v. Patrick*, 965 F.2d 1390 (6th Cir. 1992) .............................................................. 13

*United States v. Randall*, 887 F.2d 1262 (5th Cir. 1989 .............................................................. 15

*United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004) ...................................................................... 9

*United States v. Swenson*, 894 F.3d 677 (5th Cir. 2018) .............................................................. 16

*United States v. Tyndall*, 521 F.3d 877 (8th Cir. 2008) ............................................................... 13

*United States v. Walters*, 351 F.3d 159 (5th Cir. 2003)................................................................ 12

*Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984) ..................................................... 21, 22

*Youngblood v. West Virginia*, 547 U.S. 867 (2006).................................................................... 11

**Statutes**

42 U.S.C § 1983 ........................................................................................................................ 2, 7

Louisiana Code of Criminal Procedure § 719.A...................................................................... 8

Louisiana Code of Criminal Procedure § 723........................................................................... 8

Louisiana Revised Statutes § 13:4232 ..................................................................................... 8

**Rules**

Louisiana Rule of Professional Conduct 3.3............................................................................. 8

## PRELIMINARY STATEMENT

Plaintiff Sullivan Walter was arrested at the age of 17 for a crime he did not commit.  Because of Defendants' misconduct, he was unjustifiably prosecuted, convicted, and incarcerated for 35 years.  The charges against Mr. Walter arose from a 1986 rape.  Independent testing of two, separates pieces of evidence containing the perpetrator's semen showed that the perpetrator was a "non-secretor"—meaning that the perpetrator was among the approximately 20% of humans who do not secrete ABO blood-typing antigens into bodily fluids.  Mr. Walter, by contrast, is a secretor.  This means that he could not have been the perpetrator.  Mr. Walter was nevertheless wrongfully convicted of the crime, in part because prosecutors concealed the serological testing reports until the morning of trial, when it was too late to use them.

On appeal, the state appellate court ruled that the prosecution "violated its duty" in discovery.  *State v. Walter*, 514 So.2d 620, 621 (La. App. 4 Cir. 1987).  Recognizing that the serological reports "may be exculpatory Brady material," *id.* at 622, the court remanded the case for proceedings that included testing of Mr. Walter's secretor status.  The testing showed Mr. Walter was an ABO antigen secretor and therefore could not be the perpetrator.  Unbeknownst to Mr. Walter and his attorney, however—and as Defendant Orleans Parish District Attorney Jason Williams later admitted—the Orleans Parish District Attorney's Office ("OPDA") "asked its criminalist [Defendant Harry O'Neal] to come in and 'fudge'" at the evidentiary hearing on Mr. Walter's motion for a new trial.  "And," in the words of Defendant Williams's appointed representative, "that's what he did."  Defendant O'Neal testified falsely that the lab results did *not* exclude Mr. Walter as the perpetrator.  Based on that perjury, and the continued concealment of the truth by police and prosecutors, Mr. Walter remained wrongfully imprisoned for decades.

1

Mr. Walter was exonerated on August 25, 2022.  During the exoneration hearing, Judge Darryl A. Derbigny acknowledged that Mr. Walter is "an innocent man" who was "incarcerated . . . for a crime that he did not commit."  He described Mr. Walter's wrongful conviction and incarceration as "clearly a failure of the system" and "an egregious injustice."  Defendant Williams, by his designated representative, also recognized that "the serology evidence" "shows that" Mr. Walter "did not commit the crime" and "concede[d] that Mr. Walter did not receive a fair trial."  Mr. Walter now seeks compensation from Defendants for violations of his rights, including his rights under the Fifth and Fourteenth Amendments.

In arguing for dismissal, Defendant Williams contends Mr. Walter has failed to state a claim against him under 42 U.S.C § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  To the contrary, Mr. Walter has alleged violations of his rights under the Fifth and Fourteenth Amendments by alleging that Defendants: (1) failed to disclose the serological testing results until the day of trial, when they were effectively unusable, and (2) subsequently suborned Defendant O'Neal to commit perjury.  Mr. Walter has alleged that the "moving force" behind these violations was an OPDA policy and custom—created by then-District Attorney Harry Connick—of suppressing and failing to timely disclose material exculpatory evidence, fabricating and knowingly allowing the presentation of false evidence, and engaging in the affirmative concealment of such misconduct.  Accordingly, Mr. Walter has stated a claim against Defendant Williams, and this motion to dismiss should be denied.

## BACKGROUND

On May 10, 1986, L.S. was in her home in New Orleans.  Am. Compl.[1] ¶ 26. Shortly after midnight, L.S. was sexually assaulted by a man she did not know (the "Actual

---

1.   R. Doc. 35.

Perpetrator"). *Id.* ¶¶ 27-31. During most of the assault, L.S. could not see the Actual Perpetrator's face. *Id.* ¶¶ 27-30. Immediately following the assault, L.S. provided a description of the Actual Perpetrator that did not match Mr. Walter. *Id.* ¶¶ 32-33. That night, a rape kit was performed on L.S. *Id.* ¶ 34. Among other things, the examination identified seminal fluid and spermatozoa that, because of L.S.'s recent sexual history, could only have come from the Actual Perpetrator. *Id.* Semen was also recovered from L.S.'s shorts. *Id.* ¶ 44. Patricia Daniels, Medical Technologist of the OPC, serologically tested the spermatozoa in the vaginal swabs taken from L.S. *Id.* ¶ 43. Separately, Defendant O'Neal, acting on behalf of the NOPD, serologically tested the semen retrieved from her shorts. *Id.* ¶ 44. Each test independently demonstrated that the perpetrator was a non-secretor.[2] *Id.* ¶¶ 43-45.

A few days after the assault, L.S. worked with a police sketch artist to prepare a composite drawing of the Actual Perpetrator. *Id.* ¶ 46. Then, on June 23, 1986, Mr. Walter—just 17 years old—was arrested for an unrelated simple burglary and identified as a potential match to the composite drawing. *Id.* ¶ 47. On June 26, 1986, a detective presented a photo array to L.S. *Id.* ¶ 48. The detective who conducted the photo array knew that Mr. Walter was the suspect, and Mr. Walter was the only man in the array wearing a hat (as the Actual Perpetrator had been during the assault). *Id.* ¶¶ 32, 48. After viewing the photo array, L.S. incorrectly identified Mr. Walter. *Id.* ¶ 48. Mr. Walter was charged on November 13, 1986, by grand jury indictment. *Id.* ¶ 49. He was arraigned and pleaded not guilty on December 1, 1986. *Id.* The next day, following a three-hour trial, a twelve-member jury found Mr. Walter guilty. *Id.* ¶ 50.

