# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SULLIVAN WALTER,** **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **NO.  23-4352** |
| **CITY OF NEW ORLEANS, ET AL.,** **Defendants** | **SECTION: "E" (2)** |

## ORDER AND REASONS

Before the Court is Defendant, Jason Williams ("Williams"), in his official capacity as Orleans Parish District Attorney ("OPDA"),[1] who filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] Plaintiff, Sullivan Walter, opposes the motion.[3] Defendant filed a reply.[4] Plaintiff also filed three notices of supplemental authority,[5] and Williams filed a response.[6]

## BACKGROUND

This case arises out of the conviction and incarceration of Plaintiff Sullivan Walter.[7] On May 10, 1986, L.S. was sexually assaulted in her home.[8] Immediately after the assault, L.S. called the police and was taken to the hospital, where a resident physician performed an examination and collected several swabs to preserve the evidence in a rape

---

[1] Williams is sued in his official capacity as the District Attorney for Orleans Parish. Although the Court at times refers to the OPDA as the entity against which Plaintiff asserts claims and as the entity allegedly responsible for the constitutional violations at issue, Williams is the proper defendant, as discussed below. *See infra* pp. 13-14. Accordingly, references to the OPDA in this context are properly understood as references to Williams in his official capacity.

[2] R. Doc. 87; FED. R. CIV. P. 12(b)(6).

[3] R. Doc. 88.

[4] R. Doc. 89.

[5] R. Doc. 95; R. Doc. 97; R. Doc. 102.

[6] R. Doc. 96.

[7] These facts are taken from Plaintiff's third amended complaint. R. Doc. 85.

[8] *Id.* at p. 9.

kit.[9] That night, L.S. provided a description of the perpetrator to the police.[10] She described the perpetrator "as a Black man who was '5'11, slender, 18-20 years old, with thick eyebrows, jerri curl ringlets, [and who was] wearing a backwards baseball hat.'"[11] L.S. stated that the man's baseball hat was blue and he wore a face covering during the assault, but that the face covering dropped several times during the assault.[12] A sketch artist prepared a composite drawing of the perpetrator.[13]

Plaintiff alleges that serological testing "is used to determine whether a person's body secretes ABO blood group antigens into their bodily fluids, such as saliva, sweat, and semen."[14] Persons who secrete blood group antigens are known as "secretors," while those who do not are referred to as "non-secretors."[15] A medical technologist at the Orleans Parish Coroner's Office performed serological testing on the vaginal swabs recovered from L.S.[16] The testing revealed that the seminal fluid came from a perpetrator who was a non-secretor.[17] Separately, Detective O'Neal, a criminalist in the New Orleans Police Crime Lab at the time,[18] serologically tested a semen sample retrieved from L.S.'s shorts.[19] This testing also revealed the perpetrator was a non-secretor.[20]

On June 23, 1986, Plaintiff—who was 17, of an average build, had cropped natural

---

[9] *Id.* at p. 10.

[10] *Id.*

[11] *Id.* at p. 10.

[12] *Id.* at p. 9. Plaintiff alleged that L.S. told the police the face covering dropped several times during the crime and she believed she could identify the perpetrator. *Id.*

[13] *Id.* at p. 11.

[14] *Id.* at p. 10.

[15] *Id.* Serological testing of bodily fluids from secretors reveals the blood type of the person who was the source of the fluid. *Id.* at pp. 10-11. When someone is a non-secretor, blood type is not determinable from bodily fluids. Plaintiff asserts that this distinction "allows laboratories to investigate evidentiary bodily fluids other than blood to eliminate persons of interest as the source." *Id.* at p 11.

[16] *Id.* at pp. 10-11.

[17] *Id.* at p. 11.

[18] *Id.* at p. 8.

[19] *Id.* at p. 11.

[20] *Id.*

hair, sparse eyebrows, and was without facial hair at the time—was arrested for an unrelated simple burglary.[21] Plaintiff was wearing a blue hat when he was arrested.[22] The police identified him as a potential match to the composite drawing.[23] On June 26, 1986, the police presented L.S. with a photo lineup of seven individual photographs, one of which was a photo of Plaintiff wearing a hat.[24] Plaintiff was the only man in the photo lineup who was wearing a hat.[25] "L.S. made a cross-racial identification and incorrectly identified Mr. Walter as the perpetrator."[26]

On November 13, 1986, Plaintiff was charged with two counts of aggravated crimes against nature, one count of aggravated rape, and one count of aggravated burglary.[27] On December 1, 1986, he was arraigned and pleaded not guilty.[28] The next day, December 2, 1986, following a three-hour trial, a twelve-member jury found Plaintiff guilty on all counts.[29] At the time of the trial, Plaintiff's status as a "secretor" or "non-secretor" was not known.[30] Plaintiff underwent serological testing in January 1988, a little over a year after the trial.[31]

Plaintiff alleges that, when they were preparing his defense, he and his counsel were unaware of the serological testing that had been performed.[32] Plaintiff alleges that "neither [he] nor his attorney received the lab report before the morning of trial. As a

---

[21] *Id.*
[22] *Id.*
[23] *Id.* at pp. 11-12.
[24] *Id.* at p. 12.
[25] *Id.*
[26] *Id.* The Innocence Project and others have described cross-racial identification as "when the witness and the defendant being identified are of different racial backgrounds." *See* https://perma.cc/KS7S-XXDS.
[27] R. Doc. 85 at p. 12.
[28] *Id.*
[29] *Id.*
[30] *Id.* at pp. 12-14.
[31] *Id.* at p. 13.
[32] *Id.* at p. 12.

result, this evidence was unusable at trial, and Mr. Walter was deprived of an opportunity to obtain and present any evidence regarding his own secretor status or the implication of his secretor status."[33]

At trial, L.S. testified and identified Plaintiff as the perpetrator.[34] Detective O'Neal testified that the police serology test of the seminal fluid performed by him revealed the perpetrator was a non-secretor, but he did not explain—and was not asked to explain—the significance of this finding:

> "In this particular case, examination of seminal fluid revealed no secretor activity which would indicate that the individual who left seminal fluid stains was a non-secretor. In other words, they did not secrete their blood type."[35]

Plaintiff alleges that O'Neal confirmed the perpetrator was a non-secretor during his cross-examination, testifying:

> "Q. Now—basically, all you had was—you examined the shorts and the blouse and found that the shorts contained seminal fluid, and the blouse did not, is that correct?
>
> A. That is correct.
>
> Q. That's all your analysis showed?
>
> A. That's correct.
>
> Q. You weren't able to establish a blood type?
>
> A. No, sir. The stain that was tested for secretor activity reflected that there was no secretor activity."[36]