---

2. Serological testing determines whether someone secretes ABO blood group antigens (*i.e.*, antigens reflecting a blood type of A, B, AB, or O) into bodily fluids like blood, saliva, and semen. Am. Compl. ¶ 36. A person whose body does secrete blood group antigens into their bodily fluids is a "secretor." *Id.* ¶ 37. A person whose body does not secrete blood group antigens into their bodily fluids is a "non-secretor." *Id.* ¶ 38.

While preparing for trial, Mr. Walter and his counsel were unaware that serological testing had been performed. *Id.* ¶ 51.  Neither Mr. Walter nor his attorney received either lab report before the day of trial.  *Id.*  This evidence was therefore unusable at trial, and Mr. Walter could not present evidence regarding his own secretor status or the implication of that status.  *Id.*  At trial, Defendant O'Neal testified unequivocally that his testing showed the perpetrator was a non-secretor: "examination of seminal fluid revealed no secretor activity which would indicate that the individual who left seminal fluid stains was a non-secretor."  *Id.* ¶ 53.

Mr. Walter appealed, arguing that the late disclosure of the serological testing deprived him of a fair trial.  *Id.* ¶ 56.  In October 1987, the Louisiana Fourth Circuit Court of Appeal agreed there was "no doubt" the OPDA "violated its duty" in discovery and acknowledged that the test results "may be exculpatory *Brady* material."  *State v. Walter*, 514 So.2d 620, 621-22 (La. App. 4 Cir. 1987).  It remanded the case to allow Mr. Walter to present *Brady* claims for a new trial.  *Id.* at 622.  On January 13, 1988, tests of Mr. Walter's blood and saliva were ordered.  Am. Compl. ¶ 58.  Defendant O'Neal performed the tests and confirmed that Mr. Walter is a secretor.  *Id.* ¶¶ 59-60.  Given that the Actual Perpetrator was a *non*-secretor, *id.* ¶¶ 43-45, the testing results confirmed that Mr. Walter did not commit the crimes against L.S.

Based on this testing, Mr. Walter moved for a new trial.  *Id.* ¶ 62.  On April 29, 1988, the Criminal District Court held an evidentiary hearing on Mr. Walter's motion.  *Id.* ¶ 63.  The prosecution's only witness was Defendant O'Neal.  *Id.* ¶ 64.  Prior to Defendant O'Neal's testimony, the OPDA directed Defendant O'Neal to lie about the secretor status testing and its significance.  *Id.* ¶ 65.  As Defendant Williams's representative later admitted during Mr. Walter's exoneration hearing, the OPDA "asked its criminalist [Defendant O'Neal] to come in and 'fudge'" his testimony.  *Id.* ¶¶ 65, 114.  "And that's what he did."  *Id.*  Defendant O'Neal

changed his story to falsely say that the lab results did not necessarily exclude Mr. Walter from

the pool of possible perpetrators.  *Id.* ¶ 66.  Instead, he claimed—falsely, for the first time, and

contrary to his trial testimony—that his testing did not establish whether the perpetrator was a

non-secretor.  *Id.* ¶¶ 66, 68.  This testimony contradicted not only Defendant O'Neal's prior

testimony, but also the corroborating test performed by the OPC, which likewise showed the

perpetrator was a non-secretor.  *Id.* ¶ 68.  Nonetheless, the Criminal District Court relied on

Defendant O'Neal's testimony to deny Mr. Walter's motion for a new trial.  *Id.* ¶ 69.  Mr. Walter

again appealed.  *Id.* ¶ 70.  Unaware of Defendant O'Neal's false and misleading testimony, the

Louisiana Fourth Circuit Court of Appeal affirmed Mr. Walter's conviction.  *Id.* ¶¶ 70-72.

Mr. Walter was exonerated on August 25, 2022.  *Id.* ¶¶ 75, 77.  At the exoneration

hearing, Judge Derbigny acknowledged that Mr. Walter is "innocent" and was "incarcerated . . .

for a crime that he did not commit."  *Id.* ¶ 76.  He described Mr. Walter's wrongful incarceration

as "clearly a failure of the system" and "an egregious injustice."  *Id.* ¶ 77.  Judge Derbigny

vacated Mr. Walter's conviction and ordered his release.  *Id.*  During the hearing, Defendant

Williams's representative stated that "the serology evidence" "shows that" Mr. Walter "did not

commit the crime," "concede[d] that Mr. Walter did not receive a fair trial," and agreed that "in

all likelihood, [Mr. Walter] did not commit the crime."  *Id.* ¶¶ 78, 81.

Defendant Williams, as the current Orleans Parish District Attorney, is

responsible for the management and supervision of the OPDA and its employees.  *Id.* ¶ 21.

## PROCEDURAL HISTORY

On August 25, 2023, Mr. Walter filed suit against the City of New Orleans; Jason

Williams, in his official capacity; Michelle Woodfork, in her official capacity; Harry Connick,

Sr., in his official capacity; Eddie Jordan, Jr., in his official capacity; Leon Cannizzaro, Jr., in his

official capacity; Harry O'Neal, in his individual capacity; and John/Jane Does #1-20, in their individual capacities.  Compl.[3]  On September 11, 2023, Harry Connick, Sr., Eddie Jordan, Jr., and Leon Cannizzaro, Jr. (the "Former D.A. Defendants") moved to dismiss the claims against them.  *See* First Mot. to Dismiss.[4]  Mr. Walter voluntarily dismissed the Former D.A. Defendants on September 19, 2023.  *See* Not. of Voluntary Dismissal.[5]  Defendant Williams filed a motion to dismiss on October 17, 2023,[6] and Mr. Walter filed an amended complaint on October 20, 2023.[7]  The Court denied both motions to dismiss as moot.[8]  On November 17, 2023, Defendant Williams filed this third motion to dismiss.  Third Mot. to Dismiss ("MTD").[9]

### LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "if the plaintiff alleges facts that . . . allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).  The court should "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff[]."  *Luebano v. Office Depot, L.L.C.*, 2023 WL 4249268, 2023 U.S. App. LEXIS 16524, at *7 (5th

---

3.  R. Doc. 1.

4.  R. Doc. 23.

5.  R. Doc. 24.

6.  Second Mot. to Dismiss, R. Doc. 32.

7.  R. Doc. 35.

8.  *See* R. Docs. 37, 38.