The jury found Plaintiff guilty on all counts.[37] Plaintiff was sentenced to 35 years in

---

[33] *Id.*
[34] *Id.* Plaintiff alleges L.S.'s trial testimony contradicted the prior statement she gave to police because she testified that the perpetrator did not have much hair, while her prior statement described the perpetrator as having thick eyebrows, curly hair, and stubble. *Id.*
[35] *Id.*
[36] *Id.* at p. 13.
[37] *Id.* at p. 12.

prison.[38]

Plaintiff appealed his conviction, arguing the Orleans Parish District Attorney's Office ("OPDA") violated his constitutional due process rights and violated its discovery duties when it withheld the serological testing reports until the day of trial.[39] In October 1987, the Louisiana Fourth Circuit Court of Appeal, after finding the OPDA violated its discovery duties, remanded the case to the trial court to allow Plaintiff to present his *Brady*[40] claims.[41] On January 13, 1988, additional serological testing was conducted, which revealed that Plaintiff was a secretor and secreted Blood Type B antigens.[42] Plaintiff alleges this testing confirmed that Plaintiff could not have been the perpetrator of the crimes against L.S.[43]

Plaintiff moved for a new trial.[44] On April 29, 1988, the criminal district court held an evidentiary hearing on Plaintiff's motion for a new trial.[45] Plaintiff alleges the prosecution's only witness at the hearing was O'Neal.[46] Plaintiff alleges that

> prior to . . . [O'Neal's] testimony, one or more agents of the OPDA directed Defendant O'Neal to lie about the secretor status testing and significance. In the OPDA's words, the OPDA "asked its criminalist [O'Neal] to come in and 'fudge'" his testimony. "And that's what he did."[47]

Plaintiff alleges the OPDA directed Detective O'Neal to lie about the secretor status testing and its significance and "to fudge" his testimony.[48] In the alternative, Plaintiff alleges that Detective O'Neal intentionally falsified his testimony on his own, without the

---

[38] *Id.* at p. 13.
[39] *Id.* at p. 13.
[40] *Brady v. Maryland,* 373 U.S. 83 (1963).
[41] R. Doc. 85 at p. 13.
[42] *Id.*
[43] *Id.* at pp. 13-14.
[44] *Id.* at p. 14.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.* at p. 14.

prosecutors' knowledge, and concealed from the OPDA the fact that he had given false testimony.[49]

At the hearing on the motion for a new trial, Detective O'Neal testified that the serological testing did not necessarily exclude Mr. Walter as a potential perpetrator.[50] Detective O'Neal also testified that the serological testing of the rape kit swabs did not conclusively establish whether or not the perpetrator was a secretor.[51] Plaintiff alleges this testimony was false and directly contradicted Detective O'Neal's testimony at the first trial.[52]

The state district court denied Plaintiff's motion for a new trial.[53] Plaintiff alleges that O'Neal's testimony was the "sole basis for the criminal district court to deny [Plaintiff's] motion for a new trial," as no other witness testified at the hearing.[54] Plaintiff appealed, and the Louisiana Fourth Circuit Court of Appeal affirmed the denial of the motion for a new trial.[55]

In October 2021, the Innocence Project New Orleans ("IPNO") took on Plaintiff's case.[56] The IPNO contacted the Civil Rights Division of the OPDA, which began conducting its own investigation into Plaintiff's case.[57] On August 23, 2022, attorneys from the OPDA and the IPNO filed a "Joint Agreement and Motion to Vacate" Plaintiff's

---

[49] *Id.*
[50] *Id.* at p. 14.
[51] *Id.*
[52] *Id.* at pp. 14-15.
[53] *Id.* at p. 15.
[54] *Id.*
[55] *Id.* Plaintiff alleges the Fourth Circuit applied the incorrect legal standard to evaluate whether the newly discovered evidence would have changed the result of the trial. *Id.* The Louisiana Supreme Court granted Mr. Walter's writ and remanded for the Fourth Circuit to apply the correct standard. *Id.* The Fourth Circuit again affirmed Mr. Walter's conviction. *Id.*
[56] *Id.*
[57] *Id.*

conviction.[58] At the motion hearing on August 25, 2022, the OPDA "stated that 'the serology evidence' disclosed on the morning of Mr. Walter's trial 'show[ed] that' Mr. Walter 'did not commit the crime.'"[59] After the hearing, a criminal district court judge vacated Plaintiff's conviction and ordered his release from prison.[60]

Plaintiff filed the instant civil lawsuit, seeking to recover compensatory damages, punitive damages, and an award of costs and attorneys' fees for violations of his civil rights under 42 U.S.C. §§ 1983 and 1988, the Fifth and Fourteenth Amendments of the United States Constitution, the Louisiana Constitution, and other Louisiana state law.[61] Plaintiff sought to hold Williams, the City, and O'Neal liable for violations of his civil rights, which resulted in his wrongful incarceration for over 35 years.[62] Plaintiff alleges that Defendants violated his Fifth and Fourteenth Amendment rights by "fabricating evidence; suppressing exculpatory evidence; suborning and committing perjury; and creating and maintaining unlawful policies, customs, and practices that caused the wrongful and unconstitutional acts . . . ."[63]

Title 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .[64]

---

[58] *Id.*
[59] *Id.* at p. 16.
[60] *Id.*
[61] *See generally* R. Doc. 85.
[62] *Id.* at pp. 3-5.
[63] *Id.* at p. 3.
[64] 42 U.S.C. § 1983.

This statute provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States.[65] The statute is "not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere."[66] To pursue a claim under § 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the United States; and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.[67] "A municipality or other local government may be liable under this section if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."[68]

## I.    Procedural History in Federal Court

The Court has addressed numerous claims in this matter. First, the Court dismissed without prejudice all of Plaintiff's claims against the unidentified John and Jane Does #1-20 Defendants, finding that the allegations were conclusory and lacked the specificity required to survive a motion to dismiss.[69] Second, the Court dismissed with prejudice Plaintiff's § 1983 claims against Defendant O'Neal individually based on allegations of perjury and/or conspiracy to commit perjury or provide false testimony, holding that O'Neal is entitled to absolute witness immunity as to those claims.[70] Third, the Court dismissed with prejudice Plaintiff's civil conspiracy claims against the individual defendants, concluding that the allegations failed to meet the required level of

---

[65] *Id.*

[66] *Olabisiomotosho v. City of Hou.*, 185 F.3d 521, 525 (5th Cir. 1999).