9.  R. Doc. 42.

Cir. 2023) (per curiam) (citation omitted).  All reasonable inferences should be drawn in the plaintiff's favor.  *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023).

## ARGUMENT

Mr. Walter states a claim against Defendant Williams in his official capacity under 42 U.S.C § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "Municipal liability under § 1983, or *Monell* liability, requires proof of three elements: 1) a policymaker, 2) an official policy or custom, and 3) a violation of constitutional rights whose 'moving force' is the policy or custom." *Marshall v. Webre*, 2023 WL 5952645, 2023 U.S. Dist. LEXIS 162031, at *7 (E.D. La. Sept. 13, 2023) (Morgan, D.J.) (citing *Monell*, 436 U.S. at 694). "These three elements are consistent with the Fifth Circuit's added requirement that a plaintiff show either an unconstitutional official policy or a facially innocuous one promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Mixon v. Pohlmann*, 2022 WL 2921733, 2022 U.S. Dist. LEXIS 131160, at *13 (E.D. La. July 25, 2022) (Morgan, D.J.) (cleaned up and citation omitted).

Mr. Walter has alleged violations of his constitutional rights under the Fifth and Fourteenth Amendments by alleging, *inter alia*, that the OPDA violated *Brady*, suborned perjury, and otherwise denied Mr. Walter due process.  Mr. Walter has further alleged that the "moving force" behind these violations were OPDA policies and customs—created by then-District Attorney Harry Connick—of suppressing and failing to timely disclose material exculpatory evidence, fabricating and knowingly allowing the presentation of false evidence, and engaging in the affirmative concealment of such misconduct.  Accordingly, Mr. Walter has stated a claim

against Defendant Williams in his official capacity and the Court should deny his motion to

dismiss.[10]

I.      **Defendants Violated Mr. Walter's Right to Due Process under the Fifth and Fourteenth Amendments**

Mr. Walter has alleged violations of his constitutional rights under the Fifth and

Fourteenth Amendments because he alleges that the OPDA: (1) failed to disclose the serological

testing results until the day of trial, rendering the evidence unusable; (2) subsequently caused

Defendant O'Neal to falsely testify that the serological testing did not establish whether the

perpetrator was a secretor; and (3) failed to disclose the prosecutorial misconduct underlying

Defendant O'Neal's testimony and its known falsity.

A.      **Defendants' Failure to Disclose Exculpatory Serological Testing Results Until the Day of Trial Was a *Brady* Violation**[11]

Mr. Walter has alleged a violation of his constitutional rights under *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and the Fifth and Fourteenth Amendments based on the untimely

---

10. Mr. Walter has also stated a claim against Defendant Williams because "municipalities may face liability under section 1983 where they breach duties imposed by state or local law." *Evans v. Lopinto*, 2022 WL 2304512, 2022 U.S. Dist. LEXIS 112705, at *21 (E.D. La. June 27, 2022) (alteration adopted) (quoting *O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985)). Louisiana law mandates that prosecutors comply with *Brady*, *see* La. C.Cr.P. § 723.B, that prosecutors produce reports of examinations and tests to defendants on request, *see id.* § 719.A, and that attorneys do not knowingly offer false evidence, *see* La. R. Prof'l Cond. 3.3(a)(3). Because Mr. Walter has alleged that OPDA employees violated all of these duties, *see infra* at 9-20, he has stated a claim against Defendant Williams in his official capacity.

11. Contrary to Defendant Williams's assertion (MTD at 7), Mr. Walter is not barred from raising a *Brady* claim. It is true that the Louisiana Fourth Circuit Court of Appeal rejected Mr. Walter's *Brady* claim in *State v. Walter*, 698 So. 2d 439 (La. App. 4 Cir. 1997). However, that court explicitly relied on Defendant O'Neal's testimony at the hearing on Mr. Walter's motion for a new trial to find that the serological reports were not material—testimony that the District Attorney has since conceded was false, and in direct conflict with O'Neal's previous testimony and other evidence. *See* Am. Compl. ¶¶ 65-70; *Walter*, 698 So. 2d at 442 (finding that the serological test reports were not material because "[a]s O'Neal testified at the hearing, the test results did not rule out the possibility that the perpetrator was a secretor and, therefore, the results did not eliminate Walter as a suspect."). *See Allen v. McCurry*, 449 U.S. 90, 95, 105 (1980) (for Section 1983 claims, federal courts should "give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so"); *Donley v. Hudsons Salvage, L.L.C.*, 517 F. App'x 216, 222 (5th Cir. 2013) ("The Louisiana res judicata statute makes an exception where 'exceptional circumstances justify relief from the res judicata effect of the [prior] judgment.'" (quoting La. Rev. Stat. § 13:4232(A)(1))); *Sutton ex rel. Rjano Holdings, Inc. v. Jack Adams, Maison Royale, LLC*, 356 So. 3d 1017, 1025 (La. 2023) (per curiam) (exception extends to a situation where party provided false information to the

disclosure of the serological test results.  Indeed, on direct appeal, the Louisiana Fourth Circuit

Court of Appeal agreed that there was "no doubt" that the prosecution "violated its duty" in

discovery and acknowledged that the undisclosed serological test reports "may be exculpatory

*Brady* material."  *See State v. Walter*, 514 So.2d 620, 621-22 (La. App. 4 Cir. 1987).

   "Under *Brady*, a state actor 'deprives a criminal defendant of his right to due

process when the state actor suppresses or withholds evidence that is both favorable to the

defendant and material to his defense.'"  *Adams v. City of New Orleans*, 2016 WL 4275246,

2016 U.S. Dist. LEXIS 107534, at *12 (E.D. La. Aug. 12, 2016) (Morgan, D.J.) (alteration

adopted) (quoting *Truvia v. Connick*, 577 F. App'x 317, 321-22 (5th Cir. 2014)).  "[T]he purpose

of [] *Brady* . . . is to ensure that the defendant receives a fair trial."  *Powell v. Quarterman*, 536

F.3d 325, 336 (5th Cir. 2008) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  A "*Brady*

determination is inevitably a contextual inquiry, involving questions of both law and fact."

*Banks v. Thaler*, 583 F.3d 295, 321 (5th Cir. 2009) (citations omitted).  "[T]he court must

consider not simply the withheld evidence in isolation, but also the quantity and quality of other

evidence in the record."  *Neal v. Vannoy*, 2021 WL 1212663, 2021 U.S. Dist. LEXIS 62132, at

*32 (E.D. La. Mar. 30, 2021) (quoting *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004)).