[67] *Sw. Bell Tel., LP v. City of Hou.*, 529 F.3d 257, 260 (5th Cir. 2008); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

[68] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692, (1978)).

[69] R. Doc. 101 at p. 11.

[70] *Id.* at pp. 12-13.

specificity.[71] Fourth, the Court determined that Plaintiff sufficiently stated a *Monell* claim against the City.[72] Finally, the Court dismissed Plaintiff's § 1983 claims against Defendant O'Neal in his personal capacity, finding that, following the limited discovery authorized by the Court, Plaintiff failed to establish O'Neal was personally involved in the alleged constitutional violations, thereby entitling O'Neal to qualified immunity.[73] This    Order and Reasons addresses Williams' pending motion to dismiss Plaintiff's § 1983  claims against him in his official capacity.

Williams filed his first motion to dismiss on October 17, 2023.[74] On October 20, 2023, Plaintiff filed his first amended complaint as of right pursuant to Rule 15(a)(1)(B).[75] As a result, the Court dismissed Williams' first motion to dismiss as moot.[76] In his first amended complaint, Plaintiff raised Monell claims against Williams (1) for violations under *Brady v. Maryland*[77] based on the  OPDA's policy and practice of withholding material exculpatory evidence; (2) for violations under *Napue v. Illinois*[78] based on the OPDA's policy and practice of fabricating evidence including false witness statements and concealing such misconduct; and (3) for the OPDA's policy and practice of failing to train, monitor, and supervise employees.[79]

Williams filed his second motion to dismiss on November 17, 2023.[80] The Court issued an Order and Reasons on September 30, 2024, addressing Williams' arguments,

---

[71] *Id.* at pp. 19-20.
[72] *Id.* at pp. 20-22.
[73] R. Doc. 113 at pp. 18-19.
[74] R. Doc. 32.
[75] R. Doc. 35.
[76] R. Doc. 38.
[77] 373 U.S. 83 (1963).
[78] 360 U.S. 264 (1959).
[79] R. Doc. 35 at pp. 39-40.
[80] R. Doc. 42.

in part, with respect to the Plaintiff's first two *Monell* claims.[81] The Court held in that Order that Plaintiff had sufficiently alleged violations of his constitutional rights in support of his first two *Monell* claims against Williams as he alleged that: (1) under *Brady v. Maryland*, Williams "withheld evidence that was both favorable to Plaintiff and material to his defense, which prejudiced him at trial and resulted in his lengthy period of incarceration;"[82] and (2) under *Napue v. Illinois*, the OPDA "explicitly instructed O'Neal to perjure himself to maintain Mr. Walter's wrongful conviction."[83] However, the Court found Plaintiff's allegations deficient as to the other elements of those two *Monell* claims because the amended complaint failed to identify a final policymaker for OPDA and lacked factual allegations that OPDA's unconstitutional policies or customs of withholding exculpatory evidence and condoning false testimony were the "moving force" behind the constitutional violations in this case.[84]

In the portion of his second motion to dismiss seeking dismissal of Williams' third *Monell* claim based on the OPDA's policy and practice of failing to train, monitor, and supervise employees, Williams argued Plaintiff's failure to train allegations do not sufficiently plead a pattern of similar constitutional violations that would have put the OPDA on notice, at the time of Plaintiff's prosecution, of any potential deficiency with its policies or training.[85] After examining the cases cited by Plaintiff in the first amended complaint, the Court found Plaintiff had alleged 10 cases in which the defendants were convicted and their convictions reversed on a *Brady* violation prior to December 1986.[86]

---

[81] R. Doc. 64.
[82] *Id.* at p. 14.
[83] *Id.* at pp. 14-15.
[84] *Id.* at pp. 27-28.
[85] R. Doc. 42-1 at p. 16.
[86] R. Doc. 64 at p. 24.

The Court granted Plaintiff leave to file an amended complaint to clarify whether there are additional cases with both convictions and *Brady* findings before December 1986 and to more specifically allege the factual similarities between the *Brady* violations found in these cases and the facts of Plaintiff's case.[87]

Plaintiff filed his amended complaint on January 13, 2025, again bringing three *Monell* claims against Williams based on *Brady v. Maryland* for failure to disclose material exculpatory evidence, *Napue v. Illinois* for fabricating evidence including false witness statements and concealing such misconduct, and failing to train, monitor, and supervise employees.[88] Williams then filed the instant motion to dismiss on January 14, 2025,[89] seeking dismissal of all three of Plaintiff's *Monell* claims against Williams on the basis that, even if Plaintiff adequately alleged constitutional violations, Plaintiff failed to allege "the elements necessary to hold OPDA liable."[90]

## **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief may be granted if the plaintiff has not set forth factual allegations in support of his claim that would entitle him to relief.[91] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[92] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

---

[87] *Id.*
[88] R. Doc. 85.
[89] R. Doc. 87.
[90] *See* R. Doc. 87-1 at p. 6.
[91] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).
[92] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

draw the reasonable inference that the defendant is liable for the misconduct alleged."[93] The Court, however, does not accept as true legal conclusions or mere conclusory statements, and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[94] Indeed, "threadbare recitals of elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient.[95]

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]'—that the pleader is entitled to relief."[96] However, "legal conclusions can provide the framework of a complaint, [if] they [are] supported by factual allegations."[97] "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[98] "Although detailed factual allegations are not required," "[d]ismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'"[99] Whether a plaintiff "will be able to offer sufficient proof to support [his or her] claims is more appropriate in the context of a motion for summary judgment or a trial on the merits" rather than in a motion to dismiss.[100] "[I]ntensive disputes of material fact . . . are usually more appropriate for summary judgment . . . ."[101]

---

[93] *Id.*

[94] *S. Christian Leadership Conf. v. Sup. Ct. of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).

[95] *Iqbal*, 556 U.S. at 663, 678 (citations omitted).

[96] *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

[97] *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

[98] *Iqbal*, 556 U.S. at 679.

[99] *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (per curiam) (citations omitted).

[100] *Smith v. GE Healthcare, Inc.*, No. 3:19-CV-00492, 2019 WL 4565246, at *7 (W.D. La. Sept. 4, 2019).

[101] *Dong Phuong Bakery, Inc. v. Gemini Soc'y, LLC*, No. CV 21-1109, 2022 WL 898750, at *5 (E.D. La. Mar. 28, 2022).