  **1.**  **The Withheld Serological Test Results Were Both Favorable to**
     **Mr. Walter and Material to His Defense**

   *First*, contrary to Defendant Williams's suggestion otherwise, *see* MTD 4-5, the

withheld serological test results were favorable to Mr. Walter.  "The character of a piece of

evidence as favorable will often turn on the context of the existing or potential evidentiary

---

court).  In any event, at Mr. Walter's exoneration hearing, the Orleans Criminal District Court judge granted Mr. Walter's motion to vacate his conviction on the basis of this evidence, effectively finding that, when considered with full knowledge of the truth regarding the serological evidence, those reports are material. *See infra* at 11-12.

record." *Floyd v. Vannoy*, 894 F.3d 143, 163 (5th Cir. 2018) (per curiam) (alteration adopted) (quoting *Kyles*, 514 U.S. at 439).  Here, the potential evidentiary record would have been profoundly altered had the serological test results been timely disclosed and had Mr. Walter been able to obtain testing of his own; in that situation, he could have presented evidence of his status as a secretor.  That, along with Defendant O'Neal's testimony "that the individual who left seminal fluid stains was a non-secretor," Am. Compl. ¶ 53, would have presented a drastically different picture to the jury.  Mr. Walter was not the source of the semen, which undisputedly came from the Actual Perpetrator. *Id.* ¶ 34.  In short, and as the OPDA conceded in Mr. Walter's exoneration hearing, the "serology evidence . . . shows that" Mr. Walter "did not commit the crime."[12] *Id.* ¶ 78.  Absent this serological evidence, Mr. Walter was unable to provide *any* physical evidence to the jury to undermine their belief in the reliability of L.S.'s identification. This evidence rises far beyond the relatively low bar of having "some value in countering" the prosecution's case required for evidence to be considered favorable.  *See Floyd*, 894 F.3d at 163 (quoting *Kyles*, 514 U.S. at 450).  It would have completely undermined—and, 35 years later, *did* completely undermine—any case against Mr. Walter.

Defendant Williams cites no case to support his claim that the serological evidence is not favorable because, taken in isolation, the reports do not exculpate Mr. Walter. *See* MTD at 4-5.  That is for good reason, as Fifth Circuit and Supreme Court caselaw is clear that the favorability of evidence should be assessed *in context*, not on a standalone basis.  *See*

---

12. Defendant Williams is judicially estopped from arguing to the contrary.  Judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington*, 650 F.3d 571, 573-74 (5th Cir. 2011).  Because Defendant Williams is sued as the representative of the OPDA, the court at Mr. Walter's exoneration hearing accepted the OPDA's position that Mr. Walter is innocent, and the OPDA did not act inadvertently, Defendant Williams cannot now claim that the evidence did not establish Mr. Walter's innocence. *Id.* at 574 ("In assessing whether judicial estoppel should apply, we look to see whether the following elements are present: (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.").

*Kyles*, 514 U.S. at 439; *Floyd*, 894 F.3d at 163.  And, indeed, the Court should consider not just

the existing record, but also the "potential evidentiary record" had the evidence timely been

disclosed.  *Floyd*, 894 F.3d at 163 (quoting *Kyles*, 514 U.S. at 439).  When viewed through this

lens, as explained above, the potential record would have been drastically different from the

actual record presented at trial, and the serological test results are favorable.

          *Second*, the withheld serological test results were material to Mr. Walter's

defense.  In the *Brady* analysis, "[e]vidence is material if prejudice ensued as a result of its

non-disclosure."  *Adams*, 2016 U.S. Dist. LEXIS 107534, at *12 (citing *Banks v. Dretke*, 540

U.S. 668, 691 (2004)).  That is, it must "demonstrate[] 'a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different.'"

*Floyd*, 894 F.3d at 166 (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)).  "A

reasonable probability is a likelihood sufficient to 'undermine confidence in the outcome.'"  *Id.*

(quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  Here, the untimely disclosure of

serological reports prejudiced the defense:  Mr. Walter was unable to present evidence of his

*actual innocence*.  Indeed, in Mr. Walter's exoneration hearing, the OPDA acknowledged that

Mr. Walter was prejudiced by the delayed production of the serological reports by "conced[ing]

that Mr. Walter did not receive a fair trial."[13]  Am. Compl. ¶ 81.  Likewise, Judge Derbigny

described Mr. Walter's wrongful conviction as "clearly a failure of the system" and "an

egregious injustice."  *Id.* ¶ 77.  In other words, Defendant Williams has conceded that the

---

13. For the reasons explained *supra*, at note 12, Defendant Williams is now judicially estopped from taking a
     contrary position.

delayed disclosure of the serological evidence "undermine[d] confidence in the outcome" of Mr. Walter's trial.[14]  That evidence is material.

This materiality finding is particularly strong given the weakness of the case against Mr. Walter, which relied entirely on an unreliable eyewitness identification made by an understandably traumatized victim who could not see the Actual Perpetrator for much of the crime, Am. Compl. ¶¶ 27-30.  *See Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990) ("[M]ateriality . . . depends almost entirely on the value of the evidence relative to the other evidence."), *vacated on other grounds*, *Smith v. Black*, 503 U.S. 930 (1992); *Grace v. Cain*, 2021 WL 5711942, 2021 U.S. Dist. LEXIS 230654, at *36 (E.D. La. Dec. 2, 2021) ("[W]ithheld evidence is more likely material when the State presents a weaker case." (quoting *Floyd*, 894 F.3d at 166)), *vacated in part on other grounds*, *Grace v. Hooper*, 2023 WL 2810059, 2023 U.S. App. LEXIS 8261 (5th Cir. Apr. 6, 2023); *Neal*, 2021 U.S. Dist. LEXIS 62132, at *65-*66 ("[A] *Brady* violation is more likely . . . when the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration.'" (quoting *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011))).