## LAW AND ANALYSIS

I.  **The Plaintiff has sufficiently pleaded that Williams was the final policymaker.[102]**

To establish liability against a municipality or other local government, a plaintiff must show: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)."[103] In the Court's September 30, 2024, Order and Reasons, the Court found Plaintiff's allegations failed to identify a final policymaker for the OPDA.[104] Plaintiff was granted leave to amend his complaint "to more specifically allege that Harry Connick was the final policymaker at the time of Plaintiff's conviction."[105]

To succeed on his *Monell* claims, Plaintiff is required to identify a final policymaker for the OPDA.[106] The determination of a final policymaker is a matter of state law.[107] It is well settled that, in Louisiana, the "district attorney is the independent and final official policymaker for all of the administrative and prosecutorial functions of the office."[108] In his third amended complaint, Plaintiff clearly alleges that Harry Connick served as the OPDA's final policymaker from approximately 1974 to 2003, including at the time of Mr. Walter's conviction in 1986.[109] In § 1983 actions against Louisiana district attorneys when the alleged final policymaker no longer holds office, "any judgment against a district attorney in his official capacity must be recovered from . . . the public funds controlled by

---

[102] There is no question Williams was acting under color of state law.
[103] *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021) (quoting *Pineda v. City of Hou.*, 291 F.3d 325, 328 (5th Cir. 2002)).
[104] R. Doc. 64 at pp. 27-28.
[105] R. Doc. 64 at p. 17.
[106] *Rivera v. Hou. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003).
[107] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 468-69 (5th Cir. 1999).
[108] *Id.* at 469.
[109] R. Doc. 85 at pp. 7-8.

. . . his successor in office."[110] Moreover, "Louisiana law does not permit a district attorney's office to be sued in its own name."[111] Instead, "when attempting to sue a Louisiana [district attorney's] office under *Monell*, the current [district attorney], rather than the office, is the proper defendant."[112]

Consistent with this authority, Plaintiff sued Jason Williams in his official capacity as the current District Attorney for Orleans Parish.[113] Plaintiff alleges "Jason Williams is currently the Orleans Parish District Attorney, and currently responsible for the operation, maintenance, and control of the OPDA . . . [and] is the successor as final policymaker for the OPDA to . . . Harry Connick."[114] Accordingly, Plaintiff has sufficiently pleaded that Harry Connick was the municipal policymaker with final policymaking authority at the time of Mr. Walter's conviction and he has properly sued Jason Williams as Harry Connick's successor in office.

## II. Plaintiff has sufficiently pleaded that Connick was aware of OPDA's policy, custom, or practice of failing to train its employees on their Brady obligations, that this policy, custom, or practice was maintained with deliberate indifference to the constitutional violations that would result, and that this policy, custom or practice was the moving force behind the deprivation of Plaintiff's constitutional rights.

For Plaintiff's *Monell* claim based on a failure to train theory to survive a motion to dismiss, Plaintiff must sufficiently allege that the OPDA was aware it had inadequate training procedures with respect to its prosecutors' *Brady* and *Napue* obligations, that the OPDA was deliberately indifferent to the constitutional violations that would result from these training procedures, and the failure to train was the "moving force" behind the

---

[110] *Burge*, 187 F.3d at 470.
[111] La. Const. art. V, § 24; *Hudson v. City of New Orleans*, 174 F.3d 677, 680 (5th Cir. 1999).
[112] *Armstrong v. Ashley*, 60 F.4th 262, 268 n. 4 (5th Cir. 2023).
[113] R. Doc. 85 at pp. 7-8.
[114] *Id.*

constitutional violations suffered by the Plaintiff.[115]

Ordinarily, the Plaintiff must sufficiently allege a *pattern* of similar constitutional violations by untrained employees that would put Connick on notice that OPDA's *Brady* and *Napue* training was inadequate. The OPDA argues that, to put Connick on notice of a pattern of similar violations by untrained employees, the convictions in other cases must have been overturned before Plaintiff's conviction.[116] In its September 30, 2024 Order and Reasons, the Court discussed Fifth Circuit cases holding that Plaintiff must sufficiently allege cases with both convictions and *Brady* findings (or instances of withheld exculpatory evidence) occurring prior to the date of Plaintiff's own conviction to demonstrate that (1) the OPDA had a pattern or practice of suppressing exculpatory evidence, and  (2) Connick had actual or constructive knowledge of the OPDA's failure  to train employees  and was  deliberately indifferent  to  the resulting constitutional violations.[117]  The Court also referenced cases holding  that  the  alleged pattern of cases must be factually similar to the case at hand.[118]  In his renewed motion to dismiss, Williams argues that "Mr. Walter's new Complaint does not remedy the deficiencies noted by the Court"[119] because he failed to identify additional cases with court-found *Brady* or *Napue* violations prior to December 1986.[120]

As to the pattern of constitutional violations, Plaintiff alleges in his amended complaint that "there are at least 51 criminal cases from New Orleans in which courts have found—and/or the prosecution has acknowledged—that . . . [the] OPDA violated *Brady*,

---

[115] *World Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009).
[116] R. Doc. 87-1 at pp. 11-12.
[117] R. Doc. 64 at pp. 19-22.
[118] *Id.* at p. 24.
[119] R. Doc. 87-1 at p. 5.
[120] *Id.*

as well as several others in which strong claims of *Brady* violations existed but the convictions were reversed on other grounds."[121] In response to the Court's instruction, Plaintiff provided significantly greater factual detail as to the 10 cases with conviction dates as well as findings of *Brady* violations prior to the date of Plaintiff's own conviction, which span the years 1968 to 1986.[122] Plaintiff also provided one case in which the OPDA's "conduct amounted to an admission of a *Brady* violation,"[123] and one case in which "credible evidence of *Brady* violations was raised, although the cases were ultimately resolved on other grounds."[124] Plaintiff provides detailed allegations of 26 other cases in which the state suppressed and/or withheld exculpatory evidence from the defense, resulting in a wrongful conviction.[125] These involve specific allegations of the OPDA's involvement in suppressing and/or concealing exculpatory evidence that resulted in a court vacating the defendant's conviction.[126]

Plaintiff also provides cases in which the State suppressed police reports containing prior inconsistent witness statements, evidence of other suspects, fingerprint analysis, blood-type lab reports, and other similar incidents of suppression of material exculpatory evidence.[127] Specifically, as to the 12 cases in which both the convictions and "found" *Brady* violations occurred prior to 1986, Plaintiff alleges that the OPDA suppressed inconsistent witness statements, evidentiary reports, and evidence of other perpetrators, and prevented witnesses from testifying at trial, and that the suppressed