> **2.     The Serological Test Results Were Untimely Disclosed Because Mr. Walter Did Not Receive Them in Time for Their Effective Use at Trial**

In the Fifth Circuit, a plaintiff can state a *Brady* claim where the evidence is not received "in time for its effective use at trial."  *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) (citing *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003)).  Although the Supreme Court has not defined when a late disclosure violates *Brady*, most circuits have adopted

---

14.  The facts conceded by Defendant Williams's counsel at Mr. Walter's exoneration hearing are, at a minimum, evidentiary admissions entitled to the presumption of truth at the pleading stage in this case.  *Cf. Mays v. Dir., Office of Workers' Comp. Programs*, 938 F.3d 637, 647-48 (5th Cir. 2019) (discussing differences between judicial and evidentiary admissions).

rules substantially identical to that of the Fifth Circuit.  *See, e.g.*, *United States v. Bundy*, 968 F.3d 1019, 1033-37 (9th Cir. 2020) (affirming dismissal of indictments where government disclosed *Brady* material during trial and it was effectively unusable at trial); *United States v. Djibo*, 730 F. App'x 52, 56 (2d Cir. 2018) ("*Brady* requires disclosure [of covered evidence] 'in time for its effective use at trial'" (citation omitted)); *United States v. Burke*, 571 F.3d 1048, 1056 (10th Cir. 2009) (delayed disclosure that is "materially prejudicial" can be *Brady* violation); *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) (delayed disclosure "violates *Brady* only if it comes too late for the defense to make use of it"); *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992) ("Delay [in disclosure] only violates *Brady* when the delay itself causes prejudice."); United *States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) ("No denial of due process occurs if *Brady* material is disclosed to appellees in time for its effective use at trial.").  *See also Powell*, 536 F.3d at 335 n.4 (collecting cases).

Defendant Williams acknowledges *Powell* but argues, without merit, that there was no *Brady* violation here because the serological test reports were disclosed "before trial, and less than three weeks after Mr. Walter's indictment."  MTD at 5.  That framing, however, glosses over the fact that the reports were not disclosed to Mr. Walter until *the morning of trial*, making it far too late for him to make any effective use of this evidence, including by obtaining his own serological testing.  *See* Am. Compl. ¶ 51.  This evidence is the precise kind of evidence that requires additional investigation or work from the defense before it can be used effectively. Courts considering this kind of evidence have held that it can be protected *Brady* material even when disclosed during or shortly prior to trial.  In the Second Circuit, for example—where, as in the Fifth Circuit, "disclosure prior to trial is not mandated"—when material that "could have led to specific exculpatory information only if the defense undertook further investigation" is

untimely disclosed, the delay may so "impair[]" the defense's "opportunity to use it" that it cannot do so effectively.  *Leka v. Portuondo*, 257 F.3d 89, 100-01 (2d Cir. 2001); *cf. Smith*, 904 F.2d at 965 ("Timing is critical to proper *Brady* disclosure.").  In *Leka*, evidence—an account of a non-testifying eyewitness the defense did not have time to contact—could have led to specific exculpatory information only if the defense undertook further investigation by speaking with that witness.  257 F.3d at 101, 106-07.  The Second Circuit found a *Brady* violation, noting:

> When such a disclosure is first made on the eve of trial . . . the opportunity to use it may be impaired.  The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing.  And the defense may be unable to assimilate the information into its case.

*Id.* at 101.  That is exactly what happened in Mr. Walter's case.  *See also, e.g.*, *Blake v. Kemp*, 758 F.2d 523, 532 n.10 (11th Cir. 1985) (disclosure of transcript of confession and suicide note from defendant the day before trial violated *Brady* because, although disclosure the day before trial "may be sufficient" in "some instances," this information "was critical to trial preparation" and so should have been disclosed sooner).

     The Supreme Court of Louisiana has also found *Brady* violations due to late disclosures.  In *State v. Kemp*, the court reversed a conviction because the untimely disclosure of an eyewitness statement violated *Brady*.  828 So.2d 540, 546 (La. 2002) (per curiam).  The eyewitness statement, which contradicted testimony that witness had already provided at trial, was first disclosed to the defense during trial.  *Id.* at 543-45.  The witness could have been recalled, but the court recognized that the statement "possess[ed] such potential to give the evidence at trial an entirely different cast that [it] undermine[d] confidence" in the proceeding and failed "to provide the defense with adequate opportunity to present the material effectively in its case."  *Id.* at 545-46.  Accordingly, "the state's failure to provide timely disclosure impacted the fundamental fairness of the proceedings."  *Id.* at 546.  So too here:  The state's failure to

provide timely disclosure meant that Mr. Walter could not present evidence of his own secretor status.  Accordingly, an innocent man was convicted—a clear "impact to the fundamental fairness of the proceeding[]."

Defendant Williams does not meaningfully address this issue, instead citing a series of cases denying delayed disclosure *Brady* claims without context.  *See* MTD at 5-6. Crucially, all but one of these cases involved impeachment evidence disclosed shortly before or during trial and, in each case, the defense was able to effectively use that evidence at trial.  *See United States v. Morrison*, 833 F.3d 491, 508-09 (5th Cir. 2018) (impeachment evidence produced before trial such that defense had time to review and introduced some of the evidence at trial); *Powell*, 536 F.3d at 340-41 (impeachment evidence received before the witness testified and defense used it during cross-examination)[15]; *Lawrence v. Lensing*, 42 F.3d 255, 257-58 (5th Cir. 1994) (same); *United States v. Randall*, 887 F.2d 1262, 1269 (5th Cir. 1989) (impeachment evidence uncovered during direct of witness and defense had opportunity to cross-examine regarding evidence); *United States v. Nixon*, 634 F.2d 306, 312-13 (5th Cir. 1981) (impeachment evidence of meeting with prosecutors uncovered and fully exposed during cross-examination). Those cases are not analogous to Mr. Walter's because the effective use of impeachment evidence involves undermining the credibility of the witness through cross-examination.  Thus, if the defense can use it in that manner, the impeachment evidence may well be disclosed in time for its effective use at trial.  Not so here:  Without time to obtain serological testing of his own, Mr. Walter was deprived of his opportunity to use the serological reports, and the untimely

---

15. The *Powell* court was reviewing the denial of a habeas petition and did not consider the *Brady* claim on the merits.  The court held only that "the state court's decision that the [evidence was] not material and w[as] disclosed in time to be of effective use" was not "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court."  *Powell*, 536 F.3d at 340-41.

disclosure amounted to *non*-disclosure.  Thus, this situation is more analogous to the disclosure of impeachment evidence during trial but *after* the witness has testified; in such a case, the defense would be unable to cross-examine the witness, and so could not effectively use the evidence.  Indeed, that is precisely the conclusion the Fifth Circuit came to when faced with that situation.  *See United States v. McKinney*, 758 F.2d 1036, 1051 (5th Cir. 1985) (impeachment evidence "effectively suppressed" because defense counsel could not cross-examine witness and so "received [it] at a point at which it was too late to do [defendant] any good at trial").[16]

United States v. Swenson*, 894 F.3d 677 (5th Cir. 2018), is similarly inapposite. There, the defendant argued that "the delay prejudiced her because 'if she had received the documents at the beginning of the case, her preparation and strategy would have been entirely different.'  She also claim[ed] that she would have searched for other documents and evidence." *Id.* at 684.  The Fifth Circuit rejected this argument as "too speculative" and found that "[e]ven without a continuance, Swenson probably could have used the evidence effectively at trial."  *Id.* In that case, the defendant did not explain *how* her preparation and strategy would have been different, nor did she explain what "other documents and evidence" she would have sought— hence the conclusion that her argument was "speculative."  *Id.*  Mr. Walter, however, has specifically alleged what testing he would have conducted (serological testing), the results of that testing (he is an ABO antigen secretor), and how that evidence would have impacted his trial (the introduction of evidence that he is innocent).  His claim is not speculative.