---

[121] R. Doc. 85 at p. 32.
[122] *Compare id.* at pp. 32-36 (Linroy Davis, James Carney, Arthur Monroe, Norman Clark, Raymond Lockett, Floyd Falkins, Larry Curtis, William Perkins, Ronald Monroe, Stephen Rosiere), *with* R. Doc. 35 at pp. 24-30.
[123] R. Doc. 85 at pp. 36-37 (Johnny Ross).
[124] *Id.* at p. 37 (Wilbert Parker).
[125] *Id.* at pp. 37-45.
[126] *Id.* at pp. 32-45 (detailing suppression of witness statements, making witnesses unavailable or otherwise concealing them, or otherwise suppressing other forms of evidence).
[127] *See* R. Doc. 85 at pp. 32-46.

evidence was material to the defense.[128]

The parties disagree about whether the cases cited establish a pattern sufficient to put Connick on notice that the OPDA's *Brady* and *Napue* training was inadequate rendering him deliberately indifferent to the resulting constitutional violations. "Guidance from appellate courts on how many cases are enough to prove a custom and notice to the policymaker is sparse."[129] Plaintiff alleges 12 *Brady* violations resulting in vacated convictions prior to 1986, 29 *Brady* violations resulting in convictions before 1986, 38 *Brady* violations resulting in convictions between 1967 and 1999, and eight *Napue* violations between 1980 and 1998, and argues these violations are sufficient to establish that Connick was aware of a pattern of constitutional violations, rendering his actions—or inaction—deliberately indifferent to the constitutional rights of defendants his office prosecuted.[130] Moreover, Connick himself testified on multiple occasions as to the lack of training and supervision regarding compliance with *Brady* and *Napue*.[131] This testimony is corroborated by former prosecutors, who confirmed the OPDA's lack of training and disciplinary practices regarding these obligations.[132]

In *Flanks v. City of New Orleans*,[133] another section of this court distinguished both *Connick v. Thompson*[134] and *Armstrong v. Ashley*,[135] noting that *Thompson*'s

---

[128] *Id.* at pp. 32-37 (Linroy Davis, James Carney, Arthur Monroe, Norman Clark, Raymond Lockett, Floyd Falkins, Larry Curtis, William Perkins, Ronald Monroe, Stephen Rosiere, Johnny Ross, Wilbert Parker).

[129] *Flanks v. City of New Orleans*, No. 23-6897, 2025 WL 660037 (E.D. La. Feb. 28, 2025) (Brown, J.); *Moses v. City of New Orleans*, No. 24-1768, 2025 WL 816296 (E.D. La. Mar. 14, 2025) (Ashe, J.).

[130] R. Doc. 85 at pp. 32-45.

[131] *Id.* at pp. 22-46.

[132] *Id.*

[133] *Flanks*, 2025 WL 660037, at *10 (finding allegations of eight convictions with court-found *Brady* violations over the span of twelve years, all predating plaintiff's conviction, sufficient). Twelve cases with convictions and *Brady* violations found over the course of eighteen years is a significantly greater number of cases than "nine over twenty-four years," as alleged in *Armstrong*.

[134] 563 U.S. 51 (2011).

[135] 60 F.4th 262 (5th Cir. 2023). Defendants argue that *Armstrong* held that "nine constitutional violations over a 24-year period and thousands of prosecutions are hardly sufficient to show a municipal custom." R. Doc. 87-1 at p. 16.

holding pertained only to a prosecutor's liability based on a "single-incident" theory, rather than liability based on allegations of a widespread custom or practice,[136] and that in *Armstrong v. Ashley* "the Fifth Circuit examined [nine] cases over a 24-year period to determine if a policymaker could be said to have been on notice of the *Brady* violations that occurred in the plaintiff's case . . . . Four of the nine cases the Fifth Circuit considered occurred after the defendant was convicted. It follows that reversals occurring after a plaintiff's conviction are relevant in determining if there existed an unconstitutional custom in Connick's office and if he had actual or constructive notice of it."[137]

The *Flanks* court held that, at the motion-to-dismiss stage, (1) the plaintiff had sufficiently identified 26 similar *Brady* violations over an 18-year period to plausibly allege a "custom of *Brady* violations" sufficient to put Connick on notice of these violations; and (2) even if the court were to only consider cases predating the plaintiff's conviction for purposes of establishing constructive notice, eight cases over a 12-year period were sufficient to do so.[138] The district court reasoned that, although eight cases is one fewer than the number cited in *Armstrong*, those eight cases occurred in approximately half the measured time period, thereby placing Connick on constructive notice of a custom or pattern of constitutional violations.[139]

In *Moses v. City of New Orleans*, another section of this court similarly held:

[Plaintiff] lists 30 OPDA prosecutions in which he says *Brady* violations occurred, including instances from 1967, up to and including 1995, when he was tried. At this motion-to-dismiss stage, this listing constitutes a plausible allegation that the OPDA had a custom of nondisclosure of favorable evidence, as would violate *Brady*, with Connick on constructive or actual notice of such violations – including the need to train, supervise, and

---

[136] *Flanks*, 2025 WL 660037, at *9 ("Additionally, the *Thompson* Court did not create a rule requiring reversals occur before a given plaintiff's conviction for constructive notice to attach.").
[137] *Id.* at *9.
[138] *Id.* at *10-11.
[139] *Id.*

discipline prosecutors – as to reflect his deliberate indifference. Moreover, as discussed in *Flanks*, the *Brady* violations identified by [plaintiff] as occurring during Connick's tenure need not have come to light before [plaintiff's] trial to demonstrate constructive notice to the policymaker and those violations need not be identical to those in [plaintiff's] case.[140]

The *Moses* court denied the OPDA's motion to dismiss holding that the Brady violations identified by the plaintiff need not have come to light before the plaintiff's trial to demonstrate constructive notice to the policymaker and the violations need not be identical.[141]

The Court adopts the reasoning of Judge Brown in *Flanks v. The City of New Orleans* and Judge Ashe in *Moses v. The City of New Orleans* and finds that, at this motion-to-dismiss stage, the Plaintiff's listing constitutes a "plausible allegation that the OPDA had a custom of nondisclosure of favorable evidence, as would violate *Brady*, with Connick on constructive or actual notice of such violations—including the need to train, supervise, and discipline prosecutors—as to reflect his deliberate indifference."[142] Moreover, as also discussed in *Flanks* and *Moses,* the Court finds the Brady violations need not have come to light before Plaintiff's trial to demonstrate constructive notice to the policymaker and those violations need not be identical to those in Plaintiff's cases. As recognized by these other sections of this court in similar cases, the Plaintiff's allegations