Moreover, Defendant Williams's contention that Mr. Walter was not prejudiced because "his own bodily fluids" were "in his control" is ludicrous.  *See* MTD at 6.  Mr. Walter

---

16. There was no *Brady* violation in *McKinney*, however, because the suppressed evidence there was not material.  *Id.*  For the reasons explained above, that is not the situation here.

had no reason to test his bodily fluids because he did not know, and could not have known, that

his secretor status was relevant.  Given that he had just three weeks to prepare for trial, Am.

Compl. ¶¶ 49-50, such apparently irrelevant testing could not be expected to have been on any

reasonable list of priorities for himself or his defense counsel.  By the time he knew it would be

relevant—indeed, crucial—on the day of his three-hour trial, it was too late.  Defendant

Williams's claim that Mr. Walter would not have "acted promptly to test his secretor status" is

similarly unfounded.  *See* MTD at 7.  Mr. Walter raised the issue on direct appeal and promptly

obtained testing once he found that he would be able to present evidence of his secretor status.

Am. Compl. ¶¶ 57-58.  In any event, these arguments fail because they "are in direct contrast to

clearly-established *Brady* law rejecting the defense's ability to conduct their own analysis as

justification for prosecutorial non-disclosure."  *Floyd*, 894 F.3d at 163 (citation omitted).

**B.**     **The OPDA Allowed the Presentation of Defendant O'Neal's False Testimony
          in Violation of *Napue v. Illinois***

Mr. Walter has also alleged a violation of his constitutional rights under *Napue v.*

*Illinois*, 360 U.S. 264, 269 (1959), and the Fourteenth Amendment because he alleges that the

OPDA caused Defendant O'Neal to falsely testify that the serological testing did not establish

whether the perpetrator was a secretor.  "A criminal defendant's due process rights are violated

when the government obtains a conviction with testimony that government agents know is false."

*Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (citing *Napue*, 360 U.S at 269).  Under

*Napue*, Mr. Walter must allege that: (1) the statements were actually false, (2) the state knew

they were false, and (3) the statements were material.  *See Ho v. Thaler*, 495 F. App'x. 488, 493

(5th Cir. 2012) (citing *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996)).[17]

---

17.  The OPDA's failure to disclose the prosecutorial misconduct—directing the single witness for the state to
     perjure himself—was also an independent *Brady* violation, as well as a standalone due process violation that
     "offends some principle of justice so deeply rooted in the traditions and conscience of our people as to be

Mr. Walter has adequately alleged that the testimony was actually false and that the prosecution knew it was false.[18]  In arguing to the contrary, Defendant Williams completely ignores Mr. Walter's allegation that "an OPDA prosecutor 'asked its criminalist [Harry O'Neal] to come in and 'fudge.'  And that's what he did."  Am. Compl. ¶¶ 65, 114.  This allegation alone, accepted as true, "show[s] that the prosecution did more than present inconsistent testimony"; instead, "[t]he prosecution presented statements that . . . [it] knew to be false."  *See Ho*, 495 F. App'x. at 493.  Accordingly, Mr. Walter has stated a *Napue* claim.  *See id.*

Mr. Walter has provided additional detailed allegations regarding the falsity of Defendant O'Neal's testimony:

> Defendant O'Neal changed his story to falsely say that the lab results did not necessarily exclude Mr. Walter from the pool of possible perpetrators.  Instead, he claimed—falsely, and for the first time— that his testing did not conclusively establish whether the perpetrator was a non-secretor. . . .
>
> Defendant O'Neal's testimony was false, and it directly contradicted his own testimony at Mr. Walter's trial.  It also contradicted the corroborating test performed by the coroner's office on the victim's rape kit, which likewise demonstrated that the perpetrator was a non-secretor.

Am. Compl. ¶¶ 66, 68.  At trial, on the other hand, O'Neal testified that "the individual who left seminal fluid stains was a non-secretor" and that "there was no secretor activity."  *Id.* ¶¶ 53-54.  In short: at trial, O'Neal testified that the semen donor was a non-secretor; at the evidentiary hearing, he testified that it was unclear whether the semen donor was a non-secretor.  These two

---

ranked as fundamental" and "transgresses any recognized principle of fundamental fairness in operation." *District Attorney's Office v. Osborne*, 557 U.S. 52, 69 (2009) (citation omitted).

18. Defendant Williams does not dispute that O'Neal's testimony was material.  *See* MTD at 8-10.  That is for good reason, as the prosecution's only witness at the evidentiary hearing on Mr. Walter's motion for a new trial was Defendant O'Neal, and his false testimony served as the basis for the conclusions of both the Criminal District Court and the Louisiana Fourth Circuit Court of Appeal.  Am. Compl. ¶¶ 69-70.

stories are contradictory.  Moreover, Defendant Williams ignores the OPC testing results—

conducted by a different person, from a different agency, on a different sample—which *also*

found that the perpetrator was a non-secretor, Am. Compl. ¶¶ 43, 45, 68.  That report

corroborates O'Neal's testimony that the perpetrator was a non-secretor—increasing confidence

in the accuracy of that conclusion and, in turn, in the falsity of O'Neal's later testimony.