---

[140] *Moses*, 2025 WL 816296, at *7 (internal citations omitted).
[141] *Id.*
[142] *Id.* (citing *Flanks*, 2025 WL 660037, at *8–10). The Court agrees with *Moses* and *Flanks* in their conclusions that "the *Brady* violations identified by [Plaintiff] as occurring during Connick's tenure" were numerous and detailed enough to show a custom. *See id.* (citing *Flanks* at *10–11).

in this case are "sufficient – though barely – to survive a motion to dismiss."[143], [144]

Plaintiff also brings a *Monell* claim based on *Napue v. Illinois,*[145] alleging the OPDA maintained a policy, custom, or practice of committing perjury and providing false or misleading testimony in violation of *Napue*.[146] Plaintiff alleges the OPDA "created and/or maintained policies, customs, and practices that permitted and encouraged officials to commit perjury and provide false or misleading testimony,"[147] and that these policies, customs, and practices condoned or suborned perjury.[148] The OPDA argues that, aside from this conclusory allegation, the complaint "is entirely devoid of any factual allegations suggesting that [the] OPDA ever had, or its prosecutors ever followed, such a policy."[149] The Court disagrees.

Plaintiff alleges that, "during the 1980s and 1990s, there was a specific pattern of testimonial deficiencies regarding serological testing within the NOPD Crime Lab,

---

[143] *See Moses*, 2025 WL 816296, at *8 n.90 (Ashe, J.) ("This Court is aware that there are only nine examples of evidence fabrication . . . listed in [plaintiff]'s amended complaint for the 20-year period from 1974 to 1994, and that this number may not itself be sufficient to establish a custom or practice as a matter of law. *Cf. Armstrong v. Ashley*, 60 F.4th 262, 277-78 (5th Cir. 2023) (upholding dismissal of *Monell* claim against a district attorney where plaintiff listed only nine cases over a 24-year period as examples of the district attorney's *Brady* violations). But because instances of the fabrication . . . of evidence . . . may not be as easily uncovered as instances of *Brady* violations by a district attorney, the Court accepts the lower number as a sufficiently pleaded plausible allegation of a custom or practice at this juncture to see if discovery may reveal a higher number of such instances more in line with prior decisions finding that a custom or practice was established. Whether [plaintiff]'s *Monell* claim . . . will survive a summary-judgment motion, then, is a decision for a different day.") (internal citations omitted).

[144] R. Doc. 87-1 at p. 5. The Court notes that it cited *Truvia v. Connick* in its prior Order and Reasons for the proposition that Brady violations had to occur prior to the date of conviction to convey the requisite notice under a failure-to-train theory. *See* R. Doc. 64 at pp. 19-21; 577 F. App'x 317, 321-22 (5th Cir. 2014). This unpublished case, although persuasive, does not bind this Court. *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5th Cir. R. 47.5.4.) ("An unpublished opinion issued after January 1, 1996 is not controlling precedent, but may be persuasive authority."). Further, *Truvia* is distinguishable, as it was on appeal from the district court's grant of summary judgment, and this matter is at the motion-to-dismiss stage.

[145] 360 U.S. 264 (1959).

[146] R. Doc. 85 at pp. 46-49.

[147] *Id.* at p. 46.

[148] *Id.* at p. 48.

[149] R. Doc. 87-1 at p. 20.

including by Defendant O'Neal."[150] Plaintiff provides examples of eight instances between 1980 and 1998 in which the OPDA, the City, and/or NOPD allegedly maintained customs or practices of "condoning or suborning perjury."[151] According to the complaint, in these other cases the OPDA "did not correct false testimony from the detectives assigned to the case," "did not correct [the presentation of] false evidence" corroborating the prosecution's theory of the case, and "deliberately elicited testimony from a detective regarding" a false eyewitness identification.[152]

Plaintiff alleges these instances are factually similar to the OPDA's "failure to correct" O'Neal's testimony during Plaintiff's trial, or, alternatively, to the OPDA's involvement in coercing O'Neal's false testimony at Plaintiff's hearing.[153] Plaintiff analogizes his case to prior matters involving O'Neal himself, alleging that in other prosecutions O'Neal "offered, at best, misleading and contradictory—and, at worst, patently false—testimony regarding serological test results,"[154] yet was neither disciplined nor trained to prevent the recurrence of such testimony.[155] The factual allegations underlying these cases are numerous enough and sufficiently similar to the facts alleged in this case to provide notice to Connick that the OPDA's training was deficient.

The OPDA's motion to dismiss will be denied as to Plaintiff's *Napue* claim for reasons similar to those supporting denial of the motion as to Plaintiff's claim based on the OPDA's failure to provide exculpatory evidence.[156] Although Plaintiff provides fewer

---

[150] R. Doc. 85 at p. 47.

[151] *Id.* at pp. 46-49 (Brent Washington, officers in *United States v. Duzac*, John Floyd, Reginald Adams, Jerome Morgan, Kuantau Reeder, Shareef Cousin, and Eddie Triplett).

[152] *Id.* at pp. 48-49.

[153] *Id.*

[154] *Id.* at p. 47.

[155] *Id.* at p. 48.

[156] Contrary to Williams' arguments, at the motion-to-dismiss stage, the Court takes the factual allegations in Plaintiff's complaint as true—that agents of the OPDA elicited or failed to correct false testimony at numerous trials throughout the 1980s and 1990s, and the false evidence was material to the outcome at

case examples in support of his *Napue* claim, Plaintiff has alleged sufficient facts that, taken as true, plausibly place Connick, as the OPDA's final policymaker, on notice of the existence of a prosecutorial custom or practice of fabricating evidence and/or facilitating perjury during the period surrounding Plaintiff's conviction.[157] Furthermore, Plaintiff's detailed allegations concerning false testimony generally, other false testimony concerning serological testing specifically by detectives from the NOPD crime lab— including O'Neal himself—are sufficiently similar to the conduct alleged here.[158]

The Court notes also that, although "[e]stablishing deliberate indifference generally requires a 'pattern of similar violations' arising from a policy 'so clearly inadequate as to be 'obviously likely to result in a constitutional violation,'"[159] the Fifth Circuit also will infer it when "the policymaker provides no training whatsoever with respect to the relevant constitutional duty."[160] "Deliberate indifference may be inferred either from a pattern of constitutional violations or, absent proof of a pattern, from 'showing a *single incident* with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights.'"[161] "The latter inference 'is possible only in very narrow circumstances' because we have 'generally reserved the single-incident method . . . for cases in which the policymaker provides *no training whatsoever* with respect to the relevant constitutional duty, as opposed to training that is inadequate only as to the particular conduct that gave rise to the

---

trial. *See Devoe v. Davis*, 717 F. App'x 419, 426 (5th Cir. 2018) (citing *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014)).