## II.     Former District Attorney Harry Connick Was a Final Policymaker

Mr. Walter has alleged that former District Attorney Harry Connick was the final

policymaker for the OPDA.  Under *Monell*, a "policymaker is an official whose decisions

represent the official policy of the local governmental unit.'"  *Smith v. Williams*, 2023 WL

2263841, 2023 U.S. Dist. LEXIS 32662, at *15 (E.D. La. Feb. 28, 2023) (cleaned up) (quoting

*Arnone v. Dallas County*, 29 F.4th 262, 266 (5th Cir. 2022)).  Under Louisiana law,[19] "a district

attorney is the independent and final official policymaker for all of the administrative and

prosecutorial functions of his office."  *Burge v. Parish of St. Tammany*, 187 F.3d 452, 469 (5th

Cir. 1999).  In particular, "a suit against a district attorney in his official capacity under § 1983

for constitutional torts caused by the district attorney's policies regarding the acquisition,

security, and disclosure of *Brady* material" will, if successful, "impose[] liability on the district

attorney's office as an independent local entity."  *Id.* at 470.  Louisiana district attorneys are

therefore policymakers because they "act as an independent local entity . . . in creating policies

for disclosure of evidence to criminal defendants under *Brady*."  *Smith*, 2023 U.S. Dist. LEXIS

32662, at *19.  The same logic applies to *Napue* violations, which also reflect the "administrative

and prosecutorial functions of [the district attorney's] office."  *See Burge*, 187 F.3d at 469.

---

19. Under *Monell*, the question of whether an individual is a final policymaker is determined by state law.
*McMillian v. Monroe County*, 520 U.S. 781, 786 (1997).

Mr. Walter alleges that Harry Connick, who was District Attorney at the time of Mr. Walter's wrongful prosecution and conviction, was the final policymaker who created the policy, custom, or practice that caused the deprivation of his constitutional rights.  Mr. Connick testified that there was no instruction or guidance provided to prosecutors on how to define materiality for *Brady* during the relevant time and that prosecutors "were supposed to figure it out themselves."  Am. Compl. ¶ 99.  Mr. Connick also "repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions . . . that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance."  *Id.* ¶ 102.  Finally, Connick's successor, Leon Cannizzaro, Jr., has publicly described Mr. Connick's tenure as a period in which "bad policy decisions"—including those like the *Brady* claims raised in *Thompson v. Connick*—"took root and became institutional."  *Id.* ¶ 101.  Defendant Williams ignores these allegations regarding Connick, instead claiming that Mr. Walter only "refers generally to 'policymakers' acting on behalf of OPDA, without ever identifying who these 'policymakers' were or providing any factual basis that they had the power to make policy."  MTD at 12.  Because Mr. Walter made several specific allegations that Mr. Connick created and endorsed the policies that caused the constitutional violations against him, *see* Am. Compl. ¶¶ 99, 101-02, and because Louisiana law dictates that "a district attorney is the independent and final official policymaker for all of the administrative and prosecutorial functions of his office," this argument must fail.  *See Burge*, 187 F.3d at 469.

### III.   The OPDA Had Official Policies, Customs, and Practices That Were the Moving Force Behind Mr. Walter's Injuries

Mr. Walter alleges that the OPDA had official policies, customs, and practices that led to the violation of his rights.  "For purposes of *Monell* liability, an official policy may be either 1) 'policy statement, ordinance, regulation, or decision that is officially adopted and

promulgated by the municipality's lawmaking officers' or 2) 'A persistent, widespread practice which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'"  *Marshall*, 2023 U.S. Dist. LEXIS 162031, at *11 (alteration adopted) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)).  Such a custom or practice "can yield a *de facto* policy of the [policymaker] provided he had actual or constructive knowledge of the custom or practice and he acquiesced in it."  *Mixon*, 2022 U.S. Dist. LEXIS 131160, at *21.  Moreover, "failure to provide proper training may fairly be said to represent a policy for which the Defendants are responsible, and for which they may be held liable if it actually causes injury."  *Marshall*, 2023 U.S. Dist. LEXIS 162031, at *16 (alterations adopted) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  A failure to properly discipline employees may also give rise to a claim where the plaintiff alleges that a "legally authorized policymaker" effectively "ratified a policy that violate a constitutional right."  *McWilliams v. City of Houston*, 2022 WL 17337820, 2022 U.S. App. LEXIS 33076, at *19 (5th Cir. Nov. 30, 2022) (citation omitted).

Mr. Walter has alleged a "persistent, widespread practice [which] is so common and well settled as to constitute a custom that fairly represents municipal policy."  *Marshall*, 2023 U.S. Dist. LEXIS 162031, at *11 (quoting *Webster*, 735 F.2d at 841).  Mr. Walter alleges that the official policy of the OPDA—confirmed in testimony by then-District Attorney Connick—was that prosecutors should "figure it out themselves" with respect to determining materiality under *Brady*.  Am. Compl. ¶ 99.  Mr. Walter also alleges that Mr. Connick had *actual knowledge* of repeated constitutional violations—including *Brady* violations—and publicly declined to take action to prevent such violations.  *Id*. ¶ 102 ("Mr. Connick repeatedly and publicly expressed disdain for the *Brady* doctrine and rebuffed suggestions—including, in one

notable instance, a plea from a sitting Orleans Parish Criminal District Judge—that prosecutors

be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance.").

This failure to discipline effectively amounts to ratification of the illegal conduct because

plaintiff has alleged "specific facts that support an inference that any pertinent policymaker knew

of unlawful actions and approved them." *McWilliams*, 2022 U.S. App. LEXIS 33076, at *19.

       Mr. Walter also alleges that Mr. Connick had constructive knowledge of repeated

*Brady* and *Napue* violations because such violations "occurred for so long [and] so frequently

that the course of conduct warrants the attribution to the governing body of knowledge that the

objectionable conduct is the expected, accepted practice.'" *Guillot v. Lopinto*, 2022 WL 684159,

2022 U.S. Dist. LEXIS 40383, at *17 (E.D. La. Mar. 8, 2022) (quoting *Webster*, 735 F.2d at 841-

42).  Mr. Walter's allegations include that:

- In the 1980s, concealing exculpatory evidence in New Orleans was routine (as observed by the National Registry of Exonerations and Supreme Court Justices John Paul Stevens and Ruth Bader Ginsberg), Am. Compl. ¶ 105;

- Orleans Parish has the highest per capita exoneration rate of any county or parish in the county (and prosecutorial misconduct, including the suppression of exculpatory evidence, occurred in the majority of those exonerations), *id.* ¶ 106;

- There are at least 51 criminal cases from New Orleans in which courts have found or the prosecution has acknowledged that the OPDA violated *Brady*, as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds, *id.* ¶ 107;

- Sixteen specific cases provide illustrative examples of those repeated *Brady* violations, *id.* ¶¶ 108-09; and

- Eight specific cases provide illustrative examples of repeated *Napue* violations, *id.* ¶¶ 117, 119-20.