[157] *See, e.g.*, *Moses v. City of New Orleans*, No. 24-1768, 2025 WL 816296, at *8 (E.D. La. Mar. 14, 2025).

[158] R. Doc. 85 at pp. 46-49 (1983 trial of Brent Washington, in which OPDA prosecutors presented false serological testimony to the jury through O'Neal).

[159] *Covington v. City of Madisonville*, 812 F. App'x 219, 225 (5th Cir. 2020) (citing *Burge*, 336 F.3d at 370)).

[160] *Garza v. City of Donna*, 922 F.3d 626, 637-38 (5th Cir. 2019).

[161] *Id.* at 637-38 (emphasis added).

plaintiff's injury.'"[162] Even if there were not a pattern of similar violations in this case, this is a case in which the Plaintiffs allegations fall within the "narrow circumstances" because he alleged the policymaker provided no training whatsoever to prosecutors with respect to their constitutional duties under *Brady* and *Napue*, and this policy is so inadequate as to obviously likely result in constitutional violations. At this stage, these allegations are sufficient to allege deliberate indifference.

Finally, in the Court's September 30, 2024 Order and Reasons, the Court found Plaintiff's complaint lacked factual allegations that the OPDA's unconstitutional policies or customs of withholding exculpatory evidence and condoning false testimony were the "moving force" behind the constitutional violations alleged in this case.[163] The Plaintiff must "show that the municipal action was taken with the requisite degree of culpability and demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[164] Causation in this context "requires proximate causation."[165] When a plaintiff claims that a municipality caused an employee to inflict an injury, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."[166] To survive a motion to dismiss, "a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts."[167] Importantly, "[t]he causal link 'moving force' requirement and the degree of culpability 'deliberate indifference' requirement must not be diluted, for 'where a court fails to adhere

---

[162] *Garza*, 922 F.3d at 638 (emphasis added).
[163] R. Doc. 64 at pp. 27-28.
[164] *York v. Welch*, 2024 WL 775179, at *3 (5th Cir. 2024) (quotation and alteration omitted).
[165] *Id.*
[166] *Id.* (quotation omitted).
[167] *Id.* (quotation and alteration omitted).

to rigorous requirements of culpability and causation, municipal liability collapses into respondent superior liability.'"[168]

Plaintiff alleges that OPDA's unconstitutional policies, practices, and customs included the failure to train prosecutors about Brady compliance, failure to monitor and supervise prosecutors to ensure compliance, and failure to discipline prosecutors who did not comply, as well as a widespread culture of suppressing exculpatory evidence,[169] all of which created "a laissez-faire atmosphere that caused such violations to persist, including in Mr. Walter's case."[170]

The Court finds that Plaintiff has alleged a causal link between the OPDA's failure to train prosecutors about *Brady* and *Napue* compliance, its failure to supervise prosecutors to avoid such violations, and its failure to discipline prosecutors for such violations, and the violation of Plaintiff's constitutional rights.[171] Plaintiff has sufficiently alleged that the OPDA, through Connick, maintained a custom of suppressing exculpatory evidence, in violation of *Brady,* and of knowingly encouraging or failing to correct false testimony material to the outcome of trial, in violation of *Napue.*[172] Plaintiff alleges that his not receiving exculpatory evidence that he is a non-secretor until the day of his trial "render[ed] this evidence unusable in any meaningful fashion to the defense."[173] Plaintiff also alleges that Defendant O'Neal's perjured testimony that the "serological testing of the fluids recovered from the victim did not conclusively establish whether the perpetrator is

---

[168] *Covington*, 812 F. App'x at 225-26 (quoting *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018)).
[169] R. Doc. 85 at pp. 21-23.
[170] *Id.* at p. 24.
[171] *See Flanks*, 2025 WL 660037, at *12.
[172] *See, e.g., Moses*, 2025 WL 816296, at *7 ("[Plaintiff] has alleged a sufficient number of prior instances of *Brady* violations during Connick's tenure, which when combined with Connick's alleged disdain for *Brady*, would satisfy the requisite causal link between the policy and the deprivation of federal rights.").
[173] R. Doc. 85 at p. 52.

a secretor," deprived him of due process.[174]

The Court finds Plaintiff's factual allegations support Plaintiff's contention that Connick, as the OPDA's final policymaker, fostered a "laissez-faire" culture of indifference toward *Brady* and *Napue* obligations and failed to supervise, train, and discipline prosecutors accordingly. These allegations, taken as true, and considered in combination with Plaintiff's allegations regarding Connick's "disdain" for the *Brady* doctrine,[175] are sufficient to demonstrate that Connick was on notice of both the custom permitting and encouraging *Brady* and *Napue* violations and of the need to train, supervise, and/or discipline prosecutors with respect to *Brady* and *Napue*.[176] These cases constitute sufficient allegations to establish that Connick was on notice that there was a pattern of constitutional violations rendering his action or inaction deliberately indifferent to the constitutional rights of defendants his office prosecuted.

## III. Plaintiff has sufficiently pleaded that OPDA had a policy of failing to train its prosecutors about their legal duties under *Brady* and *Napue*.

Plaintiff brings a cause of action against the OPDA based on its policy and practice of withholding *Brady* material and condoning false testimony and of failing to train its prosecutors on these constitutional violations, which were the moving forces behind the violation of his constitutional right. Plaintiff has alleged sufficient facts, at this motions-to-dismiss stage of the proceedings, to state a *Monell* claim against the OPDA. First, the district attorney is the policymaker for the OPDA, and Plaintiff identifies Connick as the

---

[174] *Id.*

[175] *Id.* at p. 24, 26 ("[D]uring his tenure as District Attorney, Mr. Connick repeatedly and publicly expressed disdain for the Brady doctrine and rebuffed suggestions—including, in one notable instance, a plea from a sitting Orleans Parish Criminal District Court Judge—that prosecutors be instructed on their *Brady* obligations and that the OPDA take steps to ensure compliance with the law and Constitution.") ("Mr. Connick testified[] prosecutors 'were supposed to figure [*Brady*] out themselves.").