These allegations illustrate persistent, widespread practices.  Indeed, Mr. Walter has alleged

instances of "very similar violations," *Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019), to

those that he endured, including instances of failing to timely disclose evidence regarding crime

lab testing, Am. Compl. ¶ 108.a (lab report of blood-type testing), ¶ 108.c (fingerprint test results), ¶ 109.a (ballistics testing); a prior instance of, at best, contradictory and misleading— and, at worse, false—testimony by Defendant O'Neal, *id.* ¶ 117; and instances of OPDA prosecutors' knowingly allowing the presentation of false testimony, *id.* ¶ 119.a, ¶ 120 (referencing ¶¶ 108.c, 109.a, 109.e, 109.f, 109.h, 109.l).  Regarding the presentation of false testimony, Defendant Williams is incorrect that Mr. Walter does not allege facts allowing the inference that OPDA prosecutors knew about the false testimony.  *See, e.g.*, ¶ 109.a (prosecution had access to police report that directly contradicted detective testimony at trial), ¶ 109.e (prosecution had access to 911 call log contradicting prosecution theory of the timeline of the crime), ¶ 109.f (prosecution knew that key witness lied about previous conviction and failed to correct the testimony), ¶ 109.l (prosecution had access to police report refuting police testimony).

     *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360 (E.D. La. May 2, 2016), is instructive.  There, plaintiffs stated "a plausible claim for relief by identifying in the complaint, among other things, 'past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy.'"  *Id.* at 373 (quoting *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 843-44 (S.D. Tex. 2011)).  Plaintiffs met that standard by alleging "a persistent, widespread practice of failing to train, supervise, and discipline NOPD officers" and "a custom of condoning a culture within the NOPD in which NOPD personnel had the reasonable belief that their actions would not be properly monitored and that their misconduct would not be thoroughly investigated or sanctioned, but instead would be tolerated and approved."  *Id.* at 372.  Accordingly, plaintiffs "provide[d] more than a boilerplate recitation of the grounds for municipal liability" by "mak[ing] some additional

allegation to put the municipality on fair notice of the grounds for which it is being sued," and the allegations "survive[d] dismissal." *Id.* at 373-74.  So too here, where Mr. Walter alleges "a persistent, widespread practice of failing to train, supervise, and discipline" OPDA employees and "a custom of condoning a culture within the [OPDA] in which [OPDA] personnel had the reasonable belief that their actions would not be properly monitored and that their misconduct would not be thoroughly investigated or sanctioned, but instead would be tolerated and approved." *Id.*  Those allegations state a claim, which is all that is required at the pleading stage.

Mr. Walter has also alleged that OPDA adopted "an unconstitutional official policy" or, at the least, a policy "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Mixon*, 2022 U.S. Dist. LEXIS 131160, at *13 (cleaned up and citation omitted).  *First*, Mr. Walter has alleged that the OPDA effectively adopted an official policy of allowing the suppression of material exculpatory evidence, fabricating evidence (including false testimony), and engaging in the affirmative concealment of such misconduct.  *See supra* at 21-23.  Of course, such policies are facially unconstitutional.  *See Brady*, 373 U.S. at 87; *Napue*, 360 U.S at 269.  *Second*, Mr. Walter has, at minimum, alleged that the OPDA promulgated its policies regarding *Brady* and *Napue* with deliberate indifference to the obvious consequences that constitutional violations would result. "Deliberate indifference 'requires that the defendant act with 'something more than mere negligence' but 'less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.''" *Marshall*, 2023 U.S. Dist. LEXIS 162031, at *20 (quoting *Cadena v. El Paso Cty.*, 946 F.3d 717, 727 (5th Cir. 2020)).  As explained above, Mr. Walter has alleged that Mr. Connick had both actual and constructive knowledge of ongoing *Brady* and *Napue* violations but repeatedly and publicly refused to take any steps to prevent such violations

or discipline his employees for their conduct.  *See supra* at 21-23.  He thus acted "with knowledge that harm w[ould] result" from his policy, exhibiting deliberate indifference to the obvious consequence of constitutional violations like those at issue here.

Finally, the OPDA's policy was the moving force behind Mr. Walter's injuries. Under *Monell*, "proof that the municipality's decision was unconstitutional' [may] establish[] that 'the municipality itself was liable for the plaintiff's constitutional injury.'"  *Jauch v. Choctaw Cty.*, 874 F.3d 425, 436 (5th Cir. 2017) (citation omitted).  "'Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so,' the causation determination 'is straightforward.'"  *Id.* at 435 (citation omitted).  As explained above, Mr. Walter has alleged that the OPDA had a policy of promoting, facilitating, and condoning misconduct by its employees concerning the suppression of *Brady* material and the knowing presentation of false testimony.  *See supra* at 21-23.  Because such behavior violates the Fifth and Fourteenth Amendments, Mr. Walter has alleged that the OPDA's unconstitutional policies caused his constitutional injury.  *See Jauch*, 874 F.3d at 435-46 (finding it "obvious" that "policy whereby certain arrestees were indefinitely detained" was the moving force behind "due process violation [of] indefinite detention); *Durant v. Gretna City*, 2020 WL 263669, 2020 U.S. Dist. LEXIS 8422, at *75-*76 (E.D. La. Jan. 17, 2020) (arrest pursuant to unconstitutional ordinance established that unconstitutional ordinance itself "obvious[ly]" caused plaintiff's injury). Defendant Williams cites no cases to the contrary.  MTD at 16, 18.

## CONCLUSION

For the foregoing reasons, Plaintiff Sullivan Walter respectfully submits that the Court should deny Defendant Jason R. Williams's Motion to Dismiss.

Dated: December 19, 2023
       New Orleans, Louisiana


   MURELL LAW FIRM      SHANIES LAW OFFICE PLLC

By: */s/ Christopher J. Murell*    By: */s/ David B. Shanies*
  Christopher J. Murell      David B. Shanies* (T.A.)
  La. Bar No. 32075       Deborah I. Francois*
  Meghan K. Matt        Eleanor C. Davis*
  La. Bar No. 39975       110 West 40th Street, Tenth Floor
  2831 Saint Claude Avenue    New York, New York 10018
  New Orleans, Louisiana 70117   (212) 951-1710 (Tel)
  (504) 717-1297 (Tel)      (212) 951-1350 (Fax)
  chris@murell.law       david@shanieslaw.com
  meghan@murell.law      deborah@shanieslaw.com
              eleanor@shanieslaw.com

              *Admitted *Pro Hac Vice*


*Attorneys for Plaintiff Sullivan Walter*