[176] *See, e.g.*, *Moses*, 2025 WL 816296, at *7.

OPDA at the time he was prosecuted and convicted.[177] Second, Plaintiff has alleged sufficient facts, at this stage, to show that Connick had actual or constructive knowledge of an official policy, practice, or custom of similar constitutional violations.

Plaintiff alleges the OPDA not only maintained a custom of permitting and encouraging prosecutors to violate *Brady* and *Napue*, but that the OPDA's failure to train its prosecutors about their legal duties under *Brady* and *Napue*, in light of this widespread pattern of constitutional violations, rises to the level of a policy for purposes of § 1983.

> In his amended complaint, Plaintiff alleges that
>
> [b]oth the NOPD and the OPDA maintained unlawful policies, customs, and practices during Mr. Walter's investigation, arrest, and trial. In executing these unlawful policies, customs, and practices, the NOPD and OPDA violated the constitutional rights of criminal suspects and defendants, including Mr. Walter. In Mr. Walter's case, these unlawful policies, customs, and practices enabled Defendant O'Neal and other members, servants, employees, and agents of the City, NOPD, and OPDA to violate Mr. Walter's constitutional rights. The policymaking officials acting on behalf of the City, NOPD, and OPDA were deliberately indifferent to the likelihood that their agencies' unlawful policies, customs, and practices would cause constitutional violations like Mr. Walter's. As a result, the City and Defendants Williams and Kirkpatrick, sued in their official capacities, caused and are liable for Mr. Walter's injuries.[178]

An official policy "incudes a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority."[179] For *Monell* liability, "[a]n official policy may also be a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents

---

[177] R. Doc. 85 at pp. 7-8.
[178] *Id.* at pp. 5-6.
[179] *York*, 2024 WL 775179, at *3 (quotation and alteration omitted).

municipal policy and practically ha[s] the force of law."[180] To prove the existence of a custom, a plaintiff must show "a pattern of abuses that transcends the error made in a single case."[181] "A successful showing of such a pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."[182] The pattern of similar and specific acts also "must be comprised of sufficiently numerous prior incidents rather than merely isolated instances."[183] Indeed, "'[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for [*Monell*] liability.'"[184] Considering all these requirements, "[s]howing a pervasive pattern is a heavy burden."[185]

The official policy or custom "must be either unconstitutional or adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result."[186] Deliberate indifference is established by showing "a pattern of similar violations arising from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation."[187] "Mere negligence, even gross negligence, is not sufficient to establish deliberate indifference."[188]

In *Connick v. Thompson*, the Supreme Court recognized that "[i]n limited circumstances, a local government's decision not to train certain employees about their

---

[180] *Id.* (quotation and alteration omitted).
[181] *Benfer v. City of Baytown*, 120 F.4th 1272, 1286 (5th Cir. 2024) (quotation omitted).
[182] *Id.* (quotation omitted).
[183] *Id.* (quotation omitted).
[184] *Skyy v. City of Arlington*, 712 F. App'x 396, 400 (5th Cir. 2017) (quoting *Piotrowski v. City of Hou.*, 237 F.3d 567, 581 (5th Cir. 2001)).
[185] *Benfer*, 120 F.4th at 1286 (quotation omitted).
[186] *Blanchard-Daigle v. Geers*, 802 F. App'x 113, 116 (5th Cir. 2020) (quotation omitted).
[187] *Solis v. City of* Baytown, 2021 WL 309142, at *3 (S.D. Tex. Jan. 29, 2021) (quoting *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003)).
[188] *Id.* (quotation omitted).

legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."[189] The governmental entity's "failure to train its employees in a relevant respect" is considered "a policy or custom that is actionable under § 1983" only when it "amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact."[190] Because "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action[,]" the governmental entity may be deemed deliberately indifferently only when the "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights [and the policymakers] choose to retain that program."[191] "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution."[192] "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."[193] Furthermore, "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability."[194] On the other hand, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of

---

[189] *Connick*, 563 U.S. at 61.
[190] *Id.* (quotations and alteration omitted).
[191] *Id.* (quotation and alteration omitted).
[192] *Id.* at 61-62 (quotation omitted).
[193] *Id.* at 62 (quotation omitted).
[194] *Id.* (quotation omitted).

constitutional rights."[195]

In his third amended complaint, Plaintiff alleges the OPDA's "policy and practice was to tolerate, fail to train, fail to discipline, and encourage violations of officials' constitutional obligations to make timely disclosure to the defense of *Brady* information."[196] Plaintiff alleges this created a "laissez-faire atmosphere that caused such violations to persist."[197] Plaintiff alleges that Harry Connick has testified "there was no instruction on how to define materiality [under *Brady*] or guidance for prosecutors to make such determinations. Instead . . . prosecutors 'were supposed to figure it out themselves.'"[198] Plaintiff alleges Connick "set a specific policy against 'open file discovery,'" "[instructed] his prosecutors to withhold all documents that were not required by law to be disclosed," and "instructed his lawyers not to give up any information that, in their opinion, did not fall within the *Brady* rule."[199] Plaintiff alleges that "[s]everal former OPDA prosecutors have testified that they did not recall receiving any training on *Brady* at OPDA,"[200] and that they do not recall any discipline ever being imposed because of a *Brady* violation.[201] Plaintiff includes numerous allegations throughout his complaint of statements made by former OPDA prosecutors speaking to the culture of disregarding compliance with *Brady* in the office.[202]

Plaintiff has sufficiently pleaded that the OPDA had a custom of failing to train its prosecutors of their *Brady* and *Napue* obligations, which rises to the level of a policy

---

[195] *Id.* (quotation omitted).
[196] R. Doc. 85 at p. 24.
[197] *Id.*
[198] *Id.* at pp. 25-26.
[199] *Id.* at p. 26.
[200] *Id.* at p. 27.
[201] *Id.* at pp. 27-28.
[202] *Id.* at pp. 27-31.

under § 1983, which the OPDA retained despite Connick's knowledge that the policy would cause constitutional violations.

### **CONCLUSION**

**IT IS ORDERED** that Williams' Motion to Dismiss[203] is **DENIED**.[204]

**New Orleans, Louisiana, this 9th day of January, 2026.**

_____

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[203] R. Doc. 90.
[204] The claims remaining in this action are the *Monell* claims against the City, the *Monell* claims against Williams, and various state law claims against O'Neal and the City.